DAVIDOFF HUTCHER & CITRON LLP
*Proposed Attorneys for the Debtor*
605 Third Avenue
New York, New York 10158
(212) 557-7200
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| SUFFERN PARTNERS LLC, | Case No. 21-22280 |
| Debtor. | |

----------------------------------------------------------x

## DECLARATION OF ISAAC LEFKOWITZ PURSUANT TO
## LOCAL BANKRUPTCY RULE 1007-2

ISAAC LEFKOWITZ, under penalties of perjury, hereby declares and states as follows:

1.     I am the CEO of the above captioned debtor (the "Debtor") and president of its sole member, Goldman RX Inc., and I submit this Declaration pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

## PART I
## BACKGROUND

2.     In 2017, the Debtor was formed to acquire title to the commercial property located at 25 Old Mill Road, Town of Ramapo, Village of Suffern, and 19 Hemion Road in the Village of Montebello, Suffern, New York (collectively, the "Property").

3.     The Property was formerly owned and occupied by Novartis Corp. and consists of 162 acres with a 600,000 square foot building located thereon, The Property is zoned for light industrial use. A Certificate of Occupancy is in place and the Property is fully insured, secured and maintained.

1

4.      A small portion of the building is currently occupied by a holdover tenant, Continental Kosher Catering, whose lease was terminated by the Debtor for non-payment and is subject to pending eviction proceedings before the local town court.

5.      At the time of the Debtor's formation, it was 99% owned by Goldie Reisman and 1% by her wholly owned corporation, RSOM Corp. which was also the managing member of the Debtor.

6.      In 2019, Reisman and RSOM assigned their respective membership interests to Goldman RX Inc., of which I am the 100% shareholder.

7.      The Debtor's acquisition of the Property is well known to this Court, as the successor owner to Novartis, RS Old Mill, LLC ("RS1"), was a Chapter 7 debtor before this Court under Case No. 17-22218(RDD).[1]

8.      The relevant circumstances leading up the Debtor's Chapter 11 filing begin in February 2017, when RS1 filed a petition for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, Case No. 17-22218-RDD (the "RS Bankruptcy Action"), under which RS 1 allegedly sought to protect its rights under an agreement to purchase the Property from Novartis Corporation ("Novartis") for $18 million.  As the Bankruptcy Court later found, RS1 had made a $2.5 million deposit for the purchase, and was at risk of forfeiting that deposit because it had been unable to procure the balance of the funds needed and was running out of time to close on the purchase.

---

[1] Although, as can be gleaned from the history detailed below, the Debtor is not an affiliate of RS Old Mill, LLC, the Chapter 11 case should be referred to Judge Drain due to his intimate history and involvement in the RS Old Mill case and the facts and events leading to up to the Debtor's Chapter 11 filing.

9.     After filing its Chapter 11 petition, RS1 assumed the purchase agreement, and the Bankruptcy Court ultimately ordered that RS1's purchase of the Property had to close by no later than August 17, 2017.  The Bankruptcy Court's later findings confirmed certain critical facts that RS1 was ultimately still unable to secure direct financing for its acquisition of the Property.

10.     To try and protect its right to purchase the Property and avoid forfeiture of the $2.5 million deposit, RS1 – by and through its 100% owner Yehuda Salamon ("Salamon") – implemented and structured a deal whereby it would both purchase and sell the Property in a single transaction, by assigning the Property to an affiliated corporate strawman of Yehuda Salamon – RS Old Mills Rd, LLC ("RS2")[2] – which would then immediately assign the Property to the Debtor, which had secured financing and thus was able to fund the additional balance due for purchase of the Property from Novartis.

**A.     The Structure of the Deal to Sell the Property to Suffern**

11.     Testimony received during the RS Bankruptcy Action confirmed that all parties – RS1, RS2 and the Debtor – viewed the deal structure as "one collapsed transaction" through which the Debtor would receive title to the Property through a transfer from RS1. The Debtor obtained a $33 million loan from CPIF Lending, LLC ("CPIF") to permit its acquisition and also anticipated development of the Property.  To secure such additional funding above the $18 million purchase price due to Novartis, the Debtor also secured an additional $12.5 million private loan as an "equity show" in the transaction, and arranged for two additional commercial properties located in Brooklyn to serve as collateral for the $33 million loan (the "Brooklyn Collateral").

