DAVIDOFF HUTCHER & CITRON LLP
*Proposed Attorneys for the Debtor*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 381-7400
Jonathan S. Pasternak, Esq.
Robert L. Rattet, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

In re:                                                    Chapter 11

SUFFERN PARTNERS LLC,                                     Case No.:  21-22280(SHL)

                                Debtor.
---------------------------------------------------------X

**APPLICATION FOR ORDER PURSUANT TO SECTIONS 363(b), (f) and (m) and 365(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND  6004 AUTHORIZING AND APPROVING  (1) ASSUMPTION OF PRE-PETITION PURCHASE AND SALE AGREEMENT AND BROKER COMMISSION AGREEMENT IN CONNECTION THEREWITH AND (2) SALE OF THE DEBTOR'S REAL PROPERTY AND IMPROVEMENTS THEREON FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTEREST AND GRANTING GOOD FAITH <u>PURCHASER STATUS IN CONNECTION THEREWITH</u>**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

       Suffern Partners LLC., the above captioned debtor and debtor-in-possession (hereinafter

referred to as "Debtor"), by its proposed attorneys, Davidoff Hutcher & Citron LLP, as and for

its application for an order pursuant to Sections 363(b), (f), (m) and 365(b) of Title 11 of the

United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure

("Bankruptcy Rule(s)") 2002 and 6004 authorizing and approving (1) the assumption of (a) the

pre-petition Purchase and Sale Agreement, as amended (the "PSA"), between the Debtor,  as

seller, and TT Holder Entity LLC (the "Purchaser") and (b) the Broker Agreement between the

Debtor and CBRE, in connection therewith, a copy of which is annexed hereto as Exhibit "A", and (2) the sale of the Debtor's real property located at 25 Old Mill Road, Suffern, New York 10901 (the "Property") to the Purchaser in accordance with the terms of the PSA, as amended, annexed hereto as Exhibit "B", free and clear of all liens, claims, encumbrances and interests of any kind and granting good faith purchaser status to Purchaser in connection therewith, together with other related relief, respectfully represents as follows:

## Jurisdiction

1.   This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" for the Southern District of New York, dated July 10, 1984 (Ward, C.J.).  Venue of these proceedings and this Application is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).

## Background

2.   On May 16, 2021 (the "Filing Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code.  The Debtor has continued in possession of its property and the management of its business affairs as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

3.   No Official Committee of Unsecured Creditors has been appointed. No trustee or examiner has been appointed.

4.   In 2017, the Debtor was formed to acquire title to the commercial property located at 25 Old Mill Road, Town of Ramapo, Village of Suffern, and 19 Hemion Road in the Village of Montebello, Suffern, New York (collectively, the "Property").

5.    The Property was formerly owned and occupied by Novartis Corp. and consists of 162 acres with a 600,000 square foot building located thereon, The Property is zoned for light industrial use. A Certificate of Occupancy is in place and the Property is fully insured, secured and maintained.

6.    A small portion of the building is currently occupied by a holdover tenant, Continental Kosher Catering, whose lease was terminated by the Debtor for non-payment, has been served with a warrant and is subject to pending eviction proceedings before the local town court.

7.    The Debtor's acquisition of the Property is well known to this Court, as the successor owner to Novartis, RS Old Mill, LLC ("RS1"), was a Chapter 7 debtor before this Court under Case No. 17-22218(RDD).[1]

8.    The relevant circumstances leading up to the Debtor's Chapter 11 filing begin in February 2017, when RS1 filed a petition for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, Case No. 17-22218-RDD (the "RS Bankruptcy Action"), under which RS1 allegedly sought to protect its rights under an agreement to purchase the Property from Novartis Corporation ("Novartis") for $18 million.  As the Bankruptcy Court later found, RS1 had made a $2.5 million deposit for the purchase, and was at risk of forfeiting that deposit because it had been unable to procure the balance of the funds needed and was running out of time to close on the purchase.

---

1 Although, as can be gleaned from the history detailed below, the Debtor is not an affiliate of RS Old Mill, LLC, the
  Chapter 11 case should be referred to Judge Drain due to his intimate history and involvement in the RS Old Mill case and the facts and events leading to up to the Debtor's Chapter 11 filing.

9.      After filing its Chapter 11 petition, RS1 assumed the purchase agreement, and the Bankruptcy Court ultimately ordered that RS1's purchase of the Property had to close by no later than August 17, 2017.  The Bankruptcy Court's later findings confirmed certain critical facts that RS1 was ultimately still unable to secure direct financing for its acquisition of the Property.

10.     To try and protect its right to purchase the Property and avoid forfeiture of the $2.5 million deposit, RS1 – by and through its 100% owner Yehuda Salamon ("Salamon") – implemented and structured a deal whereby it would both purchase and sell the Property in a single transaction, by assigning the Property to an affiliated corporate strawman of Yehuda Salamon – RS Old Mills Rd, LLC ("RS2")[2] – which would then immediately assign the Property to the Debtor, which had secured financing and thus was able to fund the additional balance due for purchase of the Property from Novartis.

A.     The Structure of the Deal to Sell the Property to Suffern

11.     Testimony received during the RS Bankruptcy Action confirmed that all parties – RS1, RS2 and the Debtor – viewed the deal structure as "one collapsed transaction" through which the Debtor would receive title to the Property through a transfer from RS1. The Debtor obtained a $33 million loan from CPIF Lending, LLC ("CPIF") to permit its acquisition and also anticipated development of the Property.  To secure such additional funding above the $18 million purchase price due to Novartis, the Debtor also secured an additional $12.5 million private loan as an "equity show" in the transaction, and arranged for two additional commercial properties located in Brooklyn to serve as collateral for the $33 million loan (the "Brooklyn Collateral").

