# Exhibit 14

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 17-22218-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   RS OLD MILL, LLC,

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                  United States Bankruptcy Court

14                  300 Quarropas Street, Room 248

15                  White Plains, NY 10601

16

17                  July 16, 2019

18

19

20  341 Meeting of Creditors

21

22

23  B E F O R E :

24  MARIANNE O'TOOLE

25  CHAPTER 7 TRUSTEE

Page 2

```
 1   A P P E A R A N C E S :

 2

 3   LEVINE & ASSOCIATES P.C.

 4         Attorney for Mr. Salamon and Debtor

 5         15 Barclay Road

 6         Scarsdale, NY 10583

 7

 8   BY:  MICHAEL LEVINE

 9

10   LEWIS BRISBOIS

11         Attorneys for Thomas Landrigan

12         77 Water Street, 21st Floor

13         New York, NY 10005

14

15   BY:  MARK K. ANESH

16

17   HAHN & HESSEN LLP

18         Attorneys for Suffern Partners LLC

19         488 Madison Avenue

20         New York, NY 10022

21

22   STEVEN R. AQUINO

23

24

25
```

Page 3

1    BUTLER, FITZERALD, FIVESON & MCCARTHY

2         Attorney for CPIF Lending, LLC

3         9 E 45th Street

4         New York, NY 10017

5

6    BY: DAVID FIVESON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                     P R O C E E D I N G S

3          MS. O'TOOLE:  RS Old Mill, LLC, 17-22218.  Good

4    afternoon.  Somebody can pull -- Mr. Grable, if you want to

5    pull that chair, you (indiscernible) that one.  Because we

6    can grab another on in the back if you want a seat there,

7    Mr. Backenroth.  All right.  So we'll start -- sir, if you'd

8    state your name, please?

9          MR. SALAMON:  Yehuda Salamon.

10         MS. O'TOOLE:  And do you have any ID on you?

11         MR. SALAMON:  Yeah.

12         MS. O'TOOLE:  Okay.  And for purposes of the

13   record, I have a New York State driver's license which

14   reflects Yehuda Salamon, spelled S-A-L-A-M-O-N with an

15   address in Highland Mills, and I'm returning that to you,

16   sir.  Have you ever used another name?

17         MR. SALAMON:  No.

18         MS. O'TOOLE:  Okay.  And then, counsel, if you'll

19   note your appearance, please?

20         MR. LEVINE:  Levine and Associates, PC by Michael

21   Levine for Mr. Salamon and the Debtor.

22         MR. FIVESON:  David Fiveson --

23         MS. O'TOOLE:  Just one moment, okay?  I want to

24   let this proceed because there's a lot of people here and I

25   think there's an interest in a proceeding.  I'm just going

Page 5

1   to reserve my rights because you haven't yet been retained

2   by the Bankruptcy Court as Debtor's counsel.  But we're

3   going to proceed today.  Okay.  So then, we'll start -- I'm

4   sorry to have interrupted you.

5           MR. FIVESON:  Yes.  Thank you, ma'am.  David

6   Fiveson, F-I-V-E-S-O-N, for an interested party, CPIF

7   Lending, LLC.

8           MS. O'TOOLE:  Thank you.  And you, sir?

9           MR. FRANKEL:  Uziel M. Frankel.

10          MS. O'TOOLE:  Can you spell that?

11          MR. FRANKEL:  U-Z --

12          MS. O'TOOLE:  What --

13          MR. FRANKEL:  First name, U-Z-I-E-L.

14          MS. O'TOOLE:  Yes.

15          MR. FRANKEL:  Initial M, middle name, Frankel, F-

16   R-A-N-K-E-L.

17          MS. O'TOOLE:  And are you an attorney or --

18          MR. FRANKEL:  Creditor.

19          MS. O'TOOLE:  -- a creditor?

20          MR. FRANKEL:  I'm here for creditors.

21          MS. O'TOOLE:  Okay.  And for what creditor?

22          MR. FRANKEL:  Romero.

23          MS. O'TOOLE:  Romero?

24          MR. FRANKEL:  Yeah.

25          MS. O'TOOLE:  And were you previously represented

1    by Mr. Condon?

2            MR. FRANKEL:   No.

3            MS. O'TOOLE:   No.

4            MR. FRANKEL:   No.

5            MS. O'TOOLE:   Okay.  All right.  Next?

6            MR. FRANKEL:   I have another --

7            MS. O'TOOLE:   Oh, I'm sorry.  Go ahead, sir.

8            MR. FRANKEL:   Okay.  Ell City.

9            MS. O'TOOLE:   Ell?

10           MR. FRANKEL:  Ell City.

11           MS. O'TOOLE:   And that's the letter L, City?

12           MR. FRANKEL:   E-L-L.

13           MS. O'TOOLE:   Okay.  Next?

14           MR. FRANKEL:   And Alpine Fine Construction.

15           MS. O'TOOLE:   Okay.  Any others?

16           MR. FRANKEL:   Used Distributing.

17           MS. O'TOOLE:   Used?  Okay.  And that's U -- is it

18   UHCS?  Yes?  Just -- you have to answer aloud --

19           MR. FRANKEL:   Yes, yes.

20           MS. O'TOOLE:   -- because we're creating a record

21   here.  So it's UHCS Distributor.

22           MR. FRANKEL:   Right.

23           MS. O'TOOLE:   Any other creditors?

24           MR. FRANKEL:   (Indiscernible).

25           MS. O'TOOLE:   And so what is your relation to Ell

1  City?

2           MR. FRANKEL:  I was asked to come to the meeting

3  because they weren't able (indiscernible).

4           MS. O'TOOLE:  Who asked you to come on behalf of

5  Ell City, LLC?

6           MR. FRANKEL:  Ms. Ago.

7           MS. O'TOOLE:  What's that?

8           MR. FRANKEL:  Ms. Ago.

9           MS. O'TOOLE:  How do you spell --

10          MR. FRANKEL:  A-G-O.

11          MS. O'TOOLE:  A-G-O?  Does she have a first name?

12          MR. FRANKEL:  I don't know her first name.

13          MS. O'TOOLE:  Okay.  And then in terms of Alpine

14  Fine Construction, who asked you to --

15          MR. FRANKEL:  Somebody I know as Meshulam.  That's

16  all I know --

17          MS. O'TOOLE:  Meshulam?

18          MR. FRANKEL:  Yeah.

19          MS. O'TOOLE:  Help me, there.

20          MR. FRANKEL:  M-E-S-H-U-L-A-M or E-M.

21          MS. O'TOOLE:  Okay.  Are you any relation to --

22          MR. FRANKEL:  No.

23          MS. O'TOOLE:  -- mister -- you don't even know my

24  question yet, but I think you mind read.

25          MR. FRANKEL:  (Indiscernible).

1          MS. O'TOOLE:  You're any relation to Mr. Salamon?

2          MR. FRANKEL:  No.

3          MS. O'TOOLE:  Any relation to Joel Kaufman?

4          MR. FRANKEL:  No.

5          MS. O'TOOLE:  Okay.  Any relation to any of the

6    parties that are involved in this case?

7          MR. FRANKEL:  No.

8          MS. O'TOOLE:  Okay.  And next?

9          MS. MA:  Tina Ma of Wilson, Elser, Moskowitz,

10   Edelman, and Dicker on behalf of David Fleischmann.

11         MS. O'TOOLE:  Thank you.  And -- go ahead.

12         MR. GRABLE:  Stephen Grable and Gilbert

13   Backenroth, Hahn and Hessen, LLP, 488 Madison Avenue on

14   behalf of Suffern Partners, LLC.

15         MS. O'TOOLE:  Thank you.  And --

16         MS. MATERA:  Rosemarie Matera, Kurtzman Matera for

17   Bridgewater Commons, Mark Yunger, Isaac Genuth, and Goldie

18   Reisman.

19         MS. O'TOOLE:  Okay.  Anybody else that needs to

20   note an appearance?  Okay.  Does anybody object to my

21   serving as the Trustee?  I'll serve as the Trustee in this

22   matter.  Now, sir, let's start with the petition.  The

23   Debtor's name is RS Old Mill, LLC, is that correct?

24         MR. SALAMON:  Yes.

25         MS. O'TOOLE:  And when was that entity formed?  On

1    or about.  Can you give me a year?

2             MR. SALAMON:  About '16.

3             MS. O'TOOLE:  2016?

4             MR. SALAMON:  Mm hmm.

5             MS. O'TOOLE:  And -- you have to answer yes or no

6    --

7             MR. SALAMON:  Yes.

8             MS. O'TOOLE:  We do keep a record here, okay?  And

9    were -- who were the members at the time it was formed?

10            MR. SALAMON:  Me -- Yehuda Salamon.

11            MS. O'TOOLE:  You were the hundred percent member?

12            MR. SALAMON:  Right.

13            MS. O'TOOLE:  Was that formed in the State of New

14   York?

15            MR. SALAMON:  Yes.

16            MS. O'TOOLE:  And was it formed as a special

17   purpose entity?

18            MR. SALAMON:  Yes.

19            MS. O'TOOLE:  Who caused that entity to be formed?

20   Was it an attorney or how did it come into existence?

21            MR. SALAMON:  Yes, attorney.

22            MS. O'TOOLE:  What was the attorney's name?

23            MR. SALAMON:  I don't remember.

24            MS. O'TOOLE:  And would anything refresh your

25   recollection?

Page 10

1           MR. SALAMON:  Who opened --

2           MS. O'TOOLE:  Who created the entity?  So, you had

3     a -- there has to be a formation document, an organizational

4     document, so what?

5           MR. SALAMON:  Okay.  I remember it was Drew

6     Connor.

7           MS. O'TOOLE:  Drew Connor?

8           MR. SALAMON:  Drew Connor opened it and I believe

9     Mintz Levin was the lawyer.

10          MS. O'TOOLE:  Okay.  And what was the business

11    purpose for opening -- creating the entity?  And I'm just

12    going to refer to it now as Debtor.  Do we understand?

13          MR. SALAMON:  Yes.

14          MS. O'TOOLE:  Okay.  And --

15          MR. SALAMON:  Purchasing a property.

16          MS. O'TOOLE:  Okay.  And what property were you

17    purchasing?

18          MR. SALAMON:  25 Old Mill Road.  It was Novartis -

19    -- from Novartis.

20          MS. O'TOOLE:  Okay.  So we understand that we're

21    all talking about the same thing; there's 25 Old Mill Road

22    and there are two other addresses associated with that,

23    correct?

24          MR. SALAMON:  Right.

25          MS. O'TOOLE:  And we're going to collectively

Page 11

1    refer to it as the Novartis property.  Is that correct?

2            MR. SALAMON:  Yes.

3            MS. O'TOOLE:  You -- we both understand what we're

4    talking about.  Yes?

5            MR. SALAMON:  Yes.

6            MS. O'TOOLE:  So the Debtor was formed to purchase

7    the Novartis property, correct?

8            MR. SALAMON:  Right.

9            MS. O'TOOLE:  All right.  Have you always been the

10   hundred percent member of RS Old Mill, LLC?

11           MR. SALAMON:  Yes.

12           MS. O'TOOLE:  Okay.  And when -- was there then a

13   contract with Novartis to purchase the property?

14           MR. SALAMON:  When it was?

15           MS. O'TOOLE:  Was there --

16           MR. SALAMON:  Yes.

17           MS. O'TOOLE:  Did there come into existence?

18   Okay.  Now, we've spoken before.  There were depositions

19   before.  I'm going to use words like, the contract with

20   Novartis.  Do you know what I'm referring to?

21           MR. SALAMON:  Yes.

22           MS. O'TOOLE:  Okay.  And there was a down payment

23   with that contract.  Is that correct?

24           MR. SALAMON:  Yes.

25           MS. O'TOOLE:  And what was the amount of the down

1   payment?

2           MR. SALAMON:  $2.5 million.

3           MS. O'TOOLE:  Okay.  And where did the $2.5

4   million come from?

5           MR. SALAMON:  I got it from my son.

6           MS. O'TOOLE:  And what is the name of your son?

7           MR. SALAMON:  David Salamon.

8           MS. O'TOOLE:  And where did your son, David

9   Salamon, get the money from?

10           MR. SALAMON:  I don't know.

11           MS. O'TOOLE:  You don't know?  What is -- what

12   business is David Salamon in?

13           MR. SALAMON:  He has a few businesses.  It was

14   Amazon.

15           MS. O'TOOLE:  He uses an Amazon platform to sell?

16           MR. SALAMON:  Yes.

17           MS. O'TOOLE:  Is that what you're referring to?

18   Does he have a name of a business?

19           MR. SALAMON:  I don't know.

20           MS. O'TOOLE:  Okay.  Well, let's come back to

21   that.  Now, at the time that the bankruptcy petition was

22   filed, did you sign it?

23           MR. SALAMON:  It was -- the original signature was

24   -- yes.  First was signed by Joel Kaufman and afterwards, it

25   was signed by me.

Page 13

1          MS. O'TOOLE:  So there's another copy of the

2    bankruptcy petition that's signed by you?

3          MR. SALAMON:  I think so.

4          MS. O'TOOLE:  Okay.  So, sir, I'm going to show

5    you a copy of the bankruptcy petition.  I will say, there

6    was a letter sent to counsel indicating the documents we

7    needed when this case was filed.  I don't know that we ever

8    received a petition in response to that, but that letter was

9    sent by my attorney.  I have a copy of what was filed as

10   Document Number 1 on the bankruptcy ECF Pacer and ask --

11         MR. SALAMON:  Right.

12         MS. O'TOOLE:  -- you, do you recognize the

13   signature on that document?

14         MR. SALAMON:  Yes.

15         MS. O'TOOLE:  And whose signature is it?

16         MR. SALAMON:  Joel Kaufman.

17         MS. O'TOOLE:  And what is Joel Kaufman's relation

18   to the Debtor?

19         MR. SALAMON:  It was -- it's my wife's brother.

20         MS. O'TOOLE:  Whose brother?

21         MR. SALAMON:  My wife's.

22         MS. O'TOOLE:  Your -- it's your brother-in-law?

23         MR. SALAMON:  Yeah.

24         MS. O'TOOLE:  Okay.  And why is it that your

25   brother -in-law signed the bankruptcy petition?

Page 14

1            MR. SALAMON:  Because he was supposed to take care

2    of this part.

3            MS. O'TOOLE:  Was he an officer or a member of the

4    Debtor?

5            MR. SALAMON:  Yes.

6            MS. O'TOOLE:  He was the manager?

7            MR. SALAMON:  Was the manager.

8            MS. O'TOOLE:  Okay.  Is there an operating

9    agreement for the Debtor?

10           MR. SALAMON:  Yes.

11           MS. O'TOOLE:  And where is that operating

12   agreement?

13           MR. SALAMON:  I don't know.  I have to send it to

14   you.

15           MS. O'TOOLE:  Okay.  Where do you maintain the

16   books and records of the Debtor?

17           MR. SALAMON:  It was in our -- in 25, in the

18   property.

19           MS. O'TOOLE:  Okay.  So you're using past tense.

20   You're saying that the books and records of the Debtor are -

21   - were located on the Novartis property.  Is that --

22           MR. SALAMON:  Right.

23           MS. O'TOOLE:  -- correct?  When was the last time

24   that you saw the books and records on the property of

25   Novartis -- of the Novartis property, I'm going to call --

Page 15

1              MR. SALAMON:  When I was there.

2              MS. O'TOOLE:  When were you there?

3              MR. SALAMON:  Probably last year.

4              MS. O'TOOLE:  Okay.  And did there come a time

5     when you no longer had access to the Novartis property?

6              MR. SALAMON:  Yes.

7              MS. O'TOOLE:  And who look over -- do you have an

8     understanding of who, then, had access and control over the

9     property?

10             MR. SALAMON:  It -- I found out that it was

11    Suffern Partner that has control.

12             MS. O'TOOLE:  Suffern Partners?  Okay.  Did there

13    come a time where there was a sale -- that the sale of the

14    Novartis property was completed or consummated?

15             MR. SALAMON:  Yes.

16             MS. O'TOOLE:  Okay.  So, and that occurred -- when

17    did that occur?  In or about September of 2017 --

18             MR. SALAMON:  Yes.

19             MR. LEVINE:  '16.

20             MS. O'TOOLE:  Was that --

21             MR. LEVINE:  '16 -- '17, excuse me.

22             MS. O'TOOLE:  '17.  Would that refresh your

23    recollection?

24             MR. SALAMON:  Yes.

25             MS. O'TOOLE:  Okay.  And who purchased the

1   property?  The Debtor?

2           MR. SALAMON:  The Debtor.

3           MS. O'TOOLE:  Okay.  And then on the same day, did

4   the Debtor sell the property?

5           MR. SALAMON:  No.

6           MS. O'TOOLE:  No?  Are you aware of any subsequent

7   sale?

8           MR. SALAMON:  I wasn't.  I found out afterwards.

9           MS. O'TOOLE:  Okay.  Did there come a time where

10  there -- did you learn that the Debtor sold the property to

11  Suffern Partners, LLC?

12          MR. SALAMON:  If I --

13          MS. O'TOOLE:  Did there come a time where you

14  learned the Debtor sold the property, period?

15          MR. SALAMON:  Yes.

16          MS. O'TOOLE:  And when did you find that out?

17          MR. SALAMON:  Last year, about.

18          MS. O'TOOLE:  And last year, in 2018, you're

19  saying?

20          MR. SALAMON:  I think so.

21          MS. O'TOOLE:  In the beginning of 2018, at the end

22  of 2018?

23          MR. SALAMON:  I didn't understand that it was a

24  sale.  It took me time to find out that this is what

25  happened.

1          MS. O'TOOLE:  Okay, you're -- okay.  This is what

2     happens, assumes a lot of facts we haven't discussed, okay?

3     There was a sale.  The Debtor purchased the Novartis

4     property --

5          MR. SALAMON:  Right.

6          MS. O'TOOLE:  Correct?  And that purchase was for

7     --

8          MR. SALAMON:  Eighteen.

9          MS. O'TOOLE:  $18 million.  Is that right?

10         MR. SALAMON:  Yes.

11         MS. O'TOOLE:  Did you approve of that sale?

12         MR. SALAMON:  If I approved to buy it, yes.

13         MS. O'TOOLE:  Okay.  So you understood there was

14    going to be a sale and the sale --

15         MR. SALAMON:  At purchase.

16         MS. O'TOOLE:  I'm sorry?  At purchase.  I'm sorry.

17         MR. SALAMON:  -- company.  That's why --

18         MS. O'TOOLE:  And you're correct to correct me on

19    that.

20         MR. SALAMON:  I'm sorry.

21         MS. O'TOOLE:  Right?  So you understood there

22    would be a purchase?

23         MR. SALAMON:  Right.

24         MS. O'TOOLE:  And you understood that that was

25    consummated?

1          MR. SALAMON:  Yes.

2          MS. O'TOOLE:  And you don't -- there was no issue

3   related to that?

4          MR. SALAMON:  No.

5          MS. O'TOOLE:  As far as you understand.  Is that

6   correct?

7          MR. SALAMON:  Yes.

8          MS. O'TOOLE:  Did you -- your brother-in-law

9   signed the petition.  Before he signed it, did you review

10  it?

11         MR. SALAMON:  I did.  I did.

12         MS. O'TOOLE:  Okay.  Did there -- did you ever

13  come to learn that anything about the petition was

14  incorrect?

15         MR. SALAMON:  It was amended.

16         MS. O'TOOLE:  Okay.  And what was amended?

17         MR. SALAMON:  I don't know if it was filed or...

18         MR. LEVINE:  Just say what you know.

19         MS. O'TOOLE:  Did you --

20         MR. SALAMON:  I don't (indiscernible).

21         MS. O'TOOLE:  You don't know if it was amended?

22         MR. SALAMON:  No, I don't think -- no, if it was -

23  - no, I don't know.

24         MS. O'TOOLE:  Well, what did you think had to be

25  amended?

Page 19

1          MR. SALAMON:  Some creditors.

2          MS. O'TOOLE:  Okay.  And what did you need to

3   amend with respect to the creditors?  There was an amended

4   Schedule E and F with the creditors.  Is that what you're

5   referring to?

6          MR. SALAMON:  Yes.

7          MS. O'TOOLE:  And what caused that to be filed?

8          MR. SALAMON:  When we went over the creditors.

9          MS. O'TOOLE:  And you did that with Mr. Pick, is

10   that correct?

11          MR. SALAMON:  Yes.

12          MS. O'TOOLE:  And he was the attorney of record at

13   the time?

14          MR. SALAMON:  Yes.

15          MS. O'TOOLE:  Okay.  And that amended schedule was

16   filed in or about October of 2017, is that correct?

17          MR. SALAMON:  Yes.

18          MS. O'TOOLE:  And what was the purpose of that

19   amendment?  Did you add or delete creditors?

20          MR. SALAMON:  I don't remember.

21          MS. O'TOOLE:  Okay.  At about the time that you

22   filed that amended schedule in or about October of 20917,

23   had there -- a dispute arisen with respect to the ownership

24   of the Novartis property?

25          MR. SALAMON:  I don't understand.  I'm sorry.

Page 20

1          MS. O'TOOLE:  Withdrawn.  Has there ever -- is

2   there a dispute as to your ownership interest in the

3   property currently?

4          MR. SALAMON:  Yes.

5          MS. O'TOOLE:  Okay.  And why don't you describe to

6   me what you believe the nature of that dispute is?

7          MR. SALAMON:  In order -- I had Novartis -- in

8   order to close, I needed to get either an assurance or -- he

9   didn't want me to make face to one --

10         MS. O'TOOLE:  Okay.  I'm going to stop you there

11  just because --

12         MR. SALAMON:  Okay.

13         MS. O'TOOLE:  -- we have a room full of people.

14  I've read the transcript.  I know what Judge Drain did.  I

15  know there's an amended order to assume the contract.  The

16  dispute had to do with Phase 2 and insurance.  That's all

17  done and it's closed.  We're after the closing.

18         MR. SALAMON:  Okay.

19         MS. O'TOOLE:  That occurs in September of 2017.

20  You said you understood it was closing; it closed.  Did

21  there subsequently arise any issue in your mind with respect

22  to the transfer -- subsequent transfer to Suffern or your

23  ownership interest relative to the property?

24         MR. SALAMON:  Understood.

25         MS. O'TOOLE:  Okay.

Page 21

1          MR. SALAMON:  Yes.

2          MS. O'TOOLE:  And what happened?

3          MR. SALAMON:  I knew that I'm getting the mortgage

4    from Bridgewater for the purchase of the Novartis property.

