# *Exhibit A*

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------

In Re:                          Chapter 11

SUFFERN PARTNERS LLC,           Case No.

                Debtor.         21-22280-shl

-------------------------------

RS OLD MILLS RD, LLC,

                Plaintiff,

v.                              A.P. No.

SUFFERN PARTNERS, LLC,          21-07027-shl

                Defendant.

                -   -   -

            August 24, 2021

                -   -   -

        Remote oral deposition of

AVROHOM KAUFMAN, conducted at the location

of the witness in Brooklyn, New York,

commencing at 9:30 a.m., on the above

date.

            Magna Legal Services

                866-624-6221

                www.MagnaLS.com


                        Marie Foley

                        RMR, CRR



Page 2

1

2    ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

3

4    LOCKE LORD LLP

5    BY: DONALD E. FRECHETTE, ESQUIRE

6         20 Church Street

7         20th Floor

8         Hartford, Connecticut   06103

9         860.525.5065

10        dfrechette@lockelord.com

11   BY: CASEY HOWARD, ESQUIRE

12        Brookfield Place

13        200 Vesey Street

14        20th Floor

15        New York, New York   10281

16        212.415.8600

17        choward@lockelord.com

18        Representing the Plaintiff

19

20

21

22

23

24

25



Page 3

 1

 2   ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

 3

 4   THOMPSON COBURN HAHN & HESSEN LLP

 5   BY: STEPHEN J. GRABLE, ESQUIRE

 6       STEVEN R. AQUINO, ESQUIRE

 7       GILBERT BACKENROTH, ESQUIRE

 8       488 Madison Avenue

 9       New York, New York  10022

10       212.478.7200

11       sgrable@hahnhessen.com

12       Representing the Defendant

13

14

15   REBAR KELLY

16   BY: PATRICK J. HEALEY, ESQUIRE

17       800 Third Avenue

18       28th Floor

19       New York New York  10022

20       212.858.9970

21       phealey@rebarkelly.com

22       Representing the Riverside Abstract, LLC

23

24   ALSO PRESENT REMOTELY:

25       David Solomon



Page 4

```
 1
 2                        -   -   -
 3                 TRANSCRIPT INDEX
 4                                        PAGE
 5    APPEARANCES...................... 2 - 3
 6    EXAMINATION OF AVROHOM KAUFMAN:
 7    BY:  MR. GRABLE...................
 8    SIGNATURE PAGE...................
 9    ERRATA...........................
10    REPORTER'S CERTIFICATE...........
11
12                    -   -   -
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1

2                              -   -   -

3                          9:31 a.m.

4                              -   -   -

5            MR. GRABLE:  Good morning.

6     Stephen Grable on behalf of Suffern

7     Partners LLC.

8            It is 9:30 a.m. on August 24th,

9     2021.  We are here for the deposition

10    of Avrohom Kaufman as noticed in the

11    matter RS Old Mills Road LLC versus

12    Suffern Partners LLC.

13           On the Zoom conference right now

14    is counsel for RS Old Mills Road LLC,

15    as well as Avrohom Kaufman, as Casey

16    Howard and Donald Frechette of the

17    Locke Lord firm.  You have myself,

18    Steven Grable, Steven Aquino, and

19    Gilbert Backenroth of the Thompson

20    Coburn Hahn and Hessen LLP firm for

21    Suffern Partners LLC.  And Patrick

22    Healy is on the line as well on behalf

23    of Riverside Abstract, LLC.

24           The witness has not yet arrived

25    We will wait another 15 minutes to



Page 6

1

2          9:45.  Hopefully he's just running a

3          few minutes late, and then we'll come

4          back on the record and see if he's

5          here.

6               We can go off.  Thank you, Ms.

7          Foley.

8                   (Recess taken.)

9               MR. GRABLE:  It is now 9:45 a.m.

10              Avrohom Kaufman has still not

11         appeared for his deposition.  We will

12         give him another 15 minutes until 10

13         a.m., and if he doesn't appear at that

14         time, we'll take the default.

15              We can go back off.  We'll come

16         back at 10.

17              Thank you, Ms. Reporter.

18                  (Recess taken.)

19              THE STENOGRAPHER:  All parties

20         to this deposition are appearing

21         remotely and have agreed to the

22         witness being sworn in remotely.

23              Mr. Kaufman, if I could ask you

24         to raise your right hand, please.

25                         -   -   -



Page 7

1

2    AVROHOM KAUFMAN, the Witness herein,

3        having been first duly sworn by a

4        Notary Public in and of the State of

5        New York, was examined and testified

6        as follows:

7    EXAMINATION BY

8    MR. GRABLE:

9        Q.    Good morning, Mr. Kaufman.  My

10   name is Stephen Grable.  I'm an attorney

11   for Suffern Partners LLC.

12       A.    Okay.

13       Q.    Can you hear me okay?

14       A.    A little bit.  Not so okay.  But

15   how are you.

16       Q.    Good.

17             It looks like you're in a car

18   and you're driving somewhere; is that

19   correct?

20       A.    Yes.

21       Q.    Do you need to get somewhere in

22   order to be ready to be deposed today?

23       A.    I'm stopping.  I was riding.  I

24   was with my office.  I'm stopping in the

25   side over here.



Page 8

1

2          Q.      How soon will you be at your

3    office?

4          A.      I'm not going to be in my

5    office.  I can't talk in my office.  Too

6    hectic.

7          Q.      You're --

8          A.      What?

9          Q.      You're planning to conduct this

10   entire deposition in your car today; is

11   that correct?

12         A.      My office is too busy for that.

13   I can't do my office.

14                 If you want, I can go to house

15   of someone.  I don't live in next to my

16   office, so.

17         Q.      Mr. Kaufman, how long have you

18   known about today's deposition?

19         A.      How long I've known today's

20   deposition?  I've known a week or two.

21         Q.      A week or two?

22         A.      Few days, yeah.

23         Q.      Have you ever been deposed

24   before?

25         A.      What?



Page 9

```
 1
 2      Q.     Have you ever been deposed
 3  before?
 4      A.     No.
 5             MR. FRECHETTE:  May I interrupt
 6      a moment, Mr. Grable?
 7             MR. GRABLE:  Please.
 8             MR. FRECHETTE:  As I mentioned
 9      to you during one of our telephone
10      conversations concerning Mr. Solomon,
11      Mr. Kaufman, there's a language
12      barrier here.  So you might want to
13      ask your questions a little bit
14      slowly, as reasonably -- as you can
15      reasonably do, to give him time to
16      process to the extent he's capable of
17      doing so.
18             MR. GRABLE:  Sure.
19             Thank you, Mr. Frechette.
20  BY MR. GRABLE:
21      Q.     Mr. Kaufman, do you speak
22  English?
23      A.     It's not my -- my language -- my
24  first language, but I speak English.
25             MR. GRABLE:  We can't hear you,
```



 1

 2       Mr. Kaufman.  Are you on mute?

 3            (Pause.)

 4            MR. GRABLE:  Mr. Kaufman, we

 5       cannot hear you.

 6            (Pause.)

 7            MR. GRABLE:  We are still unable

 8       to hear you, Mr. Kaufman.

 9            MR. FRECHETTE:  Steve, perhaps

10       you want to, which seems to have

11       become the universal sign in Zoom,

12       point to your ear as unable to hear.

13            MR. GRABLE:  Mr. Kaufman, we

14       cannot hear you.

15            THE WITNESS:  Call you back.

16            MR. GRABLE:  Okay.

17            Please call us back.

18            It is now 9:52 a.m.

19            Mr. Kaufman had appeared

20       momentarily, it looked like as a

21       passenger in a motor vehicle.  He had

22       a very bad connection, in addition to

23       a choppy video.  We've asked him to

24       call back in.

25            We will go off the record until



Page 11

1

2      such time as he does so.

3            (Recess taken.)

4    BY MR. GRABLE:

5      Q.    Mr. Kaufman, who's in the

6    vehicle with you?

7      A.    Mr. Solomon.

8      Q.    What's Mr. Solomon's first name?

9      A.    David.

10     Q.    Where does David Solomon reside?

11     A.    What do you mean where does he

12   reside?

13     Q.    Where is Mr. David Solomon's

14   residence?

15     A.    He lives in upstate.  He's here

16   now today.

17     Q.    Does Mr. Solomon know that he

18   was asked to be deposed in connection with

19   this case?

20     A.    I don't know.

21     Q.    Why are you with Mr. Solomon

22   today?

23     A.    Why Mr. Solomon?  Because I

24   wanted should be with him.  He's here.  I

25   wanted to.



Page 12

1

2      Q.    Mr. Solomon has the ability to

3  signal you, correct?

4      A.    I can't hear you.

5      Q.    Mr. Solomon has the ability to

6  give you signals with his hands, correct?

7      A.    He has me -- he has a -- he's

8  not -- I'm here, but I took him here

9  because I wasn't -- I wanted he should be

10  with me 'cause my English because.

11      Q.    Why do you need Mr. Solomon with

12  you today for purposes of this deposition?

13      A.    I -- I told you because my -- in

14  case -- my English is -- my language, my

15  English.  So I wanted he should be here.

16      Q.    Are you suggesting that Mr.

17  Solomon is serving as your interpreter

18  today?

19      A.    What?

20      Q.    Is Mr. Solomon serving as an

21  interpreter for you today?

22      A.    Something like that.

23      Q.    How long have you known Mr.

24  Solomon?

25      A.    I know for years.



Page 13

1

2        Q.    Have you ever heard of the

3    entity RS Old Mills Road LLC?

4        A.    Yes.

5        Q.    How have you heard of that

6    entity?

7        A.    Again?

8        Q.    What is your familiarity with

9    that entity?

10       A.    Through -- through the --

11   through the case.

12       Q.    Are you the 100 percent member

13   of RS Old Mills Road LLC?

14       A.    Yes.

15       Q.    Are there any other members --

16       A.    No.

17       Q.    -- of RS Old -- are there any

18   directors of RS Old Mills Road LLC?

19       A.    No.

20       Q.    Are there any officers of RS Old

21   Mills Road LLC?

22       A.    No.

23       Q.    Are there any employees of RS

24   Old Mills Road LLC?

25       A.    No.



Page 14

 1

 2       Q.     You indicated earlier this is

 3   your first time being deposed, correct?

 4       A.     Okay.

 5       Q.     Is this your first time being

 6   deposed?

 7       A.     I answered.  Yes.

 8       Q.     I want to go over a few ground

 9   rules just so that you are clear on what's

10   going to happen.

11              This deposition is being

12   transcribed.  There is an individual on

13   the line who is recording every word that

14   I say and every word that you say.  So it

15   is important that we speak one person at a

16   time.

17              Do you understand that?

18       A.     Okay.

19       Q.     That requires that you answer --

20   why are you looking at Mr. Solomon?

21       A.     I did not look at Mr. Solomon.

22       Q.     What were you looking at?

23       A.     At the -- on the window.

24       Q.     Why were you looking out the

25   window?



Page 15

```
 1
 2        A.      For a reason.  Somebody passed.
 3   I don't know what's come in here.  I'm
 4   trying -- I do not look at the window?
 5        Q.      Mr. Kaufman, are you able to
 6   focus on today's deposition?
 7        A.      Yes.
 8        Q.      You are capable of answering
 9   questions today?
10        A.      I hope so.
11        Q.      Are you under any medication
12   that would affect your ability to testify
13   today?
14        A.      No.
15        Q.      I'm going to be asking you a
16   series of questions.  You're required to
17   answer those questions unless your counsel
18   directs you not to answer.
19               Do you understand that?
20        A.      Okay.
21        Q.      If at any point you don't
22   understand the question I've asked, please
23   let me know and I will restate it or
24   clarify it for you.
25        A.      Got it.
```



Page 16

1
2       Q.     Do you understand that?
3              Mr. Kaufman, you're comfortable
4    with the English language, correct?
5       A.     I told you, it's not my first
6    language, but it -- sometimes I -- I speak
7    my first language is a little language.
8    It's a little hard times, but --
9       Q.     Are you here today as a
10   corporate representative of RS Old Mills
11   Road LLC?
12             MR. FRECHETTE:  Objection.
13             THE WITNESS:  Hello?
14   BY MR. GRABLE:
15      Q.     Yes, you can answer my question.
16             Are you here today --
17      A.     What?  As a what?
18      Q.     As a corporate representative of
19   RS Old Mills Road LLC.
20      A.     Yes.
21      Q.     Are you represented today by
22   counsel?
23      A.     Represented by what?
24      Q.     Are you represented today by
25   attorneys?



Page 17

