**EXHIBIT A**

# Statement
# Suffern Partners, LLC

**DG REALTY MANAGMENT**

| Date | Name | Amount | Balance | Diem | Contact Interest | Default Diem | Default Interest |
|------|------|--------|---------|------|------------------|--------------|------------------|
| | | | | 0.15 | 0.15 | 0.09 | |
| 12/10/2018 | Suffern Partners LLC | 125,000.00 | 125,000.00 | 51.37 | 45,616.44 | | |
| 12/10/2018 | Suffern Partners LLC | 375,000.00 | 500,000.00 | 154.11 | 136,849.32 | | |
| 1/1/2019 | DG Realty Management | 25,000.00 | 525,000.00 | 10.27 | 8,897.26 | | |
| 1/31/2019 | Bordeaux Capital LLC | 2,500.00 | 527,500.00 | 1.03 | 858.90 | | |
| 2/1/2019 | DG Realty Management | 25,000.00 | 552,500.00 | 10.27 | 8,578.77 | | |
| 3/1/2019 | DG Realty Management | 25,000.00 | 577,500.00 | 10.27 | 8,291.10 | | |
| 3/1/2019 | Headspace | 1,500.00 | 579,000.00 | 0.62 | 497.47 | | |
| 3/5/2019 | Bordeaux Capital LLC | 2,500.00 | 581,500.00 | 1.03 | 825.00 | | |
| 3/12/2019 | Herrick Feinstein | 25,000.00 | 606,500.00 | 10.27 | 8,178.08 | | |
| 4/1/2019 | DG Realty Management | 25,000.00 | 631,500.00 | 10.27 | 7,972.60 | | |
| 4/4/2019 | Reliable Abstract Co | 2,400.00 | 633,900.00 | 0.99 | 762.41 | | |
| 4/9/2019 | Licata & Conklin | 500.00 | 634,400.00 | 0.21 | 157.81 | | |
| 4/16/2019 | Oved & Oved LLP | 12,643.50 | 647,043.50 | 5.20 | 3,954.12 | | |
| 4/17/2019 | Oved & Oved LLP | 1,850.00 | 648,893.50 | 0.76 | 577.81 | | |
| 5/1/2019 | DG Realty Management | 25,000.00 | 673,893.50 | 10.27 | 7,664.38 | | |
| 5/1/2019 | David Gefner | 49,682.45 | 723,575.95 | 20.42 | 15,231.41 | | |
| 5/2/2019 | O&R | 6,438.19 | 730,014.14 | 2.65 | 1,971.14 | | |
| 5/2/2019 | Kevin DeClark | 1,400.00 | 731,414.14 | 0.58 | 428.63 | | |
| 5/3/2019 | Licata & Conklin | 3,000.00 | 734,414.14 | 1.23 | 917.26 | | |
| 5/13/2019 | IPFS | 20,543.33 | 754,957.47 | 8.44 | 6,196.77 | | |
| 5/15/2019 | David Gefner | 40,000.00 | 794,957.47 | 16.44 | 12,032.88 | | |
| 5/16/2019 | Kevin DeClark | 1,400.00 | 796,357.47 | 0.58 | 420.58 | | |
| 5/16/2019 | Watermark Associates LLC | 8,000.00 | 804,357.47 | 3.29 | 2,403.29 | | |
| 5/16/2019 | Perigrove LLC | 5,000.00 | 809,357.47 | 2.05 | 1,502.05 | | |
| 5/17/2019 | Carlos Landscaping | 1,500.00 | 810,857.47 | 0.62 | 450.00 | | |
| 5/23/2019 | Terry Rice | 5,895.00 | 816,752.47 | 2.42 | 1,753.96 | | |
| 6/1/2019 | DG Realty Management | 25,000.00 | 841,752.47 | 10.27 | 7,345.89 | | |
| 6/6/2019 | Chase Credit CRD Epay | 10,800.00 | 852,552.47 | 4.44 | 3,151.23 | | |
| 6/26/2019 | Hann and Hessen LLC | 50,000.00 | 902,552.47 | 20.55 | 14,178.08 | | |
| 7/1/2019 | DG Realty Management | 25,000.00 | 927,552.47 | 10.27 | 7,037.67 | | |
| 7/2/2019 | RSZ FORENSIC ASSOC | 10,000.00 | 937,552.47 | 4.11 | 2,810.96 | | |
| 7/18/2019 | Oved & Oved LLP | 9,855.00 | 947,407.47 | 4.05 | 2,705.40 | | |
| 7/19/2019 | Watermark Associates LLC | 2,500.00 | 949,907.47 | 1.03 | 685.27 | | |
| 8/1/2019 | DG Realty Management | 25,000.00 | 974,907.47 | 10.27 | 6,719.18 | | |
| 8/8/2019 | Watermark Associates LLC | 2,500.00 | 977,407.47 | 1.03 | 664.73 | | |
| 8/10/2019 | Hann and Hessen LLC | 50,000.00 | 1,027,407.47 | 20.55 | 13,253.42 | | |
| 8/13/2019 | Hann and Hessen LLC | 300,000.00 | 1,327,407.47 | 123.29 | 79,150.68 | | |
| 8/13/2019 | Hann and Hessen LLC | 200,000.00 | 1,527,407.47 | 82.19 | 52,767.12 | | |
| 8/21/2019 | Oved & Oved LLP | 10,066.74 | 1,537,474.21 | 4.14 | 2,622.87 | | |
| 8/29/2019 | Watermark Associates LLC | 2,500.00 | 1,539,974.21 | 1.03 | 643.15 | | |
| 9/1/2019 | DG Realty Management | 25,000.00 | 1,564,974.21 | 10.27 | 6,400.68 | | |
| 9/3/2019 | Oved & Oved LLP | 15,643.70 | 1,580,617.91 | 6.43 | 3,992.36 | | |
| 10/1/2019 | DG Realty Management | 25,000.00 | 1,605,617.91 | 10.27 | 6,092.47 | | |
| 10/29/2019 | Licata & Conklin | 3,000.00 | 1,608,617.91 | 1.23 | 696.58 | | |
| 10/31/2019 | Hann and Hessen LLC | 100,000.00 | 1,708,617.91 | 41.10 | 23,136.99 | | |
| 11/1/2019 | DG Realty Management | 25,000.00 | 1,733,617.91 | 10.27 | 5,773.97 | | |
| 11/22/2019 | David Gefner | 25,000.00 | 1,758,617.91 | 10.27 | 5,558.22 | | |
| 11/29/2019 | David Gefner | 750.00 | 1,759,367.91 | 0.31 | 164.59 | | |
| 12/1/2019 | DG Realty Management | 25,000.00 | 1,784,367.91 | 10.27 | 5,465.75 | | |
| 12/2/2019 | Herrick Feinstein | 25,000.00 | 1,809,367.91 | 10.27 | 5,455.48 | | |
| 12/2/2019 | Oved & Oved LLP | 25,750.00 | 1,835,117.91 | 10.58 | 5,619.14 | | |
| 12/13/2019 | Village Of Suffern | 0.00 | 1,835,117.91 | 0.00 | 0.00 | | |
| 1/1/2020 | DG Realty Management | 25,000.00 | 1,860,117.91 | 10.27 | 5,147.26 | | |
| 1/17/2020 | Oved & Oved LLP | 25,750.00 | 1,885,867.91 | 10.58 | 5,132.36 | 6.35 | 3,079.42 |
| 2/1/2020 | DG Realty Management | 25,000.00 | 1,910,867.91 | 10.27 | 4,828.77 | 6.16 | 2,897.26 |
| 2/8/2020 | Zephyr Jets | 60,647.48 | 1,971,515.39 | 24.92 | 11,539.64 | 14.95 | 6,923.78 |
| 2/10/2020 | Capital Environment Consulting | 13,023.71 | 1,984,539.10 | 5.35 | 2,467.37 | 3.21 | 1,480.42 |