---

[2]     The Bankruptcy Court found that RS2 was an insider and affiliated entity of RS1 and Yehuda Salamon, as further supported by the fact that RS2 was formed only a month before the sale transaction closed.

3

12.    The transaction was heavily documented and negotiated at arm's length, with all parties represented by counsel. Additionally, the Debtor obtained title insurance and CPIF obtained mortgage insurance in connection with the Debtor's purchase and financing on the Property. Riverside Abstract, LLC ("Riverside") served as escrow agent for receipt and distribution of the sale proceeds.

13.    The sale closed on or about September 5, 2017. CPIF transferred approximately $25.5 million to be held in escrow by Riverside, with the remainder of the Debtor's $33 obtained million loan held back by CPIF for lender fees, reserves, and other expenses. Riverside also received an additional $12.5 million to be held in escrow, reflecting the short-term private loan needed to facilitate the transaction.

14.    Upon closing, Riverside distributed the escrowed funds as follows:

– Approximately $15.9 million was delivered to Novartis (through its escrow agent, Commonwealth Land Title Insurance Company), reflecting the balance due and owing to it for RS1's purchase of the Property under the Sale Agreement.

– Approximately $7.5 million was delivered to various parties in closing costs and other fees, including $4.85 million to TD Bank to pay off the existing loan on the Brooklyn Collateral put up by the Debtor's prior principal to permit CPIF a first priority mortgage against such collateral.

– Approximately $13.7 million was delivered to Cohen, LaBarbera & Landrigan, LLP, as escrow agent and real estate counsel for RS1 and its affiliated entity – RS2. These funds were then distributed at the express written direction of Yehuda Salamon and his affiliates.

4

15.     The "collapsed transaction" was thus completed and the deed transfers filed as a matter of record in September 2017. First, Novartis executed an assignment of deed on August 31, 2017 transferring the Property to RS1. Second, RS1 – by its managing member Yehuda Salamon – executed a Bargain and Sale Deed as of September 5, 2017, transferring the Property to its insider entity, RS2. Third, RS2 – by its managing member Avrohom Kaufman, who is Yehuda Salamon's brother-in-law – simultaneously executed a Bargain and Sale Deed also as of September 5, 2017, transferring the Property to the Debtor. Consequently, the Debtor has been the *bona fide* title holder of the Property since September 2017, which includes being obligated on the $33 million mortgage loan to CPIF.

**B.     RS1's Motion to Dismiss the RS Bankruptcy Matter**

16.     These transactions – involving a large commercial loan that needed to be, and was, properly negotiated, documented, and reviewed by counsel – took place under significant time pressures. RS1 was not able to close on purchase of the Property by the Bankruptcy Court-imposed deadline of August 17, 2017, and Novartis deemed RS1 in default of its purchase obligations and moved for immediate forfeiture of RS1's $2.5 million down payment. Due to the time constraints, the parties did not have time to make a formal application and obtain required Bankruptcy Court approval for RS1's immediate re-sale of the Property to the Debtor that had become necessary to enable RS1's purchase and thus avoid forfeiture of the $2.5 million deposit. That is the sole reason RS2 – held to be Salamon and RS1's insider entity – was put in place as an intermediary for the sale from RS1 to Suffern. Without RS2 as an intermediary, financing could not have been obtained on the truncated timetable and the $2.5 million deposit would have been immediately forfeited.

17.     Ultimately, after the transaction closed, RS1 filed a motion to dismiss the RS

Bankruptcy Action, pursuant to the written consent of all creditors and the United States Trustee.

However, no action was taken on RS1's motion, and the RS Bankruptcy Action then remained

open but dormant for more than a year.  During that time, neither RS1, Salamon, nor RS2, filed

any complaint to allege they never received monies due to them in connection with the transaction.