---

2       The Bankruptcy Court found that RS2 was an insider and affiliated entity of RS1 and Yehuda Salamon, as further supported by the fact that RS2 was formed only a month before the sale transaction closed.

4

12.   The transaction was heavily documented and negotiated at arm's length, with all parties represented by counsel.   Additionally, the Debtor obtained title insurance and CPIF obtained mortgage insurance in connection with the Debtor's purchase and financing on the Property.   Riverside Abstract, LLC ("Riverside") served as escrow agent for receipt and distribution of the sale proceeds.

13.   The sale closed on or about September 5, 2017.   CPIF transferred approximately $25.5 million to be held in escrow by Riverside, with the remainder of the Debtor's $33 obtained million loan held back by CPIF for lender fees, reserves, and other expenses. Riverside also received an additional $12.5 million to be held in escrow, reflecting the short-term private loan needed to facilitate the transaction.

14.   Upon closing, Riverside distributed the escrowed funds as follows:

– Approximately $15.9 million was delivered to Novartis (through its escrow agent, Commonwealth Land Title Insurance Company), reflecting the balance due and owing to it for RS1's purchase of the Property under the Sale Agreement.

– Approximately $7.5 million was delivered to various parties in closing costs and other fees, including $4.85 million to TD Bank to pay off the existing loan on the Brooklyn Collateral put up by the Debtor's prior principal to permit CPIF a first priority mortgage against such collateral.

– Approximately $13.7 million was delivered to Cohen, LaBarbera & Landrigan, LLP, as escrow agent and real estate counsel for RS1 and its affiliated entity – RS2.   These funds were then distributed at the express written direction of Yehuda Salamon and his affiliates.

5

15.     The "collapsed transaction" was thus completed and the deed transfers filed as a matter of record in September 2017.  First, Novartis executed an assignment of deed on August 31, 2017 transferring the Property to RS1. Second, RS1 – by its managing member Yehuda Salamon – executed a Bargain and Sale Deed as of September 5, 2017, transferring the Property to its insider entity, RS2.  Third, RS2 – by its managing member Avrohom Kaufman, who is Yehuda Salamon's brother-in-law – simultaneously executed a Bargain and Sale Deed also as of September 5, 2017, transferring the Property to the Debtor.  Consequently, the Debtor has been the *bona fide* title holder of the Property since September 2017, which includes being obligated on the $33 million mortgage loan to CPIF.

**B.      RS1's Motion to Dismiss the RS Bankruptcy Matter**

16.     These transactions – involving a large commercial loan that needed to be, and was, properly negotiated, documented, and reviewed by counsel – took place under significant time pressures.  RS1 was not able to close on purchase of the Property by the Bankruptcy Court-imposed deadline of August 17, 2017, and Novartis deemed RS1 in default of its purchase obligations and moved for immediate forfeiture of RS1's $2.5 million down payment.   Due to the time constraints, the parties did not have time to make a formal application and obtain required Bankruptcy Court approval for RS1's immediate re-sale of the Property to the Debtor that had become necessary to enable RS1's purchase and thus avoid forfeiture of the $2.5 million deposit.   That is the sole reason RS2 – held to be Salamon and RS1's insider entity – was put in place as an intermediary for the sale from RS1 to Suffern. Without RS2 as an intermediary, financing could not have been obtained on the truncated timetable and the $2.5 million deposit would have been immediately forfeited.

6

17.     Ultimately, after the transaction closed, RS1 filed a motion to dismiss the RS Bankruptcy Action, pursuant to the written consent of all creditors and the United States Trustee. However, no action was taken on RS1's motion, and the RS Bankruptcy Action then remained open but dormant for more than a year. During that time, neither RS1, Salamon, nor RS2, filed any complaint to allege they never received monies due to them in connection with the transaction.

### C.     Yehuda Salamon's Expired Option to Purchase an Equity Interest in the Debtor

18.     In conjunction with the transaction whereby the Debtor became the title holder of record for the Property in exchange for helping Salamon in avoiding an immediate forfeiture of the $2.5 million deposit, Salamon, RS2, and the Debtor negotiated an agreement whereby Salamon was given an option to purchase a 65% equity interest in the Debtor. Specifically, Salamon's affiliated entity – RS2 – would have the option to purchase a 65% equity interest in the Debtor on behalf of its designee, Lone Pine Associates, LLC ("Lone Pine"), if, within 180 days of the September 5, 2017 closing, it paid $12.5 million and took additional steps to release the Brooklyn Collateral from CPIF's mortgage. If these conditions were not met within the time period specified, the option would "self-terminate" and "any monies given [thereunder] would be forfeited."

19.     The equity purchase conditions were never satisfied, and thus the option agreement terminated with Yehuda Salamon and his affiliates having no interest – or further ability to obtain an interest – in the equity of the Debtor after March 5, 2018. Accordingly, as of

early 2018, Salamon, including his affiliates RS2 and Lone Pine, lost any right to purchase a portion of the Debtor's equity.

20.     The Debtor, on the other hand, has been and remains obligated on its $33 million mortgage loan from CPIF, which continues to encumber the Property and the Brooklyn Collateral, with the Debtor presently incurring more than $300,000 per month in accruing interest in addition to the continuing costs to maintain and upkeep the Property.