5          MS. O'TOOLE:  And if I could stop you there; was

6    there ever a mortgage from Bridgewater for the purpose of

7    purchase of the Novartis property?  Bridgewater ultimately

8    was not the lender.  Is that fair?

9          MR. SALAMON:  Right.

10         MS. O'TOOLE:  Okay, so then explain what arises

11   with respect to your ownership.

12         MR. SALAMON:  I knew that Bridgewater's

13   (indiscernible) me the money -- for the Novartis, because

14   they were supposed to give me the mortgage.  What I found

15   out later was that they didn't give me the money.

16         MS. O'TOOLE:  Okay.

17         MR. SALAMON:  They arranged it through someone

18   else and they transferred the deed.

19         MS. O'TOOLE:  Did you become aware that in order

20   to get the mortgage a lender -- let's not talk about the

21   name of the lender -- a lender required that there be equity

22   in the property or equity showing on a balance sheet of at

23   least $12.5 million?

24         MR. SALAMON:  Sorry?

25         MS. O'TOOLE:  Do you not understand the question?

Page 22

1          MR. SALAMON:  I didn't understand.

2          MS. O'TOOLE:  Okay.  Did it ever come to your

3    attention that any lender was requiring that there be equity

4    either in the property or in the hands of the ownership of

5    the entity owning the property?

6          MR. SALAMON:  They required what?

7          MS. O'TOOLE:  Do you know what equity is, sir?

8          MR. SALAMON:  It means --

9          MS. O'TOOLE:  Money or value.

10         MR. SALAMON:  -- money.  Yes.

11         MS. O'TOOLE:  Either collateral in terms of land

12    or some kind of money.

13         MR. SALAMON:  So besides the land, the wanted

14    something else?

15         MS. O'TOOLE:  Yes.  Were you aware that a lender

16    required that?

17         MR. SALAMON:  I found out afterwards.

18         MS. O'TOOLE:  Okay.  And what did you find out?

19         MR. SALAMON:  $12.5 million.

20         MS. O'TOOLE:  Okay.  And did you ever come to

21    learn that somebody loaned Suffern Partners, LLC $12.5

22    million?

23         MR. SALAMON:  I found out, yes.

24         MS. O'TOOLE:  Okay.  And who did you understand

25    had loaned that money?

1              MR. SALAMON:  I believe it was someone in -- a

2   person tell me that it's my money, that I loaned it.  I

3   didn't know about anything.

4              MS. O'TOOLE:  Did you ever have $12.5 million to

5   lend?  No.

6              MR. SALAMON:  No.

7              MS. O'TOOLE:  So it wasn't your money.  What was

8   the name of the person or entity that loaned the money, the

9   $12.5 million?

10             MR. SALAMON:  It was (indiscernible).

11             MS. O'TOOLE:  Okay.  Had you heard of

12  (indiscernible) before?

13             MR. SALAMON:  No.

14             MS. O'TOOLE:  What's his first name?

15             MR. SALAMON:  (Indiscernible).

16             MS. O'TOOLE:  Okay.  And did you understand that

17  that $12 million had to be returned to him within days of

18  the closing?

19             MR. LEVINE:  Did you understand the time or...

20             MR. SALAMON:  At the time, I had no --

21             MS. O'TOOLE:  Okay.

22             MR. SALAMON:  -- clue about anything.

23             MS. O'TOOLE:  Okay.

24             MR. SALAMON:  -- all that.

25             MS. O'TOOLE:  Okay.  So then I go back to where I

1    started.  At some point, there's a dispute about your

2    ownership in the Novartis property.  Is that correct?

3              MR. SALAMON:  Yes.

4              MS. O'TOOLE:  And that -- then there was some time

5    spent with the rabbi and/or the rabbinical court trying to

6    resolve that between the end of 2017 and when the adversary

7    complaint was filed in the Bankruptcy Court in April or so

8    of this year.  Is that right?

9              MR. SALAMON:  Right.

10             MS. O'TOOLE:  Okay.  And the dispute is, really,

11    who owns the equity in the entity that now owns the Novartis

12    property, correct?

13             MR. SALAMON:  Correct.

14             MS. O'TOOLE:  Okay.  Did you ever have an

15    understanding that you could purchase your interest back in

16    the entity that owns the Novartis property if you came up

17    with money?

18             MR. SALAMON:  No.

19             MS. O'TOOLE:  Okay.  Did you have -- and what is

20    the entity that owns the Novartis property, that you know

21    now, not necessarily before?

22             MR. SALAMON:  Suffern Partners.

23             MS. O'TOOLE:  Okay.  As of today, is it your

24    belief that you have any ownership interest in Suffern

25    Partners?

Page 25

1          MR. SALAMON:  I believe I own a hundred percent.

2          MS. O'TOOLE:  A hundred percent.  Okay.  And what

3    is the basis of your belief that you own a hundred percent?

4          MR. SALAMON:  Because it was transferred from RS

5    Old Mill to Suffern Partners, supposedly, in order to get

6    the mortgage for the Debtor.

7          MS. O'TOOLE:  Okay.  So when you say "it was

8    transferred," you're saying title to the Novartis property

9    was transferred to Suffern Partners, LLC.  That's correct so

10   far?

11         MR. SALAMON:  Yes.

12         MS. O'TOOLE:  And your understanding is that

13   transfer occurred to secure a mortgage?

14         MR. SALAMON:  To secure a mortgage for the Debtor.

15         MS. O'TOOLE:  For the Debtor?

16         MR. SALAMON:  For the Debtor.

17         MS. O'TOOLE:  Okay.  And did you have any

18   understanding why title to the property needed to be

19   transferred from RS Old Mill to another entity?

20         MR. SALAMON:  Because the bank required --

21   Bridgewater said in order to get financing for a company

22   that's in the bankruptcy, it needs to be done this way.

23         MS. O'TOOLE:  Okay.  Did you have any

24   understanding or did you discuss with anyone the fact that a

25   Debtor in bankruptcy could not get a mortgage without Court

1   approval?

2           MR. SALAMON:  Yes.

3           MS. O'TOOLE:  And who did you discuss that with?

4           MR. SALAMON:  With Tom Landrigan, a lawyer.

5           MS. O'TOOLE:  And you say Tom Landrigan was your

6   lawyer?  Was he your personal lawyer?

7           MR. SALAMON:  He asked me what I understood then

8   and what I understand now.

9           MS. O'TOOLE:  Well, when did you understand then?

10          MR. SALAMON:  Then, I knew that Tom is my lawyer,

11  representing --

12          MS. O'TOOLE:  Not the Debtor's lawyer but your

13  lawyer?

14          MR. SALAMON:  No, I'm -- when I say "my," I mean

15  the Debtor.

16          MS. O'TOOLE:  Okay.  So the Debtor's lawyer told

17  you as the owner and principal of Debtor that it was a

18  problem to get a mortgage with a bankrupt -- with a Debtor

19  that was in bankruptcy.  Is that correct?

20          MR. SALAMON:  Right.

21          MS. O'TOOLE:  And who else did you discuss this

22  with?

23          MR. SALAMON:  It was Doug Pick, Tom Landrigan, and

24  Bridgewater, but they were supposed to give me the financing

25  so we discussed about this and they got me from David

Page 27

1   Fleischmann a letter that --

2           MS. O'TOOLE:  You're going ahead of me.

3           MR. SALAMON:  Oh, I'm sorry.

4           MS. O'TOOLE:  Who else was present?  Was that a

5   telephone call or were there many telephone calls?

6           MR. SALAMON:  It was phone calls, yes.

7           MS. O'TOOLE:  And who else was on those telephone

8   calls?

9           MR. SALAMON:  I don't remember.

10          MS. O'TOOLE:  Okay.  But it was Tom Landrigan,

11  Doug Pick, and you said Bridgewater.  Who was representing

12  Bridgewater during those calls?  Was it Genuth or Yunger?

13          MR. SALAMON:  Both.  Some calls were...

14          MS. O'TOOLE:  Okay.  So now we've established that

15  there's no attorney-client privilege because the Landrigan

16  and Pick ostensibly represent the Debtor; although,

17  Landrigan was never retained formally in the bankruptcy or I

18  should say the order was never entered.  But you were

19  discussing with a third party, Bridgewater, either Genuth or

20  Yunger.  Correct?

21          MR. SALAMON:  Yes.

22          MS. O'TOOLE:  What were the nature of those

23  conversations?  What was said?

24          MR. SALAMON:  I'm paying the mortgage and helping

25  because of environmental issues.

Page 28

1          MS. O'TOOLE:  Okay.  We're putting --

2          MR. SALAMON:  We're not talking -- okay.

3          MS. O'TOOLE:  -- environmental issues --

4          MR. SALAMON:  Separate.

5          MS. O'TOOLE:  -- in a basket.

6          MR. SALAMON:  Okay.

7          MS. O'TOOLE:  And we're not talking about them.

8  It doesn't -- okay?  My question is, did people --

9  withdrawn.  Did the discussion include a discussion that a

10 Debtor in bankruptcy could not obtain a mortgage without the

11 Court's approval?

12         MR. SALAMON:  It was more that this particular

13 bank doesn't want to do it, not that --

14         MS. O'TOOLE:  Which bank?

15         MR. SALAMON:  Bridgewater said that one of their -

16 - they are getting the financing and they require that it

17 should be not the Debtor, just that I make it -- it should

18 be a different LLC to -- for the mortgage.

19         MS. O'TOOLE:  Okay.  And what lender was requiring

20 that, if you know?

21         MR. SALAMON:  Bridgewater.

22         MS. O'TOOLE:  Is Bridgewater in the business of

23 giving loans?

24         MR. SALAMON:  Yes.

25         MS. O'TOOLE:  Okay.  And -- okay, so Bridgewater

Page 29

1   itself was saying it didn't want to give the loan to a

2   Debtor?

3            MR. SALAMON:  Right.  Bridgewater actually even

4   told Judge Drain that they have the money to close.

5            MS. O'TOOLE:  Well, it's -- All right.  I read the

6   transcripts.  Let's leave it at that.  The transcripts speak

7   for themselves.

8            MR. SALAMON:  Okay.

9            MR. LEVINE:  I think he's referring to an

10  affidavit that was submitted by Bridgewater.

11           MS. O'TOOLE:  Okay.  Perhaps.  Did you ever

12  discuss on any of those conversations that the parties did

13  not want to go to the Bankruptcy Court for approval?

14           MR. SALAMON:  They said that -- David Fleischmann

15  gave a letter that we don't need.

16           MS. O'TOOLE:  I know your answering about David

17  Fleischmann.  My question is very different.  I want you to

18  listen to the question and I'll ask it repeatedly if you're

19  not focusing and answering what -- was it ever discussed

20  that during any of those conversations that the parties did

21  not want to go to the Bankruptcy Court for approval to

22  obtain the mortgage or something called DIP financing?

23           MR. SALAMON:  No.

24           MS. O'TOOLE:  Never --

25           MR. SALAMON:  Not that I --

1          MS. O'TOOLE:  -- discussed?

2          MR. SALAMON:  Not that I remember.

3          MS. O'TOOLE:  Okay.  And would anything refresh

4    your recollection?

5          MR. SALAMON:  Could be.

6          MS. O'TOOLE:  Okay.  Do you have emails?

7          MR. SALAMON:  I have emails.  Yes.

8          MS. O'TOOLE:  And did you exchange emails with Tom

9    Landrigan, Doug Pick, and Bridgewater in or about the time

10   that this financing was being discussed?

11         MR. SALAMON:  Yes.

12         MS. O'TOOLE:  Okay.  Have you retained those

13   emails?

14         MR. SALAMON:  Yes.

15         MS. O'TOOLE:  And you understand that there's a

16   litigation hold and that you cannot destroy any information

17   relative to this entire transaction beginning at or before

18   the time you started to negotiation with Novartis, correct?

19         MR. SALAMON:  Yes.

20         MS. O'TOOLE:  What emails addresses did you use?

21         MR. SALAMON:  Yidel, Y-I-D-E-L, 11219 at Gmail.

22         MS. O'TOOLE:  Any other email addresses?

23         MR. SALAMON:  No.

24         MS. O'TOOLE:  Did Mr. Kaufman ever use email

25   addresses in connection with the business of the Debtor?

1         MR. SALAMON:  No.

2         MS. O'TOOLE:  Are books and records of the Debtor

3    located at any location other than the Novartis property?

4         MR. SALAMON:  I believe it's there.

5         MS. O'TOOLE:  You believe --

6         MR. SALAMON:  It should be there.

7         MS. O'TOOLE:  So that's one place it would be.

8         MR. SALAMON:  Yes.

9         MS. O'TOOLE:  Second place it could be is

10   potentially with Mr. Nash or Mr. Levine.  Is that correct?

11        MR. SALAMON:  Mr. Nash?  No.  Pick.

12        MS. O'TOOLE:  Okay and do --

13        MR. SALAMON:  Tom Landrigan.

14        MS. O'TOOLE:  Do you have any books and records in

15   your custody, possession, and control?

16        MR. SALAMON:  No.

17        MS. O'TOOLE:  Any location controlled by you?

18        MR. SALAMON:  No.

19        MS. O'TOOLE:  You have no papers whatsoever --

20        MR. SALAMON:  I have --

21        MS. O'TOOLE:  -- related to the Debtor?

22        MR. SALAMON:  For the -- I have from emails that -

23   -

24        MS. O'TOOLE:  Are you saying that the only

25   documents you have relative to this Debtor currently are

Page 32

1    emails?

2              MR. SALAMON:  I have to verify.

3              MS. O'TOOLE:  Okay.  Listen.  Do you have paper or

4    not?  Any paper whatsoever related to the Debtor?

5              MR. SALAMON:  My office should have some.

6              MS. O'TOOLE:  And where is your office?

7              MR. SALAMON:  4921 12th.

8              MS. O'TOOLE:  4921 --

9              MR. SALAMON:  -- 21 12th Avenue.

10             MS. O'TOOLE:  -- 12th Avenue, in what --

11             MR. SALAMON:  Brooklyn.

12             MS. O'TOOLE:  Okay.

13             MR. SALAMON:  11219.

14             MS. O'TOOLE:  11209?

15             MR. SALAMON:  19.

16             MS. O'TOOLE:  Are any other businesses --

17             MR. LEVINE:  11219.

18             MS. O'TOOLE:  Are any other businesses located at

19   that address?

20             MR. SALAMON:  Yes.

21             MS. O'TOOLE:  What businesses are located at that

22   address?

23             MR. SALAMON:  Supermarket.

24             MS. O'TOOLE:  What supermarket?

25             MR. SALAMON:  Yidel's Supermarket.

1          MS. O'TOOLE:  Okay.  Okay, and what -- how long

2   has Yidel's Supermarket been located at that address?

3          MR. SALAMON:  Ten, 15 years.

4          MS. O'TOOLE:  Okay.  As a result of the sale --

5   and when I use "sale," I'll use any subsequent transfers

6   that occurred on or about September, 2017 -- as a result of

7   that sale, did you or any entity owned or controlled by you

8   directly or indirectly receive any funds from that sale?

9          MR. SALAMON:  No.

10          MS. O'TOOLE:  What is Star Food?  Do you know what

11   it is?

12          MR. SALAMON:  I don't know.

13          MS. O'TOOLE:  You don't know what it is?

14          MR. SALAMON:  It's not me.

15          MS. O'TOOLE:  Okay.  It's different to say, it's

16   not me than do you know what it is.  What is Star Food?

17          MR. SALAMON:  I don't -- I don't recall.

18          MS. O'TOOLE:  You don't recall or you don't want

19   to tell me?

20          MR. SALAMON:  No, no, I (indiscernible).

21          MS. O'TOOLE:  I'm sorry?

22          MR. SALAMON:  I don't know.

23          MS. O'TOOLE:  You don't know what Star Food is?

24          MR. SALAMON:  Right.

25          MS. O'TOOLE:  Did there come a time where you

Page 34

1   directed Tom Landrigan to transfer funds to Star Foods?

2       MR. SALAMON:  I remember about it, but I don't --

3   but it -- I'm trying to remember what it was for.

4       MS. O'TOOLE:  Okay.  This was a real estate

5   transaction, correct?

6       MR. SALAMON:  A real estate.  Yes.

7       MS. O'TOOLE:  Okay.  Would there any -- be any

8   reason with a real estate transaction that several hundred

9   thousand dollars would be transferred to a food company?

10      MR. SALAMON:  What I understood then, to the best

11  of my knowledge, if they had demanded some money for the

12  closing.

13      MS. O'TOOLE:  Okay, and which closing is that?

14      MR. SALAMON:  For the Novartis closing and --

15      MS. O'TOOLE:  Novartis closing with the Debtor?

16      MR. SALAMON:  With the Debtor, yes.

17      MS. O'TOOLE:  And so you think that Star Foods

18  advanced some money?

19      MR. SALAMON:  Right.

20      MS. O'TOOLE:  And would that be reflected, then,

21  on the closing statement?

22      MR. SALAMON:  Should...

23      MS. O'TOOLE:  Well, how much money did Star Foods

24  receive as a result of -- from Mr. Landrigan, if you know?

25      MR. SALAMON:  You said before, so about 700.

Page 35

1              MS. O'TOOLE:  Okay.  And how much had Star Foods

2    advanced?

3              MR. SALAMON:  The same amount.  It was -- the

4    amount that --

5              MS. O'TOOLE:  (Indiscernible).

6              MR. SALAMON:  Yes.

7              MS. O'TOOLE:  Okay.  And what bank -- who did Star

8    Foods transfer the money to, the Debtor?

9              MR. SALAMON:  It was not direct to the Debtor.  It

10   was to -- for the closing to get --

11             MS. O'TOOLE:  Okay, so what -- the money has to

12   come from someplace.  It either comes by wire.  It comes by

13   check.  But it doesn't come by osmosis.  How does the money

14   get to the closing table and what was it used for, that came

15   from Star Foods?

16             MR. SALAMON:  I don't remember.  I'm going to have

17   to get you the information.

18             MS. O'TOOLE:  Are there bank records that would

19   reflect that?

20             MR. SALAMON:  Yes.

21             MS. O'TOOLE:  Does Mr. Landrigan have that

22   information?

23             MR. SALAMON:  He should have it --

24             MS. O'TOOLE:  Did it go into an account that was

25   controlled by Mr. Landrigan?

Page 36

1          MR. SALAMON:  Yes.

2          MS. O'TOOLE:  It was -- so your testimony is that

3     the money from Star Foods went into an account controlled by

4     Mr. Landrigan prior to the Debtor's closing of the Novartis

5     sale?

6          MR. SALAMON:  I'm not sure that those -- the 700

7     from Landrigan went to Star Foods.

8          MS. O'TOOLE:  Well, I know that.

9          MR. SALAMON:  Okay.  Then you're asking how it

10    went -- the other way, how -- what advance --

11         MS. O'TOOLE:  Your testimony is that it went in

12    and they were being repaid.

13         MR. SALAMON:  Right.

14         MS. O'TOOLE:  Similar to the 12.5 that went in and

15    was repaid.  So is there a document that reflects, first,

16    that Star Food was advancing money that would be repaid?  Is

17    there a promissory note?

18         MR. SALAMON:  I have to find it for you.

19         MS. O'TOOLE:  Well, you have to find it, suggests

20    it exists.  Is there a promissory note that exists for Star

21    Food to make an advance for the closing?

22         MR. SALAMON:  I believe so.

23         MS. O'TOOLE:  And who would have that document?

24         MR. SALAMON:  Tom Landrigan.

25         MS. O'TOOLE:  Okay.  And by the way, are there any

1    other parties that are -- withdrawn.  So you're saying there

2    may be a promissory note --

3                 MR. SALAMON:  From Star Foods?

4                 MS. O'TOOLE:  From Star Foods to who?  To what?

5    What entity?  What individual?

6                 MR. SALAMON:  I believe to the Debtor.

7                 MS. O'TOOLE:  To the Debtor?  So it should show up

8    in the Debtor's --

9                 MR. SALAMON:  Right.

10                MS. O'TOOLE:  -- in possession bank account?

11   When's the advance made?

12                MR. SALAMON:  It was in the few months before the

13   closing.

14                MS. O'TOOLE:  Okay, so --

15                MR. SALAMON:  So the closing was --

16                MS. O'TOOLE:  The closing's September.

17                MR. SALAMON:  Yes --

18                MS. O'TOOLE:  The Debtor files for bankruptcy on

19   March 29th, so you have --

20                MR. SALAMON:  In between.

21                MS. O'TOOLE:  -- you have six months, so the

22   Debtor gets money during the bankruptcy, approximately $700

23   -- $700,000.  We're rounding the number, from Star Food,

24   correct?

25                MR. SALAMON:  I believe so.

Page 38

1          MS. O'TOOLE:  Okay.  Where did the Debtor maintain

2     its DIP account?

3          MR. SALAMON:  In Capital One.

4          MS. O'TOOLE:  Capital One?  All right.  I'm making

5     demand for any and all of Debtor's bank statements, and that

6     includes the DIP account, all right?  Do you have copies of

7     those bank statements?

8          MR. SALAMON:  I'm going to get you.

9          MS. O'TOOLE:  Who would have copies of them?

10         MR. SALAMON:  I should have.

11         MS. O'TOOLE:  During the pendency of the

12    bankruptcy, did any other money go into the Capital One

13    account?

14         MR. SALAMON:  No.

15         MS. O'TOOLE:  The DIP account.  No?  No?

16         MR. SALAMON:  No.

17         MS. O'TOOLE:  But you're saying the Star Food

18    money did go into the DIP account in advance of the closing?

19         MR. SALAMON:  It didn't -- what I understood is

20    that it went straight to expenses for the closing.

21         MS. O'TOOLE:  Okay, expenses for the closing is

22    not -- whose expenses?  Who got the money?  Where did the

23    money go? Did it go to Landrigan?  Did it go to a title

24    company?  Where did the money go?  You're saying what it was

25    used for, but where did the money go?

Page 39

1          MR. SALAMON:  I --

2          MS. O'TOOLE:  Who received it?

3          MR. SALAMON:  I don't remember.  I'm going to have

4    to look at the record.

5          MS. O'TOOLE:  And you say there's a promissory

6    note reflecting advancing this money and the repayment of

7    the money.

8          MR. SALAMON:  Right.

9          MS. O'TOOLE:  Okay.  Are there any other

10   agreements that exist with respect to the ownership of the

11   Novartis property?  Was anybody else supposed to get an

12   interest in the Novartis property?