```
 1
 2       A.    Yes.
 3       Q.    Who are the attorneys
 4  representing you today?
 5       A.    What's the name again?  What's
 6  the name?
 7             I forget the names by heart.  I
 8  don't remember the names by heart, but
 9  their names, they're three people there.
10  I don't remember the names.  I'm bad at
11  names.
12       Q.    Does the Locke Lord law firm
13  represent you?
14       A.    Yes.
15             I don't remember the names,
16  but -- ask me Stephen Grable's name in ten
17  minutes I won't remember that too.
18       Q.    Did you speak with anyone in
19  preparation for today's deposition?
20       A.    Yes.
21       Q.    Who did you speak with?
22       A.    Lawyer.
23       Q.    I'm sorry.  Could you say that
24  again?
25       A.    The lawyers.
```



Page 18

1

2      Q.    Did you speak with anyone else

3   in preparation for today?

4      A.    No.

5      Q.    Did you speak with David Solomon

6   about today's deposition?

7      A.    No.

8      Q.    How did Mr. Solomon know to pick

9   you up for today's deposition?

10      A.    Did not pick me.  I told me he's

11   in Brooklyn.  I told him I picked him up.

12          MR. FRECHETTE:  Stephen.

13          MR. GRABLE:  Yes, Don.

14          MR. FRECHETTE:  We need to take

15      a break.

16          MR. GRABLE:  Very good.  Thank

17      you, Don.

18          (Recess taken.)

19          MR. FRECHETTE:  Mr. Grable, if

20      you could again pose your questions

21      concerning any matters relating to

22      preparation for the deposition,

23      including the last two or three

24      questions that were asked, that might

25      be helpful.



Page 19

1

2    BY MR. GRABLE:

3        Q.    Mr. Kaufman, did you just have a

4    conversation with your counsel and David

5    Solomon?

6        A.    I have a conversation with my

7    counsel.

8        Q.    Was Mr. Solomon present?

9        A.    Solomon is present, yes.

10       Q.    Could he hear that conversation?

11       A.    He hear me talking to them.

12       Q.    What did you discuss?

13            MR. FRECHETTE:  Objection.

14        You're not going to invade the

15        attorney/client privilege.

16            To the extent the man needs help

17        interpreting things, he's got a right

18        to have somebody there with him.

19            So I'm going to instruct him not

20        to answer that question.

21            I told you when we discussed Mr.

22        Solomon that there was a language

23        barrier here.

24            MR. GRABLE:  Don, you're

25        instructing your client not to answer



Page 20

1

2         questions concerning discussions he

3         had between you, he and Mr. Solomon;

4         is that correct?

5              MR. FRECHETTE:  No, that's not

6         correct.

7              I'm instructing him not to

8         answer a question regarding a

9         discussion he had with me that was

10        interpreted for him by Mr. Solomon.

11   BY MR. GRABLE:

12        Q.   Mr. Kaufman, is Mr. Solomon

13   still present in the vehicle with you?

14        A.   Now at the moment he's not.

15   He's went out to make a phone call, if you

16   want to know.

17             MR. GRABLE:  We're going to

18        require that Mr. Solomon, if he's

19        going to participate or be listening

20        in on this deposition, that he be on

21        camera.  So he's going to need to dial

22        in when he returns.

23             MR. FRECHETTE:  You don't have

24        the right to require that.

25             MR. GRABLE:  Don, we are



 1

 2      requiring that.

 3              There's no capability here to

 4      see what type of communications or

 5      signaling may be occurring between

 6      Avrohom Kaufman, the witness, and

 7      David Solomon, an individual who is

 8      not represented in these proceedings

 9      who we've been trying to get in for a

10      deposition, who we have been unable to

11      serve, and who mysteriously appeared

12      today in a moving vehicle for Mr.

13      Kaufman's deposition.

14              I think it's an absolutely fair

15      request.

16              MR. FRECHETTE:  Whether it's a

17      fair request is not the issue.  The

18      issue is whether or not you have the

19      right to require it at this particular

20      point in time.

21              And if you want to exclude Mr.

22      Solomon, I think you have a right to

23      do that.  But in terms of requiring

24      him to appear on camera.

25              Now, I will say, if you do that,



Page 22

1

2          however, there is a significant

3          likelihood that the language barrier

4          will only be further -- further

5          heightened.  But I would have hoped we

6          would have had an interpreter here

7          today, but unfortunately not.

8                  MR. GRABLE:  Don, I would have

9          hoped we would have been in person

10         like I requested.  I would have hoped

11         I could have gotten exhibits to Mr.

12         Kaufman like I offered.  I would have

13         hoped Mr. Kaufman would be in a

14         physical location, not in a moving

15         vehicle, where he would be capable of

16         being deposed in a reasonable fashion.

17         But I am not in control of these

18         things, so we are proceeding as best

19         we can.

20                 If you will agree --

21                 MR. FRECHETTE:  I understand --

22                 THE WITNESS:  You want me to go

23         to office, I can go somebody's office,

24         if you want.  But my office I can't do

25         it.  I am trying -- it's too hectic



Page 23

 1

 2      there.

 3            MR. FRECHETTE:  If you want him

 4      to go to his office, Stephen, and we

 5      can reconvene, that's fine.

 6            As I said, you certainly have

 7      the right to tell him that Mr. Solomon

 8      can't be present, but I don't believe

 9      you have the right to compel Mr.

10      Solomon take any actions.  He's not

11      under subpoena.

12            MR. GRABLE:  Mr. Kaufman, how

13      quickly can you be to your office?

14            THE WITNESS:  For my office, a

15      few minutes, if you want.

16            MR. GRABLE:  You can be to your

17      office in ten minutes.

18            Is that correct?

19            THE WITNESS:  In ten minutes to

20      a different office.  My office is too

21      hectic.  I was trying, but it's not

22      going to work for my office.

23            MR. GRABLE:  Why don't we take a

24      break off the record.  You get to a

25      physical location, wherever you feel



Page 24

1

2      is appropriate, and we will reconvene

3      at 10:30.

4           THE WITNESS:  Okay.

5           MR. FRECHETTE:  Sounds fair.

6      Thank you.

7           MR. GRABLE:  We'll go off the

8      record.

9           (Recess taken.)

10          MR. FRECHETTE:  Mr. Grable, as I

11     mentioned to you off camera before we

12     got back on the record, it is our

13     expectation that Mr. Kaufman is no

14     longer in the presence of Mr. Solomon.

15     And you are certainly free to inquire

16     as you deem necessary.

17   BY MR. GRABLE:

18     Q.    Mr. Kaufman, you have found an

19   office, correct?

20     A.    Yes.  As I said, yes.

21     Q.    Where are you located?

22     A.    In Brooklyn, in an office.

23     Q.    Where is the office, the

24   address?

25     A.    It's a office.



Page 25

```
 1
 2      Q.    What is the street address and
 3  number of the office you are located?
 4      A.    53rd Street.
 5      Q.    I'm sorry.  Say that again?
 6      A.    53rd Street.
 7      Q.    And what is the number?
 8      A.    It's my -- it's my nephew's
 9  office.
10            Again, is this need for to know?
11  You asked me for my car before, I didn't
12  tell you where my car was parked.  I'm
13  just asking why you need to know here.
14      Q.    Mr. Kaufman, do you know the
15  address where you are physically located
16  at the moment?
17      A.    Yes, but I'm asking just why is
18  this important to know or what?
19      Q.    You're not asking questions
20  today.  I am asking questions.  You are
21  answering --
22      A.    I'm just asking -- okay.  I'm
23  at --
24      Q.    My question is --
25      A.    -- my nephew's office.
```



Page 26

1

2      Q.    What is the address of your

3  nephew's office?

4      A.    It's 1152 53.

5      Q.    And who is your nephew?

6      A.    Chaim Berkowitz.

7      Q.    Mr. Kaufman, did you speak with

8  anyone in preparation for today's

9  deposition?

10     A.    If I spoke to -- spoke to

11  yesterday when I went spoke to lawyer, my

12  nephew helped me understand a few things.

13     Q.    Who is your nephew?

14     A.    David Solomon.

15     Q.    What did David Solomon help you

16  understand yesterday?

17     A.    When I had some questions or I

18  didn't understand or something, I -- he

19  helped me understand the questions.

20     Q.    What questions did you ask Mr.

21  Solomon?

22     A.    I don't remember exactly, but

23  was -- when it came need something to

24  know, something that I -- I don't remember

25  exactly what it was.



Page 27

1

2       Q.     What, generally, did you discuss

3   with David Solomon yesterday?

4              MR. FRECHETTE:  Excuse me.

5              Mr. Kaufman, to the extent Mr.

6        Solomon served as a translator and

7        passed information from me to you or

8        from you to me, I do not want you to

9        reveal the content of those

10       communications.

11             If Mr. Solomon provided you with

12       any other information that was not

13       necessary to a simple understanding or

14       bridging of a language gap, then you

15       can answer those questions.

16             THE WITNESS:  I don't get it.  I

17       don't understand that one.

18             If the what?

19             MR. FRECHETTE:  If you have to

20       reveal a communication that you had

21       with me through Mr. Solomon, don't do

22       that.

23             Otherwise, if Mr. Solomon

24       independently provided you with

25       information, you are free to answer



Page 28

```
 1
 2      that question.
 3             THE WITNESS:  Okay.
 4             The what?  I'm trying to figure
 5      out.
 6             MR. FRECHETTE:  Steve, go ahead
 7      and make whatever record you feel you
 8      need to make.
 9 BY MR. GRABLE:
10      Q.    Mr. Kaufman, your conversations
11 yesterday with David Solomon, did they
12 involve the Locke Lord law firm?
13      A.    The what?
14      Q.    You had conversations with David
15 Solomon yesterday, correct?
16      A.    Yes.
17      Q.    Was anyone else involved in
18 those conversations?
19      A.    No.
20      Q.    Do you recall what those
21 conversations were generally about?
22      A.    Was about the -- with the case,
23 things I didn't understand.
24      Q.    Mr. Kaufman, is someone in the
25 room with you?  You keep looking to your
```



Page 29

```
 1
 2   left.
 3       A.    No.  I'm looking around the room
 4   over here.  It's my -- it's an -- I'm
 5   sitting in an office.
 6       Q.    Is anyone in the room with you?
 7       A.    No.
 8       Q.    Can anyone hear this deposition?
 9       A.    No.
10       Q.    Prior to your discussions with
11   David Solomon yesterday, did you ever have
12   discussions with anyone else about this
13   case?
14       A.    No.
15       Q.    Have you ever spoken to Yehuda
16   Solomon about this case?
17       A.    I don't remember.
18       Q.    Have you ever spoken to an
19   individual named Marty Stern about this
20   case?
21       A.    Not that I recall.
22       Q.    Do you know Marty Stern?
23       A.    I heard that name, yes.
24            MR. GRABLE:  I see we have a new
25       individual on the line.  Suzanne,
```



Page 30

1

2        could you just identify yourself,

3        please.

4              (Suzanne Pastor resumes

5        reporting of the deposition at this

6        time.)

7              (Time noted:   10:45 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 31

1

2              A C K N O W L E D G M E N T

3

4    STATE OF              )

5                              :ss

6    COUNTY OF              )

7

8         I, AVROHOM KAUFMAN, hereby

9    certify that I have read the transcript of

10   my testimony taken under oath in my

11   deposition of August 24, 2021; that the

12   transcript is a true and complete record

13   of my testimony, and that the answers on

14   the record as given by me are true and

15   correct.

16

17

18         _____

                  AVROHOM KAUFMAN

19

20   Signed and subscribed to before me this

21   _____ day of _____, 20__.

22

23   _____

24   Notary Public, State of

25



Page 32

```
 1
 2                    E R R A T A
 3    PAGE / LINE / CHANGE    /    REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```



Page 33

```
 1
 2                C E R T I F I C A T E
 3    STATE OF NEW YORK
 4    COUNTY OF NEW YORK
 5
 6            I, Marie Foley, RMR, CRR, a
 7    Certified Realtime Reporter and Notary
 8    Public within and for the State of New
 9    York, do hereby certify:
10            THAT AVROHOM KAUFMAN, the witness
11    whose deposition is hereinbefore set
12    forth, was duly sworn by me and that such
13    deposition is a true record of the
14    testimony given by the witness.
15            I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage, and that I am
18    in no way interested in the outcome of
19    this matter.
20            IN WITNESS WHEREOF, I have
21    hereunto set my hand this 25th day of
22    August, 2021.
23
24            _____
                 MARIE FOLEY, RMR, CRR
25
```



Page 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 21-22280-shl
-----------------------------------------X
IN RE :                              Chapter 11
SUFFERN PARTNERS, LLC,
                    DEBTOR.
-----------------------------------------X
RS OLD MILLS ROAD, LLC,
                    PLAINTIFF,

                                     A.P No.

     -against-
21-07027-shl

SUFFERN PARTNERS LLC,

                    DEFENDANT.
-----------------------------------------X
                    DATE:  August 24, 2021
                    TIME:  10:40 a.m.

          CONTINUED DEPOSITION of AVROHOM
KAUFMAN, taken by the Defendant, pursuant
to a notice, held remotely via Zoom
Videoconference, before Suzanne Pastor
(relief reporter), a Notary Public of the
State of New York.



Page 35

```
 1    A P P E A R A N C E S:
 2
 3    LOCKE LORD, LLP
         Attorneys for the Plaintiff
 4       20 Church Street, 20th Floor
         Hartford, Connecticut 06103
 5       BY: DONALD E. FRECHETTE, ESQ.
         860.541.7713
 6       donald.frechette@lockelord.com
 7          -and-
 8    LOCKE LORD, LLP
         200 Vesey Street, 20th Floor
 9       New York, New York 10281
         BY: CASEY B. HOWARD, ESQ.
10       212.812.8342
         choward@lockelord.com
11
12    THOMPSON COBURN HAHN & HESSEN LLP
         Attorneys for the Defendant
13       488 Madison Avenue
         New York, New York 10022
14       BY: STEPHEN J. GRABLE, ESQ.
         212.478.7200
15       sgrable@thompsoncoburn.com
         AND: STEVEN AQUINO, ESQ.
16       saquino@thompsoncoburn.com
         AND: GILBERT BACKENROTH, ESQ.
17       gbackenroth@thompsoncoburn.com
18
      REBAR KELLY
19       Attorneys for
         RIVERSIDE ABSTRACT, LLC
20       800 Third Avenue, 28th Floor
         New York, New York 10022
21       BY: PATRICK J. HEALEY, ESQ.
         212.858.9970
22       phealey@rebarkelly.coma
23
24             *          *          *
25
```



Page 36

1    A V R O H O M    K A U F M A N, called as a

2    witness, having been previously duly sworn

3    by a Marie Foley, Notary Public of the

4    State of New York, testifies as follows:

5    EXAMINATION BY

6    MR. GRABLE:

7        Q.    Mr. Kaufman, did you review any

8    documents in preparation for today's

9    deposition?

10        A.    What?

11        Q.    Did you review any documents in

12    preparation for today's deposition?

13        A.    Some documents.

14        Q.    What documents did you review?

15        A.    Affirmation and a few papers

16    that I...

17        Q.    What were those papers?

18        A.    The affirmation and notice on

19    the -- the affirmation and some other

20    details that I need to know.

21        Q.    Who provided you with those

22    papers?

23        A.    What?

24        Q.    Who provided you with those

25    papers?



Page 37

```
 1        A.      From the case.

 2        Q.      Mr. Kaufman, we're going to ask

 3   you to speak slower and louder so that the

 4   reporter can hear you.  Do you understand

 5   that?  Do you understand that?

 6        A.      Okay, I hear you, yes.

 7        Q.      Who provided you the papers

 8   that you reviewed?

 9        A.      I don't remember exactly but I

10   had the papers prepared.

11        Q.      You don't remember who provided

12   papers to you yesterday, is that correct?

13             MR. FRECHETTE:  Objection.

14        Q.      I didn't hear you, Mr. Kaufman.

15   Can you say it again louder and slower?

16        A.      I said I had some papers,

17   affirmation and stuff that I had ready for

18   me myself.

19        Q.      You prepared the papers?

20        A.      I didn't say I prepared.  I had

21   some -- I spoke to my lawyer to prepare the

22   stuff so I had some papers prepared.

23        Q.      Your lawyer prepared the

24   papers?  Yes or no.

25        A.      The what?
```



Page 38

1          Q.     Is it correct that your lawyer

2     prepared the papers that you looked at?

3               MR. FRECHETTE:  Objection.

4               Mr. Kaufman, you can go ahead

5          and answer despite my objection.

6          A.     As I told you, I prepared with

7     my lawyer.  I told you, yesterday.

8          Q.     Mr. Kaufman, are you currently

9     employed?