1

# Statement
## Suffern Partners, LLC

**DG REALTY MANAGMENT**

| Date | Name | Amount | Balance | Diem | Contact Interest | Default Diem | Default Interest |
|---|---|---|---|---|---|---|---|
| 2/13/2020 | County of Rockland IDA | 750.00 | 1,985,289.10 | 0.31 | 141.16 | 0.18 | 84.70 |
| 2/14/2020 | Hahn & Hessen LLP | 75,000.00 | 2,060,289.10 | 30.82 | 14,085.62 | 18.49 | 8,451.37 |
| 2/17/2020 | Oved & Oved LLP | 34,888.06 | 2,095,177.16 | 14.34 | 6,509.25 | 8.60 | 3,905.55 |
| 2/18/2020 | Hahn & Hessen LLP | 76,000.00 | 2,171,177.16 | 31.23 | 14,148.49 | 18.74 | 8,489.10 |
| 3/1/2020 | DG Realty Management | 25,000.00 | 2,196,177.16 | 10.27 | 4,530.82 | 6.16 | 2,718.49 |
| 3/16/2020 | Oved & Oved LLP | 34,888.06 | 2,231,065.22 | 14.34 | 6,107.80 | 8.60 | 3,664.68 |
| 3/16/2020 | Oved & Oved LLP | 34,888.06 | 2,265,953.28 | 14.34 | 6,107.80 | 8.60 | 3,664.68 |
| 4/1/2020 | DG Realty Management | 25,000.00 | 2,290,953.28 | 10.27 | 4,212.33 | 6.16 | 2,527.40 |
| 4/14/2020 | CPIF | 250,000.00 | 2,540,953.28 | 102.74 | 40,787.67 | 61.64 | 24,472.60 |
| 4/14/2020 | Eli A. Rubenstein, Esq | 14,250.00 | 2,555,203.28 | 5.86 | 2,324.90 | 3.51 | 1,394.94 |
| 4/16/2020 | Oved & Oved LLP | 34,888.06 | 2,590,091.34 | 14.34 | 5,663.34 | 8.60 | 3,398.00 |
| 4/24/2020 | ISSM Protection | 2,052.98 | 2,592,144.32 | 0.84 | 326.51 | 0.51 | 195.90 |
| 4/27/2020 | Leonard Jackson Associates | 20,000.00 | 2,612,144.32 | 8.22 | 3,156.16 | 4.93 | 1,893.70 |
| 4/27/2020 | Oved & Oved LLP | 35,265.30 | 2,647,409.62 | 14.49 | 5,565.15 | 8.70 | 3,339.09 |
| 4/27/2020 | ISSM Protection | 4,105.95 | 2,651,515.57 | 1.69 | 647.95 | 1.01 | 388.77 |
| 5/1/2020 | DG Realty Management | 25,000.00 | 2,676,515.57 | 10.27 | 3,904.11 | 6.16 | 2,342.47 |
| 5/4/2020 | ISSM Protection | 4,105.77 | 2,680,621.34 | 1.69 | 636.11 | 1.01 | 381.67 |
| 5/8/2020 | Hahn & Hessen LLP | 25,000.00 | 2,705,621.34 | 10.27 | 3,832.19 | 6.16 | 2,299.32 |
| 5/14/2020 | ISSM Protection | 4,105.77 | 2,709,727.11 | 1.69 | 619.24 | 1.01 | 371.54 |
| 5/15/2020 | Eli A. Rubenstein, Esq | 1,500.00 | 2,711,227.11 | 0.62 | 225.62 | 0.37 | 135.37 |
| 5/20/2020 | ISSM Protection | 4,117.95 | 2,715,345.06 | 1.69 | 610.92 | 1.02 | 366.55 |
| 6/1/2020 | DG Realty Management | 25,000.00 | 2,740,345.06 | 10.27 | 3,585.62 | 6.16 | 2,151.37 |
| 6/2/2020 | ISSM Protection | 4,383.55 | 2,744,728.61 | 1.80 | 626.91 | 1.08 | 376.14 |
| 6/5/2020 | Hahn & Hessen LLP | 50,000.00 | 2,794,728.61 | 20.55 | 7,089.04 | 12.33 | 4,253.42 |
| 6/9/2020 | ISSM Protection | 4,105.77 | 2,798,834.38 | 1.69 | 575.37 | 1.01 | 345.22 |
| 6/18/2020 | ISSM Protection | 4,105.77 | 2,802,940.15 | 1.69 | 560.18 | 1.01 | 336.11 |
| 6/26/2020 | ISSM Protection | 8,211.54 | 2,811,151.69 | 3.37 | 1,093.37 | 2.02 | 656.02 |
| 6/26/2020 | evergreen Landscaping | 5,527.13 | 2,816,678.82 | 2.27 | 735.94 | 1.36 | 441.56 |
| 7/1/2020 | DG Realty Management | 25,000.00 | 2,841,678.82 | 10.27 | 3,277.40 | 6.16 | 1,966.44 |
| 7/1/2020 | ISSM Protection | 4,105.77 | 2,845,784.59 | 1.69 | 538.25 | 1.01 | 322.95 |
| 7/3/2020 | Licata & Conklin | 5,000.00 | 2,850,784.59 | 2.05 | 651.37 | 1.23 | 390.82 |
| 7/3/2020 | Hahn & Hessen LLP | 17,500.00 | 2,868,284.59 | 7.19 | 2,279.79 | 4.32 | 1,367.88 |
| 7/3/2020 | Licata & Conklin | 5,000.00 | 2,873,284.59 | 2.05 | 651.37 | 1.23 | 390.82 |
| 7/9/2020 | ISSM Protection | 4,105.77 | 2,877,390.36 | 1.69 | 524.75 | 1.01 | 314.85 |
| 7/11/2020 | Licata & Conklin | -5,000.00 | 2,872,390.36 | -2.05 | -634.93 | -1.23 | -380.96 |
| 7/17/2020 | ISSM Protection | 4,105.77 | 2,876,496.13 | 1.69 | 511.25 | 1.01 | 306.75 |
| 7/28/2020 | ISSM Protection | 4,105.77 | 2,880,601.90 | 1.69 | 492.69 | 1.01 | 295.62 |
| 7/28/2020 | ISSM Protection | 4,105.77 | 2,884,707.67 | 1.69 | 492.69 | 1.01 | 295.62 |
| 8/1/2020 | DG Realty Management | 25,000.00 | 2,909,707.67 | 10.27 | 2,958.90 | 6.16 | 1,775.34 |
| 8/10/2020 | Hahn & Hessen LLP | 50,000.00 | 2,959,707.67 | 20.55 | 5,732.88 | 12.33 | 3,439.73 |
| 8/11/2020 | ISSM Protection | 4,105.77 | 2,963,813.44 | 1.69 | 469.07 | 1.01 | 281.44 |
| 8/21/2020 | ISSM Protection | 4,105.77 | 2,967,919.21 | 1.69 | 452.20 | 1.01 | 271.32 |
| 8/25/2020 | ISSM Protection | 4,260.47 | 2,972,179.68 | 1.75 | 462.23 | 1.05 | 277.34 |
| 8/31/2020 | ISSM Protection | 4,105.77 | 2,976,285.45 | 1.69 | 435.32 | 1.01 | 261.19 |
| 9/1/2020 | DG Realty Management | 25,000.00 | 3,001,285.45 | 10.27 | 2,640.41 | 6.16 | 1,584.25 |
| 9/2/2020 | Oved & Oved LLP | 150,000.00 | 3,151,285.45 | 61.64 | 15,780.82 | 36.99 | 9,468.49 |
| 9/2/2020 | Oved & Oved LLP | 51,500.00 | 3,202,785.45 | 21.16 | 5,418.08 | 12.70 | 3,250.85 |
| 9/9/2020 | evergreen Landscaping | 3,300.00 | 3,206,085.45 | 1.36 | 337.68 | 0.81 | 202.61 |
| 9/10/2020 | Oved & Oved LLP | 51,500.00 | 3,257,585.45 | 21.16 | 5,248.77 | 12.70 | 3,149.26 |
| 9/11/2020 | ISSM Protection | 4,111.55 | 3,261,697.00 | 1.69 | 417.35 | 1.01 | 250.41 |
| 9/15/2020 | IM Insurance Brokerage | 32,120.83 | 3,293,817.83 | 13.20 | 3,207.68 | 7.92 | 1,924.61 |
| 9/16/2020 | ISSM Protection | 4,383.55 | 3,298,201.38 | 1.80 | 435.95 | 1.08 | 261.57 |
| 9/25/2020 | ISSM Protection | 4,105.77 | 3,302,307.15 | 1.69 | 393.14 | 1.01 | 235.88 |
| 10/1/2020 | DG Realty Management | 25,000.00 | 3,327,307.15 | 10.27 | 2,332.19 | 6.16 | 1,399.32 |
| 10/9/2020 | ISSM Protection | 4,105.77 | 3,331,412.92 | 1.69 | 369.52 | 1.01 | 221.71 |
| 10/19/2020 | Key Tov Consulting | 21,389.83 | 3,352,802.75 | 8.79 | 1,837.18 | 5.27 | 1,102.31 |
| 10/20/2020 | ISSM Protection | 4,105.77 | 3,356,908.52 | 1.69 | 350.96 | 1.01 | 210.58 |
| 10/20/2020 | ISSM Protection | 4,105.77 | 3,361,014.29 | 1.69 | 350.96 | 1.01 | 210.58 |
| 10/29/2020 | ISSM Protection | 4,105.77 | 3,365,120.06 | 1.69 | 335.77 | 1.01 | 201.46 |
| 11/1/2020 | DG Realty Management | 25,000.00 | 3,390,120.06 | 10.27 | 2,013.70 | 6.16 | 1,208.22 |