C.    **Yehuda Salamon's Expired Option to Purchase an Equity Interest
in the Debtor**

18.     In conjunction with the transaction whereby the Debtor became the title holder of

record for the Property in exchange for helping Salamon in avoiding an immediate forfeiture of

the $2.5 million deposit, Salamon, RS2, and the Debtor negotiated an agreement whereby Salamon

was given an option to purchase a 65% equity interest in the Debtor.  Specifically, Salamon's

affiliated entity – RS2 – would have the option to purchase a 65% equity interest in the Debtor on

behalf of its designee, Lone Pine Associates, LLC ("Lone Pine"), if, within 180 days of the

September 5, 2017 closing, it paid $12.5 million and took additional steps to release the Brooklyn

Collateral from CPIF's mortgage. If these conditions were not met within the time period specified,

the option would "self-terminate" and "any monies given [thereunder] would be forfeited."

19.     The equity purchase conditions were never satisfied, and thus the option agreement

terminated with Yehuda Salamon and his affiliates having no interest – or further ability to obtain

an interest – in the equity of the Debtor after **March 5, 2018**.  Accordingly, as of early 2018,

Salamon, including his affiliates RS2 and Lone Pine, lost any right to purchase a portion of the

Debtor's equity.

6

20.    The Debtor, on the other hand, has been and remains obligated on its $33 million mortgage loan from CPIF, which continues to encumber the Property and the Brooklyn Collateral, with the Debtor presently incurring more than $300,000 per month in accruing interest in addition to the continuing costs to maintain and upkeep the Property.

**D.    The Adversary Proceeding and the Bankruptcy Trustee's Motion for *Nunc Pro Tunc* Approval of RS1's Sale of the Property**

21.    Some eighteen months after the Property was purchased by and conveyed to the Debtor – and more than a year after the equity purchase option expired – RS1's principal, Yehuda Salamon, contacted the Debtor and demanded that it "pay" him in the form of an equity interest in the Debtor or he would cause to be filed an adversary complaint in the RS Bankruptcy Action seeking to unwind his *own* conveyance of the Property to the Debtor.   The Debtor rejected Salamon's demand. Just days later, on March 29, 2019, RS1 filed an unauthorized adversary proceeding complaint in the RS Bankruptcy Action which, among other things, attempted to set aside RS1's sale of the Property because of RS1's *own* failure to secure Bankruptcy Court approval for the transaction. In connection with the adversary proceeding, RS1 filed two notices of pendency against the Property (the "Bankruptcy Notices of Pendency").

22.    In response, and having paid full value, the Debtor immediately moved in the Bankruptcy Court for a *nunc pro tunc* approval of the sale.  The Bankruptcy Court subsequently converted the RS Bankruptcy Action to one under Chapter 7 and appointed Marianne O'Toole as Chapter 7 Trustee (the "Bankruptcy Trustee") to oversee RS1's estate and assess the validity of Yehuda Salamon's claims proposed to be asserted by the adversary proceeding.

23.    The Bankruptcy Trustee then conducted an exhaustive investigation of the facts surrounding RS1's sale and the Debtor's purchase of the Property. Extensive documentation and testimony was submitted to the Bankruptcy Court for review, including from: (i) Yehuda Salamon;

7

(ii) David Fleischman, Esq., who had served as real estate counsel to the Debtor; and (iii) Thomas Landrigan, Esq., who had served as real estate counsel and also escrow agent for RS1 and its affiliated entity – RS2.

24.     Salamon testified under oath that the Property was transferred from RS1 to RS2, and then to the Debtor, so that CPIF's financing for the transaction could close.  Salamon further testified under oath that the basis of his alleged claims does not at all involve any failure of payment to RS1, Salamon, or the Debtor. Indeed, there is no dispute that the Debtor sourced the financing from CPIF and the purchase was fully funded with all proceeds distributed at closing.  Rather, Salamon admitted that the dispute is whether he has a right to equity in the Debtor.

25.     The Bankruptcy Trustee and the Debtor thereafter entered into a settlement agreement resolving the adversary proceeding, pursuant to which, inter alia, RS1's transfer of the Property to RD2, RS1's receipt of $18 million of Suffern's loan proceeds that was needed for RS1 to purchase the Property from Novartis, and Suffern's valid title in the Property, would all be approved *nunc pro tunc* as of September 5, 2017, and the Bankruptcy Notices of Pendency would also be released, in exchange for the payment of $2,500,000 to the RS1 estate, with the Debtor receive a refund of all monies not needed by the Bankruptcy Trustee to satisfy all administrative expenses and claims of the RS1 estate.