       D.     **The Adversary Proceeding and the Bankruptcy Trustee's Motion
for *Nunc Pro Tunc* Approval of RS1's Sale of the Property**

21.     Some eighteen months after the Property was purchased by and conveyed to the Debtor – and more than a year after the equity purchase option expired – RS1's principal, Yehuda Salamon, contacted the Debtor and demanded that it "pay" him in the form of an equity interest in the Debtor or he would cause to be filed an adversary complaint in the RS Bankruptcy Action seeking to unwind his *own* conveyance of the Property to the Debtor.   The Debtor rejected Salamon's demand. Just days later, on March 29, 2019, RS1 filed an unauthorized adversary proceeding complaint in the RS Bankruptcy Action which, among other things, attempted to set aside RS1's sale of the Property because of RS1's *own* failure to secure Bankruptcy Court approval for the transaction. In connection with the adversary proceeding, RS1 filed two notices of pendency against the Property (the "Bankruptcy Notices of Pendency").

22.     In response, and having paid full value, the Debtor immediately moved in the Bankruptcy Court for a *nunc pro tunc* approval of the sale.  The Bankruptcy Court subsequently converted the RS Bankruptcy Action to one under Chapter 7 and appointed Marianne O'Toole as Chapter 7 Trustee (the "Bankruptcy Trustee") to oversee RS1's estate and assess the validity of

Yehuda Salamon's claims proposed to be asserted by the adversary proceeding.

23.     The Bankruptcy Trustee then conducted an exhaustive investigation of the facts surrounding RS1's sale and the Debtor's purchase of the Property. Extensive documentation and testimony was submitted to the Bankruptcy Court for review, including from: (i) Yehuda Salamon; (ii) David Fleischman, Esq., who had served as real estate counsel to the Debtor; and (iii) Thomas Landrigan, Esq., who had served as real estate counsel and also escrow agent for RS1 and its affiliated entity – RS2.

24.     Salamon testified under oath that the Property was transferred from RS1 to RS2, and then to the Debtor, so that CPIF's financing for the transaction could close.  Salamon further testified under oath that the basis of his alleged claims does not at all involve any failure of payment to RS1, Salamon, or the Debtor. Indeed, there is no dispute that the Debtor sourced the financing from CPIF and the purchase was fully funded with all proceeds distributed at closing. Rather, Salamon admitted that the dispute is whether he has a right to equity in the Debtor.

25.     The Bankruptcy Trustee and the Debtor thereafter entered into a settlement agreement resolving the adversary proceeding, pursuant to which, inter alia, RS1's transfer of the Property to RS2, RS1's receipt of $18 million of Suffern's loan proceeds that was needed for RS1 to purchase the Property from Novartis, and Suffern's valid title in the Property, would all be approved *nunc pro tunc* as of September 5, 2017, and the Bankruptcy Notices of Pendency would also be released, in exchange for the payment of $2,500,000 to the RS1 estate, with the Debtor to receive a refund of all monies not needed by the Bankruptcy Trustee to satisfy all administrative expenses and claims of the RS1 estate.

26.     Just minutes before a hearing in Bankruptcy Court to approve the stipulation with the Bankruptcy Trustee and the Debtor resolving the adversary proceeding, at approximately

9

9:50 a.m. on October 4, 2019 – and because the Bankruptcy Notices of Pendency would potentially be subject to immediate cancellation – two New York State Supreme Court lawsuits were commenced by Yehuda Salamon-affiliated entities to enable new notices of pendency to be filed:

    (a)    Lone Pine, which was created and controlled by Salamon and the designated nominee of RS2/Salamon to hold his equity in the Debtor if he exercised and closed on the 65% option (which he failed to do), commenced a lawsuit asserting unsupportable claims based upon a fabricated contract dispute and the Debtor having allegedly "swindled" transfer of the Property from RS1.  *See Lone Pine Associates LLC v. Suffern Partners LLC*, Ind. Nos. 035660/2019, NYSCEF Dkt. Nos. 1-4.  Lone Pine filed two notices of pendency against the Property (the "Lone Pine Notices of Pendency").

    (b)    Beauty Brags – an entity that testimony in the RS Bankruptcy Action later revealed was owned by Yehuda Salamon's son, David Salamon – commenced a lawsuit for equally unsupportable claims arising out of another fabricated contract dispute and the Debtor again having allegedly "swindled" transfer of the Property from Debtor.  *See Beauty Brags v. Suffern Partners LLC*, 035661/2019, NYSCEF Dkt. Nos. 1-4.  Beauty Brags also filed a notice of pendency against the Property (the "Beauty Brags Notice of Pendency").

The filing attorney for both of these state court actions was Joseph Paukman, Esq.  Notably, his ECF filing privileges were later revoked upon application of the US Trustee.

27.    The Bankruptcy Court ultimately deferred approval of the stipulation to a later date, and thus the Bankruptcy Notices of Pendency were not immediately cancelled on October 4, 2019.  Rather, the Bankruptcy Court indicated on that date that the stipulation would be approved upon a showing that the $2.5 million settlement fund would actually satisfy all legitimate creditor claims against RS1's estate.

28.    With the Bankruptcy Notices of Pendency remaining as record for the time being, Lone Pine and Beauty Brags tellingly abandoned their new lawsuits, failing to serve the Debtor with the summonses, complaints, or notice of the related notices of pendency.