13         MR. SALAMON:  No.

14         MS. O'TOOLE:  Were any of the attorneys that you

15   were working with, did they ever negotiate to get an

16   interest in the Debtor, the Novartis property, or any

17   litigation related to the Novartis property?

18         MR. SALAMON:  Suffern Partners.

19         MS. O'TOOLE:  Suffern Partners what?

20         MR. SALAMON:  Bridgewater wanted also to get

21   interest for -- of the property.

22         MS. O'TOOLE:  Okay.  And that's the equity dispute

23   that exists, if that's what you're referring to?

24         MR. SALAMON:  Right.

25         MS. O'TOOLE:  And that's Goldie Reisman and

1   there's an adversary proceeding related to that.  My

2   question's a little bit different.  Did any attorney that

3   has worked for you negotiate an agreement, whether it was

4   signed or not signed, to get an interest in the Debtor, in

5   Suffern Partners, and/or in any litigation related to this

6   bankruptcy?

7            MR. SALAMON:  Yes.

8            MS. O'TOOLE:  And what attorney did that?

9            MR. SALAMON:  Tom Landrigan.

10           MS. O'TOOLE:  He had an interest in the

11   bankruptcy?

12           MR. SALAMON:  He didn't --

13           MS. O'TOOLE:  Withdrawn.  Tom Landrigan, what?

14           MR. SALAMON:  Tried to negotiate.

15           MS. O'TOOLE:  What?  To get a piece of the deal?

16           MR. SALAMON:  Not him.

17           MS. O'TOOLE:  What did he try to negotiate?

18           MR. SALAMON:  That instead of $18 million, he's

19   going to bring -- they're going to bring $30 million for the

20   Debtor so we're going to have extra money to build up the

21   property.

22           MS. O'TOOLE:  Okay.

23           MR. SALAMON:  To stabilize the --

24           MS. O'TOOLE:  That's not the question I asked you.

25   The question I asked you is, did any of the attorneys that

1    you have worked with -- Landrigan, Pick, Nash, Mr. Levine,

2    any of them -- negotiate so they would get a piece of the

3    deal --

4              MR. SALAMON:  Oh, no --

5              MS. O'TOOLE:  -- interest in the deal?

6              MR. SALAMON:  No, that's not it.

7              MS. O'TOOLE:  An interest in any LLC?  An interest

8    in any litigation outcome?

9              MR. SALAMON:  No.

10             MS. O'TOOLE:  Okay.

11             MR. SALAMON:  I'm sorry, I didn't --

12             MS. O'TOOLE:  Okay.

13             MR. SALAMON:  I didn't hear the question.

14             MS. O'TOOLE:  Did the Debtor cause its proposed

15   counsel, either Mr. Nash or Mr. Levine to be paid anything?

16             MR. SALAMON:  If we made (indiscernible).

17             MS. O'TOOLE:  You don't understand?

18             MR. SALAMON:  Right.

19             MS. O'TOOLE:  Okay.  So Debtor has a new attorney,

20   correct?

21             MR. SALAMON:  Right.

22             MS. O'TOOLE:  It's proposing a new attorney --

23             MR. SALAMON:  Right.

24             MS. O'TOOLE:  -- although the old attorney never

25   withdrew.  Is that correct?

Page 42

1           MR. SALAMON:  Right.

2           MS. O'TOOLE:  Okay.  Did you pay Mr. Nash or Mr.

3   Levine any money in connection with those proposed

4   retentions?

5           MR. SALAMON:  Yes, but not from the Debtor.

6           MS. O'TOOLE:  Okay.  And what were they paid?

7           MR. SALAMON:  How much money?

8           MS. O'TOOLE:  Yes.

9           MR. SALAMON:  Think it was 25 --

10          MS. O'TOOLE:  $25,000?

11          MR. SALAMON:  Yeah.

12          MS. O'TOOLE:  And who paid that money?  Where did

13   the money come from?

14          MR. SALAMON:  Me.

15          MS. O'TOOLE:  And where did you get the money?

16          MR. SALAMON:  Other assets.

17          MS. O'TOOLE:  And what other assets?

18          MR. SALAMON:  From other businesses.

19          MS. O'TOOLE:  Okay --

20          MR. SALAMON:  Are you asking which --

21          MS. O'TOOLE:  You're not being specific.  Did you

22   go to the bank and take out cash?  Did you send it by wire?

23          MR. SALAMON:  What wire?

24          MS. O'TOOLE:  What entity's bank account?  Did it

25   come from your personal account?

Page 43

1                  MR. SALAMON:    Not from my personal.

2                  MS. O'TOOLE:    These are easy questions.

3                  MR. SALAMON:    Not from personal.

4                  MS. O'TOOLE:    Okay.   So what business account did

5    the money come from?

6                  MR. SALAMON:    I believe from my son's.

7                  MS. O'TOOLE:    Your son's?

8                  MR. SALAMON:    Yeah.

9                  MS. O'TOOLE:    Okay.   And which son?

10                 MR. SALAMON:    David.

11                 MS. O'TOOLE:    And what bank was that at?

12                 MR. SALAMON:    I don't remember.

13                 MS. O'TOOLE:    Do you have signatory authority on

14   that account?

15                 MR. SALAMON:    No.

16                 MS. O'TOOLE:    Are you able to initiate wires on

17   that account?

18                 MR. SALAMON:    No.

19                 MS. O'TOOLE:    Okay.   So when you get money from

20   your son's account, how do you cause that to occur?

21                 MR. SALAMON:    I ask him to do it and he does it.

22                 MS. O'TOOLE:    Okay.   Have you ever caused monies

23   belonging to you or an entity controlled by you to be

24   deposited into David Salamon's bank account?

25                 MR. SALAMON:    If I ever deposited money to my --

Page 44

1          MS. O'TOOLE:  Well, you're doing a good job

2    rephrasing, but listen to my question.  The question is, did

3    you or an entity controlled by you ever cause monies to be

4    deposited into an account in the name of David Salamon or

5    controlled by David Salamon?

6          MR. SALAMON:  Yes.

7          MS. O'TOOLE:  Okay.  And when did you do that?

8          MR. SALAMON:  It was, I believe, in '16.

9          MS. O'TOOLE:  Have you done it more than once?

10         MR. SALAMON:  Yes.

11         MS. O'TOOLE:  Okay.  And did you do it in

12   connection with the deposit that was used for the Novartis

13   contract?

14         MR. SALAMON:  Yes.

15         MS. O'TOOLE:  Okay.  So -- and where did the funds

16   -- and to be specific, the $2.5 million that was used as a

17   deposit from the Novartis contract came from an account in

18   the name of or controlled by David Salamon, correct?

19         MR. SALAMON:  Yes.

20         MS. O'TOOLE:  And where did that money come from

21   that he had in that account?

22         MR. SALAMON:  He -- it was numerous deals that was

23   done.

24         MS. O'TOOLE:  Was it from a closing on another

25   account -- closing on another piece of property that that

Page 45

1   money was deposited?

2               MR. SALAMON:  Yes.

3               MS. O'TOOLE:  And is that closing, was that

4   subject to litigation in State Court?

5               MR. SALAMON:  Yes.

6               MS. O'TOOLE:  And as a result of that litigation,

7   was it determined that the funds there and the satisfactions

8   provided there were fraudulent?

9               MR. SALAMON:  No.

10              MS. O'TOOLE:  Okay.  Going back to the $2.5

11  million, was that money -- the $2.5 million which was the

12  down payment, the deposit -- yes --

13              MR. SALAMON:  Yes.

14              MS. O'TOOLE:  You understand?  Was that money

15  supposed to be returned by the Debtor to your son?

16              MR. SALAMON:  No.

17              MS. O'TOOLE:  So why did he make a deposit if he

18  didn't have any interest in the deal?

19              MR. SALAMON:  Because one of his obligations was

20  to give me the 2.5.

21              MS. O'TOOLE:  And what was -- what do you mean,

22  one of his obligations?  Is there a written agreement?

23              MR. SALAMON:  Yes.

24              MS. O'TOOLE:  Why -- there is a written agreement?

25  I'm going to make demand for a copy of the written agreement

Page 46

1    with respect to the 2.5.  And why did he have to give you

2    $2.5 million?

3                MR. SALAMON:  Because I sold him some merchandise,

4    some...

5                MS. O'TOOLE:  Merchandise?  Was that food?  Was

6    that on an Amazon platform?  What was that about?

7                MR. SALAMON:  It was -- I have to see from this

8    how it went because we had a few deals with him.

9                MS. O'TOOLE:  You had a few deals with your son?

10                MR. SALAMON:  With my son, yes.

11                MS. O'TOOLE:  Okay.  And how many sons do you

12    have?

13                MR. SALAMON:  Four.

14                MS. O'TOOLE:  And do you have deals with any of

15    your other sons?

16                MR. SALAMON:  I have -- I had one with one son.

17                MS. O'TOOLE:  Okay.  And David's in Boston, is

18    that correct?

19                MR. SALAMON:  No.

20                MS. O'TOOLE:  No?  Where is he?

21                MR. SALAMON:  In (indiscernible).

22                MS. O'TOOLE:  Okay.  Did you tell me he was in

23    Boston the other day?

24                MR. SALAMON:  In Boston is the lawyer.

25                MS. O'TOOLE:  David Salamon, the lawyer?

Page 47

1          MR. SALAMON:  No/

2          MS. O'TOOLE:  Steven Friedman?  No.

3          MR. SALAMON:  No.

4          MR. LEVINE:  Mitch Levine.

5          MS. O'TOOLE:  Mitch Levine.  Okay.  All right.

6   Turning now -- so the books and records, they're either

7   going to be at your place in Brooklyn, they may be with Mr.

8   Nash, they may be with Mr. Pick, they may be with Mr.

9   Levine; and some of them, you assert, were on the premises -

10  -

11         MR. SALAMON:  Right.

12         MS. O'TOOLE:  -- of Novartis?  Is that correct?

13         MR. SALAMON:  Right.

14         MS. O'TOOLE:  And you had built out an office --

15         MR. SALAMON:  In Novartis.

16         MS. O'TOOLE:  -- in Novartis but at some point,

17  you were dispossessed --

18         MR. SALAMON:  Right.

19         MS. O'TOOLE:  -- of your access to the property.

20  Can you fix the time when you were purportedly dispossessed

21  of your property?  Well, dispossessed of your office at the

22  Novartis property.

23         MR. SALAMON:  Well, the -- I don't remember

24  exactly.

25         MS. O'TOOLE:  Okay, well what occurred?  Did you

Page 48

1    arrive there one day and your key didn't work?  Were you

2    physically removed from the premises?

3                  MR. SALAMON:  We have guards.  They didn't let me

4    go in.

5                  MS. O'TOOLE:  Okay.  And you have no recollection.

6    Can you fix it around a particular holiday?

7                  MR. SALAMON:  I don't remember.

8                  MS. O'TOOLE:  And did you then contact somebody

9    and say, I wasn't allowed in, what happened?

10                 MR. SALAMON:  Ye.

11                 MS. O'TOOLE:  Who'd you contact?

12                 MR. SALAMON:  Bridgewater.

13                 MS. O'TOOLE:  And when you say Bridgewater, who

14   was that?

15                 MR. SALAMON:  Mark Yunger.

16                 MS. O'TOOLE:  Yunger?

17                 MR. SALAMON:  Yeah.

18                 MS. O'TOOLE:  And what did he say to you?

19                 MR. SALAMON:  It was, no, it's not you.  I was

20   just -- and then the -- I mean --

21                 MS. O'TOOLE:  So there was a dispute as to who

22   owned --

23                 MR. SALAMON: Suffern.

24                 MS. O'TOOLE:  -- the interest in Suffern Partners

25   --

Page 49

1          MR. SALAMON:  Right.

2          MS. O'TOOLE:  Right?  And then there was an

3   attempt and their continuing attempt to reconcile the 65

4   percent versus 35 percent ownership in Suffern Park, right?

5          MR. SALAMON:  Right.

6          MS. O'TOOLE:  All right.  And that's really what

7   this is all about, right?

8          MR. SALAMON:  Right.

9          MS. O'TOOLE:  Who owns Suffern Partners.

10          MR. SALAMON:  Right.

11          MS. O'TOOLE:  Not about who owns the Debtor,

12   correct?

13          MR. SALAMON:  The question who owns Suffern

14   Partners is the debt -- when I say that I own it, I don't

15   own it personally.  It's the Debtor owning it.

16          MS. O'TOOLE:  Well, isn't it true that your

17   ownership in Suffern Partners was through an entity called

18   Lone Pine, not through the Debtor?

19          MR. SALAMON:  I don't think so.

20          MS. O'TOOLE:  Is the Debtor in the organizational

21   structure of Suffern Partners, LLC?

22          MR. SALAMON:  That's what I understood.

23          MS. O'TOOLE:  And how did you understand it?  What

24   would it look like if we did a diagram of the organizational

25   chart?

Page 50

1          MR. SALAMON:  That Suffern Partners is owned by --

2    65 percent was going to be the Debtor.

3          MS. O'TOOLE:  The Debtor.

4          MR. SALAMON:  Right.

5          MS. O'TOOLE:  And who owns the other 35 percent in

6    your --

7          MR. SALAMON:  Well, that --

8          MS. O'TOOLE:  -- of it?

9          MR. SALAMON:  The Bridgewater, Goldie Reisman,

10   whatever.

11         MS. O'TOOLE:  Okay.  didn't there come a time

12   where $12.5 million was put up in connection with Suffern

13   acquiring the property?

14         MR. SALAMON:  I didn't know about it until --

15         MS. O'TOOLE:  Okay.  Were you ever given the

16   option to buy your equity in Suffern Partners, LLC?

17         MR. SALAMON:  You're talking about the 35 percent?

18         MS. O'TOOLE:  Any percent.  Were you ever -- was

19   there ever a written agreement where you or an entity

20   controlled by you would have the right to have a percentage

21   in Suffern Partners if you came up with a certain amount of

22   money, you release Goldie Reisman's guarantee, and you

23   released the Brooklyn property which was posted as

24   collateral for the $33 million loan?

25         MR. SALAMON:  Yes, for the 35 percent of it.

Page 51

1          MS. O'TOOLE:  Okay.  Did you ever -- did there

2     ever come a time where Goldie Reisman's guarantee was

3     released?

4          MR. SALAMON:  No.

5          MS. O'TOOLE:  Did there ever come a time where the

6     Brooklyn property -- and that's 14 North -- was ever

7     released as collateral for the loan on the $33 million?

8          MR. SALAMON:  I don't think so.

9          MS. O'TOOLE:  Okay.  And did there ever come a

10    time where you came up with capital in any amount to put

11    into Suffern Partners, LLC?

12         MR. SALAMON:  No.

13         MS. O'TOOLE:  Okay.  So the initial down payment

14    is through your son.  Also, then, the only other money you

15    put in, directly or indirectly, was through Star Food?

16         MR. SALAMON:  Star Food and me.

17         MS. O'TOOLE:  Okay.  Do you have any of your own

18    money in this deal anywhere along the line --

19         MR. SALAMON:  Sure.

20         MS. O'TOOLE:  -- whether it's in the Debtor,

21    whether it's in Suffern, and how was your money in the deal?

22         MR. SALAMON:  How -- the $2.5 million that my son

23    owes me, I mean, my son needed to give me --

24         MS. O'TOOLE:  Okay.  And you're going to give me

25    the documents that reflect that in writing as well as how

1    the money was transferred, so let's table that.  What other

2    money --

3                MR. SALAMON:  So you're asking besides the 2.5?

4                MS. O'TOOLE:  I said beside the 2.5, besides the

5    Star Food money, what other money did you put into the deal?

6                MR. SALAMON:  Legal fees, (indiscernible).

7                MS. O'TOOLE:  Have you paid -- during the pendency

8    of the bankruptcy, have you paid Mr. Pick any money?

9                MR. SALAMON:  No.

10               MS. O'TOOLE:  Okay.  Did you cause Mr. Landrigan

11   to pay Pick money from the proceeds of the sale?

12               MR. SALAMON:  I told him?  No.

13               MS. O'TOOLE:  You told him no?

14               MR. SALAMON:  I --

15               MS. O'TOOLE:  Who did you tell no?

16               MR. SALAMON:  No, I didn't tell him.

17               MS. O'TOOLE:  I'm saying, did you?  The questions

18   is, did you and your answer could be no.  I'm just asking

19   you, did you cause any money from the proceeds of the

20   transaction on September 2017 -- in September 2017 to be

21   transferred to Mr. Pick?

22               MR. SALAMON:  No.

23               MS. O'TOOLE:  Did you -- have you paid any other

24   attorneys any other money since this case was started,

25   yourself or through an entity controlled by you?

Page 53

1          MR. SALAMON:  I paid Levine.  I paid --

2          MS. O'TOOLE:  What did you pay Levine?

3          MR. SALAMON:  Whatever...

4          MS. O'TOOLE:  I don't know whatever means.  Look

5    at me.  He's not going to answer it for you.  How much did

6    you pay Levine?

7          MR. SALAMON:  I don't remember.

8          MS. O'TOOLE:  You don't remember or you don't want

9    to tell me?

10          MR. SALAMON:  No, I don't remember.

11          MS. O'TOOLE:  When did you pay it to him?

12          MR. SALAMON:  You're talking for the Debtor,

13    right?

14          MS. O'TOOLE:  I'm asking, did you or an entity

15    controlled by you cause any money to be transferred to Mr.

16    Levine since the bankruptcy case was filed.

17          MR. SALAMON:  (Indiscernible) just clarity.

18          MS. O'TOOLE:  You're not taking pictures, are you?

19    Okay.

20          MR. SALAMON:  So do you mean transferred from the

21    Debtor to the lawyer or --

22          MS. O'TOOLE:  I'm going to ask it again.  Did you

23    or an entity controlled by you cause any money to be

24    transferred to Mr. Levin since this case was filed in March?

25          MR. LEVINE:  In connection with any matter?

Page 54

1           MS. O'TOOLE:  Connection with any matter.

2           MR. SALAMON:  Oh, yes.

3           MS. O'TOOLE:  Okay.  And what matters have you

4   paid -- caused money to be transferred to Mr. Levine?

5           MR. SALAMON:  I've -- RS Old Mills.

6           MS. O'TOOLE:  And how much did you transfer for RS

7   Old Mills?

8           MR. SALAMON:  I don't remember.

9           MS. O'TOOLE:  Where did the money come from?

10          MR. SALAMON:  From my businesses.

11          MS. O'TOOLE:  And which businesses in particular?

12          MR. SALAMON:  Mine or my son's.

13          MS. O'TOOLE:  Yours or your son's

14          MR. SALAMON:  Right.

15          MS. O'TOOLE:  What businesses?

16          MR. SALAMON:  Or Amazon or --

17          MS. O'TOOLE:  Or Amazon?  And when you say Amazon,

18   you don't own Amazon.  You mean some platform that you

19   control --

20          MR. SALAMON:  Right, right, right.

21          MS. O'TOOLE:  -- on Amazon, correct?

22          MR. SALAMON:  Right.

23          MS. O'TOOLE:  And how -- you have no idea?  Over a

24   hundred thousand, more than a hundred thousand?

25          MR. SALAMON:  More than a hundred thousand.

Page 55

1          MS. O'TOOLE:  More than a hundred thousand.

2          MR. SALAMON:  Yes.

3          MS. O'TOOLE:  In connection with RS Old Mills?

4          MR. SALAMON:  I believe so.

5          MS. O'TOOLE:  And when did you first speak to Mr.

6  Levine about RS Old Mills?

7          MR. SALAMON:  Probably before the closings.

8          MS. O'TOOLE:  Okay, and did he represent you in

9  connection with the State Court order to show cause with

10  respect to the environmental liability insurance?

11          MR. SALAMON:  Right.

12          MS. O'TOOLE:  Okay.  And you spoke to Mr. Levine

13  prior to the closing of the Novartis transaction in

14  September of 2017?

15          MR. SALAMON:  Sure, he made it --

16          MS. O'TOOLE:  Right, because that predates it,

17  right?

18          MR. SALAMON:  Yeah.

19          MS. O'TOOLE:  Okay.  And so what -- aside from --

20  withdrawn.  Did your conversations -- withdrawn.  How much

21  did you cause Mr. Pick to be paid, either through your own

22  entities or any other entity controlled by you?

23          MR. SALAMON:  I don't remember.

24          MS. O'TOOLE:  Well, did you pay him anything to

25  file the case?

1              MR. SALAMON:  Yes.

2              MS. O'TOOLE:  How much did you pay him to file the

3     case?

4              MR. SALAMON:  I think it was 25.

5              MS. O'TOOLE:  Okay.  And then after he filed the

6     case, did you pay him or an entity controlled by you pay

7     Doug Pick any money?

8              MR. SALAMON:  I know that from the closing money —

9     —

10             MS. O'TOOLE:  And that's the money that Mr.

11    Landrigan wired to Mr. Pick.

12             MR. SALAMON:  Right.

13             MS. O'TOOLE:  Other than that money and the

14    $25,000, did you or an entity controlled by you cause Mr.

15    Pick to be paid any money in connection with this case?

16             MR. SALAMON:  I don't think so.

17             MS. O'TOOLE:  You don't think so or you don't

18    know.

19             MR. SALAMON:  I don't remember.

20             MS. O'TOOLE:  How about Reiss Sheppe, LLP?  Have

21    you paid them anything in connection with the Novartis

22    transaction?  Well, you know Steven Friedman, right?

23             MR. SALAMON:  Right.

24             MS. O'TOOLE:  And Steven Friedman caused Lone Pine

25    to be formed, is that correct?

1         MR. SALAMON:  Right.

2         MS. O'TOOLE:  Okay.  And had you retained him for

3    that purpose?

4         MR. SALAMON:  For that --

5         MS. O'TOOLE:  Yes?

6         MR. SALAMON:  Yes.

7         MS. O'TOOLE:  And the purpose of creating Lone

8    Pine was to address the equity split in Suffern, isn't that

9    right?

10        MR. SALAMON:  Right.

11        MS. O'TOOLE:  Okay, and you were going to hold

12   your interest in Suffern Partners, LLC through Lone Pine?

13        MR. SALAMON:  I --

14        MS. O'TOOLE:  If you were going to hold it at all,

15   isn't that right?  That entity was created in or about

16   August 28th of 2017, isn't that correct, sir?

17        MR. SALAMON:  I understand that the Debtor is

18   going to.

19        MS. O'TOOLE:  Well, why did you cause Lone Pine to

20   be created?

21        MR. SALAMON:  What I understood is the thirty --

22   to buy the 35 percent.