10         A.     Yes.

11         Q.     Where are you employed?

12         A.     By Royal Fruit Garden.

13         Q.     How long have you worked for

14    Royal Fruit Garden?

15         A.     For ten years.

16         Q.     Are you an owner of Royal Fruit

17    Garden?

18         A.     Partner in the corporation.

19               THE REPORTER:  Did you say

20          "corporation" and "partner"?

21         Q.     Mr. Kaufman, we did not hear

22    that last answer.  Could you please resay

23    it?

24         A.     I said it's a corporation.  I'm

25    a partner in the corporation.



Page 39

1        Q.    You are a partner in the

2    corporation for Royal Fruit Garden Company?

3        A.    Yes.

4        Q.    What kind of business does

5    Royal Fruit Garden Company do?

6        A.    Fruits and vegetable

7    distribution.

8        Q.    Have you had any other jobs in

9    the last ten years?

10        A.    Other than that, no.

11        Q.    Have you ever been involved in

12    commercial real estate investing?

13        A.    No.

14        Q.    Have you ever been involved in

15    commercial real estate development?

16        A.    No.

17        Q.    How about residential real

18    estate, have you ever invested in

19    residential real estate?

20        A.    No.

21        Q.    Are you familiar with an entity

22    called RS Old Mill, LLC?

23        A.    If I'm familiar with RS Old

24    Mill, yes.

25        Q.    Mr. Kaufman, it's very



1    difficult when you move around in and out

2    from the microphone.  I need you to stay as

3    close to the microphone so the reporter and

4    the rest of the parties can hear you.

5              I'm going to ask that question

6    again.  Are you familiar with an entity

7    named RS Old Mill, LLC?

8        A.    Yes.

9        Q.    How are you familiar with that

10   entity?

11       A.    Because it was part of RS Mill

12   Road.  That's why -- it came from RS Mill

13   Road.

14       Q.    Who is the principal of RS Old

15   Mill, LLC?

16       A.    I don't recall.  I don't

17   remember.

18       Q.    Do you know if Yehuda Solomon

19   is the principal of RS Old Mill, LLC?

20       A.    He's one of them.  But I don't

21   know exactly.

22       Q.    Yehuda Solomon is --

23       A.    He's a -- I don't know how you

24   call it.  Exactly details, I don't know.

25       Q.    And Yehuda Solomon is your



Page 41

```
 1   brother-in-law, correct?
 2        A.    Yes.
 3        Q.    Do you know if anyone else is
 4   involved in owning or managing RS Old Mill,
 5   LLC?
 6        A.    If I know what?
 7        Q.    Do you know any other
 8   individuals who are owners or managers of
 9   RS Old Mill, LLC?
10        A.    Not that I recall.
11        Q.    When did you form the entity RS
12   Old Mill Road, LLC?
13             MR. FRECHETTE:  Objection.
14        Q.    You can answer.
15        A.    When I form a -- when I -- I
16   was -- somebody -- when I got it from --
17   somebody came to me that my brother-in-law,
18   to help my brother-in-law to help him
19   financing.  So I got two -- I got an uncle,
20   and two people that came to me that I -- my
21   brother needs help in financing, that I
22   should -- that's how I got involved.
23        Q.    Do you recall when that
24   occurred?
25        A.    It was in 2017, around.
```



Page 42

1    September 2017.  I don't remember exactly

2    the timing.

3         Q.    Are you reading from something,

4    Mr. Kaufman?  It looks like you were

5    looking at a piece of paper.

6         A.    I was looking on the desk over

7    here.  It was in 2017.

8         Q.    Is there a piece of paper on

9    the desk related to this case?

10        A.    No, I wrote --

11              THE REPORTER:  Repeat that.

12        A.    What did you say?

13        Q.    We did not hear that last

14   answer.

15        A.    I said I have affirmation over

16   here that I have, that I need to know.  So

17   I have information for it.

18        Q.    We're going to call for the

19   production of those notes.  Please do not

20   destroy them.  You're required to preserve

21   them.  And we will coordinate with your

22   counsel for the production of those notes.

23              MR. FRECHETTE:  I don't know

24       that he indicated that there are

25       notes.



Page 43

```
 1          A.     The what?  I told you that --
 2          Q.     You indicated that you made
 3   some --
 4          A.     I told you I have affirmation,
 5   as I told you before, I had affirmation
 6   prepared.
 7          Q.     And that information is in
 8   front of you now, correct?
 9          A.     Yes.
10                 MR. GRABLE:  Don, we're going
11            to call for the production of those
12            notes.
13                 MR. FRECHETTE:  We don't know
14            that they're notes, Steve.  I think
15            you need to establish that.  He says
16            they're information.  Information can
17            take many forms.
18          A.     Affirmation I said.
19          Q.     Affirmation.
20                 MR. FRECHETTE:  Affirmation.
21          Q.     That's an affirmation that you
22   previously signed in connection with these
23   proceedings?
24          A.     Yes.
25          Q.     What is the date of that
```



Page 44

1    affirmation?

2         A.    Date of affirmation is -- the

3    date that I signed was December 2019.

4         Q.    December what?

5         A.    December 16, 2019.

6         Q.    Yehuda Solomon asked you to

7    form RS Old Mill Road, LLC to help get

8    financing, is that correct?

9         A.    The what?  I didn't hear you.

10   I did not hear you.

11        Q.    Yehuda Solomon asked you to

12   form RS Old Mill Road, LLC to help get

13   financing, correct?

14        A.    As I told you, it was in 2017

15   when I was approached by two people who

16   came over to me that day doing financing

17   for my brother-in-law.  And that's when I

18   said I'll do it.

19        Q.    Does RS Old Mill Road, LLC have

20   any operations?

21        A.    RS Mill has no operations at

22   the moment now because there's nothing

23   there.  There's nothing going on, there's

24   nothing to work from.  Nothing to -- at the

25   moment.  As of the moment.



Page 45

1          Q.    RS Old Mill Road, LLC ever had
2    any operations?
3          A.    Operations for the thing, but
4    now there's nothing doing.  There's no
5    money -- nothing to be available because
6    it's like -- there's no -- everything is,
7    like -- there's nothing doing now.
8          Q.    It previously was operating?
9    Is that your testimony?
10         A.    What do you mean previously
11   operating testimony?  I don't understand
12   the question.
13         Q.    Has RS Old Mill, LLC ever had
14   any operations?
15         A.    We signed for a loan.  But
16   since then there's nothing doing because
17   the -- there's no happening there because
18   it's on -- there's no -- it was, like, sold
19   and it was giving away -- the whole thing
20   happened.  So there's nothing doing.
21   There's no need for doing anything.
22   There's no...
23         Q.    Does RS Old Mill Road, LLC have
24   any bank accounts?
25         A.    No.  There's no business.



Page 46

1   There's no bank account, no.  No bank
2   account.
3        Q.    Has RS Old Mill Road, LLC ever
4   had a bank account?
5        A.    Not that I remember.
6        Q.    Could anyone other than you
7   have opened a bank account for RS Old Mill
8   Road, LLC?
9        A.    I don't recall that.  I don't
10  remember.  But not that I know of.
11       Q.    Have you ever authorized anyone
12  to open a bank account on behalf of RS Old
13  Mill Road, LLC?
14       A.    I don't remember that.  I don't
15  remember.
16       Q.    Does RS Old Mill Road, LLC have
17  any debts?
18       A.    The whole situation.  That's
19  what's the whole thing happening now, yes.
20       Q.    Could you explain that a little
21  more.  What debts does RS Old Mill Road,
22  LLC have?
23       A.    We have a debt to Uzi Frankel.
24             THE REPORTER:  I'm sorry, say
25  it again, please.



Page 47

1       A.      It has a debt to Uzi Frankel.

2       Q.      You have a debt to Uzi Frankel?

3       A.      We have a debt to Uzi Frankel,

4   yes.

5       Q.      What is the debt owed to

6   Mr. Frankel?

7       A.      He was a lender for the

8   property.

9       Q.      Mr. Frankel provided a loan to

10  RS Old Mill Road, LLC, is that correct?

11      A.      The what?

12      Q.      Did Mr. Frankel provide a loan

13  to RS Old Mill Road, LLC?

14      A.      He provided a loan to fix up

15  the property, the loan for that.  That's

16  why the whole situation went.  That's why

17  there's no -- nothing happening in a while.

18      Q.      I'm going to ask my question

19  again.  Did Mr. Frankel provide a loan to

20  RS Old Mill Road, LLC?

21      A.      Yes.

22      Q.      Where were the monies for that

23  loan deposited?

24      A.      I don't know.  I don't recall.

25      Q.      How much was the loan?



Page 48

1        A.    I don't remember the numbers
2    exactly.
3        Q.    Was it over $100,000?
4        A.    It was a lot more than
5    $100,000.  I don't remember exactly the
6    numbers.
7        Q.    Was it more than a million
8    dollars?
9        A.    Yes.  A lot more, yes.
10       Q.    Was it more than $2 million?
11       A.    I don't remember exactly the
12   numbers.
13       Q.    Was it more than $2 million?
14       A.    I don't remember.
15       Q.    Mr. Frankel provided a loan of
16   more than a million dollars to Old Mill
17   Road, LLC and you don't know where those
18   funds were deposited, is that correct?
19       A.    He provided the loan -- I don't
20   remember exactly the number but he provided
21   the loan.  It was expedited for certain
22   things to do there.  But I don't remember
23   exactly what numbers.  I don't recall.
24   It's like a while already, so.
25       Q.    What things were the loan



Page 49

1    monies used to expedite?

2        A.    I don't know.  I don't

3    remember.

4        Q.    Did that loan relate to RD's

5    acquisition of the property at 25 Old Mill

6    Road?

7        A.    I don't remember exactly.

8        Q.    If I say RD, I'm talking about

9    RS Old Mill Road, LLC.  Do you understand

10   that?  It's okay if I use RD as a

11   shorthand?

12       A.    Yes.

13       Q.    Last year you caused RD to file

14   a complaint again Suffern Partners, LLC in

15   the Rockland County Supreme Court, is that

16   correct?

17       A.    Yes.

18       Q.    What was the basis for that

19   lawsuit?

20       A.    Say it again.  I didn't hear

21   you.

22       Q.    Why did you file that lawsuit?

23       A.    Why I filed the lawsuit?  It

24   was --

25       Q.    Mr. Kaufman, what are you



Page 50

1    reading or looking at?

2        A.    I told you I have an

3    affirmation.  I'm trying to remember

4    exactly.  You ask me one question to

5    another.  I'm trying to remember.

6        Q.    Can you turn your camera around

7    for me.  I want to see the room, please.

8        A.    What did you say?

9        Q.    Turn your camera around.  I

10   want to see the room.  Keep going.

11          And down in front of you.

12   Lower.  Lower in front of you.  In front of

13   you.  In front of you where you were

14   sitting.  Behind the computer.

15          Why did you cause RD to file a

16   lawsuit against Suffern Partners, LLC last

17   year?

18       A.    Because we didn't get the

19   $30 million and we made a lawsuit for that.

20       Q.    I didn't hear you.  Because RD

21   did not get what?

22       A.    The money, the $30 million.

23       Q.    You alleged that RD was owed

24   $30 million from Suffern Partners, LLC?

25       A.    Yes.



Page 51

1        Q.    Why is RD owed $30 million from
2    Suffern Partners?
3        A.    The phone came in very not
4    clearly.  I can't hear you.
5        Q.    Was there a transaction --
6        A.    It's very not clear.  I can't
7    hear you.  Say it again.
8        Q.    Can you hear me now?
9        A.    Repeat I said.  I can't hear
10   you.  The phone is not clear.
11       Q.    Can you hear me now?
12       A.    Yes, now better.  A lot better.
13       Q.    On what basis do you allege
14   Suffern Partners, LLC owes RD $30 million?
15       A.    I don't remember exactly, but.
16       Q.    You don't remember why you're
17   suing Suffern Partners, LLC --
18       A.    I can' hear you.
19       Q.    -- for $30 million?
20       A.    For the sale but exactly
21   details I don't recall right now.
22       Q.    What sale?
23       A.    So from -- there was -- the
24   sale that they were supposed to -- from the
25   loan that some...



Page 52

1          Q.    Mr. Kaufman, other than that
2    December 16th, 2019 affirmation, do you
3    have any other personal knowledge or
4    information concerning RD's claims against
5    Suffern Partners, LLC?
6          A.    I don't know.
7          Q.    I'm going to ask the question
8    again, and I'm going to require a yes or no
9    answer.
10               MR. FRECHETTE:  Objection.
11         Q.    Other than that affirmation
12   that you're looking at, do you have any
13   personal knowledge concerning the
14   allegations that RD has asserted against
15   Suffern Partners, LLC?
16               MR. FRECHETTE:  I'm going to
17          object.  If he can answer yes or no
18          truthfully, he can do so.  If he
19          doesn't know though, he doesn't know.
20          So his requirement here is to be
21          truthful, and that's what we want him
22          to be.
23         Q.    You can answer the question,
24   Mr. Kaufman, and I will restate it again.
25   Other than what's written in that December



Page 53

1    16, 2019 affirmation, do you have any --

2        A.    I don't recall.  I don't

3    remember exactly.

4            MR. FRECHETTE:  Mr. Kaufman,

5        Mr. Kaufman, please let Mr. Grable

6        finish his question.

7            I'm sorry, Steve, go ahead.

8        Q.    It's all right.

9            Other than what's written in

10   that December 16 --

11       A.    I'm not --

12       Q.    -- 2019 -- Mr. Kaufman, I need

13   to be able to finish my question and then I

14   will give you an opportunity to answer.  Is

15   that clear?

16       A.    Okay.

17       Q.    Other than what is written in

18   that December 16, 2019 affirmation that you

19   signed, do you have any personal knowledge

20   concerning the claims that RD is alleging

21   against Suffern Partners, LLC?

22       A.    Again, any what?

23       Q.    Personal knowledge.

24       A.    Personal knowledge?  I can't

25   explain that.



Page 54

1      Q.     You don't know if you have any
2  knowledge?
3      A.     I can't hear you.  What?
4      Q.     Do you have any knowledge
5  concerning RD's allegations against Suffern
6  Partners, LLC?
7      A.     As I told you, I cannot explain
8  it.
9      Q.     Did you search for documents
10 requested in connection with this
11 litigation?
12     A.     What?
13     Q.     Did you search for any
14 documents --
15     A.     Did I search for what?
16     Q.     You need to let me finish the
17 question.  If you let me finish, you'll
18 probably understand it better.  Do you
19 understand?
20     A.     Okay.  Got you.
21     Q.     Did you search for any
22 documents in connection with this
23 litigation?
24     A.     If I searched for any
25 documents.