# Statement
## Suffern Partners, LLC

**DG REALTY MANAGMENT**

| Date | Name | Amount | Balance | Diem | Contact Interest | Default Diem | Default Interest |
|------|------|--------|---------|------|------------------|--------------|------------------|
| 11/17/2020 | ISSM Protection | 4,128.91 | 3,394,248.97 | 1.70 | 305.43 | 1.02 | 183.26 |
| 11/17/2020 | ISSM Protection | 4,105.77 | 3,398,354.74 | 1.69 | 303.71 | 1.01 | 182.23 |
| 11/23/2020 | ISSM Protection | 4,105.77 | 3,402,460.51 | 1.69 | 293.59 | 1.01 | 176.15 |
| 12/1/2020 | DG Realty Management | 25,000.00 | 3,427,460.51 | 10.27 | 1,705.48 | 6.16 | 1,023.29 |
| 12/4/2020 | ISSM Protection | 4,383.55 | 3,431,844.06 | 1.80 | 293.64 | 1.08 | 176.18 |
| 12/9/2020 | ISSM Protection | 4,105.77 | 3,435,949.83 | 1.69 | 266.59 | 1.01 | 159.96 |
| 12/22/2020 | ISSM Protection | 4,105.77 | 3,440,055.60 | 1.69 | 244.66 | 1.01 | 146.80 |
| 12/22/2020 | ISSM Protection | 4,105.77 | 3,444,161.37 | 1.69 | 244.66 | 1.01 | 146.80 |
| 12/28/2020 | Hahn & Hessen LLP | 75,000.00 | 3,519,161.37 | 30.82 | 4,284.25 | 18.49 | 2,570.55 |
| 12/28/2020 | Hahn & Hessen LLP | 25,000.00 | 3,544,161.37 | 10.27 | 1,428.08 | 6.16 | 856.85 |
| 12/30/2020 | Jackson Leonard Associates | 10,000.00 | 3,554,161.37 | 4.11 | 563.01 | 2.47 | 337.81 |
| 12/31/2020 | ISSM Protection | 4,383.55 | 3,558,544.92 | 1.80 | 245.00 | 1.08 | 147.00 |
| 12/31/2020 | Jackson Leonard Associates | 10,000.00 | 3,568,544.92 | 4.11 | 558.90 | 2.47 | 335.34 |
| 1/1/2021 | DG Realty Management | 25,000.00 | 3,593,544.92 | 10.27 | 1,386.99 | 6.16 | 832.19 |
| 1/4/2021 | ISSM Protection | 4,383.55 | 3,597,928.47 | 1.80 | 237.79 | 1.08 | 142.68 |
| 1/13/2021 | Village of Montebello | 940.50 | 3,598,868.97 | 0.39 | 47.54 | 0.23 | 28.52 |
| 1/14/2021 | ISSM Protection | 4,105.77 | 3,602,974.74 | 1.69 | 205.85 | 1.01 | 123.51 |
| 1/20/2021 | ISSM Protection | 4,105.77 | 3,607,080.51 | 1.69 | 195.73 | 1.01 | 117.44 |
| 1/28/2021 | ISSM Protection | 4,105.77 | 3,611,186.28 | 1.69 | 182.23 | 1.01 | 109.34 |
| 2/1/2021 | DG Realty Management | 25,000.00 | 3,636,186.28 | 10.27 | 1,068.49 | 6.16 | 641.10 |
| 2/22/2021 | ISSM Protection | 4,105.77 | 3,640,292.05 | 1.69 | 140.05 | 1.01 | 84.03 |
| 2/22/2021 | ISSM Protection | 4,105.77 | 3,644,397.82 | 1.69 | 140.05 | 1.01 | 84.03 |
| 3/1/2021 | DG Realty Management | 25,000.00 | 3,669,397.82 | 10.27 | 780.82 | 6.16 | 468.49 |
| 3/3/2021 | ISSM Protection | 4,105.77 | 3,673,503.59 | 1.69 | 124.86 | 1.01 | 74.92 |
| 3/3/2021 | ISSM Protection | 4,007.38 | 3,677,510.97 | 1.65 | 121.87 | 0.99 | 73.12 |
| 3/11/2021 | ISSM Protection | 4,105.77 | 3,681,616.74 | 1.69 | 111.36 | 1.01 | 66.82 |
| 3/15/2021 | ISSM Protection | 4,105.77 | 3,685,722.51 | 1.69 | 104.61 | 1.01 | 62.77 |
| 4/1/2021 | DG Realty Management | 25,000.00 | 3,710,722.51 | 10.27 | 462.33 | 6.16 | 277.40 |
| 4/6/2021 | ISSM Protection | 4,105.77 | 3,714,828.28 | 1.69 | 67.49 | 1.01 | 40.50 |
| 4/6/2021 | ISSM Protection | 4,082.62 | 3,718,910.90 | 1.68 | 67.11 | 1.01 | 40.27 |
| 4/16/2021 | ISSM Protection | 4,105.77 | 3,723,016.67 | 1.69 | 50.62 | 1.01 | 30.37 |
| 4/16/2021 | ISSM Protection | 4,105.77 | 3,727,122.44 | 1.69 | 50.62 | 1.01 | 30.37 |
| 4/22/2021 | ISSM Protection | 4,105.77 | 3,731,228.21 | 1.69 | 40.50 | 1.01 | 24.30 |
| 4/27/2021 | ISSM Protection | 4,105.77 | 4,085,333.98 | 1.69 | 32.06 | 1.01 | 19.24 |
| 4/30/2021 | CPF | 350,000.00 | 4,081,228.21 | 143.84 | 2,301.37 | 86.30 | 1,380.82 |
| 5/1/2021 | DG Realty Management | 25,000.00 | 4,110,333.98 | 10.27 | 154.11 | 6.16 | 92.47 |
| 5/7/2021 | ISSM Protection | 4,105.77 | 4,114,439.75 | 1.69 | 15.19 | 1.01 | 9.11 |
| 5/7/2021 | ISSM Protection | 4,105.77 | 4,118,545.52 | 1.69 | 15.19 | 1.01 | 9.11 |
| 5/14/2021 | evergreen Landscaping | 2,709.38 | 4,121,254.90 | 1.11 | 2.23 | 0.67 | 1.34 |
| 5/16/2021 | ISSM Protection | 4,105.77 | 4,125,360.67 | 1.69 | 0.00 | 1.01 | 0.00 |
| 5/16/2021 | ISSM Protection | 4,065.26 | 4,129,425.93 | 1.67 | 0.00 | 1.00 | 0.00 |
| | | $4,129,425.93 | $4,129,425.93 | | $792,215.79 | | $145,192.31 |
| | | $4,129,425.93 | $4,129,425.93 | | | | |

**TOTAL** $5,066,834.03

**EXHIBIT B**

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("**Agreement**") is made as of this 10th day of December 2018, between **SUFFERN PARTNERS, LLC**, a New York limited liability company, with an address at 202 Grandview Avenue, Monsey, New York 10950 ("**Borrower**"), and **DG REALTY MANAGEMENT, LLC** a New York limited liability company with an address at 22 Phyllis Terrace, Monsey, NY 10952 ("**Lender**").

WHEREAS, Lender has agreed to make a loan to Borrower in the original principal amount of up to Five Million no/100 ($5,000,000.00) Dollars ("**Loan**") and Borrower has agreed to accept the Loan proceeds on the terms and conditions set forth in the "Loan Documents" (as hereinafter defined); and

WHEREAS, the Loan shall be disbursed as follows: (a) $500,000.00 to Borrower (the "**First Disbursement**" as further detailed in the accompanying Promissory Note) after deducting the fees and expenses detailed in the disbursement sheet annexed hereto as EXHIBIT A and made a part hereof; and (b) the balance of the loan amount after fees (the "**Subsequent Disbursements**") made available to Borrower as a line of credit upon the terms of the Promissory Note. and;

WHEREAS, the Loan is evidenced by that certain Promissory Note of even date herewith ("**Note**") in the amount of the Loan executed by Borrower in favor of Lender, encumbering that certain commercial real estate listed in EXHIBIT B attached hereto ("**Property**"), which Property is more fully described in the herein.  Capitalized terms and phrases used herein and not otherwise defined shall have meanings set forth in the Note, or other Loan Documents. and;

WHEREAS, the members of Borrower have entered into that certain Ownership Interests Pledge And Security Agreement with lender. Pursuant to which Lender shall be entitled to all of the membership interest of Borrower upon the occurrence of an event of default.

WHEREAS, Borrower has consented to Lender filing a UCC financing statement against Borrower.

WHEREAS, the Lender currently serves as the manager of the Property pursuant to that certain Property Management Agreement annexed hereto as EXHIBIT C ("**Management Agreement**")

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.      Loan Documents.  The term "**Loan Documents**" as used in this Agreement means the Note, this Agreement, and any and all other documents executed by Borrower in connection with the Loan.

2.      Purpose.  Proceeds of the Loan shall be used to refinance the subject Property.

3.      Repayment.  The Loan shall be repaid pursuant to the terms and conditions set forth in the Note. Upon the repayment of the Loan by Borrower, acceleration of the obligation under the Note pursuant to an event of default, and/or a sale or refinance of the Property, Lender shall be entitled to a percentage of equity in Borrower based on a $4,858,054.00 contribution ("**Equity Kicker**"). The Equity Kicker shall be

calculated as a capital contribution to the Borrower by the Lender and reduce all other members' respective percentage interests in Borrower on a pro rata basis.

    4.    <u>Management Fees</u>. Any management fees or other monies payable to Lender as property manager under the Management Agreement which remain unpaid following any due date thereunder may be applied by Lender under the Loan as a Subsequent Disbursement. The terms and conditions of the Note shall apply to any Subsequent Disbursement made pursuant to this Section 4..

    5.    <u>Books and Records</u>. Borrower shall maintain accurate books and records for the Property in accordance with generally accepted accounting principles ("GAAP") or such other principles acceptable to Lender, consistently applied and give representatives of the Lender access thereto at all reasonable times, including permission to examine, copy and make abstracts from any of such books and records and such other information as the Lender may from time to time reasonably request, and the Borrower will make available to the Lender for examination copies of any reports, statements and returns which the Borrower may make to or file with any federal, state or local governmental department, bureau or agency.

    6.    <u>Financial Statements; Tax Returns. The provisions of this paragraph 5 shall become effective upon the 3-month anniversary hereof.</u>

    a.    Within thirty (30) days of filing thereof, Borrower shall furnish Lender with their respective annual federal tax returns, including all schedules attached thereto, and within thirty (30) days of Lender's request of same, any and all other information required by Lender, in form and substance acceptable to Lender.

    b.    Borrower shall furnish Lender with all annual internally prepared financial statements including, without limitation, statements of financial condition, income and cash flows, a reconciliation of net worth, a listing of all contingent liabilities, notes to financial statements, and any other information requested by Lender, within ninety (90) days of fiscal year end.

    c.    Borrower shall furnish Lender with any and all information regarding the financial condition and operations of Borrower upon the reasonable request of Lender, which may include all internally prepared quarterly financial statements.

    d.    Borrower shall maintain a financial condition acceptable to the Lender in Lender's sole discretion during the term of the Note, and shall notify Lender of any adverse change in its financial conditions throughout the term of the Loan.

    e.    If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "**Required Records**") required by this Section 5 within the applicable time periods set forth in this Section 5, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $250.00 for each Required

Record that is not delivered prior to the expiration of five (5) days following delivery of notice from Lender to Borrower of such failure to deliver any Required Records.