26.     Just minutes before a hearing in Bankruptcy Court to approve the stipulation with the Bankruptcy Trustee and the Debtor resolving the adversary proceeding, at approximately 9:50 a.m. on October 4, 2019 – and because the Bankruptcy Notices of Pendency would potentially be subject to immediate cancellation – two New York State Supreme Court lawsuits were commenced by Yehuda Salamon-affiliated entities to enable new notices of pendency to be filed:

8

(a) Lone Pine, which was created and controlled by Salamon and the designated nominee of RS2/Salamon to hold his equity in the Debtor if he exercised and closed on the 65% option (which he failed to do), commenced a lawsuit asserting unsupportable claims based upon a fabricated contract dispute and the Debtor having allegedly "swindled" transfer of the Property from RS1. *See Lone Pine Associates LLC v. Suffern Partners LLC*, Ind. Nos. 035660/2019, NYSCEF Dkt. Nos. 1-4. Lone Pine filed two notices of pendency against the Property (the "Lone Pine Notices of Pendency").

(b) Beauty Brags – an entity that testimony in the RS Bankruptcy Action later revealed was owned by Yehuda Salamon's son, David Salamon – commenced a lawsuit for equally unsupportable claims arising out of another fabricated contract dispute and the Debtor again having allegedly "swindled" transfer of the Property from Debtor. *See Beauty Brags v. Suffern Partners LLC*, 035661/2019, NYSCEF Dkt. Nos. 1-4. Beauty Brags also filed a notice of pendency against the Property (the "Beauty Brags Notice of Pendency").

The filing attorney for both of these state court actions was Joseph Paukman, Esq. Notably, his ECF filing privileges were later revoked upon application of the US Trustee.

27.    The Bankruptcy Court ultimately deferred approval of the stipulation to a later date, and thus the Bankruptcy Notices of Pendency were not immediately cancelled on October 4, 2019. Rather, the Bankruptcy Court indicated on that date that the stipulation would be approved upon a showing that the $2.5 million settlement fund would actually satisfy all legitimate creditor claims against RS1's estate.

28.    With the Bankruptcy Notices of Pendency remaining as record for the time being, Lone Pine and Beauty Brags tellingly abandoned their new lawsuits, failing to serve the Debtor with the summonses, complaints, or notice of the related notices of pendency.

29.    Instead, Lone Pine, Beauty Brags, RS2, and other Yehuda Salamon affiliates filed proofs of claim in the RS Bankruptcy Action to suggest that "creditor" claims would far exceed the $2.5 claim fund that the Debtor provided and hoping the Bankruptcy Court would thus reconsider whether a *nunc pro tunc* approval of RS1's sale of the Property remained appropriate. In short, despite the RS Bankruptcy Action having been dormant for more than a year and all

9

creditors previously consenting to dismissal, over a matter of weeks and some two years later, "creditors" all now known to be affiliated with Yehuda Salamon incredulously claimed to be owed in excess of $27 million from the RS1's estate!  Among those "creditors" was RS2 – who filed a proof of claim executed and verified under penalty of law on October 24, 2019 by Yehuda Salamon's brother-in-law, Avrohom Kaufman, claiming that RS2 was owed $13.5 million in connection with the sale transaction.

30.    Notably, Joseph Paukman, Esq. was the filing attorney on submissions opposing the Bankruptcy Trustee's request for *nunc pro tunc* approval of the sale and instead supporting various Yehuda Salamon-affiliated "creditor" claims, including filings on behalf of Lone Pine, Beauty Brags, and RS2. The Bankruptcy Court ultimately disallowed *all* of those "creditor" claims in January 2020.