29.     Instead, Lone Pine, Beauty Brags, RS2, and other Yehuda Salamon affiliates filed proofs of claim in the RS Bankruptcy Action to suggest that "creditor" claims would far exceed the $2.5 claim fund that the Debtor provided and hoping the Bankruptcy Court would thus reconsider whether a *nunc pro tunc* approval of RS1's sale of the Property remained appropriate. In short, despite the RS Bankruptcy Action having been dormant for more than a year and all creditors previously consenting to dismissal, over a matter of weeks and some two years later, "creditors" all now known to be affiliated with Yehuda Salamon incredulously claimed to be owed in excess of $27 million from RS1's estate!  Among those "creditors" was RS2 – who filed a proof of claim executed and verified under penalty of law on October 24, 2019 by Yehuda Salamon's brother-in-law, Avrohom Kaufman, claiming that RS2 was owed $13.5 million in connection with the sale transaction.

30.     Notably, Joseph Paukman, Esq. was the filing attorney on submissions opposing the Bankruptcy Trustee's request for *nunc pro tunc* approval of the sale and instead supporting various Yehuda Salamon-affiliated "creditor" claims, including filings on behalf of Lone Pine, Beauty Brags, and RS2. The Bankruptcy Court ultimately disallowed *all* of those "creditor" claims in January 2020.

### E.     The Bankruptcy Court's *Nunc Pro Tunc* Approval of RS1's Transfer of the Property, and the Trustee's Settlement with the Debtor

31.     At a hearing on January 10, 2020, the Bankruptcy Court approved the Bankruptcy Trustee's settlement with the Debtor and RS1's transfer of the property, *nunc pro tunc* to September 5, 2017.  The Bankruptcy Court expressly found that RS2 was a corporate strawman and thus "clearly an insider entity" of Yehuda Salamon and RS1.  Further thereto, the Bankruptcy Court found that the parties "faced an impossibly short deadline to get Court

11

approval of the transaction and the financing that was going to flow from it." In so finding, the Bankruptcy Court acknowledged that RS1's transfer of the Property was a single, integrated transaction structured by RS1, Yehuda Salamon, and RS2 to facilitate purchase of the Property. The Bankruptcy Court further found that the Debtor paid for the Property, as its funding was necessary in order for RS1 to acquire the Property in the first place from Novartis. In addition, the Bankruptcy Court noted, based on the allegations in the adversary proceeding complaint and Yehuda Salamon's testimonial admissions, that the real dispute was his alleged claim to an equity ownership interest in the Debtor. Lastly, the Bankruptcy Court approved the Trustee's waiver of any claims – with prejudice – by RS1 that the Debtor did not obtain good title to the Property through RS1 and RS2.

32.    On January 14, 2020, the Bankruptcy Court's written Order entered that formally approved the transfer of the Property *nunc pro tunc* to September 5, 2017, waived all claims of RS1 with respect to the Debtor's title to the Property, withdrew the adversary proceeding, and directed immediate cancellation of the Bankruptcy Notices of Pendency. The Bankruptcy Trustee thereafter effectuated cancellation of the Bankruptcy Notices of Pendency with the Rockland County Clerk.

33.    On May 8, 2020, the District Court denied RS1 and Salamon's appeal and affirmed the Bankruptcy Court approval of the settlement agreement between the Bankruptcy Trustee and the Debtor.

34.    For these reasons, there is no legitimate dispute as to the validity of the Debtor's title to the Property.

F.    **The State Court's Cancellation of the Lone Pine Notices of Pendency and Beauty Brags Notice of Pendency, and RS2's Immediate Commencement of a New Action to Enable Filing of New Notices of Pendency**

35.    On January 14, 2020, the Debtor moved by emergency order to show cause for mandatory dismissal of the Lone Pine Notices of Pendency and Beauty Brags Notice of Pendency.

36.    Lone Pine and Beauty Brags defaulted on the motions, and by letter to the State Court dated April 7, 2020, the Debtor requested expedited entry of orders cancelling such notices of pendency given related impacts upon discussions with Good Samaritan Hospital and New York State in addressing the COVID-19 pandemic. Joseph Paukman, Esq. responded, imploring the Court to delay entry of any such Orders and claiming Lone Pine was working to retain new counsel.   The Debtor explained the fallacies of Mr. Paukman's position and request in a reply letter dated April 9, 2020.

37.    On April 14, 2020, the State Court entered orders which: (a) vacated and cancelled the Lone Pine Notices of Pendency and Beauty Brags Notice of Pendency; and (b) enjoined both parties from filing any successive notices of pendency.

38.    Within just *hours* of the entry of those Orders, RS2 – represented by Joseph Paukman, Esq. before the Bankruptcy Court – commenced a plenary action through an application to designate the matter an "essential proceeding" pursuant to the Administrative Order of the Chief Judge of the Court, AO-78-20(E)(1).   With its proposed summons and complaint, RS2 sought permission to file yet additional notices of pendency against the Property. Notice of the request was not provided to the Debtor, and it thus was not afforded any ability to be heard or file any response before consideration by the state court.

13

39.    On April 21, 2020, the state court granted RS2's request to deem this matter an "essential proceeding," with the RS2 Notices of Pendency deemed accepted by the Rockland County Clerk at File Nos. 2020-00011622 and 2020-00011624.  The primary goal of Yehuda Salamon and his affiliated entities is to maintain a cloud on title and delay in perpetuity any ability for the Debtor to resolve the issue or, as will be discussed below, its ability to sell the Property pursuant to a pending contract of sale to which the Debtor is a party and has been for quite some time.