23        MS. O'TOOLE:  Lone Pine was going to hold the 35

24   percent for who?

25        MR. SALAMON:  There was so much negotiation that I

Page 58

1    am confused.

2            MS. O'TOOLE:   So on August 28th of 2017, Lone Pine

3    is created, right?

4            MR. SALAMON:   Right.

5            MS. O'TOOLE:   And Reiss Sheppe was representing

6    you, correct?

7            MR. SALAMON:   Right.

8            MS. O'TOOLE:   Okay.  And then separately on that

9    date, there's created MY Suffern Partners, LLC, is that

10   right?  And that's for Mr. Yunger.  And then there's also

11   created the -- an entity, IG Suffern Partners, LLC for Mr.

12   Genuth, right?  Yes?

13           MR. SALAMON:   I don't know.

14           MS. O'TOOLE:   Okay.  At or about that time, there

15   was the discussion about how equity in Suffern Partners was

16   going to be addressed, right?

17           MR. LEVINE:   What time we talking about?

18           MS. O'TOOLE:   This is August 28th of 2017 --

19           MR. LEVINE:   Okay.

20           MS. O'TOOLE:   -- approximately a week before the

21   Novartis closing.  Does that refresh your recollection?

22           MR. SALAMON:   No.

23           MS. O'TOOLE:   Okay.  All right.  Let's turn to the

24   creditors in this case.  The first creditor that's listed on

25   the bankruptcy petition is Alpine Fine Construction.  It's

Page 59

1    listed as a general unsecured claim.  Well, I shouldn't say

2    it's on the petition.  It's on Document 64 which is the

3    amendment to the bankruptcy petition.  What is that debt?

4    Why does the Debtor Alpine Fine Construction $210,000?

5              MR. SALAMON:  I don't remember it's 210, but --

6              MS. O'TOOLE:  I'm sorry.  What were those words

7    you said?

8              MR. SALAMON:  I don't remember it's $210,000.

9              MS. O'TOOLE:  Okay, well -- just what's the debt -

10   -

11             MR. SALAMON:  Okay.

12             MS. O'TOOLE:  -- to Alpine?

13             MR. SALAMON:  He did work in --

14             MS. O'TOOLE:  Who's he?

15             MR. SALAMON:  Meshulam, Alpine Construction.

16             MS. O'TOOLE:  Okay.  And you're referring to a he.

17   Who's the he --

18             MR. SALAMON:  Yeah --

19             MS. O'TOOLE:  -- in Alpine?

20             MR. SALAMON:  Meshulam.

21             MS. O'TOOLE:  Okay.

22             MR. SALAMON:  We were going to fix over the place.

23             MS. O'TOOLE:  And the place is the Novartis

24   property?

25             MR. SALAMON:  (Indiscernible).  Right.

1          MS. O'TOOLE:  And what did he do?  Is there a

2    contract?

3          MR. SALAMON:  Yes.

4          MS. O'TOOLE:  So you're going to give me the

5    contract?

6          MR. SALAMON:  Sure.

7          MS. O'TOOLE:  Okay.  Were any payments made on the

8    contract?

9          MR. SALAMON:  No.

10          MS. O'TOOLE:  Had he performed on the contract?

11          MR. SALAMON:  Yes.

12          MS. O'TOOLE:  And (indiscernible) was going to

13    build out space at the Novartis property?  Is that what

14    you're saying?

15          MR. SALAMON:  Right.

16          MS. O'TOOLE:  So there's a contract.  Do you know

17    the date of the contract?

18          MR. SALAMON:  No.

19          MS. O'TOOLE:  Okay.  So just to reiterate, we had

20    a meeting.  It was last Tuesday.  The emphasis of the

21    meeting, among other things, was there's only case here if

22    there are creditors here.  I need to support to whether

23    there's creditors.  I'm going through all the creditors that

24    are listed or that I think we have to deal with.  What about

25    Better Distributors?  That was a breakup fee.  What was that

Page 61

1   for?  Do you recall an amendment being filed and there's a

2   claim for $3.1 million?  It's for Better Distributors and it

3   refers to as a breakup fee.

4              MR. SALAMON:  It's disputed, no?

5              MS. O'TOOLE:  It's what?

6              MR. SALAMON:  Disputed.

7              MS. O'TOOLE:  Yeah, but I'm just -- what is it

8   for?

9              MR. SALAMON:  We were supposed to...

10             MS. O'TOOLE:  What was the claim, even if it

11  didn't come to fruition?  Why was it listed?  What does it

12  mean?

13             MR. SALAMON:  They were going to take care of the

14  property.

15             MS. O'TOOLE:  It was -- they were going to be

16  property managers?

17             MR. SALAMON:  Managers and fix --

18             MS. O'TOOLE:  But they never did it, right?

19             MR. SALAMON:  Right.

20             MS. O'TOOLE:  So that's not an actual claim

21  anymore.  Is that correct?

22             MR. SALAMON:  Right.

23             MS. O'TOOLE:  All right.  Next one, Bridgewater

24  Capital, 1.8 financing agreement.

25             MR. SALAMON:  It's disputed.

1              MS. O'TOOLE:  That's -- well, I know it's

2    disputed, but --

3              MR. SALAMON:  Yes.

4              MS. O'TOOLE:  That was pursuant to a written

5    agreement that you had with Bridgewater, is that right,

6    where they could get 10 percent of the deal and it capped

7    out at a certain amount.  That's what that claim's --

8              MR. SALAMON:  Right.

9              MS. O'TOOLE:  -- related to.  I'm just trying to

10   understand --

11             MR. SALAMON:  Right.

12             MS. O'TOOLE:  -- what they're related to.  Okay.

13             MR. SALAMON:  I'm sorry, I'm not thinking.

14             MS. O'TOOLE:  Oh, I think you're thinking.  What

15   about Capskull.

16             MR. SALAMON:  Same thing.

17             MS. O'TOOLE:  Is that like -- they make hats?

18             MR. SALAMON:  Yeah.

19             MS. O'TOOLE:  Yarmulkes, things like that?  What's

20   Capskull?

21             MR. SALAMON:  They (indiscernible) yarmulkes.

22             MS. O'TOOLE:  Why in a real estate transaction is

23   there a creditor for yarmulkes?

24             MR. SALAMON:  (Indiscernible).

25             MS. O'TOOLE:  My disbelief shouldn't be the same

Page 63

1   as yours.  Why is it listed as a creditor?  You tell me.

2          MR. SALAMON:  Because at the time when we had to

3   file, last minute, Bridgewater was involved and he told me

4   that this is what's owed, so that's why --

5          MS. O'TOOLE:  Bridgewater told you what RS Old

6   Mill owed?

7          MR. SALAMON:  On this debt, they were supposed to

8   help us with the property and --

9          MS. O'TOOLE:  Did anyone ever tell you that to

10  file a bankruptcy petition, we need to have some creditors,

11  so let's add some creditors?  Were you ever told that?

12         MR. SALAMON:  No.

13         MS. O'TOOLE:  Okay.  Well, is Capskull a business

14  that you owned?

15         MR. SALAMON:  No.

16         MS. O'TOOLE:  Who owns that business?

17         MR. SALAMON:  I don't know.

18         MS. O'TOOLE:  Is it an incorporated entity?  You

19  have to answer yes or no.

20         MR. SALAMON:  No.

21         MS. O'TOOLE:  And it is -- does it have an online

22  presence to an Amazon platform?

23         MR. SALAMON:  Not that I'm aware.

24         MS. O'TOOLE:  Okay.  Is it owned by anybody who's

25  related to you --

1           MR. SALAMON:  No.

2           MS. O'TOOLE:  -- or for which you're familiar?

3           MR. SALAMON:  No.

4           MS. O'TOOLE:  Okay.  So you have no idea why

5     Capskull --

6           MR. SALAMON:  No.

7           MS. O'TOOLE:  -- that sells yarmulkes is on a

8     bankruptcy petition for real estate?

9           MR. SALAMON:  Right.

10          MS. O'TOOLE:  Okay.  All right.  El City, LLC.

11    What's that debt?

12          MR. SALAMON:  Yes.

13          MS. O'TOOLE:  What is it related to?

14          MR. SALAMON:  They did work for the Debtor.

15          MS. O'TOOLE:  Okay.  And what kind of work?

16          MR. SALAMON:  For developing the place.

17          MS. O'TOOLE:  Okay, you got to be more specific

18    than that.  The whole thing and you know the judge charged

19    us with this in the last transcript, right?

20          MR. SALAMON:  Right.

21          MS. O'TOOLE:  That we need to understand what the

22    creditor body is here and whether there's a case here.

23          MR. SALAMON:  We'll bring the...

24          MR. LEVINE:  Yeah, we'll be submitting to you the

25    (indiscernible) for all creditors including --

Page 65

1              MS. O'TOOLE:  Okay.

2              MR. LEVINE:  -- administrative creditors that --

3              MS. O'TOOLE:  You know, respectfully, it seems

4    like it's always a day after I need it.  When we keep doing

5    this --

6              MR. LEVINE:  I'm doing the best I can.  We had --

7              MS. O'TOOLE:  What is -- I appreciate you're doing

8    the best you can, but that is, in itself, a little puzzling

9    to me since the Debtor should know what the creditors are,

10   but anyway, what is El City, LLC and why does it -- why is

11   it owed a debt?

12             MR. SALAMON:  Can't remember.  I need the papers.

13             MS. O'TOOLE:  Okay, you don't know the answer as

14   you sit here today, is that right?  And I may get some

15   subsequent papers?

16             MR. SALAMON:  Right.

17             MS. O'TOOLE:  Is that correct?

18             MR. FRANKEL:  You --

19             MS. O'TOOLE:  Sir, you're present on their behalf,

20   is that correct?

21             MR. FRANKEL:  Yes.

22             MS. O'TOOLE:  And do you understand what the

23   nature of the debt is for whom you're representing --

24             MR. FRANKEL:  My understanding is that they were

25   hiring people.  They (indiscernible).

Page 66

1           MS. O'TOOLE:  They were hiring --

2           MR. FRANKEL:  Hiring people to -- which was

3    involved in developing the property on behalf of the Debtor.

4    The Debtor was intending to keep the property.  And that the

5    -- and that there was (indiscernible) trying to --

6           MS. O'TOOLE:  So they were like a broker?

7           MR. FRANKEL:  It wasn't so much a broker as much

8    as a company that was involved and developed their property.

9           MS. O'TOOLE:  Okay.  Is there a written agreement?

10          MR. SALAMON:  Yes.

11          MS. O'TOOLE:  Okay, and that's Mr. Salamon

12   speaking now.  Okay.  And you're saying there's a written

13   agreement and you're going to provide it to me?  Did you

14   sign that agreement?

15          MR. SALAMON:  Yes.

16          MS. O'TOOLE:  And you signed that agreement on

17   behalf of the Debtor?

18          MR. SALAMON:  Right.

19          MS. O'TOOLE:  And that was signed contemporaneous

20   with the sale or prior to the sale?  See, if I had the

21   document, I could say to you, it's dated this date and was

22   it signed at or about the time that it was created.  But I

23   don't have the benefit of any of this. Who's Goldman

24   Copeland?  What did they get money for?

25          MR. SALAMON:  Copeland.

1        MS. O'TOOLE:  $48,000.  That's on the amendment to

2    the petition.  Any relationship between that debt to Goldman

3    Copeland and the amount of money that was paid to Sheppe or

4    Mr. Friedman's firm?

5        MR. SALAMON:  Nothing that I know of.

6        MS. O'TOOLE:  Is there a written agreement with

7    respect to Goldman Copeland?

8        MR. SALAMON:  Everything has written agreement.  I

9    thought it was --

10        MS. O'TOOLE:  Okay.  Do you have any recollection

11    as you sit here today why you filed an amended schedule of

12    creditors and you included Goldman Copeland on that amended

13    schedule?

14        MR. SALAMON:  Because we went through the books

15    then and saw that it wasn't on the petition.

16        MS. O'TOOLE:  Right, but what was the nature of

17    the business?  Is there a written contract?

18        MR. SALAMON:  Yes.

19        MS. O'TOOLE:  Okay.  I'm going to make demand for

20    the written contract and any and all information --

21        MR. SALAMON:  And all --

22        MS. O'TOOLE:  -- supporting that claim.

23        MR. SALAMON:  Right.

24        MS. O'TOOLE:  In Style Interiors.  It says breakup

25    fee $1.2 million.  What was that for?  Is that a proposed

Page 68

1    tenant?

2              MR. SALAMON:  Was proposed tenant but it's --

3              MS. O'TOOLE:  Was a lease ever signed?

4              MR. SALAMON:  It -- I think it was withdrawn.

5              MS. O'TOOLE:  What's that word?

6              MR. SALAMON:  Withdrawn.

7              MS. O'TOOLE:  The claim is withdrawn?

8              MR. SALAMON:  Right.

9              MS. O'TOOLE:  Is there a document withdrawing the

10   claim?  Was there a lease with them that was ever signed?

11             MR. SALAMON:  Yes, but I don't think that it

12   materialized.  It didn't materialize.

13             MS. O'TOOLE:  Okay, so that's not a claim anymore?

14             MR. SALAMON:  Right.

15             MS. O'TOOLE:  Okay.  Lincrest Consulting.  What

16   was that?

17             MR. SALAMON:  No.

18             MS. O'TOOLE:  I don't know what no means.

19             MR. SALAMON:  It --

20             MS. O'TOOLE:  Why was it listed in the first

21   instance?  You know, these things are signed under penalty

22   of perjury, sir.  There must've been a reason why you

23   initially put them in the bankruptcy petition.

24             MR. SALAMON:  I believe it's Bridgewater.

25             MS. O'TOOLE:  You believe that Lincrest Consulting

Page 69

1    is Bridgewater?

2              MR. SALAMON:  Yes.

3              MS. O'TOOLE:  And why do you believe it's -- what

4    do you mean, it's Bridgewater?  It's an affiliated entity?

5              MR. SALAMON:  Affiliated entity that -- told me it

6    owed money, then, for the Debtor so that's why they were on

7    the...

8              MS. O'TOOLE:  Didn't you have a written agreement

9    with Bridgewater?  Sir, didn't the Debtor have a written

10   agreement with Bridgewater?

11             MR. SALAMON:  Yes.

12             MS. O'TOOLE:  And is this 172 in addition to that

13   written agreement or included in the written agreement?

14             MR. SALAMON:  Asking...

15             MS. O'TOOLE:  Did you negotiate any of these

16   contracts?

17             MR. SALAMON:  This one, not.

18             MS. O'TOOLE:  Who did?

19             MR. SALAMON:  Bridgewater.

20             MS. O'TOOLE:  RFG.  What's RFG, $400 breakup fee?

21             MR. LEVINE:  $400, you said?

22             MS. O'TOOLE:  $400,000.  My apologies.

23             MR. SALAMON:  It was also for the tenant.

24             MS. O'TOOLE:  For a tenant?

25             MR. SALAMON:  Right.

Page 70

1              MS. O'TOOLE:  And the tenant -- did that tenant

2     ever have a lease?

3              MR. SALAMON:  Yes, but was withdrawn.

4              MS. O'TOOLE:  I don't know what it means, it was

5     withdrawn.  Are there liquidated damages or anything to not

6     performing under the lease?

7              MR. SALAMON:  I'm going to provide you all the --

8              MS. O'TOOLE:  Shefa Trans Pacific.  What is Shefa

9     Trans Pacific, what is that claim?

10             MR. LEVINE:  I have a Shefa Trans Public.

11             MS. O'TOOLE:  Shefa Trans Pacific.  Do I have it

12    wrong on --

13             MR. LEVINE:  I have a copy right --

14             MS. O'TOOLE:  -- Document 64?  It's on the amended

15    schedule 64.  What is that?

16             MR. SALAMON:  I don't --

17             MS. O'TOOLE:  Is it a shipping company?  Is that

18    related to one of your other businesses?

19             MR. SALAMON:  No.

20             MS. O'TOOLE:  All right.  UHCS Distributors.

21    Again, we have a breakup fee, $140,000.  What's that claim?

22             MR. SALAMON:  Yes, he was going to use warehousing

23    and help us develop --

24             MS. O'TOOLE:  Is there a contract?

25             MR. SALAMON:  Yes.

1              MS. O'TOOLE:  And you're going to provide that

2       contract?

3              MR. SALAMON:  Yes.

4              MS. O'TOOLE:  Okay.  And do you believe that

5       amount is still due?

6              MR. SALAMON:  Yes.

7              MS. O'TOOLE:  Ordermark Associates.  What's that,

8       a $2.8 million breakup fee?

9              MR. SALAMON:  No --

10             MS. O'TOOLE:  No is not a response.  You keep

11      saying --

12             MR. SALAMON:  I understand.

13             MS. O'TOOLE:  -- no to me, but what is the nature

14      of the claim that was listed on the bankruptcy petition

15      amendment, Ordermark Associates?

16             MR. SALAMON:  That is also -- the amendment or it

17      was on the first one?

18             MS. O'TOOLE:  I -- well, I don't know.  I'm

19      looking at amended schedule filed Document Entry 64.  Maybe

20      it's on both.  I don't know.

21             MR. SALAMON:  Oh.  I believe it was Bridgewater.

22             MS. O'TOOLE:  What about Bridgewater?  What did

23      Ordermark Associates do?  Some kind of consulting company?

24             MR. SALAMON:  Yes.

25             MS. O'TOOLE:  All right.  Mintz Levin.  What were

1   those debts related to on the petition --

2          MR. SALAMON:  It was the closing -- he was under

3   (indiscernible) --

4          MS. O'TOOLE:  (Indiscernible) his contract.

5          MR. SALAMON:  -- his contract and the litigation -

6   -

7          MS. O'TOOLE:  Litigated to it.

8          MR. SALAMON:  Yes.

9          MS. O'TOOLE:  Was that bill ever paid?

10         MR. SALAMON:  No.

11         MS. O'TOOLE:  Okay.  AKRF Consulting, Inc.

12         MR. SALAMON:  They were making surveys --

13         MS. O'TOOLE:  Okay.

14         MR. SALAMON:  Wasn't paid.

15         MS. O'TOOLE:  Okay, the next one is Novartis.

16  Novartis is the $2.5 million.  That's the --

17         MR. SALAMON:  right.

18         MS. O'TOOLE:  -- down payment.  That's no longer a

19  claim, right, because you closed on the deal?

20         MR. SALAMON:  Right.

21         MS. O'TOOLE:  Okay.  Romero.  What's that?

22  (Indiscernible).

23         MR. SALAMON:  He made for the development, he

24  did...

25         MS. O'TOOLE:  What kind of services did he

1    provide?  What did he build?  What did he bring to the

2    table?  I don't know what that means.

3              MR. SALAMON:  A few things --

4              MS. O'TOOLE:  It's all related.

5              MR. SALAMON:  I'm going to provide it to you.

6              MS. O'TOOLE:  Well, help me out now.  Sir, you're

7    here.  You're representing. Romero.  What did Romero --

8              MR. FRANKEL:  Romero is a person.  His name is

9    Peter.

10             MS. O'TOOLE:  Okay.

11             MR. FRANKEL:  He was involved in, I believe, it

12   was a few million dollars as I don't have the number in

13   front of me.  He was involved with development of the

14   property.

15             MS. O'TOOLE:  And you say he --

16             MR. FRANKEL:  (Indiscernible) Romero.  Romero.

17             MS. O'TOOLE:  You're saying he's expended or is

18   owed a few million?

19             MR. FRANKEL:  He's owed.  I believe he's owed.  I

20   believe he is owed.  I don't remember how much exactly at

21   this moment, but -- I don't have the invoices.

22             MS. O'TOOLE:  Okay.  Are you aware, though, that

23   he filed a claim in the case --

24             MR. FRANKEL:  Yes.

25             MS. O'TOOLE:  Claim number 6 and that was only

Page 74

1   $115, 000?

2           MR. FRANKEL:  I believe -- yes, because there's

3   some contract (indiscernible).

4           MS. O'TOOLE:  And now you're saying it's upward of

5   a couple million?

6           MR. FRANKEL:  I believe that Romero runs -- may

7   have bigger claims than that $115,000.

8           MS. O'TOOLE:  Okay.  And did you speak to Peter

9   Romero?

10          MR. FRANKEL:  I met him, yes.

11          MS. O'TOOLE:  And when did you speak to him?

12          MR. FRANKEL:  About a month ago.

13          MS. O'TOOLE:  Okay.  And you're not an attorney,

14  right?

15          MR. FRANKEL:  No.

16          MS. O'TOOLE:  Okay.  And how is it that you came

17  to be the person to appear for Peter Romero today?  Did you

18  speak to him within the last week?

19          MR. FRANKEL:  No, I spoke to him about

20  (indiscernible).

21          MS. O'TOOLE:  Okay.  Did you speak to Mr. Condon?

22          MR. FRANKEL:  I spoke to -- no (indiscernible).

23          MS. O'TOOLE:  Did you speak to Tom Landrigan?

24          MR. FRANKEL:  No.

25          MS. O'TOOLE:  Have you spoke, with Doug Pick?

Page 75

1              MR. FRANKEL:  No.

2              MS. O'TOOLE:  Have you spoken with Kevin Nash?

3              MR. FRANKEL:  Kevin Nash, I did speak to.

4              MS. O'TOOLE:  And when did you speak to Kevin

5   Nash?

6              MR. FRANKEL:  About a week ago.

7              MS. O'TOOLE:  And what did he say to you and what

8   did you say to him?

9              MR. FRANKEL:  (Indiscernible) hello.

10             MS. O'TOOLE:  All right, hello to you back.  But

11  I'd like to know what your conversation was.

12             MR. FRANKEL:  Conversation wasn't...

13             MS. O'TOOLE:  Well why did he reach out?  Did you

14  call him --

15             MR. FRANKEL:  I didn't know -- no, no.

16             MS. O'TOOLE:  -- or did he call you?

17             MR. FRANKEL:  No, I met him.  I was --

18             MS. O'TOOLE:  Where'd you meet him?

19             MR. FRANKEL:  I met him when -- at the meeting.

20  Before the meeting.

21             MS. O'TOOLE:  What meeting?

22             MR. FRANKEL:  It was a meeting that was last week

23  that was held in -- somewhere near (indiscernible).

24             MS. O'TOOLE:  Who was in the -- attendance at the

25  meeting?

1          MR. FRANKEL:  Just myself.

2          MS. O'TOOLE:  Okay.  So this was a meeting that

3     occurred last week in Montauk?