Page 55

```
 1              THE REPORTER:  Did you say "no"
 2         or "I don't know"?
 3         A.     I don't remember.
 4         Q.     Do you have any documents that
 5    belong to RD?
 6         A.     The affirmation that I have
 7    from...
 8         Q.     Other than the affirmation, do
 9    you have any other documents concerning RD?
10         A.     Any other affirmation what?
11         Q.     Do you have any documents
12    concerning RD, not including the
13    affirmation that is in front of you?
14         A.     What do you mean, not
15    affirmation?
16         Q.     Not the affirmation.  Do you
17    have any other documents concerning RD?
18         A.     Stuff from closing.
19         Q.     You have documents from a
20    closing, is that correct?
21         A.     Yes.
22         Q.     That's the closing that
23    occurred in September 2017, correct?
24         A.     I don't know exactly the dates.
25    Dates I don't remember exactly.  I have
```



Page 56

1   e-mails.  I don't remember exactly the

2   dates.

3        Q.    What is the transaction that

4   you have documents related to?

5        A.    I don't recall now.

6        Q.    Did you recall a minute ago?

7        A.    I said I had some e-mails.  I

8   don't remember dates.  I don't remember

9   exactly what.

10       Q.    But you do have documents

11  related to the transaction, correct?

12       A.    Yes.  But I told you some

13  e-mails.  At the moment I don't remember

14  exactly the times.

15       Q.    And that transaction is a

16  transaction involving RD, correct?

17       A.    Yes.

18       Q.    What was the nature of that

19  transaction?  What was the nature of that

20  transaction, Mr. Kaufman?

21       A.    I can't hear you.

22       Q.    What was the nature of that

23  transaction?

24       A.    I can't explain.

25       Q.    Do you recall anything about



Page 57

1   that transaction?

2        A.    As I told you, I can't explain

3   details.

4        Q.    Do you recall anything about

5   that transaction other than that RD

6   allegedly is owed $30 million?

7        A.    Rephrase that question again,

8   please.

9        Q.    Do you recall anything about

10  that transaction other than that RD is

11  allegedly owed $30 million?

12       A.    No.  I don't remember it.

13       Q.    Do you even remember that RD is

14  owed $30 million?

15       A.    I remember that -- that I

16  remember.  Details I don't remember now.

17       Q.    When was RD supposed to receive

18  $30 million?

19       A.    When was what?

20       Q.    When was RD supposed to receive

21  $30 million?

22       A.    When there was the closing.

23       Q.    And when was that?

24       A.    What?

25       Q.    When was the closing?



Page 58

1       A.    When was the closing.  That was

2    when I -- that was in September 2017, but

3    exactly details I don't remember.

4       Q.    What did you do after RD did

5    not receive $30 million in 2017?

6             Are you on mute again?

7       A.    I'm not on mute, no.  Hello.

8       Q.    Yes, we hear you.  What did you

9    do after RD did not receive $30 million in

10   2017?

11            (Pause.)

12            We can't hear you.

13      A.    One minute, please.

14      Q.    Why do you keep putting

15   yourself on mute, Mr. Kaufman?  Is someone

16   in the room with you?

17      A.    I'm not even next to -- my

18   cellphone is 3 inches away from me.  I

19   didn't touch my phone.  You say I'm on

20   mute, I didn't touch my cellphone.

21      Q.    Every time you go on mute I'm

22   going to assume there's someone else in the

23   room with you.

24      A.    My cellphone is on a stand.

25            MR. FRECHETTE:  You can assume



1          whatever you want, Mr. Grable.  That

2          doesn't make it --

3      A.    My cellphone is on a stand.  I

4   can take a picture.  My cellphone is on a

5   stand.  I don't hit mute.  I don't hear you

6   a lot of times.  So I don't know what

7   you're talking about.

8      Q.    I'm going to ask the question

9   again.  What did you do after RD did not

10  receive $30 million in 2017?

11     A.    What can I do?  What I did.

12  What can I do?  That's what happened.

13  That's what the whole situation is.

14     Q.    Did you send anyone an e-mail

15  immediately after the closing asking where

16  the money was?

17     A.    No.

18     Q.    Did you write a letter to

19  anyone immediately after the closing asking

20  where the money was?

21     A.    Repeat that question again.

22     Q.    Did you write a letter to

23  anyone immediately after the closing asking

24  where the $30 million was?

25     A.    No.  It was phone calls.



Page 60

1        Q.    Who did you call by phone to
2    ask where the $30 million was?
3        A.    Who I called what?
4        Q.    Did you call someone by phone
5    to ask where the $30 million was?
6        A.    I called Yehuda Solomon.
7    That's why I called him, what's happening.
8    I see what's happening, I told them I need
9    to know what's happening over here.  I
10   didn't know the whole thing like that.
11       Q.    You called Yehuda Solomon to
12   ask him where the $30 million was?
13       A.    What's happening with that,
14   yes.  What's happening with the money
15   because I did it as a favor and I didn't
16   know it was going to turn into the whole
17   situation.
18       Q.    Did you provide an affirmation
19   to the court saying that you were only
20   going to be involved in this transaction
21   for a very short period of time?
22       A.    Yes.
23       Q.    And it was your expectation
24   that you would never receive $30 million
25   out of this transaction, correct?



Page 61

1        A.     Nope.

2        Q.     You did not receive -- strike

3   that.  Did you believe that RD was to

4   receive $30 million out of this

5   transaction?

6        A.     That I believe so, yes.

7        Q.     But you were only involved for

8   a short period of time, correct?

9        A.     Yes.

10        Q.     And that was to get the

11   financing, correct?

12        A.     To help get the financing, yes.

13        Q.     What was going to happen with

14   the $30 million that was going to be

15   received by RD?

16        A.     I don't know.

17        Q.     Was it going to belong to you?

18        A.     The what?  I didn't hear you.

19        Q.     Were you going to keep

20   $30 million from this transaction?

21        A.     I didn't discuss that part with

22   him.

23        Q.     You didn't discuss what you

24   were going to do with $30 million, is that

25   correct?



Page 62

1        A.    What did you say?

2        Q.    You didn't discuss with anyone

3    what you were going to do with $30 million

4    that you were involved with for only a

5    short period of time?

6        A.    Not sure the amount.  I didn't

7    discuss the amount.  I told you it wasn't

8    discussed.

9        Q.    What did you discuss about the

10   money that RD was receiving?

11       A.    I told you I don't remember

12   exactly.

13       Q.    How was RD going to receive

14   $30 million if it had no bank account?

15       A.    How what?  Rephrase that

16   question, please.

17       Q.    How was RD going to receive

18   $30 million if it had no bank account?

19       A.    I don't know but at the moment

20   there's no purpose in having a bank account

21   because there's nothing doing.  There's no

22   action there.

23       Q.    Did RD have legal counsel in

24   connection with the 2017 transaction?

25       A.    I don't know.



Page 63

1        Q.    Have you ever been to the

2   property at 25 Old Mill Road?

3        A.    If I?  Again, what did you say?

4        Q.    Have you ever been to the

5   property at 25 Old Mill Road?

6        A.    Not that I recall, no.

7        Q.    So you allege RD was an owner

8   and was to receive $30 million for property

9   you've never even visited, is that correct?

10        A.    Yes.

11        Q.    Did you attend the closing for

12   this transaction?

13        A.    The what?

14        Q.    Did you attend the closing for

15   this transaction?

16        A.    No.

17        Q.    Did you sign a deed

18   transferring the property from RD to

19   Suffern Partners, LLC?

20        A.    I don't remember.  I don't

21   recall.

22        Q.    Are you familiar with the name

23   Thomas Landrigan?

24        A.    I heard that name.

25        Q.    Have you ever spoken to



Page 64

1   Mr. Landrigan?

2        A.    I was on speaker once on the

3   phone.

4        Q.    You have spoken to

5   Mr. Landrigan on the phone, is that

6   correct?

7        A.    So I was told on the phone

8   once, yes.

9        Q.    I'm struggling to hear you, I

10  apologize.

11       A.    So I was told once that he was

12  on speaker on the phone.

13       Q.    You were told you were speaking

14  to him on the phone?

15       A.    Yes.

16       Q.    Who else was on that call with

17  you, if anyone?

18       A.    There was two people.  Junger

19  and someone else over there.  I don't

20  remember the names.  He told me that he was

21  on speaker, that it was him.  I don't

22  remember exactly what it was.

23       Q.    Did Mr. Landrigan file

24  paperwork with New York State to register

25  RD --



Page 65

1        A.      I don't know.

2        Q.      -- as an LLC?

3                How did you cause RD to be

4     formed?

5                MR. FRECHETTE:  Objection.

6        Q.      You can answer.

7        A.      Rephrase the question.

8        Q.      How did you cause RD to be

9     formed?

10       A.      How I caused -- I don't get it.

11    I don't understand the question.  Rephrase

12    the question.

13       Q.      You are the 100 percent member

14    of RD, correct?

15       A.      Yes.

16       Q.      When did you create RD?

17               MR. FRECHETTE:  Objection.  You

18        can still answer, Mr. Kaufman.

19       A.      Sorry, I don't see -- hello?

20       Q.      Yes.  When did you create RD?

21       A.      I don't remember.

22       Q.      Why did you create RD?

23       A.      Again, why I created RD?  Was

24    that the --

25       Q.      Yes.



Page 66

1        A.      It was a favor for a loan for

2    Yehuda Solomon.

3        Q.      Who helped you create RD?

4        A.      I don't remember.

5        Q.      Did an attorney help you create

6    RD?

7        A.      I don't remember details.

8        Q.      Did Yehuda Solomon help you

9    create RD?

10        A.      I don't remember the details as

11    of now.

12        Q.      Mr. Kaufman, you're familiar

13    with the entity RS Old Mill, LLC?

14        A.      What?  I didn't hear you.

15        Q.      Are you familiar with the

16    entity RS Old Mill, LLC?

17        A.      I'm familiar with that.

18              THE REPORTER:  I'm sorry, you

19    have to repeat your answer, please.

20        Q.      Do you recall RS Old Mill, LLC

21    being in bankruptcy proceedings?

22        A.      I don't remember exactly -- I

23    don't recall everything.

24        Q.      Do you recall filing proofs of

25    claim in the RS Old Mill, LLC bankruptcy?



Page 67

1        A.      I don't remember.

2        Q.      Have you ever signed a proof of

3   claim for a bankruptcy proceeding?

4        A.      Again?

5        Q.      Have you ever signed a proof of

6   claim for a bankruptcy proceeding?

7        A.      For what?

8        Q.      Do you know what a proof of

9   claim is?

10       A.      No.  You're talking about

11   which -- what are you talking about?  I

12   told you I'm -- are you talking about

13   for -- what are you talking about now?

14   You're talking about a road or for RS Old

15   Mill?

16       Q.      I'm talking about for RS Old

17   Mill.

18       A.      I told you I don't recall.  I

19   don't remember.

20       Q.      Now I'm asking generally, have

21   you ever filed a claim in any bankruptcy

22   proceeding?

23       A.      I don't remember.

24       Q.      Do you recall filing a claim in

25   Suffern Partners, LLC's bankruptcy



Page 68

1   proceeding?

2        A.    I don't remember.

3        Q.    Mr. Kaufman, I see you keep

4   looking off to your left and it's taking

5   you an awful lot of time to answer

6   questions.  Who is in the room with you?

7        A.    Are you asking me again the

8   same question?  I showed you already.  No

9   one is in the room.

10       Q.    Is David Solomon in that

11  building?

12       A.    No.  You want me to go back to

13  my car now?  Nobody is in the building.  No

14  one is in the building.  No one is in the

15  room.  I showed you three times already.  I

16  don't know you want.  You want me to go

17  back to the car?  You're not happy.  I

18  don't know what you want.  I came to an

19  office.  I specifically left the car

20  because of that.  I don't know what you

21  want now.

22       Q.    I want you to focus on

23  answering questions during this deposition.

24  And it seems to be very difficult for you.

25  Are you having difficulty focussing today?



Page 69

1        A.     I'm thinking what you're saying
2   and I'm saying I don't remember.  I don't
3   recall.
4        Q.     Do you recall filing tax
5   documents in connection with the 2017
6   transaction?
7        A.     I don't know.  I don't
8   remember.
9        Q.     Do you agree that RD
10  transferred the property to Suffern
11  Partners?
12       A.     That what?
13       Q.     Did RD transfer the property to
14  Suffern Partners?
15       A.     Rephrase that question.  I'm
16  trying to figure out -- to understand that
17  question.
18       Q.     You understand when I say "the
19  property" I'm talking about the property at
20  25 Old Mill Road in Suffern, Montebello,
21  correct?
22       A.     Yes.
23       Q.     Did RD transfer the property to
24  Suffern Partners?
25       A.     I don't remember.



Page 70

1          Q.    It's 11:36.  Let's take a short
2    break.  I'll come back at 11:45.
3                Mr. Kaufman, if you need a
4    restroom or anything, that's fine.  Please
5    know that if you speak with anyone about
6    this deposition, I will ask you what you
7    spoke about.
8                MR. FRECHETTE:  I object.  If
9          he speaks to counsel you can ask but
10         you will not get an answer.
11               MR. GRABLE:  We'll be back at
12         11:45.
13               (Whereupon, a short recess was
14         taken.)
15   BY MR. GRABLE:
16         Q.    Mr. Kaufman, are you ready to
17   proceed?
18         A.    Yes.
19         Q.    Mr. Kaufman, did you retain the
20   Locke Lord law firm?
21         A.    What?
22         Q.    Did you retain the Locke Lord
23   law firm?
24         A.    I have to turn the air
25   conditioner.  Can you wait one minute?



Page 71

```
 1                (Pause.)

 2       Q.      Did you retain the Locke Lord

 3   law firm?

 4       A.      Yes.

 5       Q.      And you're paying their fees?

 6       A.      Fees are being paid.

 7       Q.      They are being paid.  Who is

 8   paying the Locke Lord law firm?

 9       A.      I don't recall exactly.

10       Q.      RD is not paying the Locke Lord

11   law firm, is that correct?

12       A.      I don't have all the

13   information over here right now.

14       Q.      And you are not personally

15   paying the Locke Lord law firm, correct?

16       A.      I told you I don't have the

17   information here.

18       Q.      You don't know how the Locke

19   Lord law firm is being paid for its

20   services in connection with these

21   proceedings?

22       A.      I know it's being paid.  I

23   don't know exactly details.  I have the

24   details over here.

25       Q.      Do you know if Yehuda Solomon
```



MAGNA
LEGAL SERVICES

Page 72

1  is paying for them?

2       A.    I just told you I don't know

3  exactly the details.

4       Q.    Did you retain the Kent

5  Beatty & Gordon firm?

6       A.    I what?

7       Q.    Have you ever heard of the Kent

8  Beatty & Gordon law firm?

9       A.    I don't remember everything,

10 all the details.