Borrower acknowledges that Lender has relied on the financial statements provided to Lender and represents and warrants that all matters set forth in the financial statements are true and correct in all material respects and all material liabilities and material contingent liabilities have been fully disclosed. In addition, it shall be an "Event of Default" under the Loan Documents if any of the following shall occur: (i) any failure of Borrower to provide to Lender any of the Required Records within the applicable time periods set forth in this Section 5, (ii) any Required Records shall be materially inaccurate or false, or (iii) the failure of Borrower to permit Lender or its representatives to inspect said books, records and accounts upon request of Lender. Borrower represents and warrants that there has been no adverse material change in the financial statements previously provided to Lender and that Borrower is not the subject of any insolvency proceeding or commencement of a case under Title 11 of the United States Code entitled "Bankruptcy" ("**Bankruptcy Code**") or any other applicable bankruptcy, insolvency or creditors' rights law. During the term of the Loan, Borrower shall maintain its financial condition without any material adverse change from the financial condition that existed for each such party as of the date hereof and, further, shall promptly notify Lender of any such material adverse change in their respective financial conditions.

7.    <u>Financial Covenants</u>. Borrower shall comply with all of the financial and other covenants contained in this Agreement and the other Loan Documents.

On an annual basis, Lender shall have received and approved financial statements from Borrower complying with the standards set forth in Section 5. In the event Borrower fails to comply with the Financial Covenants set forth herein, shareholder distributions are not allowed. Increases or reductions in accounts shall be calculated from the previous fiscal year-end. Beginning with fiscal year end 2018 and moving forward, if Borrower is unable to meet the financial covenants set forth above, shareholder distributions may not exceed the prior year net income unless authorized by Lender. Monitoring will be done annually beginning with the December 31, 2018 fiscal year end financial statements.

"**Debt Service Coverage Ratio**" shall be defined as earnings before interest, depreciation, and amortization (numerator), divided by total annual principal and interest payment on all loans, including Lender's principal and interest payments (denominator).

"**Current Ratio**" shall be defined as current assets (numerator), divide by current liabilities (numerator).

8.    <u>Additional Reporting Obligations</u>. Borrower shall within five (5) business days of its knowledge of the same, provide written notice to the Lender of the occurrence of any of the following (together with a description of the action which the Borrower proposes to take with respect thereto): (i) any Event of Default or any event, act or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default, (ii) any litigation filed by or against the Borrower , (iii) any event which might result in a material adverse change in the business, assets, operations, condition (financial or otherwise) or results of operation of the Borrower, or (iv) any insolvency proceeding or

commencement of a case under the Bankruptcy Code or any other applicable bankruptcy, insolvency or creditors' rights law against or related to the Borrower.

9.    <u>Furnishing Reports</u>.  Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower from time to time from its employees, agents, representatives, architects, engineers, any contractors and any other parties involved in the operation of the Property, which in any material way relate to the Property or any part thereof.

10.    <u>Lost Note</u>.  Borrower shall, if the Note is mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new promissory note containing the same terms and conditions as the Note with a notation thereon of the unpaid accrued and unpaid interest.

11.    <u>Maintenance of Existence/Operation and Assets</u>.  Borrower shall do all things necessary to: (i) maintain, renew and keep in full force and effect its organizational existence and all rights, permits and franchises necessary to enable it to continue its business as currently conducted; (ii) continue in operation in substantially the same manner as at present; (iii) keep its properties in good operating condition and repair; and (iv) make all necessary and proper repairs, renewals, replacements, additions and improvements thereto.

12.    <u>Further Assurances</u>.  Borrower covenants and agrees to execute any and all other documents required by Lender in connection with this Agreement required to perfect Lender's security interest(s) in the real and personal property owned by Borrower, whether now owned or existing, or hereafter arising or acquired or received by Borrower, wherever located (**"Collateral"**) or to otherwise comply with and effectuate the terms of the Loan Documents.

13.    <u>Assignment</u>.  Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Agreement shall also inure.  Borrower acknowledges and agrees that Lender may assign the Loan or any portion thereof together with its rights and interests therein, as described more fully in the Note.

14.    <u>Insurance</u>.  Borrower, at its expense, is obligated to maintain the insurance policies in compliance with Lender's insurance requirements as modified and amended from time to time before the same lapses and provide originals or copies of the same to Lender, as required by Lender and as provided in the Mortgage.

15.    <u>Offset/Defense</u>.  The Loan is a valid, legally enforceable obligation of the Borrower and is not subject to any offset or other defense or to any claim on the part of the Borrower denying liability.

16. <u>Representations and Warranties</u>.  Borrower represents and warrants as of the Closing Date that:

    a.    <u>Legal Status and Authority</u>.  Borrower (i) is duly organized, validly existing and in good standing under the laws of its state of formation; (ii) is duly qualified to transact business and is in good standing in the state in which the Property is located; and (iii) has all necessary approvals, governmental and otherwise, and full power and authority to own and

operate the Property. Borrower has full power, authority and legal right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement and the other Loan Documents on Borrower's part to be performed.

b.  <u>Validity of Documents</u>. (i) The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and the borrowing evidenced by the Note and this Agreement (a) are within the power and authority of such parties; (b) have been authorized by all requisite organizational action of such parties; (c) have received all necessary approvals and consents, corporate, governmental or otherwise; (d) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court, board, agency, commission, office or other authority of any nature whatsoever for any federal, state, county, district, municipal, or city governmental unit (each a **"Governmental Authority"**), any license, certificate or other approval required to operate the Property, any applicable organizational documents, or any applicable indenture, agreement or other instrument; (e) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created by the Loan Documents; and (f) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the [Mortgage] in appropriate land records and except for Uniform Commercial Code filings relating to the security interest created hereby), (ii) this Agreement and the other Loan Documents have been duly executed and delivered by Borrower and (iii) this Agreement and the other Loan Documents constitute the legal, valid and binding obligations of Borrower. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar creditors rights laws, and by general principles of equity).

c.  <u>Litigation</u>. There is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened against Borrower or against or affecting the Property that would have a material adverse effect on the Property or Borrower's ability to perform its respective obligations under the Loan Documents.

d.  <u>Agreements</u>. Borrower is not in default in any material respect in the performance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under this Agreement and the Loan Documents.

e. <u>Financial Condition</u>.  Borrower is solvent. In the last ten (10) years, no (i) petition in bankruptcy has been filed by Borrower and (ii) Borrower has made any assignment for the benefit of creditors or taken advantage of the Bankruptcy Code or any other creditors' rights laws.

f. <u>Status of Property</u>.  Borrower has obtained all permits, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.   The Property is served by all utilities required for the current or contemplated use thereof. All public roads and streets necessary for service of and access to the Property have been completed, are serviceable and are open for public use. The Property is served by public water and sewer systems. The Property is free from damage caused by fire or other casualty.

g. <u>Liens</u>. There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that could give rise to any such liens) affecting the Property which are or may be prior to or equal to the lien of the Mortgage.

h. <u>Special Assessments</u>. To Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

i. <u>Condemnation</u>.  No condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of the access to the Property.

j. <u>Separate Lots</u>.  Each individual Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

k. <u>Leases and Rent Roll</u>.  Except as disclosed in the rent roll for the Property delivered to, certified to and approved by Lender in connection with the closing of the Loan (the "<u>Rent Roll</u>"), (i) Borrower is the sole owner of the entire lessor's interest in the leases; (ii) the leases are valid and enforceable and in full force and effect; (iii) the leases are arms-length agreements with bona fide, independent third parties; (iv) no party under any lease is in default except as noted on the Rent Roll; (v) all rents due have been paid in full and no tenant is in arrears in its payment of rent except as noted on the Rent Roll; (vi) none of the rents reserved in the leases have been assigned or otherwise pledged or hypothecated; (vii) none of the rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (viii) the premises demised under the leases have been completed, all improvements, repairs, alterations or other work required to be furnished on the part of Borrower under the leases have been completed, the

tenants under the leases have accepted the premises demised thereunder and have taken possession of the same on a rent-paying basis and any payments, credits or abatements required to be given by Borrower to the tenants under the Leases have been made in full; (ix) there exist no offsets or defenses to the payment of any portion of the rents and Borrower has no monetary obligation to any tenant under any lease; (x) no Lease contains an option to purchase, right of first refusal to purchase, right of first refusal to lease additional space at the Property, or any other similar provision; (xi) no brokerage commissions or finders fees are due and payable regarding any lease; (xii) to Borrower's knowledge, there are no actions or proceedings (voluntary or otherwise) pending against any tenants or guarantors under leases, in each case, under bankruptcy or similar insolvency laws or regulations; and (xiii) no event has occurred giving any tenant the right to terminate its lease or pay reduced or alternative rent to Borrower under any of the terms of such lease.

l.   Filing and Recording Taxes. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable laws and regulations currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of this Agreement and the other Loan Documents have been paid or will be paid.