### E.    The Bankruptcy Court's *Nunc Pro Tunc* Approval of RS1's Transfer of the Property, and the Trustee's Settlement with the Debtor

31.    At a hearing on January 10, 2020, the Bankruptcy Court approved the Bankruptcy Trustee's settlement with the Debtor and RS1's transfer of the property, *nunc pro tunc* to September 5, 2017.  The Bankruptcy Court expressly found that RS2 was a corporate strawman and thus "clearly an insider entity" of Yehuda Salamon and RS1.  Further thereto, the Bankruptcy Court found that the parties "faced an impossibly short deadline to get Court approval of the transaction and the financing that was going to flow from it."  In so finding, the Bankruptcy Court acknowledged that RS1's transfer of the Property was a single, integrated transaction structured by RS1, Yehuda Salamon, and RS2 to facilitate purchase of the Property.  The Bankruptcy Court further found that the Debtor paid for the Property, as its funding was necessary in order for RS1 to acquire the Property in the first place from Novartis.  In addition, the Bankruptcy Court noted, based on the allegations in the adversary proceeding complaint and Yehuda Salamon's testimonial

10

admissions, that the real dispute was his alleged claim to an equity ownership interest in the Debtor. Lastly, the Bankruptcy Court approved the Trustee's waiver of any claims – with prejudice – by RS1 that the Debtor did not obtain good title to the Property through RS1 and RS2.

32.    On January 14, 2020, the Bankruptcy Court's written Order entered that formally approved the transfer of the Property *nunc pro tunc* to September 5, 2017, waived all claims of RS1 with respect to the Debtor's title to the Property, withdrew the adversary proceeding, and directed immediate cancellation of the Bankruptcy Notices of Pendency. The Bankruptcy Trustee thereafter effectuated cancellation of the Bankruptcy Notices of Pendency with the Rockland County Clerk.

33.    On May 8, 2020, the District Court denied RS1 and Salamon's appeal and affirmed the Bankruptcy Court approval of the settlement agreement between the Bankruptcy Trustee and the Debtor.

34.    For these reasons, there is no legitimate dispute as to the validity of the Debtor's title to the Property.

**F.    The State Court's Cancellation of the Lone Pine Notices of Pendency and Beauty Brags Notice of Pendency, and RS2's Immediate Commencement of a New Action to Enable Filing of the New RD Notices of Pendency**

35.    On January 14, 2020, the Debtor moved by emergency order to show cause for mandatory dismissal of the Lone Pine Notices of Pendency and Beauty Brags Notice of Pendency.

36.    Lone Pine and Beauty Brags defaulted on the motions, and by letter to the State Court dated April 7, 2020, the Debtor requested expedited entry of orders cancelling such notices of pendency given related impacts upon discussions with Good Samaritan Hospital and New York State in addressing the COVID-19 pandemic. Joseph Paukman, Esq. responded, imploring the Court to delay entry of any such Orders and claiming Lone Pine was working to retain new counsel.

The Debtor explained the fallacies of Mr. Paukman's position and request in a reply letter dated April 9, 2020.

37.    On April 14, 2020, the State Court entered orders which: (a) vacated and cancelled the Lone Pine Notices of Pendency and Beauty Brags Notice of Pendency; and (b) enjoined both parties from filing any successive notices of pendency.

38.    Within just ***hours*** of the entry of those Orders, RS2 – represented by Joseph Paukman, Esq. before the Bankruptcy Court – commenced a plenary action through an application to designate the matter an "essential proceeding" pursuant to the Administrative Order of the Chief Judge of the Court, AO-78-20(E)(1).  With its proposed summons and complaint, RS2 sought permission to file yet additional notices of pendency against the Property.  Notice of the request was not provided to the Debtor, and it thus was not afforded any ability to be heard or file any response before consideration by the state court.

39.    On April 21, 2020, the state court granted RS2's request to deem this matter an "essential proceeding," with the RS2 Notices of Pendency deemed accepted by the Rockland County Clerk at File Nos. 2020-00011622 and 2020-00011624.The primary goal of Yehuda Salamon and his affiliated entities is to maintain a cloud on title and delay in perpetuity any ability for Suffern to resolve the issue or, as will be discussed below, its ability to sell the Property pursuant to a pending contract of sale to which the Debtor is a party and has been for quite some time.

40.    The new RS2 and the RS2 Notices of Pendency were not filed in good faith. The complaint purports to assert four separate causes of action to challenge the Debtor's title to the Property and thus permit filing of the RS2 Notices of Pendency.   The linchpin of each such cause of action is the unfounded and preposterous claim that the Debtor never paid for the Property.