40.    The new RS2 lawsuit and the RS2 Notices of Pendency were not filed in good faith. The complaint purports to assert four separate causes of action to challenge the Debtor's title to the Property and thus permit filing of the RS2 Notices of Pendency.    The linchpin of each such cause of action is the unfounded and preposterous claim that the Debtor never paid for the Property.  The complaint, of course, fails to mention that the Bankruptcy Court found otherwise in recognizing the Debtor was the source of funding that enabled RS1's purchase and contemporaneous transfer of the Property on September 5, 2017.

41.    The disputes and litigation over the Debtor's ownership of the Property has also resulted in a multitude of litigation with the Debtor's title insurer, Old Republic National Title Insurance Company ("Old Republic") and Old Republic's abstract company, Riverside, as the Debtor seeks to compel Old Republic and Riverside to defend, indemnify for damages caused by RS1, RS2 and the Salamon related parties, and insure title to the Property for which they have both declined, further impairing the Debtor's ability to refinance or sell the Property. Litigation over these disputes is pending in the District Court for the Southern District of New York.

14

42.   Meanwhile, the Property is currently generating no income[3], while interest, legal fees and real estate taxes continue to accrue while the Debtor must also continue to maintain and upkeep the Property.

43.   In order to lease out the Property, the Debtor would require, inter alia, substantial additional capital for tenant improvement and/or subdivision.

### G.      The Debtor's Pre-Petition Sale and Marketing Efforts

44.   Therefore, in order to maximize the value of the Property and cut off the continuing accruals and costs associated with the ownership and management of the Property, the Debtor, pursuant to a written agreement dated October 30, 2019 ("Broker Agreement"), a copy of which is annexed hereto as **Exhibit** "A", engaged CBRE as broker to lease or sell the Property.

44.   After an extensive marketing period which resulted in multiple expressions of interest, on March 9, 2020, the Debtor entered into a Purchase and Sale Agreement ("PSA") with TT Holder Entity LLC  ("Purchaser"), an entity owned or controlled a well-known New Jersey commercial property developer and a party wholly unaffiliated or related to the Debtor or its owners, managers or insiders, for $55,000,000, reduced to $52,500,000 pursuant to the First Amendment to the PSA. Copies of the PSA and all amendments thereto are annexed hereto as **Exhibit "B".** Since the PSA was entered into prior to the Petition Date, the PSA is an executory contract, or unexpired agreement, within the meaning of Section 365 of the Bankruptcy Code

45.   The sale closing has been time and time again delayed and held hostage by the litigation tactics of RS1, RS2, Salamon and their related entities/individuals to the direct material

---

3 The holdover tenant has not paid rent in over 12 months.

detriment and peril of the Debtor's mortgagee and other legitimate creditors.

46.     Notwithstanding, the Purchaser is currently still ready, willing and able to close on the sale. However, if the sale is further delayed, the Debtor risks the Purchaser walking away and losing the contract and perhaps ultimately the Property through foreclosure, as the Debtor is currently in default under the CPIF mortgage.

## RELIEF REQUESTED AND THE LEGAL BASIS THEREFORE

47.     Debtor submits this Application for authority to (a) assume the PSA and Broker Agreement and (b) sell the Property pursuant to the terms and provisions of the PSA, free and clear of all liens, claims, interests and encumbrances, including but not limited to the RS2 Notices of Pendency, pursuant to Sections 363(b),(f) and (m) and 365(b) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

### Request for Authority to Assume the PSA and
### Broker Agreement Under Section 365

48.     Section 365(a) of the Bankruptcy Code permits a debtor-in-possession to assume or reject any executory contract of the Debtor.

49.     Both the PSA and Broker Agreements are executory contracts within the meaning of Section 365 of the Bankruptcy Code.

50.     In order to sell the Property to Purchaser under the PSA, the Debtor must first assume the PSA and, as required under the PSA, also assume the Broker Agreement as a condition to closing under the PSA.

51.     The Debtor has exercised sound business judgment in determining that it is in the best interest of creditors to assume the PSA and Broker Agreement so that it can sell the Property to Purchaser under the terms of the PSA.

16

52.    As explained below, the Debtor's estate would be subject to significant rejection claims if it did not assume the PSA, and the Debtor could not satisfy the conditions to closing without also assuming the Broker Agreement.

53.    Moreover, there are no cure claims associated with assuming either the PSA or Broker Agreement under Section 365(b) of the Bankruptcy Code.

54.    Accordingly, it is in the best interests of the estate that, as part of the sale requested herein, that the Debtor be authorized to assume the PSA and Broker Agreement, respectively.

**Request for Authority To Sell the Property To Purchaser Under the Terms of the PSA Pursuant to Sections 363(b) and (f)**

55.    Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, as follows:

> "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate…"

56.    The PSA contemplates the sale be a private sale, i.e., not subject to higher and better offers.

57.    Under General Order M-383, the moving party must demonstrate extraordinary circumstances justifying, inter alia, a private sale.

58.    In addition, Bankruptcy Rule 6004 specifically addresses the procedures required for a private sale, as contemplated herein and provides as follows:

> (f) Conduct of sale not in the ordinary course of business
> (1) Public or private sale
> All sales not in the ordinary course of business
> may be by private sale or by public auction.

17

59.    "When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*. 147 B.R. 650 (S.D.N.Y. 1992).