4          MAN 1:  Correct (indiscernible).

5          MS. O'TOOLE:  And that was at the office of

6     Monica, Herbst, and LaMonica, Herbst, and Maniscalco that we

7     had the meeting.

8          MR. FRANKEL:  I wasn't there.

9          MS. O'TOOLE:  Okay, but prior to that meeting, you

10    had a meeting with Mr. Nash?

11         MR. FRANKEL:  Yeah, for about five minutes.

12         MS. O'TOOLE:  And who else was there?

13         MR. FRANKEL:  Just myself.

14         MS. O'TOOLE:  Okay.  And how did it come about --

15    what time did you meet Mr. Nash?

16         MR. FRANKEL:  What time?

17         MS. O'TOOLE:  Yeah.

18         MR. FRANKEL:  I'm trying to remember.

19         MS. O'TOOLE:  Okay.

20         MR. FRANKEL:  It was before 12:00.

21         MS. O'TOOLE:  Okay.  And so you met with Mr. Nash

22    prior to him meeting with me and my counsel.  Is that right?

23         MR. FRANKEL:  Yes.

24         MS. O'TOOLE:  Okay.  And was Gary Eisenberg there?

25    Was Salamon there?

Page 77

1                    MR. FRANKEL:  No --

2                    MS. O'TOOLE:  Was Mr. Levine there?

3                    MR. FRANKEL:  NO.

4                    MS. O'TOOLE:  Okay.

5                    MR. FRANKEL:  I met him in a conference.

6                    MS. O'TOOLE:  You met him in a conference.

7                    MR. FRANKEL:  He didn't know who I was and it was

8     a mistake and I just (indiscernible) happened to be by

9     mistake.  He thought I was somebody else.

10                    MS. O'TOOLE:  Okay.  So where did you happen to

11    meet each other by mistake?

12                    MR. FRANKEL:  I met him at the parking lot.  I was

13    there.

14                    MS. O'TOOLE:  You were t the parking lot in

15    Montauk?

16                    MR. FRANKEL:  Yeah.

17                    MS. O'TOOLE:  How did you come to the parking lot?

18                    MR. FRANKEL:  I was not -- I wanted to know if I

19    had to be -- I wanted to know if I had to be -- from Peter,

20    if I had to be at the meeting.

21                    MS. O'TOOLE:  Who told you that there was a

22    meeting with the Trustee and the Trustee's counsel?

23                    MR. FRANKEL:  Peter.

24                    MS. O'TOOLE:  So you drove out to Montauk by

25    yourself?

Page 78

1              MR. FRANKEL:  That's right.

2              MS. O'TOOLE:  Okay.  And you -- just to find out

3     if you needed to be at this meeting?

4              MR. FRANKEL:  I thought I had to be.  I wasn't

5     sure.

6              MS. O'TOOLE:  Who -- and what did Peter say to you

7     and what did you say to Peter?

8              MR. FRANKEL:  He wasn't sure but he thought -- he

9     wasn't sure if it was a Trustee -- if it was a meeting that

10    had to do with creditors.

11             MS. O'TOOLE:  Okay.

12             MR. FRANKEL:  That's all.

13             MS. O'TOOLE:  So when did Peter --

14             MR. FRANKEL:  I couldn't reach anybody.  I had no

15    answers.

16             MS. O'TOOLE:  Okay.  so this meeting occurred last

17    Tuesday, right?

18             MR. FRANKEL:  I believe so.

19             MS. O'TOOLE:  And when did -- hello only takes a

20    second.  So you talked to Mr. Nash for about five minutes.

21    What did he say to you and what did you say to him?

22             MR. FRANKEL:  What he asked me?  What I said to

23    him?

24             MS. O'TOOLE:  Yeah, exactly.  Yeah.

25             MR. FRANKEL:  I just said to him that I thought it

1   was very important that whatever happened that we should

2   understand that this, Mr. Salamon, okay, he doesn't have the

3   greatest memory -- I mentioned that -- and that he, we're

4   concerned that the property -- I'm concerned on behalf of

5   Peter and the others -- (indiscernible) these others, what I

6   mentioned -- that the property should stay (indiscernible)

7   the Debtor.  It shouldn't -- if we don't want --

8          MS. O'TOOLE:  Okay.

9          MR. FRANKEL:  The reason is because the Debtor was

10  involved in -- we were involved in developing this property.

11  It wasn't -- they were robbed by this Yunger and Genuth.

12         MS. O'TOOLE:  Okay.  So let me ask you, sir, have

13  you ever been diagnosed with memory loss?  Sir?

14         MR. SALAMON:  No.

15         MS. O'TOOLE:  And this is Mr. Salamon, for the

16  clarity of the record.  Do you take any medications that

17  impair your ability to recall information?

18         MR. SALAMON:  No.

19         MS. O'TOOLE:  Okay.  Have you ever conveyed to Mr.

20  Frankel that you suffer from memory loss?

21         MR. SALAMON:  (Indiscernible).  I told him...

22         MS. O'TOOLE:  Please don't mumble.  Answer

23  clearly.

24         MR. SALAMON:  If I ever told him that I don't

25  remember?

1          MS. O'TOOLE:  Uh huh.  I didn't say that.

2          MR. SALAMON:  No, okay.

3          MS. O'TOOLE:  I said have you ever told Mr.

4    Frankel that you suffer from memory loss or any type of

5    neurological impairment that interferes with your ability to

6    recall information?

7          MR. SALAMON:  No.

8          MS. O'TOOLE:  Okay.  All right.

9          MR. FRANKEL:  I don't have to.  I (indiscernible).

10         MS. O'TOOLE:  Okay.  Sir, what is your relation to

11   this matter?  You happened to show up in a parking lot in

12   Montauk, Long Island before a meeting you're not invited to

13   to discuss it with Debtor's counsel who's not yet retained

14   in the case.

15         MR. FRANKEL:  I wasn't going to discuss it with

16   Debtor's counsel.  I did not go to discuss it with Debtor's

17   counsel.

18         MS. O'TOOLE:  Okay.  Who were you going to meet,

19   then?

20         MR. FRANKEL:  I was -- I went there on behalf of

21   Peter because Peter believe that he had to be at the --

22         MS. O'TOOLE:  Okay.  And how did Peter know there

23   was meeting?

24         MR. FRANKEL:  He told me to be there, so

25   (indiscernible).

1           MS. O'TOOLE:  Okay.  So I had this meeting which

2   was July -- it was July 9th, correct, that you were out in

3   Montauk?

4           MR. FRANKEL:  Could be.  I don't have a calendar.

5           MS. O'TOOLE:  You're not remembering too well?

6           MR. FRANKEL:  Calendar.

7           MS. O'TOOLE:  Okay.  All right.  So you're out in

8   Montauk because --

9           MR. FRANKEL:  I believe it was Tuesday.

10          MS. O'TOOLE:  -- because Peter tells you.  Yes.

11          MR. FRANKEL:  Yeah.

12          MS. O'TOOLE:  Okay.  And how many days in advance

13  of that meeting did Peter call you?

14          MR. FRANKEL:  The morning.

15          MS. O'TOOLE:  The morning of the meeting?  And you

16  went out to Montauk?

17          MR. FRANKEL:  Yeah.

18          MS. O'TOOLE:  For a 12:00 meeting?

19          MR. FRANKEL:  I went there for --

20          MS. O'TOOLE:  Where do you live?

21          MR. FRANKEL:  I live in Kensington, in Brooklyn.

22          MS. O'TOOLE:  In Brooklyn.  Okay. All right.

23          MR. FRANKEL:  And why didn't (indiscernible) have

24  to go because I had --

25          MS. O'TOOLE:  Did you --

Page 82

1           MR. FRANKEL:  I had to go --

2           MS. O'TOOLE:  -- speak to Mr. Levin before the

3    meeting?

4           MR. FRANKEL:  No, but I met -- no, I did not speak

5    to him before.

6           MS. O'TOOLE:  Did you speak to Mr. Fleischmann

7    before the meeting?

8           MR. FRANKEL:  No, (indiscernible).

9           MS. O'TOOLE:  Do you know who David Fleischmann

10   is?

11          MR. FRANKEL:  No.

12          MS. O'TOOLE:  Do you know who Doug Pick is?

13          MR. FRANKEL:  No.

14          MS. O'TOOLE:  Have you ever spoken to anybody else

15   related to this case since it's been filed?

16          MR. FRANKEL:  To him.

17          MS. O'TOOLE:  To -- and him is Mr. Yehuda Salamon

18   --

19          MR. FRANKEL:  Yeah.

20          MS. O'TOOLE:  -- who's testifying for the Debtor.

21   And how many times since March of 2018 have you spoken to

22   Yehuda Salamon?

23          MR. FRANKEL:  Few times.

24          MS. O'TOOLE:  Did you speak to him in or about the

25   time the Novartis property was sold?

Page 83

1           MR. FRANKEL:  Yes.

2           MS. O'TOOLE:  Okay, and what were the nature of

3     your conversations with Mr. Salamon?

4           MR. FRANKEL:  I was -- am trying to be involved in

5     the development (indiscernible).

6           MS. O'TOOLE:  Okay.  And do you have any contracts

7     with any of the entities --

8           MR. FRANKEL:  Yes, I do.

9           MS. O'TOOLE:  And what is your -- who's your

10    contract with?

11          MR. FRANKEL:  I would prefer this hearing

12    (indiscernible) before I answer those questions, because I

13    have the documents rather than make a mistake and say the

14    wrong thing.

15          MS. O'TOOLE:  Okay.

16          MR. FRANKEL:  I can be confused, too.

17          MS. O'TOOLE:  A little confusion.  All right,

18    well, we'll probably issue a 2004 to have the documents

19    turned over.  Mr. Salamon, is there anybody who -- I've now

20    learned that Mr. Frankel, are you aware of a document that

21    Mr. Frankel has executed which gives him an interest

22    directly or indirectly in the Novartis development?

23          MR. SALAMON:  Yes.

24          MS. O'TOOLE:  And what is the document?

25          MR. SALAMON:  I will provide.

1          MS. O'TOOLE:  That's not the answer today, okay?

2     There was a demand for the documents in a written letter to

3     your lawyers, okay?  If you have documents of the Debtor,

4     they now belong to me.  I'm the Trustee in the case.  So

5     every document you have, you need to turn over.  All the

6     bank records, any written agreements.  It's not a puzzle or

7     a Rubik's cube that I'm trying to figure out here.  The

8     documents come over to me.  The privilege belongs to me and

9     I'm going to look at all the documents.  Do you understand

10    that?

11         MR. SALAMON:  Yes.

12         MS. O'TOOLE:  Now, what is the written agreement

13    that you have with Mr. Frankel?

14         MR. SALAMON:  Don't have.

15         MS. O'TOOLE:  Excuse me?

16         MR. SALAMON:  I don't have it.  I mean...

17         MS. O'TOOLE:  You don't have what?

18         MR. SALAMON:  Written --

19         MS. O'TOOLE:  You have a written agreement with

20    Mr. Frankel, isn't that correct, sir?

21         MR. SALAMON:  Nothing that I've...

22         MS. O'TOOLE:  That's a yes or no question.

23         MR. LEVINE:  By you, you mean the Debtor?

24         MR. SALAMON:  It means the Debtor.

25         MS. O'TOOLE:  Is there a written agreement that

Page 85

1    exists between you, the Debtor, or any entity controlled by

2    you with Mr. Frankel?

3              MR. SALAMON:  I don't remember it.

4              MS. O'TOOLE:  Mr. Frankel remembers it, but you

5    don't remember it?

6              MR. SALAMON:  No.

7              MS. O'TOOLE:  Did you ever have an agreement with

8    him that may or may not be in writing that he would have

9    some role to play in the Novartis property?

10             MR. SALAMON:  Yeah, but I don't remember -- don't

11   remember working out -- I can't remember.

12             MS. O'TOOLE:  Okay.  Well, did you ever draft or

13   did you cause a lawyer to draft an agreement with Mr.

14   Frankel related to the Novartis property?

15             MR. SALAMON:  I had my son negotiate with him, but

16   I don't --

17             MS. O'TOOLE:  Your son, David, negotiated with Mr.

18   Frankel --

19             MR. SALAMON:  Right.

20             MS. O'TOOLE:  -- to have some role relative to the

21   Novartis property, is that correct?

22             MR. SALAMON:  Right.

23             MS. O'TOOLE:  And what was the role you

24   anticipated that Mr. Frankel would have relative to the

25   Novartis property?

1          MR. SALAMON:  Bringing tenants, but I don't know

2   if -- I don't remember --

3          MS. O'TOOLE:  Is Mr. Frankel a broker?

4          MR. SALAMON:  No, but he says that he has good

5   connections.

6          MS. O'TOOLE:  Okay.  And did you ask him to appear

7   today on behalf of other creditors?

8          MR. SALAMON:  No.

9          MS. O'TOOLE:  Okay.  I'm making demand for any and

10  all written agreements related to any agreed -- withdrawn.

11  I'm making demand for any and all documents of the Debtor.

12         MR. SALAMON:  Yes.

13         MS. O'TOOLE:  Period.  In whosever custody,

14  possession, and control.  Okay?

15         MR. SALAMON:  Yes.

16         MS. O'TOOLE:  And if they're not forthcoming soon,

17  I'm going to seek an order of the Court and from there, I'm

18  going to compel because it's been a while since we made our

19  initial demand.  Separately, I'm looking for any --

20         MR. LEVINE:  Excuse me, the initial demand -- just

21  (indiscernible).

22         MS. O'TOOLE:  There was a letter sent nearly the

23  first or second day of the case outlining what we'd want and

24  it was from LaMonica, Herbst, and Maniscalco --

25         MR. LEVINE:  To?

1          MS. O'TOOLE:  So, I assume it was to Mr. Nash.

2          MR. LEVINE:  Okay.

3          MS. O'TOOLE:  I -- we can retrieve the letter.

4    That would not be a difficult thing to do.

5          MR. LEVINE:  Okay.

6          MS. O'TOOLE:  But I'm requesting any and all

7    documents of the Debtor, period.  That must include whatever

8    drafts and/or agreements you have in writing with Mr.

9    Frankel or any other person relative to the Debtor or the

10   operation of the Novartis property.  That includes lawyers.

11   That includes brokers.  That includes tenants.  It includes

12   every document.  Understood?

13         MR. SALAMON:  Yes.

14         MS. O'TOOLE:  Okay.  M. David Graubert.  This is

15   an attorney you consulted initially in terms of filing for

16   bankruptcy?

17         MR. SALAMON:  Yes.

18         MS. O'TOOLE:  Was he ever paid?

19         MR. SALAMON:  No.

20         MS. O'TOOLE:  Okay.  Are there any other creditors

21   that I have not discussed with you that exist for the

22   Debtor?

23         MR. LEVINE:  Prepetition or post-petition?

24   (Indiscernible).

25         MS. O'TOOLE:  Prepetition and post-petition.  Now,

Page 88

1   this shouldn't be a surprise because we talked about this

2   last Tuesday and you were going to put together the list.

3           MR. SALAMON:   (Indiscernible).

4           MS. O'TOOLE:   Are you aware of any other creditors

5   as you sit here today?

6           MR. SALAMON:   Yes, I know that Nash

7   (indiscernible) everything.   That's why I want...

8           MR. LEVINE:   Okay, just answer the question.

9           MS. O'TOOLE:   You are aware of other creditors?

10          MR. SALAMON:   We put together --

11          MS. O'TOOLE:   Do you know the names of them today?

12          MR. SALAMON:   (Indiscernible).

13          MR. LEVINE:   Answer her question.

14          MS. O'TOOLE:   You can't answer -- speak to counsel

15  while --

16          MR. SALAMON:   I'm sorry.

17          MS. O'TOOLE:   -- a question is pending.

18          MR. SALAMON:   Lone Pine was --

19          MS. O'TOOLE:   Lone Pine?   Okay, and Lone Pine we

20  discussed earlier --

21          MR. SALAMON:   Yeah.

22          MS. O'TOOLE:   -- is an entity controlled by you.

23  Are you the member -- Lone Pine, what?   Associates, LLC?

24          MR. SALAMON:   Right.

25          MS. O'TOOLE:   Okay.   Are you the hundred percent

Page 89

1   member of that entity?

2           MR. SALAMON:  No.

3           MS. O'TOOLE:  Who is?  Who are the members, I

4   should say?

5           MR. SALAMON:  Mike, my son.

6           MS. O'TOOLE:  Your son?

7           MR. SALAMON:  Yeah.

8           MS. O'TOOLE:  And was he always the only member?

9           MR. SALAMON:  No.  He is part of the -- he has

10  interest in this.

11          MS. O'TOOLE:  Okay.  I asked you a question.  It's

12  an LLC.  LLCs have members.  There's aw hundred percent.

13  Who are the members of Lone Pine Associates, LLC?

14          MR. SALAMON:  I don't know.

15          MS. O'TOOLE:  You don't know?

16          MR. SALAMON:  No.

17          MS. O'TOOLE:  Were you ever a member of that

18  entity?

19          MR. SALAMON:  Never.

20          MS. O'TOOLE:  Did you cause that entity to be

21  created?

22          MR. SALAMON:  No.

23          MS. O'TOOLE:  You didn't cause that to be created

24  with Steve Friedman?

25          MR. SALAMON:  I don't remember.

Page 90

1          MS. O'TOOLE:  Yes or no?  He said he can't

2    remember?

3          MR. SALAMON:  I don't remember that.

4          MS. O'TOOLE:  Okay.  Are you aware that Mr.

5    Friedman was paid a certain amount of money at the closing

6    of the $33 million transaction with Suffern Partners?

7          MR. SALAMON:  No.

8          MS. O'TOOLE:  Okay.  All right.  I have a room

9    full of people that are going to be going crazy soon because

10   this is a very long 341 meeting.  I'm going to continue the

11   meeting, adjourn it, until a date and time in which I'll

12   have the rest of this list of creditors so I can continue my

13   questioning.  There's a limited opportunity to ask some

14   questions if people need to.

15         MR. GRABLE:  One question.

16         MS. O'TOOLE:  Go ahead.

17         MR. GRABLE:  There was one more schedule --

18         MS. O'TOOLE:  Just -- Mr. Grable's speaking, for

19   the record.

20         MR. GRABLE:  Thank you.  There was one more

21   scheduled creditor which I think we did not discuss and that

22   listed as JLL.  What was that -- was services did that

23   creditor provide to the Debtor?

24         MR. SALAMON:  (Indiscernible).

25         MR. LEVINE:  May I just point out for the record

1    that I think we've been made by someone who's not

2    representing a creditor.

3              MS. O'TOOLE:  That's fine.  There's another

4    creditor that's listed, JLL.  Can you advise who that

5    creditor is?

6              MR. SALAMON:  They did some kind of...

7              MR. LEVINE:  Go ahead.  Finish your answer.

8              MS. O'TOOLE:  What is it?

9              MR. SALAMON:  They did some kind of research or --

10   for the environmental thing.

11             MS. O'TOOLE:  The what thing?

12             MR. SALAMON:  Environmental.

13             MS. O'TOOLE:  Okay.  And that's listed as

14   contingent, disputed.  Okay.  All right.  Any other

15   questions --

16             MR. FIVESON:  Yeah.

17             MS. O'TOOLE:  And just identify the speaker.

18             MR. FIVESON:  David Fiveson.  Mr. Salamon --

19             MR. LEVINE:  We're going to object to Mr. Fiveson

20   asking questions.  Just go on the record, he is not

21   representing any creditor.

22             MR. FIVESON:  Mr. Salamon, you testified you're

23   not known by any other name.  Are you not known by other

24   names?

25             MR. SALAMON:  No.

Page 92

1          MR. FIVESON:  Did you not testify in State Court

2     proceedings that you're known by another name?

3          MR. LEVINE:  This is not a cross examination of

4     this witness.

5          MS. O'TOOLE:  Listen, listen.  There's a limited

6     opportunity to ask questions.

7          MR. LEVINE:  Yeah.

8          MS. O'TOOLE:  We can engage in the rhetoric of him

9     slipping me a note of the questions.  I'm interested in the

10    questions.  There's a small opportunity here.  We are

11    charged with figuring out the facts and figuring out the

12    facts quickly by the judge.  Use your discretion and

13    everybody reserves all their rights.

14         MR. FIVESON:  Fine.  Do you not recall that?

15         MR. LEVINE:  Recall what?

16         MR. FIVESON:  Testifying he was known by at least

17    one other name.

18         MR. SALAMON:  Not legally.

19         MS. O'TOOLE:  And what name is that?

20         MR. SALAMON:  Marty.

21         MS. O'TOOLE:  Marty Salamon?

22         MR. SALAMON:  Salamon.

23         MR. FIVESON:  Okay.  Now, last two questions.

24    Romero, that creditor, signed the consent order to dismiss

25    this case, acknowledging it had been paid in full.  Did you

Page 93

1  know that?

2         MR. SALAMON:  Everybody got a signed -- they were

3  told by Landrigan to sign in order to get paid including the

4  lawyer, what's his name --

5         MR. LEVINE:  Mintz Levin?

6         MR. SALAMON:  -- Mintz Levin signed us up.

7         MS. O'TOOLE:  Okay.  And I'm just going to say,

8  I'm taking exception to the characterization of what the

9  notice of presentment --

10        MR. FIVESON:  Okay.

11        MS. O'TOOLE:  -- says, because I don't think it

12  says what you're saying.  There's crafty wordsmithing going

13  on there.

14        MR. FIVESON:  Did you have any communications with

15  Romero after the document was filed and before they filed

16  the notice claiming they weren't paid?

17        MR. LEVINE:  Well...

18        MS. O'TOOLE:  Is that all?  Okay.  All right.

19  We're adjourned until August 9th at 5 p.m.  Do not come back

20  on that date.  You need to get me the documents.  It's a

21  duty to turn them over to me and in addition, as a

22  fiduciary, I need to figure out what the creditors are in

23  this case so send me the list that you are going to provide

24  me.

25        MR. LEVINE:  We're going to send you a list with

Page 94

1      the backup materials.