11      Q.    Are you familiar with the name

12 Yitzchak Zelman?

13      A.    I don't remember all the

14 details now I told you.

15      Q.    Do you know the name of the

16 attorney that first filed this action in

17 the New York State Supreme Court?

18      A.    I told you I don't remember all

19 the information.

20      Q.    You said earlier that you

21 formed RD to do a favor for Yehuda Solomon,

22 is that correct?

23      A.    Yes.

24      Q.    Could you describe the nature

25 of that favor?



Page 73

1          A.      As I told you, it was a favor

2     for -- he needed financing.

3          Q.      And how were you helping?

4          A.      By helping him getting a loan.

5          Q.      As part of that transaction in

6     2017, did RD at any point receive a deed to

7     the property?

8          A.      I don't remember details.

9          Q.      Did RD ever pay any money for

10    the property?

11         A.      I don't remember the details

12    exactly, I told you.

13         Q.      Mr. Solomon, I'm going to share

14    my screen.  Hopefully everybody can see

15    that.  Do you see a document on your

16    screen, Mr. Solomon?

17         A.      "Mr. Solomon"?

18         Q.      I'm sorry, Mr. Kaufman.  Do you

19    see a document on your screen?

20         A.      Okay.

21         Q.      I'm going to mark this as

22    Exhibit 1.  This is an Agreement of Sale

23    dated as of November 28th, 2016 between

24    Novartis Corporation and RS Old Mill, LLC.

25                 (Whereupon, November 28, 2016



Page 74

1           Agreement of Sale was marked as

2           Kaufman Exhibit 1 for identification

3           as of this date by the Reporter.)

4       Q.    Mr. Kaufman, do you recall ever

5    seeing this document?

6       A.    I don't remember.  I don't

7    remember details now I told you.  It was a

8    while ago.  I don't remember.

9       Q.    I'm asking you to take a look

10   at the document and see if that helps you

11   recall whether or not --

12      A.    I don't remember it.  I don't

13   remember details.

14           MR. FRECHETTE:  Excuse me, wait

15       a second.

16           I don't know whether he's able

17       to, Steve, but I'm not able to scroll

18       through the document.  And I think if

19       you're going to ask him to identify a

20       document, he ought to be able to at

21       least look at it in its entirety.  In

22       fairness, I'm a complete Luddite, so

23       I don't want to suggest that -- maybe

24       he's able to do it and I'm not, but.

25      Q.    Mr. Kaufman, are you able to



Page 75

1    see this document?

2           A.    I told you I don't remember

3    details.  I told you this.

4           Q.    Do you have any knowledge

5    concerning an agreement of Novartis

6    Corporation to sell the 25 Old Mill

7    property to RS Old Mill, LLC?

8           A.    I don't remember this

9    information.

10          Q.    Do you know whether RS Old

11   Mill, LLC ever contracted to purchase the

12   25 Old Mill Road property from Novartis?

13          A.    I told you, I don't remember

14   the information.  It's a while ago.  I

15   don't remember every details.

16          Q.    Do you know how much RS Old

17   Mill, LLC was paying for the property --

18          A.    I told you I don't remember the

19   information.

20          Q.    I'm going to mark this as

21   Exhibit 2.  This is an Agreement of

22   Assignment entered into the 29th day of

23   November 2016 between RS Old Mill, LLC and

24   RS Old Mills Road, LLC.

25                    (Whereupon, November 29, 2016



Page 76

1           Agreement of Assignment was marked as

2           Kaufman Exhibit 2 for identification

3           as of this date by the Reporter.)

4      Q.    Mr. Kaufman, do you recall an

5  Agreement of Assignment in November 2016

6  related to the 25 Old Mill property?

7      A.    You asked me that already.  I

8  told you I don't remember.

9      Q.    This is a slightly different

10  question.  And thank you for clarifying

11  that.  The last question related to a

12  transaction from Novartis to RS Old Mill.

13  Now I'm asking about an assignment from RS

14  Old Mill to RS Old Mills Road.  Do you

15  recall --

16      A.    You said 2016.

17      Q.    Correct.

18      A.    And over here it says 2019.

19  I'm trying to figure out all --

20           MR. FRECHETTE:  Again, I'm

21        going to object.  I can't scroll

22        through this document, so if you're

23        asking him questions about a document

24        that he can't see the entirety of, I

25        think that's inherently unfair.  You



Page 77

1        can obviously continue as you deem

2        appropriate, but.

3             MR. GRABLE:  I haven't asked a

4        single question about the document.

5        I'm just asking if he recalls an

6        assignment.

7             MR. FRECHETTE:  Well, Steve,

8        come on, in context, when you put up

9        a document that says "assignment" and

10       then you ask him questions about an

11       assignment, I think the average

12       person fairly concludes that the

13       assignment you're talking about is

14       the one that's showing on the screen.

15            So if you want to take it down

16       and ask him questions, that's fine.

17       But let's not jumble that up.

18            MR. GRABLE:  I am doing the

19       best I can, counsel.  I hoped to

20       deliver these documents to

21       Mr. Kaufman in advance of the

22       deposition in hard copy.  He or you

23       were unwilling to provide an address,

24       so here we are.

25            The document is available, I



Page 78

1          believe it's scrollable, I believe
2          it's viewable.  And when I get to
3          questions about the documents, we
4          will work through them.
5               MR. FRECHETTE:  Okay, Steve,
6          first of all, I didn't suggest that
7          you weren't doing the best you can.
8          I accept your representation in that
9          regard.  I think you're doing a very
10         able job.
11              That said, I am not having any
12         luck scrolling the document.  And
13         Mr. Kaufman, if I might inquire,
14         Mr. Kaufman, are you able to scroll
15         the document on your page?
16              THE WITNESS:  I could try to
17         zoom in to it, it's not so clear.
18         But I'm trying to zoom in.  A little
19         bit.  But that's why I see the date.
20         I'm trying to figure out what's going
21         on over here.
22         Q.    My colleague just placed a
23    document in the chat.  Perhaps that's an
24    easier way to proceed for everyone.
25              MR. FRECHETTE:  Got it.  I



Page 79

 1          appreciate it.

 2                  I can now read it, as I presume

 3          the witness can.  So thank you very

 4          much for that.

 5          Q.    As we enter each exhibit, we

 6   will put them --

 7          A.    Give me one minute.

 8                  MR. FRECHETTE:  I'm sorry,

 9          Steve, you were saying.

10                  MR. GRABLE:  As we introduce

11          exhibits, we'll put them in the chat

12          function so everybody can download

13          them, view them, do what they want.

14                  MR. FRECHETTE:  That's perfect.

15          Thank you very much.

16          Q.    Mr. Kaufman, are you with us?

17          A.    Yes.

18          Q.    Are you able to view that

19   document?

20          A.    A little bit, but I told you I

21   don't recall it's 2016.  But 2019, 2016,

22   I'm trying to figure out what's going on

23   here.  I'm a little lost.

24          Q.    If you scroll to the last page

25   of the document --



Page 80

1          A.     I can't scroll that.  I can't

2     do that.  I don't know if I can do that.  I

3     don't have that function on my phone to do

4     this.

5               MR. FRECHETTE:  Mr. Kaufman,

6          are you able to open up the document

7          in the chat function?

8               THE WITNESS:  I don't know how

9          to do that.  No, I'm not familiar

10         with that, no.

11         Q.     Mr. Kaufman, what type of

12    device are you on?

13         A.     Galaxy.

14         Q.     Sorry?

15         A.     A Galaxy Note 10.

16         Q.     Are you able to do Zoom on the

17    computers that are in front of you?  Or it

18    looked like an iPad that's also in front of

19    you.

20         A.     I'm in somebody's office.  I

21    have only my phone over here.  I'm too long

22    in this office already.  I didn't know it

23    was going to take so long.  I don't even

24    know what he's talking about.

25               MR. FRECHETTE:  I don't know



Page 81

```
 1          how much help this will be, but we
 2          will e-mail you the document,
 3          Mr. Kaufman.  Although
 4          technological --
 5      A.    I told you, I don't recall
 6  these things.  I don't remember.  I don't
 7  remember.
 8      Q.    Mr. Kaufman, are you willing to
 9  look at documents today to try and refresh
10  your recollection?
11      A.    I could take a look but I'd
12  have to see if I can remember.  2016 -- I
13  don't remember exactly.  I don't remember
14  the date.  I can't remember the time.  I
15  don't remember.  I don't remember.  As I
16  told you, I don't remember.
17      Q.    You have no recollection of an
18  assignment from RS Old Mill, LLC to RS Old
19  Mills Road, correct?
20      A.    I told you I don't remember.  I
21  told you I don't remember.  I'm trying to
22  see what's going on.  On my phone I zoom it
23  in, but I can't...
24      Q.    We're going to introduce
25  another document.  It will be in the chat.
```



Page 82

1        A.    I don't know what chat you're

2    talking about.

3              MR. FRECHETTE:  I think the

4         record needs to reflect that the

5         witness is not seeing these

6         documents.

7        Q.    Mr. Kaufman, you do see the

8    contract of sale on the screen right now,

9    correct?

10       A.    Now I see.  There's 24 lines of

11   it.  What are you trying to...

12             MR. FRECHETTE:  Again, in

13        fairness, Steve, he's seeing the

14        page, not scrollable.  If he can't

15        open chat -- I am able to open chat

16        and I can see the agreement, and I'm

17        more than happy to e-mail it to him.

18        I just don't know whether that's

19        going to work depending upon the

20        device he's on.  But we will go ahead

21        and e-mail it to him.

22             (Whereupon, Contract of Sale,

23        RS Old Mills Rd, LLC and Suffern

24        Partners LLC was marked as Kaufman

25        Exhibit 3 for identification as of



Page 83

1          this date by the Reporter.)

2          Q.    Mr. Kaufman, do you see the

3    contract of sale on your screen?

4          A.    I see that already.  I don't

5    recall what it is.  What are you trying

6    to...

7          Q.    Do you have any knowledge of a

8    contract of sale between RS Old Mills Road,

9    LLC and Suffern Partners, LLC?

10         A.    Give me one moment.  I have to

11   get a bigger device.  I can't see like

12   that.  Let me see if I got an e-mail.

13         Q.    You're going to try and access

14   your e-mail, Mr. Kaufman?  Is that what you

15   said?

16         A.    Something like that.  How could

17   I do -- I can't get it like that.  He's

18   showing the whole time and I can't watch.

19   I can't see.

20              MR. FRECHETTE:  Mr. Kaufman,

21          you want to open the second e-mail

22          that we sent.  That would be the

23          Purchase and Sale Agreement that

24          Mr. Grable is speaking about now.

25         A.    Hold on one second.  I'm



Page 84

1  opening something now.  One minute.  It's

2  not opening.  Hold on one second.  It's not

3  opening.  Hold on one second.  I'm trying

4  to open it but it's not opening.  Hold on

5  one second, please.

6            It doesn't let it open.  I'll

7  try a different way.  It's not opening.

8  Hold on one second.  One minute.

9            I don't know what to do.  I

10  can't use the computers over here because

11  it's not my office.  Not opening.  If you

12  give me a minute, I could try to call my

13  nephew to come into the office.  It doesn't

14  open on my phone.  I'm having issues with

15  it.

16       Q.    We'll proceed as best we can.

17  And if we need to bring you back, we'll do

18  that.  But let's continue.  We've lost

19  enough time as it is and I'd like to

20  continue.

21       A.    I didn't know you would show me

22  things that I can't open on my phone.  What

23  should I do?

24       Q.    I'm going to ask you questions

25  and you're going to answer them.  The same



Page 85

1   thing we've been trying to do for the last

2   two and a half hours.

3              Mr. Kaufman, do you have any

4   knowledge of a contract of sale between RS

5   Old Mill Road, LLC and Suffern Partners,

6   LLC --

7        A.    I told you I don't remember.

8              MR. FRECHETTE:  Sir,

9         Mr. Kaufman -- excuse me, one second.

10        Mr. Kaufman, please let Mr. Grable

11        finish his question.

12       A.    Sorry.

13             MR. FRECHETTE:  I'm sorry,

14        Steve, go ahead.

15       Q.    I'll restate the question.

16   Mr. Kaufman, do you have any knowledge of a

17   contract of sale between RS Old Mills Road,

18   LLC and Suffern Partners, LLC dated

19   December 16, 2016?

20       A.    I don't remember.

21       Q.    Do you have any knowledge

22   concerning any written agreement between RS

23   Old Mills Road and Suffern Partners, LLC

24   related to the property at 25 Old Mill

25   Road?



Page 86

1          A.     I don't remember.

2          Q.     Do you have any knowledge of a

3    written agreement requiring Suffern

4    Partners, LLC to render payment to RD for

5    the property at 25 Old Mill Road?

6          A.     I don't remember.  I told you.

7          Q.     Do you have any knowledge of

8    any oral agreements regarding a transfer,

9    purchase or sale of the property from RS

10   Old Mills Road to Suffern Partners, LLC?

11         A.     I don't remember details.

12         Q.     Did RD ever pay $25 million to

13   RS Old Mill?

14         A.     I told you I don't remember

15   details.

16         Q.     Do you have any knowledge

17   concerning a bargain and sale deed

18   transferring the property from Novartis

19   Corporation to RS Old Mill, LLC?

20         A.     Again, repeat it.

21         Q.     Do you have any knowledge

22   concerning a bargain and sale deed

23   transferring the property from Novartis

24   Corporation to RS Old Mill?

25         A.     I don't remember details, no.



Page 87

1        Q.    Do you know what a bargain and
2    sale deed is?
3        A.    I know something but I don't
4    remember details.
5        Q.    What do you know?
6        A.    I don't remember details.
7        Q.    What is your understanding of a
8    bargain and sale deed?
9        A.    I can't explain it.  I'm not
10   going to describe it.  I don't know
11   exactly.  I don't remember details about
12   the situation, the whole situation.  And I
13   don't remember -- I can't explain what a
14   bargain and sale is.
15       Q.    We're having a lot of
16   difficulty hearing you.
17       A.    I said I can't describe it.  I
18   don't know exactly what it is.  I can't
19   describe it.
20             MR. FRECHETTE:  Mr. Kaufman,
21         something has happened to your sound.
22         It went from being --
23       A.    I have to leave and come back
24   again.  I didn't touch my phone.
25       Q.    Please call back again.  We



Page 88

1   will wait.

2          (Whereupon, a short recess was

3      taken.)

4   BY MR. GRABLE:

5      Q.   Mr. Kaufman, what is your

6   understanding of a bargain and sale deed?

7      A.   I told you I'm not -- I can't

8   describe it exactly.  I'm not too familiar

9   with it.  Whatever I know, I can't describe

10  it.