m.  Taxes. Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

n.  Permitted Encumbrances. None of the Permitted Encumbrances (defined below), individually or in the aggregate, materially interferes with the benefits of the security intended to be provided by this Agreement and the other Loan Documents, materially and adversely affects the value or marketability of the Property, impairs the use or the operation of the Property or impairs Borrower's ability to pay its obligations in a timely manner. "Permitted Encumbrances" shall mean collectively, (a) the lien and security interests created by the this Agreement, [Mortgage] and the other Loan Documents, (b) all liens, encumbrances and other matters disclosed in the title insurance policy delivered to Lender, (c) liens, if any, for taxes imposed by any Governmental Authority not yet due or delinquent and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

o.  Investment Company Act. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject

to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

17. <u>Miscellaneous</u>.

    a. <u>Single Purpose Entity</u>. Effective the date hereof, Borrower shall not do, cause and/or permit any of the following:

        i. engage in any business or activity other than the ownership, operation and maintenance of the Property and activities incidental thereto;

        ii. acquire or own any material assets other than the Property and such incidental personal property as may be necessary for the operation of the Property;

        iii. without in each case Lender's consent: merge into or consolidate with any entity; dissolve, terminate or liquidate in whole or in part; transfer or otherwise dispose of all or substantially all of its assets; permit the sale of any ownership interests therein; and/or change its legal structure;

        iv. own any subsidiary or make any investment in or acquire the obligations or securities of any entity without the consent of Lender;

        v. commingle its assets with the assets of any of its partners, members, managers, shareholders, affiliates, principals or of any other party or entity or transfer any assets to any such person or entity other than distributions on account of equity interests in the Borrower permitted hereunder and properly accounted for;

        vi. fail to maintain its records, books or account and bank statements separate and apart from those of the partners, members, managers, shareholders, principals and affiliates of a partner, member, manager, shareholder or principal, and any other party or fail to prepare and maintain its own financial statements in accordance with GAAP and susceptible to audit, or if such financial statements are consolidated fail to cause such financial statements to contain footnotes disclosing that the Property is actually owned by the Borrower;

        vii. fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender;

        viii. enter into any contract or agreement with any shareholder, partner, member, manager, affiliate, or principal of Borrower, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's length basis with third parties other than any shareholder, partner, member, manager, affiliate, or principal of Borrower, or any shareholder, partner, member, manager, affiliate, or principal thereof;

        ix. fail to correct any known misunderstandings regarding the separate identity of Borrower;

        x. fail to file its own tax returns (unless Borrower is not legally required to file its own tax returns) or to use separate contracts, purchase orders, stationary, invoices and checks;

     xi.  fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any shareholder, partner, member, principal, or affiliate of Borrower, or any shareholder, partner, member, principal, or affiliate thereof);

     xii.  allow any person or entity to pay the salaries of its own employees or fail to maintain a sufficient number of employees for its contemplated business operations;

     xiii.  fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

     xiv.  share any common logo with or hold itself out as or be considered as a department or division of (i) any shareholder, partner, principal, member or affiliate of Borrower, (ii) any affiliate of a shareholder, partner, principal, member or affiliate of Borrower, or (iii) any other person or entity to identify the Borrower as a department or division of that person or entity; or

     xv.  conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of the Borrower or the creditors of any other person or entity.

b.  <u>USA Patriot Act</u>. Borrower represents, warrants and covenants that neither Borrower, nor any of its members or managers, (i) are or previously have been identified in any list of known or suspected terrorists published by the any United States government agency (individually, as each such list may be amended or supplemented from time to time, referred to as "**Blocked Persons List**"), including, without limitation, (a) the annex to Executive Order 13224 issued on September 23, 2001 by the President of the United States, and (b) Specially Designated Nationals List published by the United States Office of Foreign Assets Control or (ii) are or previously have been in violation of any applicable laws relating to anti-money laundering or anti-terrorism.

c.  <u>Americans with Disabilities Act</u>. Borrower covenants and agrees that, during the term of the Loan, the Property will be in material compliance with the Americans with Disabilities Act ("**ADA**") of July 26, 1990, 42 U.S.C. Section 12191 et seq., as amended from time to time, and the regulations promulgated pursuant thereto. Borrower will be solely responsible for all ADA compliance costs, including without limitation, attorneys' fees and litigation costs, which responsibility shall survive the repayment of the Loan and any foreclosure of the Property.

d.  <u>Compliance with Applicable Laws</u>. Borrower shall fully, promptly and faithfully comply with, conform and obey all present and future federal, state, and local laws, ordinances, rules, regulations, and all other legal requirements of any type whatsoever.

e. <u>Unlawful use, medical marijuana, controlled substances and prohibited activities</u>. The undersigned shall not use, occupy, or permit the use of or occupancy of any Property or Collateral by the undersigned or any lessee, tenant, licensee, permitee, agent, or any other person in any manner that would be a violation of any applicable federal, state, or local law or regulation, regardless of whether such use or occupancy is lawful under any conflicting law, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the medicinal use of or distribution of marijuana (collectively, "Prohibited Activities"). Any lease, license, sublease, or other agreement for use, occupancy or possession of any Property or Collateral (collectively a "lease") with any third person ("lessee") shall expressly prohibit the lessee from engaging or permitting others to engage in any Prohibited Activities. The undersigned shall upon demand provide Lender with a written statement setting forth its compliance with this section and stating whether any Prohibited Activities are or may be occurring in, on or around the Property or Collateral. If the undersigned becomes aware that any lessee is likely engaged in any Prohibited Activities, the undersigned shall, in compliance with applicable law, terminate the applicable lease and take all actions permitted by law to discontinue such activities. The undersigned shall keep Lender fully advised of its actions and plans to comply with this section and to prevent Prohibited Activities.

The terms and conditions of this Section constitute material consideration and inducement upon which Lender relies in extending credit and other financial accommodations to the undersigned. Failure by the undersigned to comply with this section shall constitute a material non-curable Event of Default. Notwithstanding anything in this Agreement or the Note regarding rights to cure Events of Default, Lender is entitled upon breach of this section to immediately exercise any and all remedies under this agreement, the Note, the Related Documents, and by law.

In addition, and not by way of limitation, the undersigned shall indemnify, defend, and hold Lender harmless from and against any loss, claim, damage, liability, fine, penalty, cost or expense (including attorneys' fees and expenses) arising from, out of or related to any Prohibited Activities at or on the Property or Collateral. Prohibited Activities by the undersigned or any lessee of the Property or Collateral, or the undersigned's breach, violation, or failure to enforce or comply with any of the covenants set forth in this section. This indemnity includes, without limitation any claim by any governmental entity or agency, any lessee, or any third person, including any governmental action for seizure or forfeiture of any Property or Collateral (with or without compensation to Lender, and whether or not Property or Collateral is taken free of or subject to Lender's lien or security interest). As used in this section, the word "undersigned" does not include Lender or any individual signing on behalf of Lender.

f. <u>Credit Information</u>. Borrower hereby authorizes Lender to obtain the personal credit information of each of the undersigned annually during the term of the Loan. Further, Borrower gives Lender express authority to execute any and all documents, on Borrower's behalf if necessary, that may be required by any third party for Lender to obtain such credit information.

g. <u>Capital Expenditures</u>. Borrower will not make or incur any capital expenditures, including by way of the incurrence of capital lease obligations, expenditures for maintenance and repairs in accordance with GAAP or otherwise without Lender's prior written consent.

h. <u>Fiscal Year/Accounting Treatment</u>. Borrower shall not change its fiscal year for accounting or tax purposes from a period consisting of the twelve (12) month period ending on December 31st of each calendar year, and shall not make any change in accounting treatment and reporting practices or tax reporting treatment except as requirement by GAAP or law and disclosed in writing to Lender.

i. <u>Subordination</u>.

i. From the date hereof and throughout the term of the Loan, Borrower hereby fully and unconditionally subordinates to and in favor of Lender any and all future debt from Borrower in favor of any owner of Borrower (i.e., shareholder debt). Borrower will promptly execute all documents required by Lender regarding such subordination.

j. <u>Changes in Ownership</u>. The transfer, sale, assignment or other conveyance of any legal or equitable title to the Property or any interest therein is expressly prohibited unless approved by Lender in advance and in writing. The transfer, assignment, sale or conveyance of legal or equitable title to any equity or other ownership interest in Borrower is expressly prohibited unless approved by Lender in advance and in writing.

k. <u>No Waiver By Lender</u>. Notwithstanding the foregoing or anything to the contrary contained herein or in any other Loan Document, to the extent that Lender may have acquiesced in noncompliance with any requirements precedent to the Loan closing, or precedent to any subsequent disbursement of Loan proceeds, such acquiescence shall not constitute a waiver by Lender, and Lender may at any time after such acquiescence require Borrower to comply with all such requirements prior to any additional disbursement.

20. <u>CERTAIN WAIVERS</u>. BORROWER ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS LOAN AGREEMENT IS A COMMERCIAL TRANSACTION AND WAIVES ITS RIGHTS TO NOTICE AND HEARING UNDER NEW YORK LAW, OR AS OTHERWISE ALLOWED BY ANY OTHER STATE OR FEDERAL LAW WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH THE LENDER MAY DESIRE TO USE, AND FURTHER, WAIVES DILIGENCE, DEMAND, PRESENTMENT FOR PAYMENT, NOTICE OF NONPAYMENT, PROTEST AND NOTICE OF PROTEST, AND NOTICE OF ANY RENEWALS OR EXTENSIONS OF THIS LOAN AGREEMENT OR

THE OTHER LOAN DOCUMENTS. THE BORROWER ALSO WAIVES IN ANY ACTION, SUIT OR PROCEEDING BROUGHT BY THE LENDER WITH REGARD TO THIS LOAN AGREEMENT ANY OFF-SETS OR COUNTERCLAIMS THE BORROWER MAY HAVE. BORROWER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

21.    WAIVER OF TRIAL BY JURY. BORROWER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER WRITTEN OR VERBAL) OR ANY ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREES THAT IT WILL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.