The complaint, of course, fails to mention that the Bankruptcy Court found otherwise in recognizing the Debtor was the source of funding that enabled RS1's purchase and contemporaneous transfer of the Property on September 5, 2017.

41.    The disputes and litigation over the Debtor's ownership of the Property has also resulted in a multitude of litigation with the Debtor's title insurer, Old Republic National Title Insurance Company ("Old Republic") and Old Republic's abstract company, Riverside, as the Debtor seeks to compel Old Republic and Riverside to defend, indemnify for damages caused by RS1, RS2 and the Salamon related parties, and insure title to the Property for which they have both declined, further impairing the Debtor's ability to refinance or sell the Property. Litigation over these disputes is pending in the District Court for the Southern District of New York.

42.    Meanwhile, the Property is currently generating no income, while interest, legal fees and real estate taxes continue to accrue while the Debtor must also continue to maintain and upkeep the Property.

43.    In order to lease out the Property, the Debtor would require, inter alia, substantial additional capital for tenant improvement and/or subdivision.

44.    Therefore, in order to maximize the value of the Property and cut off the continuing accruals and costs associated with the ownership and management of the Property, the Debtor engaged CBRE as broker to lease or sell the Property. After an extensive marketing period which resulted in multiple expressions of interest, on March 9, 2020, the Debtor entered into a Purchase and Sale Agreement ("PSA") with TT Holder Entity LLC ("Purchaser"), a party wholly unaffiliated or related to the Debtor or its owners, managers or insiders, for $55,000,000, reduced to $52,500,000 pursuant to the First Amendment to the PSA.

13

45.     The sale closing has been time and time again delayed and held hostage by the litigation tactics of RS1, RS2, Salamon and their related entities/individuals to the direct material detriment and peril of the Debtor's mortgagee and other legitimate creditors.

46.     The Purchaser is current still ready, willing and able to close on the sale. However, if the sale is further delayed, the Debtor risks the Purchaser walking away and losing the contract and perhaps ultimately the Property through foreclosure, as the Debtor is currently in default under the CPIF mortgage.

47.     If, on the other hand, the sale can be consummated though an expeditious sale in bankruptcy, the creditors will likely be paid in full with a return to equity through a liquidating Chapter 11 plan.

48.     The Debtor will thereafter promptly adjudicate any claims or interests asserted by RS1, RS2 and the Salamon related parties.

49.     Accordingly, on May 16, 2021, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

50.     The Debtor submits that the filing of the Chapter 11 case was necessary to preserve the value of the estate and maximize a return to its legitimate creditors.

51.     The needs and interests of the Debtor's creditors will best be served by the continued possession of their property and management of their affairs as debtor-in-possession under Chapter 11 until a restructuring plan can be formulated and presented to creditors.

## PART II

## INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007

52.      In addition to the foregoing, S.D.N.Y. Local Bankruptcy Rule 1007-2 requires

certain information related to the Debtor, which is set forth below.

**Local Rule 1007-2(a)(1)**

53.      The Debtor's principal assets are located at 25 Old Mill Road, Village of Suffern,

Town of Ramapo and 19 Hemion Road in the Village of Montebello, Town of Ramapo, New York

10901 (the "Property"), which consist of a 162 acre parcel of improved real property zoned for

light industrial use.

**Local Rule 1007-2(a)(2)**

54.      This case was not originally commenced under Chapter 7 or 13 of title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq.*(the "Bankruptcy Code").

**Local Rule 1007-2(a)(3)**

55.      Upon information and belief, no committee was organized prior to the order for

relief in this Chapter 11 case.

**Local Rule 1007-2(a)(4)**

56.      A list of the names and addresses of the Debtor's 20 largest unsecured claims,

excluding those who would not be entitled to vote at a creditors' meeting and creditors who are

"insiders" as that term is defined in §101(31) of the Bankruptcy Code is annexed hereto as

**Schedule I**.

**Local Rule 1007-2(a)(5)**

57.      A schedule of the Debtor's 5 largest secured creditors is annexed hereto as

**Schedule II**.

**Local Rule 1007-2(a)(6)**

58.    A summary of the Debtor's consolidated assets and liabilities is annexed hereto as

**Schedule III.**

**Local Rule 1007-2(a)(7)**

59.    There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

60.    None of the Debtor's property is in the possession or custody of any custodian,

public officer, mortgagee, pledgee, assignee of rents or secured creditor.