60.    The Debtor believes that the sale to Purchaser pursuant to a private sale is a sound exercise of the Debtor's business judgment and is clearly in the best interests of the Debtor and its estate.

61.    First and foremost, the Debtor has conducted a thorough pre-petition marketing process through an established well known commercial real estate broker, CBRE. CBRE received multiple expressions of interest, resulting in the procurement and acceptance of the offer contained in the PSA, which offer was the highest and best offer received by the Debtor.

62.    Second, the Purchase Price  of $52,500,000 is sufficient to satisfy all claims of the Debtor's estate.

63.    Third, if the Debtor were to seek higher and better offers for the Property, it would have to attempt to get a modification or, more likely, reject the PSA, resulting in significant rejection damages in favor of the Purchaser due to the Debtor's deemed default/termination under operation of Section 365(b) of the Bankruptcy Code, which damages would materially diminish a return to the Debtor's unsecured creditor and likely assure they would not receive 100% on account of their claims.

64.    Fourth, the Debtor is in immediate need to sell the Property. Interest and Taxes continue to accrue at the rate of approximately $475,000 per month. In addition, the Debtor does not have the necessary cash to continue to maintain and upkeep the Property without DIP financing, which would further diminish the return to unsecured creditors. The delay that would

18

result from a further marketing and auction sale process could actually result in a diminished

return to creditors. There is no guarantee that the Purchaser will bid at an auction. Simply put,

the risk associated with an auction sale process is real and significant, as opposed to the certainty

of closing with Purchaser under the PSA which, if closed immediately, will result in a 100%

return to all creditors.

65.    Accordingly, it is in the best interests of the Debtor to approve a private sale of

the Property under the PSA, and the Debtor's creditors shall be well served with the proposed

sale since it will result in a 100% distribution to all administrative, secured and priority creditors

as well as a significant distribution to the Debtor's unsecured creditors, with a possible return

even to equity.

66.    This Court has approved private sales where the debtor or trustee has

demonstrated the sale is within the reasonable judgment of such estate representative. *See In re

Dewey & LeBeouf LLP*, 2012 WL 5386276 at 4-5 (Bankr. S.D.N.Y. 2012); This Court has also

approved private sales  where the purchaser is in a uniquely favorable position to acquire the

subject property or asset. *See In re MF Global Inc.*, 535 B.R. 596, 606-07 (Bankr. S.D.N.Y.

2015). This Court has further ruled that sale need not be the result of "public" sale to be

approved. See *In re Cooper*, 592 B.R. 469, 480 (S.D.N.Y. 2018).


67.    Purchaser has been represented by separate outside counsel from the outset of

its negotiations with the Debtor and has no connection or relationship with the Debtor or any of

its officers, directors, shareholders or principals. The transaction proposed herein is therefore

completely "arm's length" in nature.

68.     In light of the foregoing, the Debtor submits that the private sale of the Property is reasonable and a sale at auction, subject to higher and better offers, would only cause risk, uncertainly and a possible erosion of the estate.

## REQUIREMENTS FOR PRE-CONFIRMATION SALE

69.     The Debtor has not yet determined the best course of action with respect to the chapter 11 proceeding; to confirm a plan of reorganization or seek the approval of the Court to dismiss the case. However, it is in the best interest of the estate to obtain immediate approval of the PSA so as to cut off all ongoing interest, taxes and expenses associated with the Property, as well as to comply with the current closing deadlines thereunder.

70.     It is well settled that a sale of a debtor's assets may take place prior to the filing and confirmation of a plan of reorganization, if supported by the sound business judgment of the debtor's management. *See, generally, In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *Official Comm. Of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corporation (In re Chateaugay Corp.)*, 973 F.2d 141, 143-144 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

71.     This Court has specifically approved sales outside of a plan of reorganization if there is a good business reason for doing so and such sale is in the best interest of creditors. *See In re Saint Vincent's Catholic Medical Centers of New York*, 2010 Bankr. LEXIS 6196 (Bankr. S.D.N.Y. 2010); *In re Cornell Indus.*, 2010 Bankr. LEXIS 3212 (Bankr. S.D.N.Y. 2010); *In re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010). As set forth above, both good business reason (Purchaser's eminent domain claim) and sound business judgment (maximum value of the Property based on current condition) exists herein for the sale of the Property to

20

Purchaser. This proposed sale will yield sufficient funds to make distribution to all of the

Debtor's creditors as well as yield a possible return to equity. The Debtor believes that the

proposed purchase price is the highest and best offer and that the estate cannot benefit by

conducting an auction, assuming it was legally permissible given the eminent domain posture of

the Purchaser. In addition, the Debtor and its estate will avoid the time delay, cost, expense and

risk of an eminent domain proceeding.

72.     Based upon the foregoing, it is respectfully submitted that sound business

judgment exists for a pre-confirmation sale of the Property on the terms and conditions set forth

in the PSA.

**SALE FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES**

73.     Section 363(f) of the Bankruptcy Code provides that a debtor in possession may

sell property free and clear of liens, claims and encumbrances with any such encumbrances

attaching to the net proceeds of the sale, if one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and
        clear of such interest;

(2)     the lienholder or claimholder consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater
        than the aggregate value of all liens on such property;

(4)     *such interest is in bona fide dispute*; or

(5)     the lienholder or claimholder could be compelled, in a legal or equitable

        proceeding, to accept a money satisfaction of such interest.