2              MS. O'TOOLE:  Okay.

3              MR. SALAMON:  I told you (indiscernible).

4              MS. O'TOOLE:  All right, that's it.  Thank you.

5              MR. FIVESON:  Thank you.

6              MR. LEVINE:  Thank you.

7              (End of Proceedings)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski

6    Hyde
Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2019.08.02 15:11:52 -04'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 2, 2019

[& - amended]    Page 1

| & |
| --- |
| **&**   2:3,17 3:1 |

| 0 |
| --- |
| **000**   74:1 |

| 1 |
| --- |
| **1**   13:10 76:4 |
| **1.2**   67:25 |
| **1.8**   61:24 |
| **10**   62:6 |
| **10005**   2:13 |
| **10017**   3:4 |
| **10022**   2:20 |
| **10583**   2:6 |
| **10601**   1:15 |
| **11209**   32:14 |
| **11219**   30:21 32:13 32:17 |
| **115**   74:1 |
| **115,000**   74:7 |
| **11501**   95:23 |
| **12**   23:17 |
| **12.5**   21:23 22:19 22:21 23:4,9 36:14 50:12 |
| **12:00**   76:20 81:18 |
| **12th**   32:7,9,10 |
| **14**   51:6 |
| **140,000**   70:21 |
| **15**   2:5 33:3 |
| **16**   1:17 |
| **17-22218**   1:3 4:3 |
| **172**   69:12 |
| **18**   17:9 40:18 |
| **19**   32:15 |

| 2 |
| --- |
| **2**   20:16 95:25 |
| **2.5**   12:2,3 44:16 45:10,11 46:2 51:22 52:3,4 72:16 |
| **2.5.**   45:20 46:1 |
| **2.8**   71:8 |
| **2004**   83:18 |
| **2016**   9:3 |
| **2017**   15:17 19:16 20:19 24:6 33:6 52:20,20 55:14 57:16 58:2,18 |
| **2018**   16:18,21,22 82:21 |
| **2019**   1:17 95:25 |
| **20917**   19:22 |
| **21**   32:9 |
| **210**   59:5 |
| **210,000**   59:4,8 |
| **21st**   2:12 |
| **248**   1:14 |
| **25**   10:18,21 14:17 42:9 56:4 |
| **25,000**   42:10 56:14 |
| **28th**   57:16 58:2 58:18 |
| **29th**   37:19 |

| 3 |
| --- |
| **3.1**   61:2 |
| **30**   40:19 |
| **300**   1:14 95:22 |
| **33**   50:24 51:7 90:6 |
| **330**   95:21 |
| **341**   1:20 90:10 |
| **35**   49:4 50:5,17,25 57:22,23 |

| 4 |
| --- |
| **400**   69:20,21 |
| **400,000**   69:22 |
| **45th**   3:3 |
| **48,000**   67:1 |
| **488**   2:19 8:13 |
| **4921**   32:7,8 |

| 5 |
| --- |
| **5**   93:19 |

| 6 |
| --- |
| **6**   73:25 |
| **64**   59:2 70:14,15 71:19 |
| **65**   49:3 50:2 |

| 7 |
| --- |
| **7**   1:25 |
| **700**   34:25 36:6 37:22 |
| **700,000**   37:23 |
| **77**   2:12 |

| 9 |
| --- |
| **9**   3:3 |
| **9th**   81:2 93:19 |

| a |
| --- |
| **ability**   79:17 80:5 |
| **able**   7:3 43:16 |
| **access**   15:5,8 47:19 |
| **account**   35:24 36:3 37:10 38:2,6 38:13,15,18 42:24 42:25 43:4,14,17 43:20,24 44:4,17 44:21,25 |
| **accurate**   95:4 |
| **acknowledging**   92:25 |
| **acquiring**   50:13 |
| **actual**   61:20 |
| **add**   19:19 63:11 |
| **addition**   69:12 93:21 |
| **address**   4:15 32:19,22 33:2 57:8 |
| **addressed**   58:16 |
| **addresses**   10:22 30:20,22,25 |
| **adjourn**   90:11 |
| **adjourned**   93:19 |

| administrative |
| --- |
| 65:2 |
| **advance**   36:10,21 37:11 38:18 81:12 |
| **advanced**   34:18 35:2 |
| **advancing**   36:16 39:6 |
| **adversary**   24:6 40:1 |
| **advise**   91:4 |
| **affidavit**   29:10 |
| **affiliated**   69:4,5 |
| **afternoon**   4:4 |
| **ago**   7:6,8 74:12 75:6 |
| **agreed**   86:10 |
| **agreement**   14:9 14:12 40:3 45:22 45:24,25 50:19 61:24 62:5 66:9 66:13,14,16 67:6 67:8 69:8,10,13 69:13 84:12,19,25 85:7,13 |
| **agreements**   39:10 84:6 86:10 87:8 |
| **ahead**   6:7 8:11 27:2 90:16 91:7 |
| **akrf**   72:11 |
| **allowed**   48:9 |
| **aloud**   6:18 |
| **alpine**   6:14 7:13 58:25 59:4,12,15 59:19 |
| **amazon**   12:14,15 46:6 54:16,17,17 54:18,21 63:22 |
| **amend**   19:3 |
| **amended**   18:15 18:16,21,25 19:3 19:15,22 20:15 67:11,12 70:14 |

71:19
amendment  19:19
  59:3 61:1 67:1
  71:15,16
amount  11:25
  35:3,4 50:21
  51:10 62:7 67:3
  71:5 90:5
anesh  2:15
answer  6:18 9:5
  52:18 53:5 63:19
  65:13 79:22 83:12
  84:1 88:8,13,14
  91:7
answering  29:16
  29:19
answers  78:15
anticipated  85:24
anybody  8:19,20
  39:11 63:24 78:14
  82:14 83:19
anymore  61:21
  68:13
anyway  65:10
apologies  69:22
appear  74:17 86:6
appearance  4:19
  8:20
appreciate  65:7
approval  26:1
  28:11 29:13,21
approve  17:11
approved  17:12
approximately
  37:22 58:20
april  24:7
aquino  2:22
arisen  19:23
arises  21:10
arranged  21:17
arrive  48:1
aside  55:19

asked  7:2,4,14
  26:7 40:24,25
  78:22 89:11
asking  36:9 42:20
  52:3,18 53:14
  69:14 91:20
assert  47:9
assets  42:16,17
associated  10:22
associates  2:3
  4:20 71:7,15,23
  88:23 89:13
assume  20:15
  87:1
assumes  17:2
assurance  20:8
attempt  49:3,3
attendance  75:24
attention  22:3
attorney  2:4 3:2
  5:17 9:20,21 13:9
  19:12 27:15 40:2
  40:8 41:19,22,24
  74:13 87:15
attorneys  2:11,18
  39:14 40:25 52:24
attorney's  9:22
august  57:16 58:2
  58:18 93:19 95:25
authority  43:13
avenue  2:19 8:13
  32:9,10
aw  89:12
aware  16:6 21:19
  22:15 63:23 73:22
  83:20 88:4,9 90:4

b

b  1:23
back  4:6 12:20
  23:25 24:15 45:10
  75:10 93:19
backenroth  4:7
  8:13

backup  94:1
balance  21:22
bank  25:20 28:13
  28:14 35:7,18
  37:10 38:5,7
  42:22,24 43:11,24
  84:6
bankrupt  26:18
bankruptcy  1:1
  1:13 5:2 12:21
  13:2,5,10,25 24:7
  25:22,25 26:19
  27:17 28:10 29:13
  29:21 37:18,22
  38:12 40:6,11
  52:8 53:16 58:25
  59:3 63:10 64:8
  68:23 71:14 87:16
barclay  2:5
basis  25:3
basket  28:5
beginning  16:21
  30:17
behalf  7:4 8:10,14
  65:19 66:3,17
  79:4 80:20 86:7
belief  24:24 25:3
believe  10:8 20:6
  23:1 25:1 31:4,5
  36:22 37:6,25
  43:6 44:8 55:4
  68:24,25 69:3
  71:4,21 73:11,19
  73:20 74:2,6
  78:18 80:21 81:9
belong  84:4
belonging  43:23
belongs  84:8
benefit  66:23
best  34:10 65:6,8
better  60:25 61:2
bigger  74:7

bill  72:9
bit  40:2
body  64:22
books  14:16,20,24
  31:2,14 47:6
  67:14
boston  46:17,23
  46:24
breakup  60:25
  61:3 67:24 69:20
  70:21 71:8
bridgewater  8:17
  21:4,6,7 25:21
  26:24 27:11,12,19
  28:15,21,22,25
  29:3,10 30:9
  39:20 48:12,13
  50:9 61:23 62:5
  63:3,5 68:24 69:1
  69:4,9,10,19
  71:21,22
bridgewater's
  21:12
bring  40:19,19
  64:23 73:1
bringing  86:1
brisbois  2:10
broker  66:6,7
  86:3
brokers  87:11
brooklyn  32:11
  47:7 50:23 51:6
  81:21,22
brother  13:19,20
  13:22,25 18:8
build  40:20 60:13
  73:1
built  47:14
business  10:10
  12:12,18 28:22
  30:25 43:4 63:13
  63:16 67:17

[businesses - counsel]                                                    Page 3

businesses  12:13
  32:16,18,21 42:18
  54:10,11,15 70:18
butler  3:1
buy  17:12 50:16
  57:22

**c**

c  2:1 4:2 95:1,1
calendar  81:4,6
call  14:25 27:5
  75:14,16 81:13
called  29:22 49:17
calls  27:5,6,8,12
  27:13
can't  65:12 85:11
  88:14 90:1
capital  38:3,4,12
  51:10 61:24
capped  62:6
capskull  62:15,20
  63:13 64:5
care  14:1 61:13
case  1:3 8:6 13:7
  52:24 53:16,24
  55:25 56:3,6,15
  58:24 60:21 64:22
  73:23 80:14 82:15
  84:4 86:23 92:25
  93:23
cash  42:22
cause  41:14 43:20
  44:3 52:10,19
  53:15,23 55:9,21
  56:14 57:19 85:13
  89:20,23
caused  9:19 19:7
  43:22 54:4 56:24
certain  50:21 62:7
  90:5
certified  95:3
chair  4:5
chapter  1:25

characterization
  93:8
charged  64:18
  92:11
chart  49:25
check  35:13
city  6:8,10,11 7:1
  7:5 64:10 65:10
claim  59:1 61:2,10
  61:20 67:22 68:7
  68:10,13 70:9,21
  71:14 72:19 73:23
  73:25
claiming  93:16
claims  74:7
claim's  62:7
clarity  53:17
  79:16
clearly  79:23
client  27:15
close  20:8 29:4
closed  20:17,20
  72:19
closing  20:17,20
  23:18 34:12,13,14
  34:15,21 35:10,14
  36:4,21 37:13,15
  38:18,20,21 44:24
  44:25 45:3 55:13
  56:8 58:21 72:2
  90:5
closings  55:7
closing's  37:16
clue  23:22
collateral  22:11
  50:24 51:7
collectively  10:25
come  7:2,4 9:20
  11:17 12:4,20
  15:4,13 16:9,13
  18:13 22:2,20
  33:25 35:12,13
  42:13,25 43:5

44:20 50:11 51:2
  51:5,9 54:9 61:11
  76:14 77:17 84:8
  93:19
comes  35:12,12
commons  8:17
communications
  93:14
company  17:17
  25:21 34:9 38:24
  66:8 70:17 71:23
compel  86:18
complaint  24:7
completed  15:14
concerned  79:4,4
condon  6:1 74:21
conference  77:5,6
confused  58:1
  83:16
confusion  83:17
connection  30:25
  42:3 44:12 50:12
  53:25 54:1 55:3,9
  56:15,21
connections  86:5
connor  10:6,7,8
consent  92:24
construction  6:14
  7:14 58:25 59:4
  59:15
consulted  87:15
consulting  68:15
  68:25 71:23 72:11
consummated
  15:14 17:25
contact  48:8,11
contemporaneous
  66:19
contingent  91:14
continue  90:10,12
continuing  49:3
contract  11:13,19
  11:23 20:15 44:13

44:17 60:2,5,8,10
  60:16,17 67:17,20
  70:24 71:2 72:4,5
  74:3 83:10
contracts  69:16
  83:6
control  15:8,11
  31:15 54:19 86:14
controlled  31:17
  33:7 35:25 36:3
  43:23 44:3,5,18
  50:20 52:25 53:15
  53:23 55:22 56:6
  56:14 85:1 88:22
conversation
  75:11,12
conversations
  27:23 29:12,20
  55:20 83:3
conveyed  79:19
copeland  66:24,25
  67:3,7,12
copies  38:6,9
copy  13:1,5,9
  45:25 70:13
correct  8:23 10:23
  11:1,7,23 14:23
  17:6,18,18 18:6
  19:10,16 24:2,12
  24:13 25:9 26:19
  27:20 30:18 31:10
  34:5 37:24 41:20
  41:25 44:18 46:18
  47:12 49:12 54:21
  56:25 57:16 58:6
  61:21 65:17,20
  76:4 81:2 84:20
  85:21
couldn't  78:14
counsel  4:18 5:2
  13:6 41:15 76:22
  77:22 80:13,16,17
  88:14

**[country - doing]**

country  95:21
couple  74:5
court  1:1,13 5:2
  24:5,7 25:25
  29:13,21 45:4
  55:9 86:17 92:1
court's  28:11
cpif  3:2 5:6
crafty  93:12
crazy  90:9
created  10:2
  57:15,20 58:3,9
  58:11 66:22 89:21
  89:23
creating  6:20
  10:11 57:7
creditor  5:18,19
  5:21 58:24 62:23
  63:1 64:22 90:21
  90:23 91:2,4,5,21
  92:24
creditors  1:20
  5:20 6:23 19:1,3,4
  19:8,19 58:24
  60:22,23,23 63:10
  63:11 64:25 65:2
  65:9 67:12 78:10
  86:7 87:20 88:4,9
  90:12 93:22
cross  92:3
cube  84:7
currently  20:3
  31:25
custody  31:15
  86:13

**d**

d  4:2 30:21
damages  70:5
date  58:9 60:17
  66:21 90:11 93:20
  95:25
dated  66:21

david  3:6 4:22 5:5
  8:10 12:7,8,12
  26:25 29:14,16
  43:10,24 44:4,5
  44:18 46:25 82:9
  85:17 87:14 91:18
david's  46:17
day  16:3 46:23
  48:1 65:4 86:23
days  23:17 81:12
deal  40:15 41:3,5
  45:18 51:18,21
  52:5 60:24 62:6
  72:19
deals  44:22 46:8,9
  46:14
debt  49:14 59:3,9
  63:7 64:11 65:11
  65:23 67:2
debtor  1:9 2:4
  4:21 10:12 11:6
  13:18 14:4,9,16
  14:20 16:1,2,4,10
  16:14 17:3 25:6
  25:14,15,16,25
  26:15,17,18 27:16
  28:10,17 29:2
  30:25 31:2,21,25
  32:4 34:15,16
  35:8,9 37:6,7,18
  37:22 38:1 39:16
  40:4,20 41:14,19
  42:5 45:15 49:11
  49:15,18,20 50:2
  50:3 51:20 53:12
  53:21 57:17 59:4
  64:14 65:9 66:3,4
  66:17 69:6,9 79:7
  79:9 82:20 84:3
  84:23,24 85:1
  86:11 87:7,9,22
  90:23

debtor's  5:2 8:23
  26:12,16 36:4
  37:8 38:5 80:13
  80:16,16
debts  72:1
deed  21:18
delete  19:19
demand  38:5
  45:25 67:19 84:2
  86:9,11,19,20
demanded  34:11
deposit  44:12,17
  45:12,17
deposited  43:24
  43:25 44:4 45:1
depositions  11:18
describe  20:5
destroy  30:16
determined  45:7
develop  70:23
developed  66:8
developing  64:16
  66:3 79:10
development
  72:23 73:13 83:5
  83:22
diagnosed  79:13
diagram  49:24
dicker  8:10
didn't  16:23 20:9
  21:15 22:1 23:3
  29:1 38:19 40:12
  41:11,13 45:18
  48:1,3 50:11,14
  52:16 61:11 68:12
  69:8,9 75:15 77:7
  80:1 81:23 89:23
different  28:18
  29:17 33:15 40:2
difficult  87:4
dip  29:22 38:2,6
  38:15,18

direct  35:9
directed  34:1
directly  33:8
  51:15 83:22
disbelief  62:25
discretion  92:12
discuss  25:24 26:3
  26:21 29:12 80:13
  80:15,16 90:21
discussed  17:2
  26:25 29:19 30:1
  30:10 87:21 88:20
discussing  27:19
discussion  28:9,9
  58:15
dismiss  92:24
dispossessed
  47:17,20,21
dispute  19:23
  20:2,6,16 24:1,10
  39:22 48:21
disputed  61:4,6
  61:25 62:2 91:14
distributing  6:16
distributor  6:21
distributors  60:25
  61:2 70:20
district  1:2
document  10:3,4
  13:10,13 36:15,23
  59:2 66:21 68:9
  70:14 71:19 83:20
  83:24 84:5 87:12
  93:15
documents  13:6
  31:25 51:25 83:13
  83:18 84:2,3,8,9
  86:11 87:7 93:20
doesn't  28:8,13
  35:13 79:2
doing  44:1 65:4,6
  65:7

[dollars - formed]

dollars 34:9 73:12
don't 7:12,23 9:23
  12:10,11,19 13:7
  14:13 18:2,17,20
  18:21,22,23 19:20
  19:25 20:5 27:9
  29:15 33:12,13,17
  33:17,18,18,22,23
  34:2 35:16 39:3
  41:17 43:12 47:23
  48:7 49:14,19
  51:8 53:4,7,8,8,10
  54:8,18 55:23
  56:16,17,17,19
  58:13 59:5,8
  63:17 65:13 66:23
  68:11,18 70:4,16
  71:18,20 73:2,12
  73:20,21 79:7,22
  79:24 80:9 81:4
  84:14,16,17 85:3
  85:5,10,10,16
  86:1,2 89:14,15
  89:25 90:3 93:11
doug 26:23 27:11
  30:9 56:7 74:25
  82:12
draft 85:12,13
drafts 87:8
drain 20:14 29:4
drew 10:5,7,8
driver's 4:13
drove 77:24
due 71:5
duty 93:21

e

e 1:23,23 2:1,1 3:3
  4:2,2 5:6,13,16
  6:12 7:20,20 19:4
  30:21 95:1
earlier 88:20
easy 43:2

ecf 13:10
edelman 8:10
eighteen 17:8
eisenberg 76:24
either 20:8 22:4
  22:11 27:19 35:12
  41:15 47:6 55:21
el 64:10 65:10
ell 6:8,9,10,25 7:5
elser 8:9
email 30:22,24
emails 30:6,7,8,13
  30:20 31:22 32:1
emphasis 60:20
engage 92:8
entered 27:18
entire 30:17
entities 55:22 83:7
entity 8:25 9:17
  9:19 10:2,11 22:5
  23:8 24:11,16,20
  25:19 33:7 37:5
  43:23 44:3 49:17
  50:19 52:25 53:14
  53:23 55:22 56:6
  56:14 57:15 58:11
  63:18 69:4,5 85:1
  88:22 89:1,18,20
entity's 42:24
entry 71:19
environmental
  27:25 28:3 55:10
  91:10,12
equity 21:21,22
  22:3,7 24:11
  39:22 50:16 57:8
  58:15
established 27:14
estate 34:4,6,8
  62:22 64:8
everybody 92:13
  93:2

exactly 47:24
  73:20 78:24
examination 92:3
exception 93:8
exchange 30:8
excuse 15:21
  84:15 86:20
executed 83:21
exist 39:10 87:21
existence 9:20
  11:17
exists 36:20,20
  39:23 85:1
expended 73:17
expenses 38:20,21
  38:22
explain 21:10
extra 40:20

f

f 1:23 5:6,15 19:4
  95:1
face 20:9
fact 25:24
facts 17:2 92:11
  92:12
fair 21:8
familiar 64:2
far 18:5 25:10
fee 60:25 61:3
  67:25 69:20 70:21
  71:8
fees 52:6
fiduciary 93:22
figure 84:7 93:22
figuring 92:11,11
file 55:25 56:2
  63:3,10
filed 12:22 13:7,9
  18:17 19:7,16,22
  24:7 53:16,24
  56:5 61:1 67:11
  71:19 73:23 82:15
  93:15,15

files 37:18
filing 87:15
financing 25:21
  26:24 28:16 29:22
  30:10 61:24
find 16:16,24
  22:18 36:18,19
  78:2
fine 6:14 7:14
  58:25 59:4 91:3
  92:14
finish 91:7
firm 67:4
first 5:13 7:11,12
  12:24 23:14 36:15
  55:5 58:24 68:20
  71:17 86:23
fitzerald 3:1
five 76:11 78:20
fiveson 3:1,6 4:22
  4:22 5:5,6 91:16
  91:18,18,19,22
  92:1,14,16,23
  93:10,14 94:5
fix 47:20 48:6
  59:22 61:17
fleischmann 8:10
  27:1 29:14,17
  82:6,9
floor 2:12
focusing 29:19
food 33:10,16,23
  34:9 36:16,21
  37:23 38:17 46:5
  51:15,16 52:5
foods 34:1,17,23
  35:1,8,15 36:3,7
  37:3,4
foregoing 95:3
formally 27:17
formation 10:3
formed 8:25 9:9
  9:13,16,19 11:6

[formed - indiscernible]

56:25
**forthcoming**
  86:16
**found** 15:10 16:8
  21:14 22:17,23
**four** 46:13
**frankel** 5:9,9,11
  5:13,15,15,18,20
  5:22,24 6:2,4,6,8
  6:10,12,14,16,19
  6:22,24 7:2,6,8,10
  7:12,15,18,20,22
  7:25 8:2,4,7 65:18
  65:21,24 66:2,7
  73:8,11,16,19,24
  74:2,6,10,12,15
  74:19,22,24 75:1
  75:3,6,9,12,15,17
  75:19,22 76:1,8
  76:11,13,16,18,20
  76:23 77:1,3,5,7
  77:12,16,18,23
  78:1,4,8,12,14,18
  78:22,25 79:9,20
  80:4,9,15,20,24
  81:4,6,9,11,14,17
  81:19,21,23 82:1
  82:4,8,11,13,16
  82:19,23 83:1,4,8
  83:11,16,20,21
  84:13,20 85:2,4
  85:14,18,24 86:3
  87:9
**fraudulent** 45:8
**friedman** 47:2
  56:22,24 89:24
  90:5
**friedman's** 67:4
**front** 73:13
**fruition** 61:11
**full** 20:13 90:9
  92:25