11     Q.   Do you have any knowledge of a

12  bargain and sale deed transferring the 25

13  Old Mill property from RS Old Mill, LLC to

14  RS Old Mills Road, LLC?

15     A.   I don't remember.

16     Q.   Do you have any knowledge

17  concerning a bargain and sale deed

18  transferring 25 Old Mill property from RS

19  Old Mills Road, LLC to Suffern Partners,

20  LLC?

21     A.   I told you I don't remember

22  information.  I don't remember.

23     Q.   We're going to mark this as

24  Exhibit 4.

25     A.   The what?



Page 89

1         Q.    Can you see my screen,

2    Mr. Kaufman?

3         A.    I see your screen but I told

4    you before, I can't zoom into it.

5         Q.    We're going to mark this as

6    Exhibit 4.  This is a bargain and sale deed

7    from RS Old Mills Road, LLC to Suffern

8    Partners, LLC made as of September 5th,

9    2017.

10              (Whereupon, September 5, 2017

11         Bargain and Sale Deed was marked as

12         Kaufman Exhibit 4 for identification

13         as of this date by the Reporter.)

14        A.    I'm trying to zoom in.

15              MR. FRECHETTE:  Mr. Kaufman,

16         are you able to scroll through that

17         document?  Mr. Kaufman?  Mr. Kaufman,

18         can you hear me?

19              THE WITNESS:  Now I hear you.

20         Before I didn't hear you.  Hello?

21         Hello?  Hello?

22              MR. FRECHETTE:  Steven, are you

23         able to hear the witness?

24              MR. GRABLE:  No.

25        Q.    Mr. Kaufman?



Page 90

1      A.      Yes.

2      Q.      Mr. Kaufman, can you sit up

3   closer to the pickup on your phone, please?

4      A.      I can't sit closer than this.

5   Something's happening, I don't know.

6      Q.      We can't hear you, Mr. Kaufman.

7      A.      I'll call back again.

8              (Whereupon, a short recess was

9        taken.)

10  BY MR. GRABLE:

11     Q.      So we were in what we've marked

12  as Exhibit 4.  And I know you're not able

13  to scroll the document, Mr. Kaufman, but do

14  you see on your screen your signature?

15     A.      I see my signature, okay.

16     Q.      Is that your signature?

17     A.      Yes.

18     Q.      And you have no recollection --

19     A.      I told you --

20     Q.      You have no recollection --

21             MR. FRECHETTE:  Mr. Kaufman,

22       please let Mr. Grable finish.  It's

23       very difficult to make a record here

24       without each side letting the other

25       finish.



Page 91

1          Q.    Mr. Kaufman, you have no

2     recollection of having signed on RD's

3     behalf to transfer the 25 Old Mill property

4     to Suffern Partners, is that correct?

5          A.    I said I don't remember

6     details.

7          Q.    I'm going to introduce as

8     Exhibit 5 a document identified as

9     Claimant's response to Trustee's objections

10    to Claim 26-1 filed by RS Old Mills Road,

11    LLC.

12               (Whereupon, Claimant's Response

13          to Trustee's Objections to Claim 26-1

14          was marked as Kaufman Exhibit 5 for

15          identification as of this date by the

16          Reporter.)

17         Q.    Mr. Kaufman, I will represent

18    to you that this document was filed in the

19    RS Old Mill bankruptcy proceeding.  Can you

20    see this document on your screen?

21         A.    A little bit.  Very not clear.

22    Very, very not clear, but.

23         Q.    Is that better for you?

24         A.    A little, but.

25         Q.    Do you recall signing this



Page 92

1    document on December 3rd, 2019?

2        A.    I don't remember.  I don't

3    remember.

4        Q.    It states here in paragraph 3,

5    "Nobody is contesting that a deed transfer

6    took place from RS Old Mills Road, LLC to

7    Suffern Partners, LLC."

8            Does that help refresh your

9    recollection as to whether you were aware

10   of a deed transferring the 25 Old Mill

11   property from RS Old Mills Road to Suffern

12   Partners?

13       A.    I don't remember details I told

14   you.  I told you.

15       Q.    Did you authorize the filing of

16   this document in the RS Old Mill bankruptcy

17   proceeding?

18       A.    What?

19       Q.    Did you authorize the filing of

20   this document in the RS Old Mill bankruptcy

21   proceeding?

22       A.    I'm trying to understand what

23   you're saying now.  Explain your question

24   again.

25       Q.    You indicated earlier that you



Page 93

1    have an affirmation in front of you dated

2    December 16th, 2019, correct?

3         A.    Yes.

4         Q.    You authorized that affirmation

5    to be filed in the RS Old Mill bankruptcy

6    proceeding, correct?

7         A.    Going from one to the next.

8         Q.    Mr. Kaufman, are you looking at

9    your December 16, 2019 affirmation?

10        A.    2009?  No.  I'm looking at

11   December 16, 2019 affirmation, yes.

12        Q.    You authorized that document to

13   be filed in the RS Old Mill bankruptcy

14   proceeding, correct?

15        A.    Yes, but I don't remember

16   details.  I'm trying to refresh my memory,

17   but I don't remember details.

18        Q.    Who requested that you provide

19   that affirmation?

20        A.    The what?

21        Q.    Who requested you to sign that

22   document?

23        A.    This was -- two gentlemen came

24   over to me that they coming for my

25   brother-in-law, help him financing.



Page 94

1        Q.    In December 2019, who asked you
2   to sign this affirmation?
3        A.    I don't remember.  I don't
4   remember.  I'm trying -- I don't remember.
5             MR. GRABLE:  We're going to
6        mark as Exhibit 6 a copy of that
7        December 16, 2019 affirmation which
8        Mr. Kaufman has a copy of in front of
9        him.
10            (Whereupon, December 16, 2019
11       Affirmation was marked as Kaufman
12       Exhibit 6 for identification as of
13       this date by the Reporter.)
14            MR. FRECHETTE:  Well, in
15       fairness, we don't know whether he
16       has the same document in front of
17       him.  I assume it's the same, but --
18       A.    It looks different to me, but
19   yeah.
20       Q.    I don't know how it looks
21   different; you haven't seen the document
22   that we're all looking at.  But let me show
23   it to you.
24       A.    I looked at the bottom of it.
25   It looks different from mine.  So I'm



Page 95

1    trying to figure out.  That's why I was

2    looking at my papers.  I don't know.  It's

3    just two lines, but the rest I can't see.

4    But anyway.

5         Q.    I'm sharing my screen with you

6    again, Mr. Kaufman.  Let me scroll down to

7    the document.  It says at the top "Document

8    243-29."  The copy you're holding has a

9    header like that at the top?

10        A.    Yeah.

11        Q.    It has that header, "Doc

12   243-29"?  And you have pages 2 of 4 --

13        A.    What?  What are you talking

14   about?

15        Q.    I'm asking if this document

16   that I'm showing you is the same document

17   you have in your hand.

18        A.    I'm trying to see.  I don't

19   know.  What are you asking me?  If it has

20   what number?

21        Q.    Who is the notary on the

22   document you're looking at?

23        A.    The notary is Michelle

24   Pellicione.

25        Q.    Is it Michael A. Pellicione?



1         A.      Yes.

2         Q.      And the last paragraph starts

3    "finally, I felt very pressured"?

4         A.      Yes.

5         Q.      Turn to the prior page, the

6    first full paragraph starts "it is

7    important to note."

8         A.      The first --

9         Q.      The second page of the

10   document.  The paragraph that starts "it is

11   important to note."

12        A.      I don't see that.  One minute.

13   Which page is that?

14        Q.      Do you have the page that has

15   the paragraph "it is important to note"?

16        A.      I don't see that.

17        Q.      How many pages is the document

18   you're holding?

19        A.      I have four pages.

20        Q.      Can you hold your document up

21   to the screen, please.  And the prior page.

22               Can you do that again, please,

23   slowly.

24               Do you know if that document

25   was ever filed in a court?



Page 97

1          A.     I don't remember details I told

2    you.

3               MR. GRABLE:  I'm going to

4          introduce another document.  Don, I

5          think this will be the final one and

6          then we'll break for lunch.

7               MR. FRECHETTE:  Okay, thanks.

8               MR. GRABLE:  Don, are you able

9          to e-mail this document to

10         Mr. Kaufman?

11              MR. FRECHETTE:  We're e-mailing

12         all of the exhibits and we're happy

13         to do that with this as well.

14              MR. GRABLE:  I'm going to mark

15         as Exhibit 7 a document dated

16         December 15, 2019 filed by RS Old

17         Mills Road, LLC in the RS Old Mill

18         bankruptcy proceeding, a request for

19         reconsideration.

20              (Whereupon, Request for

21         Consideration was marked as Kaufman

22         Exhibit 7 for identification as of

23         this date by the Reporter.)

24         Q.     Mr. Kaufman, I believe your

25    counsel has e-mailed you a copy of this



Page 98

1   document, or will momentarily.

2          A.     Okay.  Are you finished?

3          Q.     I'd like to see if you can open

4   this document, which is much smaller in

5   size than the last document you tried to

6   open.

7          A.     As I told you before, it

8   doesn't let me open any document.  That's

9   what I'm trying to explain to you.  I had

10  the issue before and I told you I'm only on

11  a phone.  I'm not on a computer that I

12  could use because I'm in somebody's office.

13             It's like I told you before, I

14  couldn't open it.  I tried both e-mails, it

15  didn't work.

16         Q.     So prior to today, have you

17  ever been able to view a PDF document on

18  your phone?

19         A.     Half sometimes it doesn't let

20  me, sometimes it does let me.  I have a

21  computer for a reason.  But I'm not next to

22  my computer now, as I told you.

23         Q.     I understand.  I'd like you to

24  try and open this document on your phone,

25  please.



Page 99

1        A.    I will try one more time.  I
2    told you before it did not work.
3        Q.    I'd like you to try one more
4    time.  Thank you.
5        A.    Okay.  It goes to download but
6    it doesn't open.  I have the same issue all
7    the time.  I was trying to get the guy's
8    computer here but I can't -- I'm not in my
9    office today.  So my office is not usable.
10   So my computer, it does not go.
11       Q.    If it doesn't open, it doesn't
12   open, Mr. Kaufman.  That's fine.  I just
13   wanted you to try one more time.  You're
14   unable to open the document, correct?
15       A.    At the moment it's not working,
16   no.  Something is wrong.
17       Q.    Do you recall ever asserting
18   during the RS Old Mill bankruptcy
19   proceeding that RD was owed $12.5 million?
20       A.    I don't remember details I told
21   you.
22       Q.    You don't remember any details
23   about any part of the 25 Old Mill
24   transaction that occurred in 2017, is that
25   correct?



1      A.    At the moment I don't remember

2   details, no.

3      Q.    Will you remember details

4   tomorrow?

5      A.    I don't know.  I have to -- I

6   don't remember.  I don't know.

7      Q.    Did you remember details

8   yesterday?

9            MR. FRECHETTE:  Objection.

10     A.    Hello?

11     Q.    Yes, I'm here.  Can you see my

12  screen?

13     A.    I see your screen.  I don't

14  remember.  I don't remember it.  I told you

15  before I don't remember.

16     Q.    Do you recall signing this

17  document on December 15, 2019?

18     A.    If I signed, it was probably

19  done, but I don't remember the details I

20  told you.

21     Q.    It says in paragraph 1, "RS Old

22  Mills Road, LLC never received $12.5

23  million from the closing between itself and

24  Suffern Partners."  Does that help refresh

25  your recollection as to --



Page 101

1      A.      Not at the moment.

2      Q.      -- whether you -- does that

3  help refresh your recollection as to

4  whether you ever claimed during the RS Old

5  Mill bankruptcy proceeding that RD was owed

6  $12.5 million?

7      A.      As I told you before, I don't

8  remember.

9      Q.      Do you recall if RD filed a

10  claim in the Old Mill bankruptcy

11  proceeding?

12      A.      I don't remember offhand the

13  details now.

14      Q.      Do you recall signing

15  affirmations that were filed on RD's behalf

16  during the Old Mill bankruptcy?

17      A.      If my signature was there, I

18  signed.  But I don't remember details I

19  told you now.  And I don't have the copy.

20  So I have to see the copy.  When I see it

21  I'll be able to tell you details.

22  Possibly, if I remember.  But at the moment

23  I don't remember.

24          MR. GRABLE:  Why don't we take

25      a break.  It's 12:43 p.m.  We've been



Page 102

1          running for a little while, albeit

2          quite slowly.

3          Q.    Mr. Kaufman, if we e-mail you

4    documents during the break, do you have any

5    ability to print documents, view documents,

6    have access to documents?

7          A.    I told you I'm going to try to

8    do it, but I'm not next to my computer.

9    And I have to see if I could get the

10   computer in the office over here.  I'll

11   see.  I don't promise but I'll try to do

12   whatever I can.

13         Q.    Do you have any ability to come

14   to Manhattan to pick up hard copy

15   documents?

16         A.    Not at the moment.

17         Q.    And if we have --

18         A.    I told you I'll see what I can

19   do.  I'll be on break now, let me see what

20   I can do with copies.  I have to try.  And

21   I can't do it at the same time I'm on the

22   phone because I can't put you on hold.  So

23   it's not a proper thing.  So.

24              MR. GRABLE:  Let's go off the

25          record.  It's 12:45 p.m.



Page 103

1          (Whereupon, a short recess was

2       taken.)

3          MR. GRABLE:  Good afternoon.

4       It's 1:40 p.m.  We had taken a lunch

5       break.  We were expecting to be back

6       on at 1:30.  The witness has not yet

7       returned, although all counsel are

8       present again.  We will continue to

9       wait for him.

10         MR. FRECHETTE:  To be clear,

11      the witness said he would do his best

12      to get back by 1:30.  He's

13      endeavoring to find a computer.

14         MR. GRABLE:  We will wait for

15      him.  Thank you.

16         MR. FRECHETTE:  Understood.  We

17      have, by the way, e-mailed him.

18         (Whereupon, a short recess was

19      taken.)

20  BY MR. GRABLE:

21      Q.   Mr. Kaufman, welcome back.  You

22  can hear us okay?

23      A.   So far, so good.

24      Q.   Is David Solomon a consultant

25  to RD?



Page 104

1        A.      What?

2        Q.      Is David Solomon a consultant

3   to RD?

4        A.      I've consulted with him in the

5   past.

6        Q.      What have you consulted with

7   him on?

8        A.      Certain details.  Certain

9   things.  I don't remember exactly about

10  what, but certain things I consulted with

11  him in the past the whole time.

12       Q.      For what purpose do you consult

13  with him?

14       A.      What do you mean "what

15  purpose"?

16       Q.      Well, David Solomon is not an

17  owner of RD, correct?

18       A.      No.

19       Q.      And David Solomon is not an

20  officer of RD, correct?