22.    WAIVER OF CERTAIN DAMAGES.    EXCEPT AS PROHIBITED BY LAW, BORROWER WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR THE LENDER TO ACCEPT THIS AGREEMENT. BORROWER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

23. Indemnification; Subrogation.

a.   If Lender is made a party defendant to any litigation concerning this Agreement, any other Loan Documents or the Property or any part thereof or interest therein, or the occupancy of the Property by Borrower, then Borrower shall indemnify, defend and hold Lender harmless from all liability by reason of said litigation, including reasonable attorneys' fees and expenses incurred by Lender in any such litigation, whether or not any such litigation is prosecuted to judgment. If Lender commences an action against Borrower to enforce any of the terms of this Agreement and the other Loan Documents or because of the breach by Borrower of any of the terms of this Agreement or the other Loan Documents, or for the recovery of any sum secured hereby, Borrower shall pay to Lender reasonable attorneys' fees and expenses, and the right to such reasonable attorneys' fees and expenses shall be deemed to have accrued on the commencement of such action, and shall be enforceable whether or not such action is prosecuted to judgment. If Borrower breaches any term of the terms of this Agreement or the other Loan Documents, Lender may employ an attorney or attorneys to protect its rights hereunder, and in the event of such employment following any breach by Borrower, Borrower shall pay Lender's reasonable attorneys' fees and expenses incurred by Lender, whether or not an action is actually commenced against Borrower by reason of breach.

b.   Borrower waives any and all right to claim or recover against Lender, its officers, employees, agents and representatives, for loss of or damage to Borrower, the Property, Borrower's

property or the property of others under Borrower's control from any cause insured against or required to be insured against by the provisions of this Agreement or the Mortgage.

c. All sums payable by Borrower under this Agreement or the other Loan Documents shall be paid without notice, demand, counterclaim, set off, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and the obligations and liabilities of Borrower hereunder shall in no way be released or discharged (except as expressly provided herein) by reason of: (i) any damage to or destruction of or any condemnation or similar taking of the Property or any part thereof; (ii) any restriction or prevention of or interference with any use of the Property or any part thereof; (iii) any title defect or encumbrance or any eviction from the Property or the improvements or any part thereof by title paramount or otherwise; (iv) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Lender, or any action taken with respect to this Agreement or the other Loan Documents by any trustee or receiver of Lender, or by any court, in any such proceeding.

24.    Notices. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person or by electronic mail in each case with receipt acknowledged by the recipient, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:    **Suffern Partners, LLC
                   202 Grandview Avenue
                   Monsey, New York 10950**

With copy to:      **Goldie Reisman
                   146 Penn Street
                   Brooklyn, New York 11211**

If to Lender:      **DG Realty Management, LLC
                   22 Phyllis Terrace
                   Monsey, NY 10952**

or addressed as such party may from time to time designate by written notice to the other parties. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

25.    Governing Law. This Agreement, and any Loan Document which does not itself expressly identify the law which is to apply to it, will be governed by the laws of the State of New York.

26.    Severability; Amendment. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect. This Agreement contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Agreement. This Agreement may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

27.    Time of the Essence. Time is of the essence with respect to each covenant of this Agreement.

if any representation or warranty contained herein was false when made, or (iii) if an "Event of Default" occurs under any other Loan Document, as defined in such Loan Document.  Upon an Event of Default, Lender shall have all remedies at law, in equity, and as provided under the other Loan Documents.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Borrower and Lender have executed this Loan Agreement as of the day and year first above.

**BORROWER:**

SUFFERN PARTNERS, LLC

By: _____
Name: Goldie Reisman
Title:   Managing Member

**LENDER:**
DG REALTY MANAGEMENT, LLC

By: _____
Name:  David Gefner
Title:   Managing Member

*[End of Signature pages]*

**EXHIBIT A**

DISBURSEMENT SHEET

## CLOSING STATEMENT

| | |
|---|---|
| Closing Date: | December 10, 2018 |
| Borrower: | SUFFERN PARTNERS, LLC |
| Lender: | DG REALTY MANAGEMENT, LLC |
| Property Name: | See Exhibit B |
| Amount: | $5,000,000.00 |

### CLOSING DISBURSEMENTS

**The undersigned hereby certify to Lender that this statement is correct.**

**BORROWER:**

**SUFFERN PARTNERS, LLC**

By: _____

Name: Goldie Reisman

Title:   Managing Member

**EXHIBIT B**
LIST OF PROPERTIES

25 Old Mill Road, Suffern New York
19 Hemion Road, Suffern New York
Route 59, Suffern New York

LEGAL DESCRIPTION

**Parcels I-II:**
BEGINNING at a point in the westerly right-of-way of Hemlon Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'55" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 88°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.78 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 76°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence:

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 226.48 feet to a point marked by a concrete monument, thence;

South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF EGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel I: 25 Old Mill Road, Suffern, NY 10901.

Designated as Section 55.08, Block 1, Lot 1, Rockland County, and also known as Parcel II: 19 Hemion Road, Montebello, NY 10901.

**Parcel III**
ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of
Ramapo, County of Rockland and State of New York, being bounded and described as follows;

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point
being the following two (2) courses from the terminus of the sixth (6) course of the overall site description
of Tax Map Section 55.22, Block 1, Lot 1. Village of Suffern, Town of Ramapo, Rockland County, New
York, Tax Map Section 55.06, Block 1, Lot 1. Village of Montebello, Town of Ramapo, Rockland County,
New York;
    a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;
    b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of
BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;
    1. South 12 degrees 02 minutes 41 seconds West a distance of 114.74 feet to a point;
    2. South 23 degrees 17 minutes 21 seconds West a distance of 161.86 feet to a point in the northerly
right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of
100.09 feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;
    1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;
    2. North 12 degrees 05 minutes 22 seconds East a distance of 118.44 feet to a point in the
Southerly right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of
101.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel III: Route 59,
Suffern, NY 10801.

**EXHIBIT C**

## LINE OF CREDIT PROMISSORY NOTE

New York, New York
**$5,000,000.00**                                                      December 10, 2018

FOR VALUE RECEIVED, **SUFFERN PARTNERS, LLC,** a New York limited liability company, with an address at 202 Grandview Avenue, Monsey, New York 10950 ("Maker"), promises to pay **DG REALTY MANAGEMENT, LLC** a New York limited liability company with an address at 22 Phyllis Terrace, Monsey, NY 10952 ("Payee") or at such other place as may be designated in writing by the holder of this Note, the principal sum of up to Five Million and 00/100 Dollars ($5,000,000.00) ("Maximum Loan Amount") or so much thereof as shall from time to time be advanced hereunder to the Maker with interest thereon as herein provided, and payable as follows:

Capitalized terms used but not defined in this Note shall have the meanings given to such terms in the Loan Agreement. "Loan Document" means any agreement by and between Maker and Payee, effective as of the Effective Date of this Note, as amended, modified or supplemented from time to time.

(a) All outstanding principal and accrued interest shall be paid on the earlier of (i) Three (3) years from the date hereof, or (ii) the date of the closing of the sale of the Property (as hereinafter defined (the earlier of such date, the "Maturity Date"), on which date all outstanding principal, together with all accrued and unpaid interest, shall be due and payable in full.

(b) The interest rate in effect on any date for the period beginning on the date hereof through and including the date that this Note is paid in full, shall be fifteen (15.00%) percent per annum ("Interest Rate").

(c) Interest shall be calculated on a 365-day year consisting of 12 months of the actual days in such months.

(d) "Default Rate" shall mean a rate of interest equal to the lesser of of 24% per annum or the maximum allowable by law at the time any such interest is to be calculated.

**IT IS HEREBY EXPRESSLY AGREED, that the said principal sum secured by this Note shall become due at the option of the holder thereof on the happening of any default or event by which, under the terms of the Loan Agreement or this Note shall be deemed a default, and that all of the covenants, conditions and agreements contained in the Loan Agreement (including the Equity Kicker as therein defined) are hereby made part of this instrument. Capitalized terms not otherwise defined herein have the respective meanings ascribed to them in the Loan Agreement.**

**Presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment are hereby waived.**

1

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Payee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this paragraph shall control every other covenant and agreement in this Note and the Loan Agreement. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note or Loan Agreement, or contracted for, charged, taken, reserved, or received with respect to the indebtedness evidenced by this Note, or if Payee's exercise of the option to accelerate the Maturity Date, or if any prepayment results in Maker having paid any interest in excess of that permitted by applicable law, then it is Payee's express intent that all excess amounts theretofore collected by Payee shall be credited on the principal balance of this Note and the provisions of this Note and the Loan Agreement immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance, or detention of the indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the indebtedness evidenced by this Note does not exceed the maximum lawful rate from time to time in effect and applicable to such indebtedness for so long as such indebtedness is outstanding.

This Note is secured by: A pledge of all of the shares of Maker to Payee, a Uniform Commercial Code Financing Statement, and Maker's obligations under that certain Loan Agreement of even date herewith.

**This Note may not be changed or terminated orally.**

Maker and Payee hereby acknowledge and agree that the Maximum Loan Amount shall be allocated as follows: (a) $500,000.00 ("First Disbursement"); and (b) the balance of the loan amount made available to Borrower as a line of credit ("Subsequent Disbursement"), it being the intent of Maker and Payee hereunder shall be to create a line of credit agreement between Maker and Payee whereby Maker may borrow up to the Maximum Loan Amount, in whole, or in part, from Lender, provided, however, that upon the occurrence of any disbursement, such funds shall be subject to the Interest Rate and all fees and costs associated with same, and due and payable on the Maturity Date subject to the terms and conditions set forth herein.