**Local Rule 1007-2(a)(9)**

61.    The Debtor owns the Property.

**Local Rule 1007-2(a)(10)**

62.    The Debtor's books and records and substantial assets are located at the Debtor's

office at 1449 57th Street, Brooklyn, New York 11219.

**Local Rule 1007-2(a)(11)**

63.    A list of lawsuits pending and involving the Debtor are annexed hereto as **Schedule**

**IV.**

**Local Rule 1007-2(a)(12)**

64.    The Debtor is currently managed by Isaac Lefkowitz as CEO.

**Local Rule 1007-2(b)(1) and (2)**

65.    The Debtor currently has no employees.

66.    The Debtor's estimated gross weekly payroll and payments to managers, members,

and directors for the thirty (30) day period following the Chapter 11 petition is 0.

67. The Debtor's estimated payroll to non-manager/non-insider employees for the thirty (30) day period following the Chapter 11 petition is approximately $0.

**Local Rule 1007-2(b)(3)**

68. A schedule, for the 30-day period following the filing of the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees is annexed as **Schedule V**.

## CONCLUSION

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2021

*/s/ Isaac Lefkowitz*
Isaac Lefkowitz

**SCHEDULE I**

<u>DEBTOR'S 20 LARGEST UNSECURED CREDITORS</u>

See attached

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Suffern Partners LLC** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | _____ |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| ATC Group Services LLC 104 E 25th Street New York, NY 10010 | | Trade services | Disputed | | | $19,285.00 |
| DG Realty Management LLC 22 Phyllis Terrace Monsey, NY 10952 | | Loans | | | | $5,000,000.00 |
| Hahn & Hessen Attn: Gil Backenroth, Esq. 488 Madison Avenue New York, NY 10022 | | Legal fees | | | | $330,256.89 |
| ISSM Protective Services 1820 Swarthmore Ave. Lakewood, NJ 08701 | | Security services | | | | $150,000.00 |
| Law Office of Jeffrey Fleischman 150 Broadway New York, NY 10038 | | Legal fees | | | | $37,268.02 |
| Lipsius-Benhaim Law, LLP 80-02 Kew Gardens Rd Suite 1030 Attn: Ira Lipsius, Esq. Kew Gardens, NY 11415 | | Legal fees | | | | $10,697.74 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor | **Suffern Partners LLC** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Old Republic National Title Ins. Co. c/o David K. Fiveson, Esq. Butler, Fitzgerald, Fiveson & McCarthy 9 East 45th Street, 9th Floor New York, NY 10017** | | **Claim related to release of funds** | **Unliquidated Disputed** | | | $0.00 |
| **Orange & Rockland Utilties, Inc. 390 W Route 59 Suffern, NY 10901** | | **Meter Assessment** | **Disputed** | | | $309,102.00 |
| **Oved & Oved LLP 401 Greenwich Street New York, NY 10013** | | **Legal fees** | | | | $52,000.00 |
| **Red Hawk Fire & Security 494 8th Avenue New York, NY 10001** | | **Trade services** | **Disputed** | | | $27,223.00 |
| **Town of Ramapo 237 Route 59 Suffern, NY 10901** | | | **Unliquidated Disputed** | $5,718,210.00 | $5,250,000.00 | $468,210.00 |

## SCHEDULE II

DEBTOR'S FIVE LARGEST SECURED CREDITORS

See attached

| Fill in this information to identify the case: |
|---|

Debtor name **Suffern Partners LLC**

United States Bankruptcy Court for the: SOUTHERN DISTRICT OF NEW YORK

Case number (if known) _____

☐ Check if this is an amended filing

## Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property          12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☑ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
|---|---|

**2. List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A | Column B |
|---|---|---|---|
| | | **Amount of claim** | **Value of collateral that supports this claim** |
| | | Do not deduct the value of collateral. | |

| 2.1 | **CPIF Lending, LLC** | | |
|---|---|---|---|

Creditor's Name

**1910 Fairview Avenue East
Seattle, WA 98102**

Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**

☑ No

☐ Yes. Specify each creditor, including this creditor and its relative priority.