See 11 U.S.C. §363(f)(emphasis supplied). S*ee also In re Collins*, 180 B.R. 447, 449-50 (Bankr.

E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the

21

enumerated conditions must be met in order for the Court to approve the proposed sale."); *In re P.K.R. Convalescent Ctrs., Inc.* 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens …. Section 363(f) addresses sales free and clear of any interest…"); *In re General Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992) (listing requirements).

74.     First, the sale contemplated herein satisfies 363(f)(3) as to all secured creditors in that the Purchase Price exceeds the aggregate liens of the Town of Ramapo (albeit disputed in amount) and CPIF, which, in the aggregate, total approximately $44,000,000.

75.     Second, the sale satisfies 363(f)(4), in that, even assuming RS2 has any interest which, based on the case law cited below, the RS2 Notices of Pendency do *not* constitute interests in the Property, the alleged interests of RS2 are subject to a bona fide dispute.

76.     Property rights are determined with reference to state law. See *Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)("[p]roperty interests are created and defined by state law"). However, the Bankruptcy Code affords mechanisms allowing, under certain circumstances such as those described in Section 363(f) for sale of property free and clear of liens and interests with those liens and interests attaching to the proceeds.

77.     It is elementary that a Notice of Pendency, under New York law, is not an interest in property. See, e.g. *In re Perosio*, 277 F. App'x 110, 113 (2d Cir. 2008) ("Because the lis pendens did not have the effect of perfecting NBT's interest in the Perosios' property, the filings of the lis pendens did not diminish the fund to which general creditors of the same class could resort for payment of their debts, as with or without the lis pendens NBT would likely be treated as a secured creditor. *See Adams,* 223 F.3d at 1007. For that reason, … [the lis pendens]…. do not constitute " ... interest[s] of the debtor in property"…")

22

78.    In *In re Adamson*, 312 B.R. 16, 20 (Bankr. D. Mass. 2004), similarly, the Court

stated:

> *In re Harbour House Operating Corp.,* 26 B.R. 324, 331
> (Bankr.D.Mass.1982), the court stated "[t]he lis pendens as notice,
> [is] not a property interest." In short, a lis pendens is a form of
> notice that affects the title to property but does not create an
> interest in property. *Id.* It is not an interest in property for purposes
> of § 363(f). Accordingly, Singer has no standing to object to the
> Debtor's sale pursuant to § 363(f), and she is not entitled to
> adequate protection of any interest under § 363(e).
>
> 312 B.R. 16, 20 (Bankr. D. Mass. 2004)

79.    The Court, in *In re Gallo*, 539 B.R. 88, 95 (Bankr. E.D.N.C. 2015) addressed the

question of whether a notice of pendency creates rights in real property, or merely serves notice

of asserted rights. The Court stated:

> Third, although the *lis pendens* itself may not constitute a
> traditional transfer of property, if the filer of a *lis pendens* is
> successful in the underlying lawsuit, any lien or other property
> interest obtained would relate back to the time of the filing of the
> *lis pendens.* ....However, the court need not address whether the
> Property was impressed with a constructive trust, in light of the
> trustee's strong arm powers under § 544(a). Under that section, the
> trustee occupies the same position as a hypothetical bona fide
> purchaser of real property, taking free and clear of this type of
> equitable claim. *See Wells Fargo Funding v. Gold,* 432 B.R. 216,
> 220 (E.D.Va.2009). The court therefore has no basis upon which to
> grant BOA a constructive trust or equitable lien.
>
> 539  B.R. 88, 95 (Bankr. E.D.N.C. 2015)

In the instant case, the Debtor's rights are superior to the disputed equitable interests of RS2 in

the Property.

80.    Notwithstanding, and assuming arguendo RS2 has a valid interest in the Property,

where there is a <u>bona fide</u> dispute as to an interest in property, the Court may order the sale of

the property free and clear of the asserted dispute. *See In re Downtown Ath. Club of N.Y. City,*

23

United States District Court for the Southern District of New York June 9, 2000, Decided ; June 9, 2000, 2000 U.S. Dist. LEXIS 7917; ("Under the Code, a debtor "may sell property . . . free and clear of any interest in such property of an entity other than the estate" if, inter alia, "such interest is in bona fide dispute." See 11 U.S.C. § 363(f) (emphasis added). Here, there is a bona fide dispute about whether RS2 has an interest in the Property. See *In re Collins*, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995) (noting that there must be "an objective basis for either a factual or legal dispute as to the validity of the debt").")

81.     While the Complaint underlying the RS2 Notices of Pendency is styled as "rescission", it is in substance a breach of contract case/claim, pursuant to which RS2 can be compelled to accept money damages. The Debtor has therefore satisfied Section 363(f)(5) as well.

82.     Further, the Debtor, as set forth in detail above, has already disputed the ability of RS2 to rescind the contract. In fact, Judge Drain approved the first leg of the integrated transaction and dismissal of any claims by RS1 against the Debtor, and his approval was upheld on appeal.  Transfer of the Property from RS2 to Suffern simply cannot be unwound, as to do so would equally require that the transfers from Novartis to RS1, and RS1 to RS2, also be unwound.  For this reason, RS2's arguments and pending state court action subject to *res judicata* and/or collateral estoppel.[4]

83.     Thus, the RS2 Notices of Pendency do not create an interest nor expand the rights of RS2 beyond its inchoate claims asserted in the underlying state court litigation. The Court may, simply put, order the sale and sort out the litigated claims later.