**funds** 33:8 34:1
  44:15 45:7

**g**

**g** 4:2 7:10,11
**gary** 76:24
**general** 59:1
**genuth** 8:17 27:12
  27:19 58:12 79:11
**getting** 21:3 28:16
**gilbert** 8:12
**give** 9:1 21:14,15
  26:24 29:1 45:20
  46:1 51:23,24
  60:4
**given** 50:15
**gives** 83:21
**giving** 28:23
**gmail** 30:21
**go** 6:7 8:11 23:25
  29:13,21 35:24
  38:12,18,23,23,23
  38:24,25 42:22
  48:4 80:16 81:24
  82:1 90:16 91:7
  91:20
**going** 4:25 5:3
  10:12,25 11:19
  13:4 14:25 17:14
  20:10 27:2 35:16
  38:8 39:3 40:19
  40:19,20 45:10,25
  47:7 50:2 51:24
  53:5,22 57:11,14
  57:18,23 58:16
  59:22 60:4,12,23
  61:13,15 66:13
  67:19 70:7,22
  71:1 73:5 80:15
  80:18 84:9 86:17
  86:18 88:2 90:9,9
  90:10 91:19 93:7
  93:12,23,25

**goldie** 8:17 39:25
  50:9,22 51:2
**goldman** 66:23
  67:2,7,12
**good** 4:3 44:1
  86:4
**grab** 4:6
**grable** 4:4 8:12,12
  90:15,17,20
**grable's** 90:18
**graubert** 87:14
**greatest** 79:3
**guarantee** 50:22
  51:2
**guards** 48:3

**h**

**h** 7:20
**hahn** 2:17 8:13
**hands** 22:4
**happen** 77:10
**happened** 16:25
  21:2 48:9 77:8
  79:1 80:11
**happens** 17:2
**hats** 62:17
**haven't** 5:1 17:2
**hear** 41:13
**heard** 23:11
**hearing** 83:11
**held** 75:23
**hello** 75:9,10
  78:19
**help** 7:19 63:8
  70:23 73:6
**helping** 27:24
**herbst** 76:6,6
  86:24
**hessen** 2:17 8:13
**he's** 29:9 40:18
  53:5 73:17,19,19
**highland** 4:15
**hiring** 65:25 66:1
  66:2

**hmm** 9:4
**hold** 30:16 57:11
  57:14,23
**holiday** 48:6
**huh** 80:1
**hundred** 9:11
  11:10 25:1,2,3
  34:8 54:24,24,25
  55:1 88:25 89:12
**hyde** 95:3,8

**i**

**idea** 54:23 64:4
**identify** 91:17
**ig** 58:11
**impair** 79:17
**impairment** 80:5
**important** 79:1
**include** 28:9 87:7
**included** 67:12
  69:13
**includes** 38:6
  87:10,11,11,11
**including** 64:25
  93:3
**incorporated**
  63:18
**incorrect** 18:14
**indicating** 13:6
**indirectly** 33:8
  51:15 83:22
**indiscernible** 4:5
  6:24 7:3,25 18:20
  21:13 23:10,12,15
  33:20 35:5 41:16
  46:21 52:6 53:17
  59:25 60:12 62:21
  62:24 64:25 65:25
  66:5 72:3,4,22
  73:16 74:3,20,22
  75:9,23 76:4 77:8
  79:5,6,21 80:9,25
  81:23 82:8 83:5
  83:12 86:21 87:24

88:3,7,12 90:24
94:3
**individual** 37:5
**information** 30:16
35:17,22 67:20
79:17 80:6
**initial** 5:15 51:13
86:19,20
**initially** 68:23
87:15
**initiate** 43:16
**instance** 68:21
**insurance** 20:16
55:10
**intending** 66:4
**interest** 4:25 20:2
20:23 24:15,24
39:12,16,21 40:4
40:10 41:5,7,7
45:18 48:24 57:12
83:21 89:10
**interested** 5:6
92:9
**interferes** 80:5
**interiors** 67:24
**interrupted** 5:4
**invited** 80:12
**invoices** 73:21
**involved** 8:6 63:3
66:3,8 73:11,13
79:10,10 83:4
**isaac** 8:17
**island** 80:12
**isn't** 49:16 57:8
57:15,16 84:20
**issue** 18:2 20:21
83:18
**issues** 27:25 28:3
**it's** 6:21 13:19,22
20:17 23:2 29:5
31:4 33:14,15,15
41:22 48:19 49:15
51:20,21 58:25

59:2,2,5,8 61:2,4
61:5,25 62:1 65:4
66:21 68:2,24
69:3,4,4 70:14
71:20 73:4 74:4
82:15 84:6 86:18
89:11 93:20
**i'd** 75:11
**i'll** 8:21 29:18
33:5 90:11
**i'm** 4:15,25 5:3,20
6:7 10:11 11:19
11:20 13:4 14:25
17:16,16,20 19:25
20:10 21:3 26:14
27:3,24 33:21
34:3 35:16 36:6
38:4,8 39:3 41:11
45:25 52:17,18
53:14,22 59:6
60:23 61:7 62:9
62:13,13 63:23
65:6 67:19 70:7
71:18 73:5 76:18
79:4 84:4,7,9 86:9
86:11,17,17,19
87:6 88:16 90:10
92:9 93:7,8
**i've** 20:14 54:5
83:19 84:21

**j**

**jll** 90:22 91:4
**job** 44:1
**joel** 8:3 12:24
13:16,17
**judge** 20:14 29:4
64:18 92:12
**july** 1:17 81:2,2

**k**

**k** 2:15 5:16
**kaufman** 8:3
12:24 13:16 30:24

**kaufman's** 13:17
**keep** 9:8 65:4 66:4
71:10
**kensington** 81:21
**kevin** 75:2,3,4
**key** 48:1
**kind** 22:12 64:15
71:23 72:25 91:6
91:9
**knew** 21:3,12
26:10
**know** 7:12,15,16
7:23 11:20 12:10
12:11,19 13:7
14:13 18:17,18,21
18:23 20:14,15
22:7 23:3 24:20
28:20 29:16 33:10
33:12,13,16,22,23
34:24 36:8 50:14
53:4 56:8,18,22
58:13 60:16 62:1
63:17 64:18 65:3
65:9,13 67:5
68:18,21 70:4
71:18,20 73:2
75:11,15 77:7,18
77:19 80:22 82:9
82:12 86:1 88:6
88:11 89:14,15
93:1
**knowledge** 34:11
**known** 91:23,23
92:2.16
**kurtzman** 8:16

**l**

**l** 4:14 5:13,16 6:11
6:12,12 7:20
30:21
**lamonica** 76:6
86:24
**land** 22:11,13

**landrigan** 2:11
26:4,5,23 27:10
27:15,17 30:9
31:13 34:1,24
35:21,25 36:4,7
36:24 38:23 40:9
40:13 41:1 52:10
56:11 74:23 93:3
**law** 13:22,25 18:8
**lawyer** 10:9 26:4
26:6,6,10,12,13
26:16 46:24,25
53:21 85:13 93:4
**lawyers** 84:3
87:10
**learn** 16:10 18:13
22:21
**learned** 16:14
83:20
**lease** 68:3,10 70:2
70:6
**leave** 29:6
**ledanski** 95:3,8
**legal** 52:6 95:20
**legally** 92:18
**lend** 23:5
**lender** 21:8,20,21
21:21 22:3,15
28:19
**lending** 3:2 5:7
**letter** 6:11 13:6,8
27:1 29:15 84:2
86:22 87:3
**let's** 8:22 12:20
21:20 29:6 52:1
58:23 63:11
**levin** 10:9 53:24
71:25 82:2 93:5,6
**levine** 2:3,8 4:20
4:20,21 15:19,21
18:18 23:19 29:9
31:10 32:17 41:1
41:15 42:3 47:4,4

[levine - money]                                          Page 8

47:5,9 53:1,2,6,16
53:25 54:4 55:6
55:12 58:17,19
64:24 65:2,6
69:21 70:10,13
77:2 84:23 86:20
86:25 87:2,5,23
88:8,13 90:25
91:7,19 92:3,7,15
93:5,17,25 94:6
**lewis**   2:10
**liability**   55:10
**license**   4:13
**limited**   90:13 92:5
**lincrest**   68:15,25
**line**   51:18
**liquidated**   70:5
**list**   88:2 90:12
93:23,25
**listed**   58:24 59:1
60:24 61:11 63:1
68:20 71:14 90:22
91:4,13
**listen**   29:18 32:3
44:2 92:5,5
**litigated**   72:7
**litigation**   30:16
39:17 40:5 41:8
45:4,6 72:5
**little**   40:2 65:8
83:17
**live**   81:20,21
**llc**   1:7 2:18 3:2 4:3
5:7 7:5 8:14,23
11:10 16:11 22:21
25:9 28:18 41:7
49:21 50:16 51:11
57:12 58:9,11
64:10 65:10 88:23
89:12,13
**llcs**   89:12
**llp**   2:17 8:13
56:20

**loan**   29:1 50:24
51:7
**loaned**   22:21,25
23:2,8
**loans**   28:23
**located**   14:21 31:3
32:18,21 33:2
**location**   31:3,17
**lone**   49:18 56:24
57:7,12,19,23
58:2 88:18,19,19
88:23 89:13
**long**   33:1 80:12
90:10
**longer**   15:5 72:18
**look**   15:7 39:4
49:24 53:4 84:9
**looking**   71:19
86:19
**loss**   79:13,20 80:4
**lot**   4:24 17:2
77:12,14,17 80:11

**m**

**m**   4:14 5:9,15
7:20,20,20 87:14
**ma**   8:9,9
**madison**   2:19
8:13
**maintain**   14:15
38:1
**making**   38:4
72:12 86:9,11
**man**   76:4
**manager**   14:6,7
**managers**   61:16
61:17
**maniscalco**   76:6
86:24
**march**   37:19
53:24 82:21
**marianne**   1:24
**mark**   2:15 8:17
48:15

**marty**   92:20,21
**matera**   8:16,16,16
**materialize**   68:12
**materialized**
68:12
**materials**   94:1
**matter**   1:5 8:22
53:25 54:1 80:11
**matters**   54:3
**ma'am**   5:5
**mccarthy**   3:1
**mean**   26:14 45:21
48:20 51:23 53:20
54:18 61:12 69:4
84:16,23
**means**   22:8 53:4
68:18 70:4 73:2
84:24
**medications**   79:16
**meet**   75:18 76:15
77:11 80:18
**meeting**   1:20 7:2
60:20,21 75:19,20
75:21,22,25 76:2
76:7,9,10,22
77:20,22 78:3,9
78:16 80:12,23
81:1,13,15,18
82:3,7 90:10,11
**member**   9:11
11:10 14:3 88:23
89:1,8,17
**members**   9:9 89:3
89:12,13
**memory**   79:3,13
79:20 80:4
**mentioned**   79:3,6
**merchandise**   46:3
46:5
**meshulam**   7:15
7:17 59:15,20
**met**   74:10 75:17
75:19 76:21 77:5

77:6,12 82:4
**michael**   2:8 4:20
**middle**   5:15
**mike**   89:5
**mill**   1:7 4:3 8:23
10:18,21 11:10
25:5,19 63:6
**million**   12:2,4
17:9 21:23 22:19
22:22 23:4,9,17
40:18,19 44:16
45:11,11 46:2
50:12,24 51:7,22
61:2 67:25 71:8
72:16 73:12,18
74:5 90:6
**mills**   4:15 54:5,7
55:3,6
**mind**   7:24 20:21
**mine**   54:12
**mineola**   95:23
**mintz**   10:9 71:25
93:5,6
**minute**   63:3
**minutes**   76:11
78:20
**mistake**   77:8,9,11
83:13
**mister**   7:23
**mitch**   47:4,5
**mm**   9:4
**moment**   4:23
73:21
**money**   12:9 21:13
21:15 22:9,10,12
22:25 23:2,7,8
24:17 29:4 34:11
34:18,23 35:8,11
35:13 36:3,16
37:22 38:12,18,22
38:23,24,25 39:6
39:7 40:20 42:3,7
42:12,13,15 43:5

43:19,25 44:20
45:1,11,14 50:22
51:14,18,21 52:1
52:2,5,5,8,11,19
52:24 53:15,23
54:4,9 56:7,8,10
56:13,15 66:24
67:3 69:6 90:5
**monica** 76:6
**monies** 43:22 44:3
**montauk** 76:3
77:15,24 80:12
81:3,8,16
**month** 74:12
**months** 37:12,21
**morning** 81:14,15
**mortgage** 21:3,6
21:14,20 25:6,13
25:14,25 26:18
27:24 28:10,18
29:22
**moskowitz** 8:9
**mumble** 79:22
**must've** 68:22

**n**

**n** 2:1 4:2,14 5:6
5:16 95:1
**name** 4:8,16 5:13
5:15 7:11,12 8:23
9:22 12:6,18
21:21 23:8,14
44:4,18 73:8
91:23 92:2,17,19
93:4
**names** 88:11
91:24
**nash** 31:10,11
41:1,15 42:2 47:8
75:2,3,5 76:10,15
76:21 78:20 87:1
88:6
**nature** 20:6 27:22
65:23 67:16 71:13

83:2
**near** 75:23
**nearly** 86:22
**necessarily** 24:21
**need** 19:2 29:15
60:22 63:10 64:21
65:4,12 84:5
90:14 93:20,22
**needed** 13:7 20:8
25:18 51:23 78:3
**needs** 8:19 25:22
**negotiate** 39:15
40:3,14,17 41:2
69:15 85:15
**negotiated** 85:17
**negotiation** 30:18
57:25
**neurological** 80:5
**never** 27:17,18
29:24 41:24 61:18
89:19
**new** 1:2 2:13,20
3:4 4:13 9:13
41:19,22
**north** 51:6
**note** 4:19 8:20
36:17,20 37:2
39:6 92:9
**notice** 93:9,16
**novartis** 10:18,19
11:1,7,13,20
14:21,25,25 15:5
15:14 17:3 19:24
20:7 21:4,7,13
24:2,11,16,20
25:8 30:18 31:3
34:14,15 36:4
39:11,12,16,17
44:12,17 47:12,15
47:16,22 55:13
56:21 58:21 59:23
60:13 72:15,16
82:25 83:22 85:9

85:14,21,25 87:10
**number** 13:10
37:23 73:12,25
**numerous** 44:22
**ny** 1:15 2:6,13,20
3:4 95:23

**o**

**o** 1:23 4:2,14 5:6
7:10,11 95:1
**o'toole** 1:24 4:3
4:10,12,18,23 5:8
5:10,12,14,17,19
5:21,23,25 6:3,5,7
6:9,11,13,15,17
6:20,23,25 7:4,7,9
7:11,13,17,19,21
7:23 8:1,3,5,8,11
8:15,19,25 9:3,5,8
9:11,13,16,19,22
9:24 10:2,7,10,14
10:16,20,25 11:3
11:6,9,12,15,17
11:22,25 12:3,6,8
12:11,15,17,20
13:1,4,12,15,17
13:20,22,24 14:3
14:6,8,11,15,19
14:23 15:2,4,7,12
15:16,20,22,25
16:3,6,9,13,16,18
16:21 17:1,6,9,11
17:13,16,18,21,24
18:2,5,8,12,16,19
18:21,24 19:2,7,9
19:12,15,18,21
20:1,5,10,13,19
20:25 21:2,5,10
21:16,19,25 22:2
22:7,9,11,15,18
22:20,24 23:4,7
23:11,14,16,21,23
23:25 24:4,10,14
24:19,23 25:2,7

25:12,15,17,23
26:3,5,9,12,16,21
27:2,4,7,10,14,22
28:1,3,5,7,14,19
28:22,25 29:5,11
29:16,24 30:1,3,6
30:8,12,15,20,22
30:24 31:2,5,7,9
31:12,14,17,19,21
31:24 32:3,6,8,10
32:12,14,16,18,21
32:24 33:1,4,10
33:13,15,18,21,23
33:25 34:4,7,13
34:15,17,20,23
35:1,5,7,11,18,21
35:24 36:2,8,11
36:14,19,23,25
37:4,7,10,14,16
37:18,21 38:1,4,9
38:11,15,17,21
39:2,5,9,14,19,22
39:25 40:8,10,13
40:15,17,22,24
41:5,7,10,12,14
41:17,19,22,24
42:2,6,8,10,12,15
42:17,19,21,24
43:2,4,7,9,11,13
43:16,19,22 44:1
44:7,9,11,15,20
44:24 45:3,6,10
45:14,17,21,24
46:5,9,11,14,17
46:20,22,25 47:2
47:5,12,14,16,19
47:25 48:5,8,11
48:13,16,18,21,24
49:2,6,9,11,16,20
49:23 50:3,5,8,11
50:15,18 51:1,5,9
51:13,17,20,24
52:4,7,10,13,15

[o'toole - owner]                                                              Page 10

52:17,23 53:2,4,8
53:11,14,18,22
54:1,3,6,9,11,13
54:15,17,21,23
55:1,3,5,8,12,16
55:19,24 56:2,5
56:10,13,17,20,24
57:2,5,7,11,14,19
57:23 58:2,5,8,14
58:18,20,23 59:6
59:9,12,14,16,19
59:21,23 60:1,4,7
60:10,12,16,19
61:5,7,10,15,18
61:20,23 62:1,4,9
62:12,14,17,19,22
62:25 63:5,9,13
63:16,18,21,24
64:2,4,7,10,13,15
64:17,21 65:1,3,7
65:13,17,19,22
66:1,6,9,11,16,19
67:1,6,10,16,19
67:22,24 68:3,5,7
68:9,13,15,18,20
68:25 69:3,8,12
69:15,18,20,22,24
70:1,4,8,11,14,17
70:20,24 71:1,4,7
71:10,13,18,22,25
72:4,7,9,11,13,15
72:18,21,25 73:4
73:6,10,15,17,22
73:25 74:4,8,11
74:13,16,21,23,25
75:2,4,7,10,13,16
75:18,21,24 76:2
76:5,9,12,14,17
76:19,21,24 77:2
77:4,6,10,14,17
77:21,24 78:2,6
78:11,13,16,19,24
79:8,12,15,19,22

80:1,3,8,10,18,22
81:1,5,7,10,12,15
81:18,20,22,25
82:2,6,9,12,14,17
82:20,24 83:2,6,9
83:15,17,24 84:1
84:12,15,17,19,22
84:25 85:4,7,12
85:17,20,23 86:3
86:6,9,13,16,22
87:1,3,6,14,18,20
87:25 88:4,9,11
88:14,17,19,22,25
89:3,6,8,11,15,17
89:20,23 90:1,4,8
90:16,18 91:3,8
91:11,13,17 92:5
92:8,19,21 93:7
93:11,18 94:2,4
**object** 8:20 91:19
**obligations** 45:19
   45:22
**obtain** 28:10
   29:22
**occur** 15:17 43:20
**occurred** 15:16
   25:13 33:6 47:25
   76:3 78:16
**occurs** 20:19
**october** 19:16,22
**office** 32:5,6
   47:14,21 76:5
**officer** 14:3
**oh** 6:7 27:3 41:4
   54:2 62:14 71:21
**okay** 4:12,18,23
   5:3,21 6:5,8,13,15
   6:17 7:13,21 8:5,8
   8:19,20 9:8 10:5
   10:10,14,16,20
   11:12,18,22 12:3
   12:20 13:4,24
   14:8,15,19 15:4

15:12,16,25 16:3
16:9 17:1,1,2,13
18:12,16 19:2,15
19:21 20:5,10,12
20:18,25 21:10,16
22:2,18,20,24
23:11,16,21,23,25
24:10,14,19,23
25:2,7,17,23
26:16 27:10,14
28:1,2,6,8,19,25
28:25 29:8,11
30:3,6,12 31:12
32:3,12 33:1,1,4
33:15 34:4,7,13
35:1,7,11 36:9,25
37:14 38:1,21
39:9,22 40:22
41:10,12,19 42:2
42:6,19 43:4,9,19
43:22 44:7,11,15
45:10 46:11,17,22
47:5,25 48:5
50:11,15 51:1,9
51:13,17,24 52:10
53:19 54:3 55:8
55:12,19 56:5
57:2,11 58:8,14
58:19,23 59:9,11
59:16,21 60:7,19
62:12 63:13,24
64:4,10,15,17
65:1,13 66:9,11
66:12 67:10,19
68:13,15 71:4
72:11,13,15,21
73:10,22 74:8,13
74:16,21 76:2,9
76:14,19,21,24
77:4,10 78:2,11
78:16 79:2,8,12
79:19 80:2,8,10
80:18,22 81:1,7

81:12,22 83:2,6
83:15 84:1,3
85:12 86:6,9,14
87:2,5,14,20 88:8
88:19,25 89:11
90:4,8 91:13,14
92:23 93:7,10,18
94:2
**old** 1:7 4:3 8:23
   10:18,21 11:10
   25:5,19 41:24
   54:5,7 55:3,6 63:5
   95:21
**once** 44:9
**online** 63:21
**opened** 10:1,8
**opening** 10:11
**operating** 14:8,11
**operation** 87:10
**opportunity**
   90:13 92:6,10
**option** 50:16
**order** 20:7,8,15
   21:19 25:5,21
   27:18 55:9 86:17
   92:24 93:3
**ordermark** 71:7
   71:15,23
**organizational**
   10:3 49:20,24
**original** 12:23
**osmosis** 35:13
**ostensibly** 27:16
**outcome** 41:8
**outlining** 86:23
**owed** 63:4,6 65:11
   69:6 73:18,19,19
   73:20
**owes** 51:23
**owned** 33:7 48:22
   50:1 63:14,24
**owner** 26:17

[ownership - public] Page 11

ownership 19:23 20:2,23 21:11 22:4 24:2,24 39:10 49:4,17
owning 22:5 49:15
owns 24:11,11,16 24:20 49:9,11,13 50:5 63:16

**p**

p 2:1,1 4:2
p.c. 2:3
p.m. 93:19
pacer 13:10
pacific 70:8,9,11
paid 41:15 42:6 42:12 52:7,8,23 53:1,1 54:4 55:21 56:15,21 67:3 72:9,14 87:18 90:5 92:25 93:3 93:16
paper 32:3,4
papers 31:19 65:12,15
park 49:4
parking 77:12,14 77:17 80:11
part 14:2 89:9
particular 28:12 48:6 54:11
parties 8:6 29:12 29:20 37:1
partner 15:11
partners 2:18 8:14 15:12 16:11 22:21 24:22,25 25:5,9 39:18,19 40:5 48:24 49:9 49:14,17,21 50:1 50:16,21 51:11 57:12 58:9,11,15 90:6

party 5:6 27:19
pay 42:2 52:11 53:2,6,11 55:24 56:2,6,6
paying 27:24
payment 11:22 12:1 45:12 51:13 72:18
payments 60:7
pc 4:20
penalty 68:21
pendency 38:11 52:7
pending 88:17
people 4:24 20:13 28:8 65:25 66:2 90:9,14
percent 9:11 11:10 25:1,2,3 49:4,4 50:2,5,17 50:18,25 57:22,24 62:6 88:25 89:12
percentage 50:20
performed 60:10
performing 70:6
period 16:14 86:13 87:7
perjury 68:22
person 23:2,8 73:8 74:17 87:9
personal 26:6 42:25 43:1,3
personally 49:15
peter 73:9 74:8,17 77:19,23 78:6,7 78:13 79:5 80:21 80:21,22 81:10,13
petition 8:22 12:21 13:2,5,8,25 18:9,13 58:25 59:2,3 63:10 64:8 67:2,15 68:23 71:14 72:1 87:23