21       A.      No.

22       Q.      And David Solomon is not a

23  member of RD, correct?

24       A.      Okay.

25       Q.      And David Solomon is not an



Page 105

1  employee of RD, correct?

2       A.     Okay.  No.

3       Q.     So what issues surrounding RD

4  are you consulting with David Solomon on?

5       A.     At the moment I don't remember

6  specific things.  I needed help and he's

7  familiar with the case so I spoke to him.

8  But I don't remember exactly details.

9       Q.     Does Mr. Solomon serve as a

10 middleman between you and Yehuda Solomon?

11      A.     He's a what?

12      Q.     Does David Solomon help

13 coordinate communication between you and

14 Yehuda Solomon?

15      A.     He just helped me.  I told you

16 I don't remember exactly what.  He helped

17 me out.

18      Q.     What does that mean?  He helps

19 you with what?

20      A.     Understanding certain things.

21      Q.     What types of things?

22      A.     The whole situation.  I don't

23 remember at the moment now.

24      Q.     What situation?

25      A.     On the whole deal, on the --



Page 106

1   what happened, on certain things.  But I'm

2   telling you I don't recall now what he

3   helped me out.

4        Q.    Well, you've consulted with him

5   just this morning, right?  You were with

6   him?

7        A.    This morning I was --

8              MR. FRECHETTE:  Objection.

9         That's a compound question.

10       Q.    Did you consult with David

11  Solomon this morning?

12             MR. FRECHETTE:  Objection.  You

13        can answer, Mr. Kaufman.

14       A.    Okay, I told you he was there

15  because he was helping me with language and

16  everything because he wanted -- he should

17  be out, he was helping me with things I

18  didn't understand.  But that's it.  Since

19  the morning he left also.  He was not

20  consulting the whole time.

21       Q.    Do you know if David Solomon

22  ever signed an affirmation to be filed in

23  connection with the court proceeding?

24       A.    I don't know.

25       Q.    If David Solomon had submitted



Page 107

1   an affirmation, would you have asked him to

2   do that?

3        A.    I told you I don't know.   I

4   told you -- you asked me something a minute

5   ago, I told you I don't know.  I should ask

6   you that.  If I don't know, I don't know.

7   How should I ask him to do it?

8        Q.    Would you agree that you don't

9   seem to know anything about RD and its

10  operations?

11            MR. FRECHETTE:  Objection.

12       Q.    You can answer.

13       A.    Hello?  I don't remember or

14  recall things.  I don't remember certain

15  things.  I just looked at papers also, but

16  if I remember everything?  I don't remember

17  everything.  I have to look it over.

18       Q.    So you don't recall a single

19  attorney that you've coordinated with in

20  regards to the 2017 sale transaction,

21  correct?

22       A.    The what?

23       Q.    You don't recall any attorney

24  that represented RD for the 2017

25  transaction, correct?



Page 108

1       A.     I didn't say anything.  I told

2  you I don't remember certain things.

3  That's what I told you.

4       Q.     Do you remember any attorney

5  that was involved in that transaction?

6       A.     There's a few things -- I don't

7  remember exactly.  I don't remember.  I

8  don't remember details.  As I told you this

9  before.

10       Q.     You can just answer no if the

11  answer is no.  I'll ask the question again.

12  Do you remember any attorney that was

13  involved --

14       A.     I told you I don't remember.

15       Q.     Do you remember any attorney

16  that was involved in the 2017 transaction?

17       A.     I don't remember.

18       Q.     And you were not personally

19  involved in that 2017 transaction, correct?

20       A.     I was involved with -- from

21  outside, but I wasn't involved -- I was

22  involved but not in daily things.

23       Q.     What was your involvement?

24       A.     As you asked me before, it was

25  for the -- going over for the RD.  The



Page 109

1    details I don't remember.

2        Q.    Does Yehuda Solomon direct you

3    what to do with respect to RD?

4        A.    Again?

5        Q.    Does Yehuda Solomon give

6    direction to you to take actions on behalf

7    of RD?

8        A.    No, not Yehuda Solomon.

9        Q.    Who gives you direction to take

10   action on behalf of RD?

11       A.    I told you I had some people

12   help me that was involved, a few people.

13   But I don't remember exactly now the

14   details.

15       Q.    Do you remember any of the

16   individuals that helped you?

17       A.    Not at the moment.

18       Q.    When is the last time you spoke

19   to Yehuda Solomon about this litigation?

20       A.    I don't remember.

21       Q.    Was it within the last week?

22       A.    I don't remember.  Not that I

23   recall.  I don't remember.  No.

24       Q.    Do you think you spoke with him

25   in the last month about this litigation?



Page 110

1        A.    No.

2        Q.    Have you spoken to Yehuda

3   Solomon at all in 2021 about this

4   litigation?

5        A.    I don't remember.  I don't

6   recall.

7        Q.    Have you ever heard of an

8   entity called Lone Pine?

9        A.    Hello?

10       Q.    Yes.  Have you ever heard of an

11  entity called Lone Pine?

12       A.    I don't recall.  I don't

13  remember.  I don't remember the

14  information.

15       Q.    Have you ever heard of an

16  entity called Beauty Brags?

17       A.    I don't remember.  I don't

18  recall.

19       Q.    What business is David Solomon

20  in?

21       A.    I don't know.  I don't do any

22  business with him.  It's a private

23  business, so I don't know.

24       Q.    Is David Solomon employed?

25       A.    If you want to ask him.  I



Page 111

1   don't know.  I don't know what he does.

2        Q.    You were just with him this

3   morning driving around and you don't know

4   what David Solomon does?

5        A.    No.  Why should I know what

6   David Solomon does because I was with him

7   this morning?  I'm in somebody's office now

8   also and don't know what he does.

9        Q.    David Solomon submitted an

10  affidavit on behalf of RD in this

11  litigation.  So you must know something

12  about him, correct?

13       A.    As I told you, I don't know

14  exactly what he does.  I don't know exact

15  details.  I don't know.  I never asked.

16       Q.    You know where David Solomon

17  lives, correct?

18       A.    Yes.

19       Q.    Does David Solomon work in

20  Brooklyn?

21       A.    Sometimes maybe he's here a lot

22  of times.  I don't know.  I don't know

23  details.

24       Q.    Does David Solomon sell goods

25  through the Amazon platform?



Page 112

1      A.    I told you I don't know.

2      Q.    Who did you coordinate with in

3  commencing this lawsuit?

4      A.    I don't remember.  I don't

5  remember details, no.

6      Q.    Prior to preparing for this

7  deposition, did you ever have a direct

8  conversation with any of the attorneys that

9  represented RD?

10     A.    I don't remember.  I don't

11 recall.

12     Q.    Other than some e-mails that

13 you spoke to earlier, does RD maintain any

14 documents?

15     A.    I don't recall.  I don't

16 recall.

17     Q.    Are you aware that RD produced

18 documents in connection with this

19 litigation?

20     A.    What kind of documents?

21 Explain to me what kind of documents are

22 you talking about?

23     Q.    Are you aware that RD produced

24 documents in connection with this

25 litigation?



Page 113

 1        A.     I'm not familiar exactly.

 2        Q.     Have you ever reviewed any

 3   closing statements rendered in conjunction

 4   with the 2017 transaction?

 5        A.     I don't remember exactly

 6   details.

 7        Q.     You indicated earlier that

 8   after the 2017 transaction closed, you

 9   contacted Yehuda Solomon to ask about the

10   transaction, correct?

11        A.     The what?  Again?

12        Q.     Let me ask it a different way.

13   You allege now that RD is owed $30 million,

14   correct?

15        A.     Okay.

16        Q.     Is that a "yes"?

17        A.     I'm trying to -- what are

18   you -- I'm trying to -- you asked me three

19   questions of the same thing.  I'm trying to

20   figure out what are you referring me.  To?

21        Q.     You don't have to figure it

22   out.  You just have to answer my questions.

23        A.     You asked me two questions.

24        Q.     I'll say it again.  Do you

25   allege now that RD was owed $30 million in



Page 114

1    conjunction with the 2017 transaction?

2         A.    I don't remember exactly the

3    numbers.  They're owed a lot of money, yes.

4    Don't catch me on numbers, on details.

5         Q.    So you're not certain what RD

6    is owed in conjunction with the 2017

7    transaction, correct?

8         A.    At the moment I don't remember

9    details.

10        Q.    Why do you believe RD is owed

11   anything in conjunction with the 2017

12   transaction?

13        A.    I told you I don't remember

14   details.  I have to look it -- I don't

15   remember details.

16        Q.    Do you have any documents that

17   support your allegation that RD is owed

18   money from Suffern Partners, LLC?

19        A.    I told you I don't remember

20   details now.

21        Q.    So is it correct that you have

22   no documents that support --

23        A.    I didn't say I have no

24   documents.  I don't know I told you.  I

25   don't remember details.



Page 115

1        Q.    Do you remember anything?

2   Forget details, do you remember anything

3   about the 2017 transaction?

4        A.    Yes.   I told you I remember he

5   came over to me.   I told you this already.

6   But I don't remember details.

7        Q.    So other than asking to do a

8   favor for Yehuda Solomon, do you remember

9   anything else about RD's involvement in the

10  2017 transaction?

11       A.    I don't remember -- I don't

12  remember exactly details, but there's some

13  stuff.   I don't remember by having a lot of

14  details exactly.   But I was aware of '17 --

15  after -- I don't recall.   I don't have it

16  in front of me so I don't know.

17       Q.    Are you familiar with the name

18  Joseph Paukman?   P-A-U-K-M-A-N?

19       A.    I remember hearing the name.   I

20  don't remember anything he was involved.   I

21  don't remember details.

22            THE REPORTER:   I'm sorry, can

23  you give me the answer again?

24       A.    I said I remember hearing that

25  name.   I don't remember details.



Page 116

1          Q.     Have you ever met Joseph

2     Paukman?

3          A.     I don't remember.  I don't

4     recall.  I don't remember.

5          Q.     Do you know what Joseph Paukman

6     does for a living?

7          A.     I told you I don't remember.

8          Q.     You just recall hearing the

9     name, correct?

10         A.     I told you I hear the name but

11    I don't remember exact details.

12         Q.     Did you ever sign an

13    irrevocable letter of direction in

14    connection with the 2017 transaction?

15         A.     I don't understand the

16    question.

17         Q.     You don't understand the

18    question?

19         A.     No.

20         Q.     Did Thomas Landrigan serve as

21    the escrow agent for RD in connection with

22    the 2017 transaction?

23         A.     Who is that?

24         Q.     Thomas Landrigan.

25         A.     I don't know which one you're



Page 117

1   talking about.  I don't remember what

2   you're talking about.  So you have to be

3   like -- I don't know what you're talking

4   about.

5        Q.    Have you heard the name Thomas

6   Landrigan before today?

7        A.    Yes.

8        Q.    When do you recall hearing the

9   name Thomas Landrigan?

10       A.    By the -- when I helped Yehuda.

11  But I never met this guy.  Just they told

12  me he's on the phone.  But I don't remember

13  details.

14       Q.    Did you ever sign any documents

15  for Thomas Landrigan?

16       A.    I signed -- no, I signed

17  documents for the people that came to do

18  the -- for the finance for Yehuda Solomon.

19       Q.    And you signed those documents

20  at the request of Yehuda Solomon, correct?

21       A.    At the request of them with him

22  on the phone.

23       Q.    So Yehuda Solomon asked you to

24  sign those documents, correct?

25       A.    I didn't say that.  I said



Page 118

1   these two people came down to me and they

2   asked me to sign papers for Yehuda Solomon

3   to finance.

4        Q.    So Yehuda Solomon and two other

5   individuals asked you to sign documents for

6   Yehuda Solomon's benefit, correct?

7        A.    It was a company that I signed

8   and they asked me to sign for Yehuda

9   Solomon.

10       Q.    And because Yehuda Solomon was

11  on the phone and was also asking, you

12  signed those documents, correct?

13       A.    No.  I did not say that.

14       Q.    What do you recall about that

15  night?

16       A.    I remember them coming down to

17  my house asking me to sign that Yehuda

18  needs help for finance.

19       Q.    And the first thing you did was

20  pick up the phone and call Yehuda Solomon,

21  correct?

22       A.    No.

23       Q.    So what did you do when he

24  asked you to sign documents?

25       A.    They asked me to sign that



Page 119

1    Yehuda needs a loan for a debt.  So I said
2    I'll do it for him.
3         Q.    You signed a document so that
4    Yehuda Solomon could get a loan, is that
5    correct?
6         A.    For Yehuda Solomon to get
7    finance, yes.
8         Q.    Do you recall what documents
9    you signed?
10        A.    I don't remember exactly.  I
11   have to look it over.  I don't have it in
12   front of me.
13        Q.    Other than that one night,
14   which is referenced in your December 16th,
15   2019 affirmation, did you ever sign any
16   other documents in connection with the
17   financing for Yehuda Solomon?
18        A.    I don't remember.
19        Q.    Have you ever heard of an
20   entity named Riverside Abstract?
21        A.    I heard something about it, but
22   I don't recall exactly.
23        Q.    Did you cause RD to deliver any
24   documents to Riverside Abstract in
25   connection with the 2017 transaction?



Page 120

```
 1        A.    I don't remember the documents
 2   in the moment.
 3        Q.    Other than signing documents as
 4   requested by two individuals and Yehuda
 5   Solomon, you had no personal involvement in
 6   the 2017 transaction, correct?
 7        A.    I don't remember details what
 8   it was, but it was done -- I did it for --
 9   that's how it started.
10        Q.    Did RD ever hold a deed to the
11   property for 25 Old Mill?
12        A.    I don't remember.  I told you I
13   don't have the papers in front of me, I
14   don't remember details.  I told you I don't
15   remember details.
16        Q.    Did you ever capitalize RD with
17   any money?
18        A.    If I what?
19        Q.    Did you ever make any
20   investment in RD?
21        A.    I told you I don't remember
22   details about it.
23        Q.    Is RD just a shell company?
24              MR. FRECHETTE:  Objection.
25        Q.    You can answer.  Is RD just a
```



Page 121

1    shell company?

2         A.    RD was the loan or something.

3    But no, I don't remember details I told you

4    now.

5         Q.    Have you ever e-mailed with

6    David Solomon regarding the 2017

7    transaction?

8         A.    I don't recall.  I don't

9    remember.

10        Q.    Have you ever e-mailed with

11   Marty Stern regarding the 2017 transaction?

12        A.    I don't remember.

13        Q.    Have you ever e-mailed with

14   Moshe Stern concerning the 2017

15   transaction?

16        A.    I don't recall.  I don't

17   remember.

18        Q.    Have you ever e-mailed with

19   Moses Stern regarding the 2017 transaction?

20        A.    I don't recall.  I don't

21   remember.