Subsequent Disbursements shall be made upon receipt of a request by Maker in amounts of not less than $500.00 per disbursement.

Provided no event of default or an event which, with or without the giving of notice and/or the passage of time, or both, would constitute an event of default, has occurred

2

hereunder or under the any of the Loan Documents, this Note may be prepaid, in whole or in part, on upon not less than thirty (30) days prior written notice to the Payee specifying the date on which prepayment is to be made (the "Prepayment Date") and upon the payment of:

    1.    all accrued interest to and including the Prepayment Date; and

    2.    all interest which would have accrued on the principal balance of this Note after the Prepayment Date to and including the last day of the calendar month in which the Prepayment Date occurs if such prepayment occurs on a date which is not on the first day of a month; and

    3.    the full amount of interest as would have been owing after two (2) months from the date hereof;

4.    all other sums due under this Note and the Loan Agreement.

Prepayments shall be applied against the outstanding Principal Balance of this Note and shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless the Payee shall agree otherwise in writing. Payee may require that any partial prepayments be made on a payment date and be in the amount of that part of one or more monthly installments which would be applicable to principal.

### Late Charges and Default Interest.

    1.    If the entire outstanding principal balance hereof, together with all accrued interest and any unpaid Additional Payments, is not paid in full and received by Payee at its office at or before 3:00 P.M. on the maturity date (whether such date is the scheduled maturity date hereof or any earlier date by reason of acceleration or notice of prepayment), the rate of interest due on the outstanding principal balance hereof shall be increased to the Default Rate from and after the date on which payment of the outstanding principal balance was due. Maker and Payee intend that in the event of a foreclosure proceeding or a bankruptcy, insolvency or similar proceeding following acceleration, notice of prepayment or scheduled maturity, the rate of interest that shall accrue and be payable during the pendency of such proceeding and until this Note is paid in full, shall be the Default Rate.

    2.    If any check for any payment due under this Note fails due collection, Maker shall immediately pay to Payee a charge of $150 to compensate Payee for its administrative cost occasioned by such failure of collection.

    3.    If any document required to be delivered by Maker to Payee under any provision of this Mortgage is delivered more than 30 days later than the date when due, Maker shall immediately pay to Payee a late charge of $250 with respect to each and every document that is late.

4.    These Late Charges and Default Interest paragraphs shall not be deemed to limit Payee's remedy of foreclosure for Maker's default or any other remedy of Payee at law or hereunder, and no other remedy that Payee may have shall limit Maker's obligation to pay the charges provided in these Late Charges and Default Interest paragraphs.

[Signature page to follow]

**MAKER:**

    **SUFFERN PARTNERS, LLC**

    By: _Goldie Reisman_

    Name: Goldie Reisman
    Title:  Managing Member


State of New York      )
                    )ss.:
County of _KINGS_  )

On the _10_ day of December in the year 2018, before me, the undersigned notary public, personally appeared **Goldie Reisman**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in his/her/their capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_Naftali S. Ausch_____ Notary Public


**PAYEE:**

    **DG REALTY MANAGEMENT, LLC**

    By: _David Gefner_

    Name:  David Gefner
    Title:   Managing Member

5

**EXHIBIT A**
LIST OF PROPERTIES

25 Old Mill Road, Suffern New York
19 Hemion Road, Suffern New York
Route 59, Suffern New York

## LEGAL DESCRIPTION

**Parcels I-II:**
BEGINNING at a point in the westerly right-of-way of Hemlon Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'55" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°46'20" West a distance of 861.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 88°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 66°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'08" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 665.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

South 84°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF EGINNING.


Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel I: 25 Old Mill Road, Suffern, NY 10901.

Designated as Section 55.06, Block 1, Lot 1, Rockland County, and also known as Parcel II: 19 Hemion Road, Montebello, NY 10901.

<u>Parcel III</u>

ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo, County of Rockland and State of New York, being bounded and described as follows;

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the following two (2) courses from the terminus of the sixth (6) course of the overall site description of Tax Map Section 55.22, Block 1, Lot 1  Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section 55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York;

    a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;

    b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;

    1. South 12 degrees 02 minutes 41 seconds West a distance of 114.74 feet to a point;

    2. South 23 degrees 17 minutes 21 seconds West a distance of 161.85 feet to a point in the northerly right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of 100.09 feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;

    1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;

    2. North 12 degrees 05 minutes 22 seconds East a distance of 118.44 feet to a point in the Southerly right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of 101.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel III: Route 59, Suffern, NY 10901.

**EXHIBIT D**

## Property Management Agreement

In consideration of the covenants herein contained **SUFFERN PARTNERS, LLC,**( hereinafter called "OWNER"), whose address is 202 Grandview Avenue, Monsey, New York 10950 and **DG REALTY MANAGEMENT, LLC** (hereinafter called "AGENT"), whose address is 22 Phyllis Terrace, Monsey, NY 10952  agree as follows:

1. THE OWNER hereby employs the AGENT exclusively to rent, operate and manage the following described properties: **25 Old Mill Road Suffern, New York 10591 aka 19 Hamion Road, Suffern New York** (hereinafter called the Premises) upon the terms and conditions hereinafter set forth, for a period of Three (3) Years beginning on the 1st of January 2019 and ending on the 30th of December 2021, OWNER and AGENT shall be responsible for advising each other of any change of address. This agreement will automatically renew unless either party to the other or the cancellation clause in Section 7D is applied provides a 30-day written notice.

2. **Notices:** All notices given in connection with this agreement shall be in writing and shall be deemed effective when sent to the address set forth above for Agent and Owner by either certified mail with a return receipt requested, by overnight courier, or by facsimile and the sender has a transmittal report verifying it was sent to the correct destination.

3. **The AGENT agrees as follows:**
A. To accept the management of the Premises, to the extent, for the period, and upon the terms herein provided and agrees to furnish the services of its organization for the rental operation and management of the Premises.

B. To render a monthly statement of receipts, disbursements and charges and to remit each month the net proceeds to the owner at the above address. ("Net Proceeds" shall mean all sums collected less the sum of expenses authorized herein and AGENT'S fees).

C. AGENT will remit the net proceeds not later than fifteen (15) days following the last day of the month from which said net proceeds were generated. AGENT will remit the net proceeds to the OWNER, or deposit them in the account, separate from AGENT'S own account: Property Management Trust Account If disbursements and charges are in excess of receipts, the OWNER agrees to pay said excess not later than fifteen (15) days following notification of said excess, but nothing herein contained shall obligate the AGENT to advance its own funds on behalf of the OWNER.

D. To cause all employees of the AGENT who handle or are responsible for the safekeeping of any moneys of the OWNER to be covered by a fidelity bond in an amount and with a company selected by the AGENT in its sole discretion.

4. **The OWNER agrees to give the AGENT the following authority and powers and agrees to assume all expenses in connection therewith:**

A. To advertise the Premises or any part thereof at expense of owner; to display signs thereon and to rent the same; to cause references of prospective tenants to be investigated; to set rental prices; to sign leases for terms not in excess of one year and to renew and/or cancel existing leases; provided, however, that the AGENT may collect from tenants all or any of the following: a nonnegotiable check charge, credit report fee, a subleasing administrative charge and/or broker's commission and; to terminate tenancies and to sign and serve such notices as are deemed necessary by the AGENT: to institute and prosecute actions in the OWNER'S name, to evict tenants, and to recover possession of the Premises; to sue in the OWNER'S name and recover rent; and, when expedient, to settle, compromise and release such actions or suits, or reinstate

1

such tenancies. OWNER shall reimburse AGENT for all expenses of litigation including attorney's fees, filing fees, and court costs which AGENT does not recover from tenants.

B. To hire, discharge, and pay for all engineers, janitors, contractors, and other employees.

C. To make, or cause to be made, and to supervise all ordinary repairs and alterations and to do decorating on the Premises; to negotiate contracts for nonrecurring items not exceeding Two Thousand Five Hundred Fifty ($2,500.00) Dollars per month and to purchase supplies and pay all bills. AGENT shall secure the approval of the OWNER for any alterations or expenditures in excess of $2,500.00 for any one item, except monthly or recurring operating charges and emergency repairs in excess of the maximum, if, in the opinion of the AGENT, such repairs are necessary to protect the Premises from damage or to maintain services to the tenant as called for by their tenancy.

D. To make contracts in the name of the OWNER and on the OWNER'S account regarding any and all matters pertaining to AGENT'S management and operation of the Premises, as the AGENT shall deem advisable.

E. To collect rents and/or assessments and other items due, or to become due, and give receipts therefor.

F. To receive all security deposits from tenants. When Security Deposit checks are received by AGENT, OWNER specifically authorizes AGENT to deposit the amount of such checks into the OWNER'S operating trust account. OWNER further specifically authorizes AGENT to expend all such funds deposited in the trust account, for and on behalf of OWNER, for the purposes and under the authority established in this agreement and as allowed by law.

OWNER agrees that when a tenant for whom a security deposit has been received, terminates his or her tenancy, OWNER shall be responsible for depositing with AGENT sufficient money to refund the tenant's security deposit, if the Owner's account does not have sufficient funds to do so. Once such amount has been deposited with AGENT or if there are sufficient funds in the trust account to refund the tenant's security deposit without an additional deposit, AGENT shall be responsible for causing the same to be returned to the tenant according to the provisions of tenant's lease and applicable state and local law.