**Describe debtor's property that is subject to a lien**
**25 Old Mill Road, Suffern, NY 10901**          $37,062,000.00          $52,500,000.00

**Describe the lien**
**First Mortgage**

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☑ Unliquidated
☐ Disputed

| 2.2 | **Town of Ramapo** | | |
|---|---|---|---|

Creditor's Name

**237 Route 59
Suffern, NY 10901**

Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**

**Describe debtor's property that is subject to a lien**          $5,718,210.00          $5,250,000.00

**Describe the lien**
**RE Taxes**

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply

# SCHEDULE III

## SUMMARY OF ASSETS AND LIABILITIES

See attached

| Fill in this information to identify the case: | |
|---|---|
| Debtor name **Suffern Partners LLC** | |
| United States Bankruptcy Court for the: SOUTHERN DISTRICT OF NEW YORK | |
| Case number (if known) _____ | ☐ Check if this is an amended filing |

# Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals

12/15

---

**Part 1:**   Summary of Assets

1.   ***Schedule A/B: Assets-Real and Personal Property*** (Official Form 206A/B)

   **1a. Real property:**
   Copy line 88 from *Schedule A/B*..................................................................................   $   52,500,000.00

   **1b. Total personal property:**
   Copy line 91A from *Schedule A/B*..............................................................................   $   5,500,000.00

   **1c. Total of all property:**
   Copy line 92 from *Schedule A/B*................................................................................   $   58,000,000.00

---

**Part 2:**   Summary of Liabilities

2.   ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*...................................   $   42,780,210.00

3.   ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F)

   **3a. Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*........................................................   $   0.00

   **3b. Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*...............................................   +$   5,935,832.65

4.   **Total liabilities** .................................................................................................
   Lines 2 + 3a + 3b

   $   48,716,042.65

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com                                                        Best Case Bankruptcy

**SCHEDULE IV**

LIST OF LITIGATION

See attached

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | RS Old Mills RD, LLC v. Suffern Partners, LLC<br>031809/2020 | Action for Breach of Contract, Etc. | Supreme Court, Rockland County | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.2. | ATC Group Services LLC v. Suffern Partners<br>030893/2021 | services rendered | Supreme Court Rockland County | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.3. | Red Hawk Fire & Safety v. Suffern Partners LLC<br>032647/20 | Services Rendered | Suprem Court Rockland County | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.4. | Suffern Partners LLC v. Old Republic National Title Insurance  Company, Et Al.<br>20-cv-08905-CS | Action for Indemnification | US District Ct. SDNY | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.5. | In re Suffern Partners LLC v. Town of Ramapo<br>033658/2019 | Tax Certiorari proceeding | Supreme Court, Rockland County | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.6. | Suffern Partner LLC v. Continental Kosher Catering Inc.<br>033841/2019 | Holdover/Disposs ession | Ramapo Town Court | ☐ Pending<br>■ On appeal<br>☐ Concluded |

# SCHEDULE V

## 30 DAY ESTIMATED INCOME AND EXPENSES

See attached

SUFFERN PARTNERS LLC

30 DAY/13 WEEK BUDGET

1ST 30 Days/Weeks 1-4:

Security                                    $16,423.08

Landscaping                              $4,000

RE Taxes (Pro Rated/Disputed)      $138,461.54

Miscellaneous/Fire Alarm/Maintenance $20,000

(Insurance pre-paid through August 2021)


Weeks 5-8:

Security                                    $16,423.08

Landscaping                              $4,000

RE Taxes (Pro Rated/Disputed)      $138,461.54

Miscellaneous/Fire Alarm/Maintenance $20,000


Weeks 9-12:

Security                                    $16,423.08

Landscaping                              $4,000

RE Taxes (Pro Rated/Disputed)      $138,461.54

Miscellaneous/Fire Alarm/Maintenance $20,000


Week 13:

Security                                    $4,105.77

Landscaping                              $1,000

RE Taxes (Pro Rated/Disputed)      $34,615.38

Miscellaneous/Fire Alarm/Maintenance $5,000