24

84.    Accordingly, Section 363(f) is satisfied to the extent applicable and the Court may authorize the sale of the Property fee and clear of, inter alia, the RS Notices of Pendency. The Debtor requests that any order approving the sale contain a provision, inter alia, that cancels the RS Notices of Pendency or deems them as canceled.

**The Property Must be Sold Free and
<u>Clear of The Holdover Tenant's Possessory Interests, If Any</u>**

85.    The Debtor seeks an Order of this Court rendering the sale of the Property free and clear of, inter alia, the possessory interests, if any, of Continental Kosher Catering Inc. ("CKC") pursuant to Section 363(f) of the Bankruptcy Code.

86.    On August 25, 2020, the Town of Ramapo Justice Court executed a warrant of eviction for non-payment against CKC, whose lease was previously terminated but remains a holdover tenant awaiting eviction for the Town Sherriff pending the results of CKC's pending appeal in State Court pursuant to which the eviction has been stayed due to the posting of a *supersedeas* bond in favor of the debtor.

87.    It is well settled that a property may be sold, pursuant to Section 363(f) of the Bankruptcy Code, free and clear of "any interest," which interest can include the possessory interest of a lessee. *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537 (7th Cir. 2003); See also *Cheslocl-Bakker & Assoc. v. Downtown Athletic Club of NYC, Inc. (In re Downtown Athletic Club of NYC, Inc.),* 2000 WL 744126 (Bankr. S.D.N.Y. 2000).

---

4 Even if Judge Drain's ruling was somehow not *stare decisis*, New York State law permits a contract vendee under a contract of sale to own the subject property, and thus sell the property pursuant to 11 U.S.C. § 363(f)(1), (3) and (4).

88.     The Debtor submits it has satisfied the requirements for a sale "free and clear" of CKC's possessory interest, if any, pursuant to Section 364(f)(4) of the Bankruptcy Code, in that such interest is subject to a bona fide dispute, as (a) such possessory interest has no value in light of CKC's mere holdover status and (b) the Debtor has offensive claims against CKC in excess of $600,000.

89.     It is a condition to closing that the Property be delivered free and clear of, inter alia, the CKC terminated lease and all interests and rights thereunder.

90.     Based upon the foregoing, the Debtor hereby seeks an Order approving the sale of the Property free and clear of any and all such CKC lease related interests.

## NOTICE PROVISIONS

91.     Bankruptcy Rule 6004 states, in part, as follows:

(a) Notice of Proposed Use, Sale or Lease of Property.  Notice of a proposed use, sale or lease of property, other than in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i) and (k)...

92.     This Application is being served in accordance with the applicable provisions of Federal Rule of Bankruptcy Procedure 2002 on (a) all of the Debtor's creditors; (b) all parties filing Notices of Appearance in these proceedings, and (c) the Office of the United States Trustee, so as to provide at least twenty (20) days' notice of the relief requested, thereby satisfying Federal Rule of Bankruptcy Procedure 2002(a)(2) and (k). Additionally, the Debtor respectfully submits that the descriptions and notices provided by this Application and exhibits hereto provide adequate notice of the terms and conditions of the proposed sale, thereby satisfying Federal Rule of Bankruptcy Procedure 2002(c)(1). Finally, no committee has been appointed herein, and therefore Federal Rule of Bankruptcy Procedure 2002(i) is not applicable. It is respectfully submitted that this notice constitutes good and sufficient service hereof.

26

## <u>GOOD FAITH PURCHASER STATUS</u>

93.     Section 363(m) of the Bankruptcy Code provides as follows:

(m) The reversal or modification on appeal of an authorization under subsection
(b) or (c) of this section of a sale or lease of property does not affect the validity of a sale
or lease under such authorization to an entity that purchased or leased such property in
good faith, whether or not such entity knew of the pendency of the appeal, unless such
authorization and such sale or lease were stayed pending appeal.

94.     The Debtor respectfully requests that the Court enter an order granting Purchaser

"good faith purchaser" status pursuant to Section 363(m) of the Bankruptcy Code.

95.     As set forth hereinabove, Purchaser has negotiated, by and through its counsel,

and entered into the PSA in good faith and at arm's length with the Debtor. Purchaser is a third

party unrelated to the Debtor, is not an "insider" of the Debtor within the meaning of Section

101(31) of the Bankruptcy Code, and is not controlled by, or acting on behalf of, and insider of

the Debtor or the Debtor itself.

96.     The Debtor submits that Purchaser has taken part in the transaction contemplated

hereby in a manner consistent with granting it "good faith purchaser" status, and the protections

concomitant with such status.

27

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order: (1)

authorizing and approving the assumption of the PSA and Broker Agreement, respectively, (2)

authorizing and approving the sale of the Property to Purchaser, free and clear of all liens, claims

and encumbrances pursuant to 11 U.S.C. Sections 363(b) and (f), including but not limited to the

RS2 Notices of Pendency and CKC's possessory interest, if any, in accordance with the PSA;

and (3) granting Purchaser good faith purchaser status pursuant to Section 363(m) of the Code,

for all of which no previous request has been made to this or any other Court.

Dated:  White Plains, New York
            May 17, 2021

                            DAVIDOFF HUTCHER & CITRON LLP
                            *Proposed Attorneys for the Debtor*
                            120 Bloomingdale Road, Suite 100
                            White Plains, New York 10605
                            (914) 381-7400



                            By: */s/ Jonathan S. Pasternak*
                                 Jonathan S. Pasternak