87:25
phase 20:16
phone 27:6
physically 48:2
pick 19:9 26:23 27:11,16 30:9 31:11 41:1 47:8 52:8,11,21 55:21 56:7,11,15 74:25 82:12
pictures 53:18
piece 40:15 41:2 44:25
pine 49:18 56:24 57:8,12,19,23 58:2 88:18,19,19 88:23 89:13
place 31:7,9 47:7 59:22,23 64:16
plains 1:15
platform 12:15 46:6 54:18 63:22
play 85:9
please 4:8,19 79:22
point 24:1 47:16 90:25
possession 31:15 37:10 86:14
post 87:23,25
posted 50:23
potentially 31:10
predates 55:16
prefer 83:11
premises 47:9 48:2
prepetition 87:23 87:25
presence 63:22
present 27:4 65:19
presentment 93:9

previously 5:25
principal 26:17
prior 36:4 55:13 66:20 76:9,22
privilege 27:15 84:8
probably 15:3 55:7 83:18
problem 26:18
proceed 4:24 5:3
proceeding 4:25 40:1
proceedings 92:2 94:7 95:4
proceeds 52:11,19
promissory 36:17 36:20 37:2 39:5
property 10:15,16 11:1,7,13 14:18 14:21,24,25 15:5 15:9,14 16:1,4,10 16:14 17:4 19:24 20:3,23 21:4,7,22 22:4,5 24:2,12,16 24:20 25:8,18 31:3 39:11,12,16 39:17,21 40:21 44:25 47:19,21,22 50:13,23 51:6 59:24 60:13 61:14 61:16 63:8 66:3,4 66:8 73:14 79:4,6 79:10 82:25 85:9 85:14,21,25 87:10
proposed 41:14 42:3 67:25 68:2
proposing 41:22
provide 66:13 70:7 71:1 73:1,5 83:25 90:23 93:23
provided 45:8
public 70:10

pull  4:4,5
purchase  11:6,13
   17:6,15,16,22
   21:4,7 24:15
purchased  15:25
   17:3
purchasing  10:15
   10:17
purportedly
   47:20
purpose  9:17
   10:11 19:18 21:6
   57:3,7
purposes  4:12
pursuant  62:4
put  50:12 51:10
   51:15 52:5 68:23
   88:2,10
putting  28:1
puzzle  84:6
puzzling  65:8

q

quarropas  1:14
question  7:24
   21:25 28:8 29:17
   29:18 40:24,25
   41:13 44:2,2
   49:13 84:22 88:8
   88:13,17 89:11
   90:15
questioning  90:13
questions  43:2
   52:17 83:12 90:14
   91:15,20 92:6,9
   92:10,23
question's  40:2
quickly  92:12

r

r  1:23 2:1,22 4:2
   5:16 95:1
rabbi  24:5
rabbinical  24:5

rdd  1:3
reach  75:13 78:14
read  7:24 20:14
   29:5
real  34:4,6,8
   62:22 64:8
really  24:10 49:6
reason  34:8 68:22
   79:9
recall  33:17,18
   61:1 79:17 80:6
   92:14,15
receive  33:8 34:24
received  13:8 39:2
recognize  13:12
recollection  9:25
   15:23 30:4 48:5
   58:21 67:10
reconcile  49:3
record  4:13 6:20
   9:8 19:12 39:4
   79:16 90:19,25
   91:20 95:4
records  14:16,20
   14:24 31:2,14
   35:18 47:6 84:6
refer  10:12 11:1
referring  11:20
   12:17 19:5 29:9
   39:23 59:16
refers  61:3
reflect  35:19
   51:25
reflected  34:20
reflecting  39:6
reflects  4:14
   36:15
refresh  9:24 15:22
   30:3 58:21
reisman  8:18
   39:25 50:9
reisman's  50:22
   51:2

reiss  56:20 58:5
reiterate  60:19
related  18:3 31:21
   32:4 39:17 40:1,5
   62:9,12 63:25
   64:13 70:18 72:1
   73:4 82:15 85:14
   86:10
relation  6:25 7:21
   8:1,3,5 13:17
   80:10
relationship  67:2
relative  20:23
   30:17 31:25 85:20
   85:24 87:9
release  50:22
released  50:23
   51:3,7
remember  9:23
   10:5 19:20 27:9
   30:2 34:2,3 35:16
   39:3 43:12 47:23
   48:7 53:7,8,10
   54:8 55:23 56:19
   59:5,8 65:12
   73:20 76:18 79:25
   85:3,5,10,11,11
   86:2 89:25 90:2,3
remembering
   81:5
remembers  85:4
removed  48:2
repaid  36:12,15
   36:16
repayment  39:6
repeatedly  29:18
rephrasing  44:2
represent  27:16
   55:8
represented  5:25
representing
   26:11 27:11 58:5
   65:23 73:7 91:2

91:21
requesting  87:6
require  28:16
required  21:21
   22:6,16 25:20
requiring  22:3
   28:19
research  91:9
reserve  5:1
reserves  92:13
resolve  24:6
respect  19:3,23
   20:21 21:11 39:10
   46:1 55:10 67:7
respectfully  65:3
response  13:8
   71:10
rest  90:12
result  33:4,6
   34:24 45:6
retained  5:1 27:17
   30:12 57:2 80:13
retentions  42:4
retrieve  87:3
returned  23:17
   45:15
returning  4:15
review  18:9
rfg  69:20,20
rhetoric  92:8
right  4:7 6:5,22
   9:12 10:24 11:8,9
   13:11 14:22 17:5
   17:9,21,23 21:9
   24:8,9 26:20 29:3
   29:5 33:24 34:19
   36:13 37:9 38:4,6
   39:8,24 41:18,21
   41:23 42:1 47:5
   47:11,13,18 49:1
   49:2,4,5,6,7,8,10
   50:4,20 53:13
   54:14,20,20,20,22

**[right - says]**                                                      Page 13

55:11,16,17 56:12
56:22,23 57:1,9
57:10,15 58:3,4,7
58:10,12,16,23
59:25 60:15 61:18
61:19,22,23 62:5
62:8,11 64:9,10
64:19,20 65:14,16
66:18 67:16,23
68:8,14 69:25
70:13,20 71:25
72:17,19,20 74:14
75:10 76:22 78:1
78:17 80:8 81:7
81:22 83:17 85:19
85:22 88:24 90:8
91:14 93:18 94:4
**rights**   5:1 92:13
**road**   2:5 10:18,21
95:21
**robbed**   79:11
**role**   85:9,20,23
**romero**   5:22,23
72:21 73:7,7,8,16
73:16 74:6,9,17
92:24 93:15
**room**   1:14 20:13
90:8
**rosemarie**   8:16
**rounding**   37:23
**rs**   1:7 4:3 8:23
11:10 25:4,19
54:5,6 55:3,6 63:5
**rubik's**   84:7
**runs**   74:6

**s**

**s**   2:1 4:2,14 5:6
7:20
**salamon**   2:4 4:9,9
4:11,14,17.21 8:1
8:24 9:2,4,7,10.10
9:12,15,18,21,23
10:1,5,8,13,15,18

10:24 11:2,5,8,11
11:14,16,21,24
12:2,5,7,7,9,10,12
12:13,16,19,23
13:3,11,14,16,19
13:21,23 14:1,5,7
14:10,13,17,22
15:1,3,6,10,15,18
15:24 16:2,5,8,12
16:15,17,20,23
17:5,8,10,12,15
17:17,20,23 18:1
18:4,7,11,15,17
18:20,22 19:1,6,8
19:11,14,17,20,25
20:4,7,10,12,18
21:1,3,9,12,17,24
22:1,6,8,10,13,17
22:19,23 23:1,6
23:10,13,15,20,22
23:24 24:3,9,13
24:18,22 25:1,4
25:11,14,16,20
26:2,4,7,10,14,20
26:23 27:3,6,9,13
27:21,24 28:2,4,6
28:12,15,21,24
29:3,8,14,23,25
30:2,5,7,11,14,19
30:21,23 31:1,4,6
31:8,11,13,16,18
31:20,22 32:2,5,7
32:9,11,13,15,20
32:23,25 33:3,9
33:12,14,17,20,22
33:24 34:2,6,10
34:14,16,19,22,25
35:3,6,9,16,20,23
36:1,6,9,13,18,22
36:24 37:3,6,9,12
37:15,17,20,25
38:3,8,10,14,16
38:19 39:1,3,8,13

39:18,20,24 40:7
40:9,12,14,16,18
40:23 41:4,6,9,11
41:13,16,18,21,23
42:1,5,7,9,11,14
42:16,18,20,23
43:1,3,6,8,10,12
43:15,18,21,25
44:4,5,6,8,10,14
44:18,19,22 45:2
45:5,9,13,16,19
45:23 46:3,7,10
46:13,16,19,21,24
46:25 47:1,3,11
47:13,15,18,23
48:17,19,23 49:1
49:5,8,10,13,19
49:22 50:1,4,7,9
50:14,17,25 51:4
51:8,12,16,19,22
52:3,6,9,12,14,16
52:22 53:1,3,7,10
53:12,17,20 54:2
54:5,8,10,12,14
54:16,20,22,25
55:2,4,7,11,15,18
55:23 56:1,4,8,12
56:16,19,23 57:1
57:4,6,10,13,17
57:21.25 58:4,7
58:13.22 59:5,8
59:11,13,15,18,20
59:22.25 60:3,6,9
60:11.15,18 61:4
61:6,9,13,17,19
61:22.25 62:3,8
62:11.13,16,18,21
62:24 63:2,7,12
63:15.17,20,23
64:1,3,6,9,12,14
64:16.20,23 65:12
65:16 66:10,11,15

66:18,25 67:5,8
67:14,18,21,23
68:2,4,6,8,11,14
68:17,19,24 69:2
69:5,11,14,17,19
69:23,25 70:3,7
70:16,19,22,25
71:3,6,9,12,16,21
71:24 72:2,5,8,10
72:12,14,17,20,23
73:3,5 76:25 79:2
79:14,15,18,21,24
80:2,7 82:17,22
83:3,19,23,25
84:11,14,16,18,21
84:24 85:3,6,10
85:15,19,22 86:1
86:4,8,12,15
87:13,17,19 88:3
88:6,10,12,16,18
88:21,24 89:2,5,7
89:9,14,16,19,22
89:25 90:3,7,24
91:6,9,12,18,22
91:25 92:18,20,21
92:22,22 93:2,6
94:3
**salamon's**   43:24
**sale**   15:13,13 16:7
16:24 17:3,11,14
17:14 33:4,5,7,8
36:5 52:11 66:20
66:20
**satisfactions**   45:7
**saw**   14:24 67:15
**saying**   14:20
16:19 25:8 29:1
31:24 37:1 38:17
38:24 52:17 60:14
66:12 71:11 73:17
74:4 93:12
**says**   67:24 86:4
93:11,12

[scarsdale - talking]                                                      Page 14

scarsdale   2:6
schedule   19:4,15
  19:22 67:11,13
  70:15 71:19 90:17
scheduled   90:21
seat   4:6
second   31:9 78:20
  86:23
secure   25:13,14
see   46:7 66:20
seek   86:17
sell   12:15 16:4
sells   64:7
send   14:13 42:22
  93:23,25
sent   13:6,9 86:22
separate   28:4
separately   58:8
  86:19
september   15:17
  20:19 33:6 37:16
  52:20,20 55:14
serve   8:21
services   72:25
  90:22
serving   8:21
sheet   21:22
shefa   70:8,8,10,11
sheppe   56:20 58:5
  67:3
shipping   70:17
shouldn't   59:1
  62:25 79:7 88:1
show   13:4 37:7
  55:9 80:11
showing   21:22
sign   12:22 66:14
  93:3
signatory   43:13
signature   12:23
  13:13,15
signed   12:24,25
  13:2,25 18:9,9

40:4,4 66:16,19
  66:22 68:3,10,21
  92:24 93:2,6
similar   36:14
sir   4:7,16 5:8 6:7
  8:22 13:4 22:7
  57:16 65:19 68:22
  69:9 73:6 79:12
  79:13 80:10 84:20
sit   65:14 67:11
  88:5
six   37:21
slipping   92:9
small   92:10
sold   16:10,14 46:3
  82:25
solutions   95:20
somebody   4:4
  7:15 22:21 48:8
  77:9
someplace   35:12
son   12:5,6,8 43:9
  45:15 46:9,10,16
  51:14,22,23 85:15
  85:17 89:5,6
sons   46:11,15
sonya   9:3,8
son's   43:6,7,20
  54:12,13
soon   86:16 90:9
sorry   5:4 6:7
  17:16,16,20 19:25
  21:24 27:3 33:21
  41:11 59:6 62:13
  88:16
southern   1:2
space   60:13
speak   29:6 55:5
  74:8,11,18,21,23
  75:3,4 82:2,4,6,24
  88:14
speaker   91:17

speaking   66:12
  90:18
special   9:16
specific   42:21
  44:16 64:17
spell   5:10 7:9
spelled   4:14
spent   24:5
split   57:8
spoke   55:12 74:19
  74:22,25
spoken   11:18 75:2
  82:14,21
stabilize   40:23
star   33:10,16,23
  34:1,17,23 35:1,7
  35:15 36:3,7,16
  36:20 37:3,4,23
  38:17 51:15,16
  52:5
start   4:7 5:3 8:22
started   24:1 30:18
  52:24
state   4:8,13 9:13
  45:4 55:9 92:1
statement   34:21
statements   38:5,7
states   1:1,13
stay   79:6
stephen   8:12
steve   89:24
steven   2:22 47:2
  56:22,24
stop   20:10 21:5
straight   38:20
street   1:14 2:12
  3:3
structure   49:21
style   67:24
subject   45:4
submitted   29:10
submitting   64:24

subsequent   16:6
  20:22 33:5 65:15
subsequently
  20:21
suffer   79:20 80:4
suffern   2:18 8:14
  15:11,12 16:11
  20:22 22:21 24:22
  24:24 25:5,9
  39:18,19 40:5
  48:23,24 49:4,9
  49:13,17,21 50:1
  50:12,16,21 51:11
  51:21 57:8,12
  58:9,11,15 90:6
suggests   36:19
suite   95:22
supermarket
  32:23,24,25 33:2
support   60:22
supporting   67:22
supposed   14:1
  21:14 26:24 39:11
  45:15 61:9 63:7
supposedly   25:5
sure   36:6 51:19
  55:15 60:6 78:5,8
  78:9
surprise   88:1
surveys   72:12

t

t   77:14 95:1,1
table   35:14 52:1
  73:2
take   14:1 42:22
  61:13 79:16
takes   78:19
talk   21:20
talked   78:20 88:1
talking   10:21 11:4
  28:2,7 50:17
  53:12 58:17

telephone 27:5,5
27:7
tell 23:2 33:19
46:22 52:15,16
53:9 63:1,9
tells 81:10
ten 33:3
tenant 68:1,2
69:23,24 70:1,1
tenants 86:1
87:11
tense 14:19
terms 7:13 22:11
87:15
testified 91:22
testify 92:1
testifying 82:20
92:16
testimony 36:2,11
thank 5:5,8 8:11
8:15 90:20 94:4,5
94:6
that's 6:11,17
7:15 13:2 17:17
20:16 25:9,22
31:7 39:22,23,25
40:24 41:6 49:6
49:22 51:6 56:10
58:10,24 61:20
62:1,7 63:4 66:11
67:1 68:13 69:6
72:16,18 78:1,12
84:1,22 88:7 91:3
91:4,13 94:4
there's 4:24,25
10:21 13:1 20:15
24:1 27:15 30:15
39:5 40:1 58:9,10
60:16,21,23 61:1
64:22 66:12 74:2
89:12 90:13 91:3
92:5,10 93:12

they're 40:19 47:6
62:12 86:16
thing 10:21 62:16
64:18 83:14 87:4
91:10,11
things 60:21
62:19 68:21 73:3
think 4:25 7:24
13:3 16:20 18:22
18:24 29:9 34:17
42:9 49:19 51:8
56:4,16,17 60:24
62:14 68:4,11
90:21 91:1 93:11
thinking 62:13,14
third 27:19
thirty 57:21
thomas 2:11
thought 67:9 77:9
78:4,8,25
thousand 34:9
54:24,24,25 55:1
time 9:9 12:21
14:23 15:4,13
16:9,13,24 19:13
19:21 23:19,20
24:4 30:9,18
33:25 47:20 50:11
51:2,5,10 58:14
58:17 63:2 66:22
76:15,16 82:25
90:11
times 82:21,23
tina 8:9
title 25:8,18 38:23
today 5:3 24:23
65:14 67:11 74:17
84:1 86:7 88:5,11
told 26:16 29:4
52:12,13 63:3,5
63:11 69:5 77:21
79:21,24 80:3,24
93:3 94:3

tom 26:4,5,10,23
27:10 30:8 31:13
34:1 36:24 40:9
40:13 74:23
trans 70:8,9,10,11
transaction 30:17
34:5,8 52:20
55:13 56:22 62:22
90:6
transcript 20:14
64:19 95:4
transcripts 29:6,6
transfer 20:22,22
25:13 34:1 35:8
54:6
transferred 21:18
25:4,8,9,19 34:9
52:1,21 53:15,20
53:24 54:4
transfers 33:5
tried 40:14
true 49:16 95:4
trustee 1:25 8:21
8:21 77:22 78:9
84:4
trustee's 77:22
try 40:17
trying 24:5 34:3
62:9 66:5 76:18
83:4 84:7
tuesday 60:20
78:17 81:9 88:2
turn 58:23 84:5
93:21
turned 83:19
turning 47:6
two 10:22 92:23
type 80:4

uhcs 6:18,21
70:20
ultimately 21:7
understand 10:12
10:20 11:3 16:23
18:5 19:25 21:25
22:1,24 23:16,19
26:8,9 30:15
41:17 45:14 49:23
57:17 62:10 64:21
65:22 71:12 79:2
84:9
understanding
15:8 24:15 25:12
25:18,24 65:24
understood 17:13
17:21,24 20:20,24
26:7 34:10 38:19
49:22 57:21 87:12
united 1:1,13
unsecured 59:1
upward 74:4
use 11:19 30:20
30:24 33:5,5
70:22 92:12
uses 12:15
uziel 5:9

**v**

v 5:6
value 22:9
verify 32:2
veritext 95:20
versus 49:4

**w**

want 4:4,6,23
20:9 28:13 29:1
29:13,17,21 33:18
53:8 79:7 86:23
88:7
wanted 22:13
39:20 77:18,19
warehousing
70:22

**u**

u 5:11,13 6:17
7:20
uh 80:1

**wasn't**  16:8 23:7
 48:9 66:7 67:15
 72:14 75:12 76:8
 78:4,8,9 79:11
 80:15
**water**  2:12
**way**  25:22 36:10
 36:25
**week**  58:20 74:18
 75:6,22 76:3
**went**  19:8 36:3,7
 36:10,11,14 38:20
 46:8 67:14 80:20
 81:16,19
**weren't**  7:3 93:16
**we'd**  86:23
**we'll**  4:7 5:3
 64:23,24 83:18
**we're**  5:2 6:20
 10:20,25 11:3
 20:17 28:1,2,7
 37:23 40:20 79:3
 91:19 93:19,25
**we've**  11:18 27:14
 91:1
**whatsoever**  31:19
 32:4
**what's**  7:7 23:14
 59:9 62:19 63:4
 64:11 68:5 69:20
 70:21 71:7 72:21
 93:4
**when's**  37:11
**where'd**  75:18
**white**  1:15
**whosever**  86:13
**who'd**  48:11
**who's**  59:14,17
 63:24 66:23 80:13
 82:20 83:9 91:1
**wife's**  13:19,21
**wilson**  8:9

**wire**  35:12 42:22
 42:23
**wired**  56:11
**wires**  43:16
**withdrawing**  68:9
**withdrawn**  20:1
 28:9 37:1 40:13
 55:20,20 68:4,6,7
 70:3,5 86:10
**withdrew**  41:25
**witness**  92:4
**word**  68:5
**words**  11:19 59:6
**wordsmithing**
 93:12
**work**  48:1 59:13
 64:14,15
**worked**  40:3 41:1
**working**  39:15
 85:11
**writing**  51:25
 85:8 87:8
**written**  45:22,24
 45:25 50:19 62:4
 66:9,12 67:6,8,17
 67:20 69:8,9,13
 69:13 84:2,6,12
 84:18,19,25 86:10
**wrong**  70:12
 83:14

| x |
|---|

**x**  1:4,10

| y |
|---|

**y**  30:21
**yarmulkes**  62:19
 62:21,23 64:7
**ye**  48:10
**yeah**  4:11 5:24
 7:18 13:23 42:11
 43:8 48:17 55:18
 59:18 61:7 62:18
 64:24 76:11,17
 77:16 78:24,24

 81:11,17 82:19
 85:10 88:21 89:7
 91:16 92:7
**year**  9:1 15:3
 16:17,18 24:8
**years**  33:3
**yehuda**  4:9,14
 9:10 82:17,22
**yidel**  30:21
**yidel's**  32:25 33:2
**york**  1:2 2:13,20
 3:4 4:13 9:14
**you'd**  4:7
**you'll**  4:18
**you're**  8:1 12:17
 14:19,20 16:18
 17:1,18 19:4 25:8
 27:2 29:18 36:9
 37:1 38:17,24
 39:23 42:21 44:1
 50:17 51:24 52:3
 53:12,18 59:16
 60:4,14 62:14
 64:2 65:7,19,23
 66:12,13 71:1
 73:6,7,17 74:4,13
 80:12 81:5,7
 91:22 92:2 93:12
**yunger**  8:17 27:12
 27:20 48:15,16
 58:10 79:11

| z |
|---|

**z**  5:11,13

| , |
|---|

**'16**  9:2 15:19,21
 44:8
**'17**  15:21,22