22        Q.    Does RD have an accounting firm

23   that they use?

24        A.    I'm not familiar -- I don't

25   know.



Page 122

1          Q.     Does RD maintain any financial

2    books and records?

3          A.     I don't know.  I don't know

4    details.  I don't think so because there's

5    nothing doing in there, but I don't know,

6    it's not in front of me.

7          Q.     Has RD ever filed a tax return?

8          A.     I just told you I don't

9    remember.  I don't recall details.

10         Q.     Have you ever on your personal

11   tax returns identified income related to

12   the RD operations?

13         A.     I told you I don't remember

14   details about it.

15         Q.     Do you recall signing proofs of

16   claim to be filed in the Suffern bankruptcy

17   case on RD's behalf?

18         A.     I told you I don't remember.  I

19   told you I don't remember details.  I don't

20   have papers in front of me, I don't

21   remember details.

22         Q.     You don't recall submitting a

23   proof of claim for $30 million in the

24   Suffern bankruptcy case?

25         A.     I don't remember details now.



Page 123

1      Q.    Less than a month ago a proof
2   of claim was filed on behalf of RD in the
3   Suffern bankruptcy case.  Are you aware of
4   that?
5      A.    I told you at the moment I
6   don't remember details.  I have to see the
7   papers.  I don't know.
8      Q.    Were you able to access your
9   e-mail and documents during the lunch
10  break?
11     A.    Yes.
12     Q.    If we e-mail you documents now,
13  are you able to view them?
14     A.    No.  Because it's not my
15  computer.  I printed out whatever I was
16  sent, but I do not have access to the
17  computer now.
18     Q.    Have you ever identified any
19  losses of RD on your personal tax returns?
20     A.    I told you I don't remember.  I
21  don't know.
22     Q.    You have no knowledge
23  concerning whether RD filed a proof of
24  claim in the Suffern Partners bankruptcy
25  proceeding?



MAGNA
LEGAL SERVICES

Page 124

```
 1        A.     I don't remember details now.
 2               MR. FRECHETTE:  Objection.
 3        Q.     Who is your personal
 4  accountant?
 5        A.     I don't have a personal
 6  accountant.
 7        Q.     You don't have a personal
 8  accountant?
 9        A.     No.
10        Q.     Did you file a tax return for
11  2020?
12        A.     That's my business.  The
13  business takes care of that.
14        Q.     Your business takes care of
15  filing your personal tax returns, is that
16  correct?
17        A.     It goes to the accountant, yes.
18        Q.     I didn't hear that.  Who is the
19  accountant?
20        A.     It's nothing to do with this
21  business, so.
22        Q.     That's not the question.  The
23  question is who is your accountant?
24        A.     It's nothing to do with the
25  business.  So it's for my business.  It's
```



Page 125

1   nothing to do with this, so.

2       Q.    Well, you're a sole member of

3   an LLC and any losses or gains there may be

4   tax consequences.  So it is relevant and

5   I'll ask the question again.  Who is your

6   personal accountant?

7       A.    My personal accountant is for

8   the business, as I said.  It's the same

9   accountant as my business.

10      Q.    So who is your accountant for

11  your business?

12      A.    Somebody Kaufman.

13      Q.    Somebody Kaufman?

14      A.    Yes, a company name.

15  Accountants.  I don't know the name.

16      Q.    Have you ever received a K1 for

17  RD?

18      A.    I don't recall.

19      Q.    Why did you not show up for

20  your deposition earlier this year when we

21  were before the state court?

22      A.    I was away.  I don't remember.

23      Q.    Were you aware that there was a

24  deposition noticed for this proceeding when

25  it was before the state court?



Page 126

1          A.     I don't remember details for

2    you.

3          Q.     Are you aware that David

4    Solomon was noticed for a deposition as a

5    representative of --

6          A.     I told you -- no.

7          Q.     Are you aware that David

8    Solomon was noticed for a deposition as a

9    representative of RD when this matter was

10   before the state court?

11         A.     I don't remember.

12         Q.     Do you know whether David

13   Solomon has ever been deposed in connection

14   with this matter?

15         A.     I don't know.

16         Q.     Are you aware that the costs

17   were awarded against RD for its failure to

18   appear for depositions when we were before

19   the state court?

20         A.     I don't know.

21         Q.     You don't know if you're aware

22   that costs were awarded against RD --

23         A.     I don't remember.  I told you I

24   don't remember any details about it.

25         Q.     Have you ever heard the name


MAGNA
LEGAL SERVICES

Page 127

1   Steven Stern?

2        A.      I don't recall.

3        Q.      Other than Locke Lord, do you

4   remember any of the other attorneys that

5   have represented RD?

6        A.      I don't remember details now.

7        Q.      Are you aware that Locke Lord

8   has filed a request to withdraw as RD's

9   counsel in this litigation?

10       A.      Something I hear but I don't

11  know details.

12       Q.      Did you hear about that from

13  someone other than Locke Lord?

14       A.      No.  I hear it from Locke Lord.

15  But I don't know details.

16            MR. FRECHETTE:  Mr. Kaufman, do

17        not discuss anything that you spoke

18        to counsel about.

19            MR. GRABLE:  Let's take a break

20        until 2:30.  Don, I think we're

21        pretty close.  I just want to go over

22        my notes and make sure we hit

23        everything.

24            MR. FRECHETTE:  Okay, thank

25        you.



Page 128

1                (Whereupon, a short recess was

2          taken.)

3    BY MR. GRABLE:

4          Q.    Mr. Kaufman, other than the

5    Locke Lord firm, have you spoken with

6    anyone else during any of the breaks of

7    this deposition?

8          A.    No.

9          Q.    Have you spoken at all with

10   David Solomon since this morning?

11         A.    No.

12         Q.    Have you spoken at all with

13   Yehuda Solomon today?

14         A.    I answered this already before,

15   but no.  Have I spoke to him again, no.

16         Q.    RD has never had a bank

17   account, correct?

18         A.    No.

19         Q.    RD has never had any

20   operations, correct?

21         A.    I don't recall, so no.

22         Q.    RD has no books and records,

23   correct?

24         A.    I don't know.

25         Q.    Where in RD's books and records



Page 129

1   does it show a receivable of $30 million

2   for the 2017 transaction?

3        A.    I told you I don't have

4   information in front of me.  I don't recall

5   details now.  I don't have information in

6   front of me.

7        Q.    From 2017 through today, have

8   you ever received a K1 from RD?

9        A.    I don't recall.

10       Q.    If you receive $30 million

11   today from Suffern, where would that money

12   go?

13       A.    That's with the lawyer.  I

14   don't know.  I can't answer that.

15            MR. GRABLE:  I didn't hear that

16        answer, Ms. Reporter.  Can you read

17        that back.

18       A.    I don't know.  I can't answer

19   that.

20       Q.    But you allege you're owed

21   $30 million, correct?

22       A.    I don't know exactly how much,

23   but I told you I can't answer that.

24       Q.    You allege you're owed

25   something from Suffern Partners, correct?



Page 130

1          A.     Yes.

2          Q.     Is it more than a million

3     dollars?

4          A.     I don't remember.  I don't

5     recall how much it is.  It's more, but I

6     don't remember how much it is.

7          Q.     You allege that RD is owed more

8     than a million dollars from Suffern

9     Partners, correct?

10          A.     I don't recall.

11          Q.     If RD received any monies today

12     from anyone, where would that money go?

13          A.     I don't know.  To a lawyer or

14     something, I don't know.

15          Q.     Why would money received by RD

16     go to a lawyer?

17          A.     Again?

18          Q.     Why would money received by RD

19     go to a lawyer?

20          A.     Because we don't have -- it

21     doesn't have a bank account, as I told you

22     before, so.

23          Q.     And what would the lawyer do

24     with the money?  Where would it go?

25          A.     I don't know.  I can't answer



Page 131

1    that as of now.

2         Q.    If RD received $30 million

3    today, would you call Yehuda Solomon to ask

4    him what to do with the money?

5         A.    I can't -- I don't know.  I

6    can't answer you that.

7         Q.    If RD received $30 million

8    today, would it issue a K1 to you?

9         A.    No.

10         Q.    And you have no knowledge of

11    the proofs of claim that RD filed in

12    connection with Suffern Partners'

13    bankruptcy proceeding, correct?

14         A.    What are you talking about?

15         Q.    Do you know what a proof of

16    claim is?

17         A.    What is that?  What are you

18    talking -- what is that?

19         Q.    I'm not answering questions,

20    Mr. Kaufman, but I can help you understand

21    my question.

22         A.    I'm trying to --

23         Q.    Are you aware --

24         A.    I --

25         Q.    Do you know what a proof of



Page 132

1    claim is in a bankruptcy proceeding?

2        A.    I know something -- it's called

3    bankruptcy proceeding.  I'm asking you for

4    when that is because I don't know what

5    you're talking about.

6        Q.    At any time has RD filed a

7    proof of claim --

8        A.    I don't remember.

9        Q.    You have no knowledge of RD at

10   any time having filed a proof of claim in

11   the Suffern Partners bankruptcy proceeding,

12   is that correct?

13       A.    I told you I don't have the

14   papers in front of me.  I don't know

15   details now.  I told you before.  I don't

16   have any papers.  I have to look at all my

17   papers and look it over.  I don't have

18   anything in front of me.

19       Q.    You're on mute again.

20           MR. GRABLE:  Don, I have no

21       further questions at this time.

22       We're going to reserve all rights,

23       obviously, given some of the

24       technological issues we've had and

25       the inability, frankly, to show



Page 133

1        documents to Mr. Kaufman.  I don't

2        know if Pat or you have any

3        questions.

4            MR. FRECHETTE:  Since you've

5        left the deposition open, I don't

6        think it's appropriate for us to ask

7        questions yet.

8            MR. GRABLE:  I am not leaving

9        the deposition open.  I am closing

10        the deposition.  I am reserving all

11        rights to make applications to the

12        court if necessary for any and all

13        relief against this witness, your

14        firm and any other relief that we

15        think might be appropriate in light

16        of the circumstances here.

17            MR. FRECHETTE:  Okay.  Can you

18        state the basis for that?

19            MR. GRABLE:  I'm not going to

20        do that on the record, Don.  I'm

21        happy to talk to you after the

22        deposition.

23            Patrick Healey or Don

24        Frechette, do you have any questions

25        for the witness at this time?



Page 134

1                    MR. FRECHETTE:  Just to be

2          clear, I've asked you to state what

3          the basis for your reservation is so

4          that we might be able to rectify it.

5          And you will not tell us.

6                    MR. GRABLE:  I don't think

7          that's accurate, Don.  The issue

8          is --

9                    MR. FRECHETTE:  All right, so

10         I'm asking.

11                   MR. GRABLE:  The issue that

12         we've had is that I'm not able to

13         show the witness documents because

14         despite us agreeing to this

15         deposition five weeks ago, when he

16         logged on he was in a moving vehicle

17         with a phone and no ability to view

18         any documents.  And also because you

19         wouldn't provide me an address

20         beforehand and take me up on my offer

21         to provide hard copies.  It's a

22         significant limitation.  I worked

23         through it as best as I can.

24                   I'm not sure that we're going

25         to need to redepose Mr. Kaufman in



Page 135

1      any way.  But if at some point that

2      becomes necessary, I reserve the

3      right to make an application to the

4      court.

5           MR. FRECHETTE:  That's fine.

6      We respectfully disagree with your

7      latter assertion that we would not

8      provide you with an address.

9           MR. GRABLE:  Don, I have an

10     e-mail from you that says you're

11     unable to provide an address for

12     Mr. Kaufman, is that not correct?

13          MR. FRECHETTE:  The e-mail says

14     what the e-mail says.  I'm not going

15     to attempt to recharacterize it.  I

16     disagree with the way you

17     characterized my e-mail.

18          MR. GRABLE:  Fair enough.  You

19     and I don't need to pepper the record

20     with this fight.  We can do that

21     before the court.

22          MR. FRECHETTE:  That sounds

23     good, thank you.

24          MR. GRABLE:  Don, you have no

25     questions for the witness then?



Page 136

1          MR. FRECHETTE:  Not at this

2     time.

3          MR. GRABLE:  And Mr. Healey, no

4     questions for the witness?

5          MR. HEALEY:  None.

6          MR. GRABLE:  At this point

7     we'll close the deposition.  Thank

8     you.

9          (Whereupon, at 2:40 P.M., the

10     examination of this witness was

11     concluded.)

12

13

14     °          °               °          °

15

16

17

18

19

20

21

22

23

24

25



Page 137

1              D E C L A R A T I O N

2

3         I hereby certify that having been

4    first duly sworn to testify to the truth, I

5    gave the above testimony.

6

7         I FURTHER CERTIFY that the foregoing

8    transcript is a true and correct transcript

9    of the testimony given by me at the time

10   and place specified hereinbefore.

11

12

13

                    _____
14                  AVROHOM KAUFMAN

15

16

17

     Subscribed and sworn to before me

18

19   this _____ day of _____ 20___.

20

21   _____
        NOTARY PUBLIC

22

23

24

25



Page 138

1                  E X H I B I T S
2    DEFENDANT EXHIBITS
3    EXHIBIT    EXHIBIT                          PAGE
     NUMBER     DESCRIPTION
4
     1        November 28, 2016 Agreement
5             Of Sale                           74
6    2        November 29, 2016 Agreement
              Of Assignment                     76
7
     3        Contract of Sale, RS Old Mills
8             Rd, LLC and Suffern Partners LLC  82
9    4        September 5, 2017 Bargain and
              Sale Deed                         89
10
     5        Claimant's Response to Trustee's
11            Objections to Claim 26-1          91
12   6        December 16, 2019 Affirmation     94
13   7        Request for Consideration         97
14
        (Exhibits accompany the transcript.)
15
16
17
18
                    I N D E X
19
     EXAMINATION BY                             PAGE
20
     MR. GRABLE                                 36
21
22
23
24
25



Page 139

```
 1        C E R T I F I C A T E
 2

   STATE OF NEW YORK        )
 3                :    SS.:
   COUNTY OF ALBANY         )
 4
 5        I, SUZANNE PASTOR, a Notary Public
 6   for and within the State of New York, do
 7   hereby certify:
 8        That the witness whose examination is
 9   hereinbefore set forth was duly sworn and
10   that such examination is a true record of
11   the testimony given by that witness.
12        I further certify that I am not
13   related to any of the parties to this
14   action by blood or by marriage and that I
15   am in no way interested in the outcome of
16   this matter.
17        IN WITNESS WHEREOF, I have hereunto
18   set my hand this day, August 27, 2021.
19
20

           _____
21         SUZANNE PASTOR
22
23
24
25
```