G. To execute and file all returns and other instruments and do and perform all acts required of the OWNER as an employer with respect to the Premises. OWNER agrees upon request to promptly execute and deliver to AGENT all necessary powers of attorney, notices of appointment, and any other document that may be required to complete the above-mentioned duties.

H. The AGENT shall not be required to advance any moneys for the care or management of the Premises, and the OWNER agrees to advance all moneys necessary therefor. If the AGENT shall elect to advance any money in connection with the Premises, the OWNER agrees to reimburse the AGENT forthwith and hereby authorizes the AGENT to deduct such advances from any moneys due the OWNER under the loan agreement between OWNER and AGENT. The AGENT shall, upon instruction from the OWNER, impound reserves each month for the payment of real estate taxes, insurance, or other special expenditure. In addition, the OWNER agrees to establish a permanent Operating Reserve Account with AGENT using the Owner's Operating Funds held on these properties. Said Operating Reserve Account may be used by AGENT to cover any excess of disbursements and charges over receipts, or for payment of any other charges and expenses in connection with the Premises in the sole discretion of AGENT.

2

5. **The OWNER further agrees as follows:**

A. To indemnify, defend, and save the AGENT harmless, except in the case of AGENT'S gross negligence and/or willful misconduct, fromnall suits in connection with the management of the Premises and from liability for damage to property and for injuries to or death of any employee or other person whomsoever, and to carry at OWNERS' expense public liability insurance naming the OWNER and naming the AGENT as an Additional Insured and Loss Payee. Such insurance shall be in form and substance reasonably satisfactory to the AGENT and in an amount not less than one million dollars ($1,000,000). OWNER shall furnish to AGENT certificates evidencing the existence of such insurance and its renewal each year. Unless the OWNER shall provide such insurance and furnish such certificate within fifteen days from the date of this agreement, the AGENT may, but shall not be obligated to, place said insurance and charge the cost thereof to the account of the OWNER to terminate this contract. All such insurance policies shall provide that the AGENT shall receive thirty (30) days written notice prior to the cancellation of the policy.

B. To pay all expenses incurred by the AGENT, including, but not limited to, reasonable attorney's fees and AGENT'S normal hourly rate and out of pocket expenses in connection with any claim, proceeding, or suit involving an alleged violation by the AGENT or the OWNER, or both, of any law pertaining to fair employment, fair credit reporting, environmental protection, taxes, or fair housing, including but not limited to; any law prohibiting, or making illegal, discrimination on the basis of race, sex, religion, color, national origin, family status, ancestry, or handicap provided however, that the OWNER shall not be responsible to the AGENT for any such expenses in the event the AGENT is finally adjudicated to have personally, and not in a representative capacity, violated any such law. Nothing contained herein shall obligate the AGENT to employ counsel to represent the OWNER in any such proceeding or suit, and the OWNER may elect to employ counsel to represent the OWNER in any such proceeding or suit. The Agent shall have the right to employ an attorney and may select the attorney of its choice. The OWNER also agrees to pay reasonable expenses incurred by the AGENT in obtaining legal advice regarding compliance with any law affecting the premises or activities related thereto.

C. To indemnify, defend, and save the AGENT harmless from all claims, investigations, and suits, or from actions or failures to act of the OWNER, with respect to any alleged or actual violation of state or federal labor laws in connection with the AGENT'S employees, it being, however, the responsibility of the AGENT to comply with all applicable state or federal labor laws. The OWNER'S obligation under this paragraph 4C shall include the payment of all settlements, judgments, damages, liquidated damages, penalties, forfeitures, back pay awards, court costs, litigation expense, and attorneys' fees.

D. AGENT is authorized to pay mortgage indebtedness, general taxes, special assessments, or fire, liability, steam boiler, or any other insurance premiums. In no event shall the AGENT be required to advance its own money in payment of any such indebtedness, taxes, assessments, or premiums.

E. That any and all bad check fees collected from the Tenants will become the property of the OWNER, to help cover any expenses incurred by the AGENT, due to the depositing and/or re-depositing of the bad checks, these fees will be deposited into the operating account. Any expenses incurred by the AGENT in the depositing and re-depositing of Tenant's bad check shall be charged to the OWNER'S operating account.
F. To permit and pay for the AGENT to have the locks changed on each unit after a tenant vacates. To pay for all postage, advertising, envelopes, paper, copies, statements, mileage for court proceedings, time for any mediation with the courts etc. used by the agent in or on behalf of the OWNER.

3

6. **The OWNER agrees to pay the AGENT each month all of the following:**

A. For MANAGEMENT: Twenty-Five Thousand Dollars $25,000.00, flat fee monthly on the first of each month regardless of the gross receipts.

B. LEASING: One half months rent or $25,000.00, whichever is the greater amount, upon execution of a new lease with a new tenant.

C. LEASE RENEWAL FEE: $10,000.00 per unit upon execution of the lease renewal.

D. MAINTENANCE OF PROPERTY: IN HOUSE VENDORS ARE $37.00 PER HOUR LABOR PLUS SUPPLIES. THESE IN HOUSE VENDORS ARE ALSO ON CALL FOR ALL AFTER HOUR EMERGENCIES AT TIME AND A HALF. Anything above and beyond our normal management duties will be billed at a fee of $70.00 per hour. These duties and cost will be described and approved by the Owner prior initiation of the work.

E. All dollar amounts owed to the AGENT shall be paid out of the OWNER'S operating account and shall be paid first before any other item. If the OWNER'S account becomes negative, the OWNER agrees to contribute money to the account within five days after request from Management Company.

7. **It is mutually agreed between OWNER and AGENT as follows:**

A. Other than expenses related to exercising the express powers above vested in the AGENT, the OWNER expressly withholds from the AGENT any power or authority to make any changes or incur expenses in excess of the dollar amounts set forth in paragraph 4C, with out the written direction of the OWNER, except for such emergency repairs as may be required because of danger to life or property or which are immediately necessary for the preservation and safety of the Premises or the safety of the tenants and occupants thereof or are required to avoid the suspension of any necessary service to the Premises.

B. The AGENT does not assume and is given no responsibility for compliance of any building on the Premises or any equipment therein with the requirements of any statute, ordinance, law or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify the OWNER promptly or forward to the OWNER promptly any complaints, warnings, notices, or summonses received by it relating to such matters. The OWNER represents that to the best of the Owner's knowledge the Premises and such equipment comply with all such requirements and authorizes the AGENT to disclose the ownership of the Premises to any such officials and agrees to indemnify and hold harmless the AGENT, its representatives, servants, and employees, of and from all loss, cost, expense, and liability whatsoever which may be imposed on the Agent, it's representatives, servants, and employees by reason of any present or future violation or alleged violation of such laws, ordinances, statutes, or regulations.

C. In the event it is alleged or charged that any building on the Premises or any equipment therein or any act or failure to act by the OWNER with respect to the Premises or the sale, rental, or other disposition thereof fails to comply with, or is in violation of, any of the requirements of any constitutional provision, statute, ordinance, law, or regulation of any governmental body or any order or ruling of any public authority or official thereof having or claiming to have jurisdiction there over, and the AGENT, in its sole and absolute discretion, considers that the
action or position of the OWNER with respect thereto may result in damage or liability to the AGENT, the AGENT shall have the right to cancel this Agreement at any time by written notice to the OWNER of its election to do so, which cancellation shall be effective upon the service of such

4

notice. Such notice may be served on the OWNER personally or by certified mail, and if served by mail shall be deemed to have been served when deposited in the mails. Such cancellation shall not release the indemnities of the OWNER nor shall it relieve the OWNER of any liability or obligation to the AGENT for any payment, reimbursement, or other sum of money then due and payable to the AGENT hereunder.

D. This agreement may be canceled by either Party before the termination date specified in Paragraph 1 on not less than thirty (30) days prior written notice to the AGENT. Such cancellation shall not release the indemnities of the OWNER nor shall it relieve the OWNER of any liability or obligation to the AGENT for any payment, reimbursement, or other sum of money then due or which becomes due and payable to the AGENT hereunder prior to the effective date of the termination.

E. This agreement may be assigned by the AGENT with the written consent of the OWNER. No assignment shall relieve OWNER from liability for performance of OWNER'S obligations under this agreement.

8. The OWNER shall pay or reimburse the AGENT for any sums of money due it under this Agreement for services or actions prior to termination, notwithstanding any termination of this Agreement. The OWNER shall pay or reimburse the AGENT for said sums not later than thirty (30) days after this Agreement is terminated. An interest rate as per the loan agreement per month will be charged on the average daily-unpaid balance. All provisions of this Agreement that require the OWNER to have insured or to defend, reimburse, or indemnify the AGENT shall survive any termination and, if AGENT is or becomes involved in any proceeding or litigation by reason of having been the OWNER'S AGENT, provisions 4A, 4B, and 4C shall apply as if this Agreement were still in effect. The parties understand and agree that the AGENT may withhold funds for thirty (30) days after the end of the month in which this Agreement is terminated to pay amounts previously incurred but not yet invoiced and to close accounts.

9. This Agreement shall be binding upon AGENT'S successors and assigns and OWNER'S heirs, administrators, executors, successors and assigns. This Agreement contains the entire understanding between OWNER and AGENT regarding management of the above-described Premises. This Management Agreement shall be interpreted under the laws of the state of New York.

**SUFFERN PARTNERS, LLC**
PROPERTY OWNER

By: _____ Date: 12/10/2018
Name: Goldie Reisman
Title:   Managing Member


**DG REALTY MANAGEMENT, LLC**
AGENT

By: _____ Date: 12/10/2018
Name:  David Gefner
Title:   Managing Member

5